GABRIEL G. GREGG [SBN. 187333]
ggg@robinsonwood.com
ROBINSON & WOOD, INC.
227 N. 1st Street
San Jose, California 95113
Telephone: (408) 298-7120
Facsimile: (408) 298-0477

CHRISTOPHER L. LARDIERE [*pro hac vice*]
chris@lmcounsel.com
LARDIERE MCNAIR, LLC
3956 Brown Park Drive, Suite B
Hilliard, Ohio 43026
Telephone: (614) 534-1355
Facsimile: (614) 319-3746

RICHARD J. MOONEY [SBN. 176486]
richard.mooney@rimonlaw.com
SCOTT R. RABER [SBN. 194924]
scott.raber@rimonlaw.com
RIMON P.C.
One Embarcadero Center #400
San Francisco, California 94111
Telephone: (800) 930-7271
Facsimile: (800) 930-7271

Attorneys for Counterclaimant
TERIX COMPUTER COMPANY, INC.

ROBINSON & WOOD, INC.
ATTORNEYS AT LAW

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

ORACLE AMERICA, INC., a Delaware corporation; ORACLE INTERNATIONAL CORPORATION, a Delaware corporation,

Plaintiffs,

v.

TERIX COMPUTER COMPANY, INC., a California corporation; MAINTECH INCORPORATED, a Delaware corporation; VOLT DELTA RESOURCES, LLC, a Nevada limited liability company; SEVANNA FINANCIAL, INC., a Nevada corporation; WEST COAST COMPUTER EXCHANGE, INC., a Nevada corporation; and DOES 1 - 50,

Defendants.

AND RELATED COUNTERCLAIM

**Case No. 5:13-CV-03385-PSG**

**COUNTERCLAIM OF TERiX COMPUTER COMPANY, INC. FOR (1) VIOLATION OF SHERMAN ACT § 1; (2) VIOLATION OF SHERMAN ACT § 2; (3) VIOLATION OF CARTWRIGHT ACT; (4) VIOLATION OF LANHAM ACT; (5) INTERFERENCE WITH CONTRACT; (6) INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE; AND (7) UNFAIR COMPETITION**

**JURY DEMAND**

TERiX COMPUTER COMPANY, INC. ("TERiX") files this counterclaim against ORACLE AMERICA, INC. ("Oracle America") and ORACLE INTERNATIONAL CORP. ("OIC"; along with Oracle America, "Oracle") for damages and injunctive relief under the antitrust and false advertising laws of the United States and under the antitrust, unfair competition, and common laws of California. TERiX alleges the following based on its personal knowledge and publicly-available materials, including public statements by Oracle personnel, and upon information and belief.

## Introduction

1. Oracle obtained ownership rights over the business and assets of Sun Microsystems, Inc. ("Sun"), including Sun's intellectual property and preexisting licensing arrangements, when Oracle's acquisition of Sun was completed on January 27, 2010. Since that time, Oracle has pursued a deliberate policy of attempting to eliminate competition in the market for the maintenance and support of computer hardware running the Solaris operating system and the market for the maintenance and support of computer hardware manufactured by Sun/Oracle, all as part of an illegal effort to monopolize those markets and to obtain supracompetitive profits from the support customers who are being denied the benefits of choice and competition. Oracle's efforts include (among other things) the use of Oracle's natural monopoly over Solaris patches (including error corrections, security fixes, and other updates) and Oracle's natural monopoly over firmware for Sun/Oracle hardware to force customers to purchase software and hardware support from Oracle, even in the many instances when those customers could and would otherwise obtain superior software and hardware support from third-party service providers such as TERiX at a significantly lower cost.

2. Senior Oracle personnel have not only admitted but in fact touted Oracle's intent. Indeed, at a press briefing on the day Oracle acquired Sun, Oracle's Executive Vice President of Global Customer Services announced: "We believe we should be the ones to support

ROBINSON & WOOD, INC.
ATTORNEYS AT LAW

our customers . . . . If you're a third-party support provider offering multivendor support, we're coming . . . . We're coming."[1]

3. Oracle's efforts have succeeded in undermining or weakening third party providers of software and hardware support, including TERiX, and allowed Oracle to force many customers to purchase support from Oracle despite their preference for third party support. Oracle's conduct has harmed both customers and third party support providers, including TERiX, and, unless it is enjoined, it will lead to Oracle's total domination of the market for the maintenance and support of computer hardware running the Solaris operating system and the market for the maintenance and support of computer hardware manufactured by Sun/Oracle,

The Parties

4. TERiX is a corporation organized and existing under the laws of California, with its principal place of business in California.

5. Upon information and belief, Oracle America is a corporation organized and existing under the laws of Delaware, with its principal place of business in California.

6. Upon information and belief, OIC is a corporation organized and existing under the laws of California, with its principal place of business in California.

Jurisdiction and Venue

7. The Court has jurisdiction over TERiX's Sherman Act and Lanham Act claims against Oracle pursuant to 28 U.S.C. § 1331.

8. The Court has jurisdiction over all of TERiX's claims, including its claims brought under the laws of California, pursuant to 28 U.S.C. § 1367.

9. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 and 15 U.S.C. § 22.

---

[1] Statement of Juergen Rottler, Oracle's Executive Vice President of Global Customer Services. *See* Richard Adhikari, *Oracle Puts Third-Party Support in Crosshairs*, E -COMMERCE TIMES, Jan. 28, 2010, http://www.ecommercetimes.com/story/69217.html (last visited April 14, 2014)

Factual Background

I. Relevant Products and Services

10. Solaris is a UNIX-based operating system originally developed by Sun and initially released in 1992, with multiple versions released since that time. The major releases of Solaris at issue in this dispute are Solaris 7 (released November 1998), Solaris 8 (February 2000), Solaris 9 (May 2002), Solaris 10 (January 2005), and Solaris 11 (November 2011).

11. Although there are other UNIX-based operating systems available such as HP-UX and AIX, those operating systems are distinct from and alternatives to, not complements of, Solaris.

12. Solaris is designed and used to operate server, blade, storage, and related hardware systems (collectively, "Hardware", with all such systems using the Solaris operating system being "Solaris Hardware" and those using a competing operating system such as HP-UX, AIX, or Windows being "Non-Solaris Hardware").

13. The Hardware at issue in this litigation is computer hardware manufactured by Sun or Oracle ("Sun/Oracle Hardware") or by third parties such as Hewlett-Packard ("Non-Sun/Oracle Hardware"). Most but not all Sun/Oracle Hardware is Solaris Hardware ("Solaris Sun/Oracle Hardware") with the remainder being "Non-Solaris Sun/Oracle Hardware". Some but not all Non-Sun/Oracle Hardware is Solaris Hardware ("Solaris Non-Sun/Oracle Hardware") with the remainder being "Non-Solaris Non-Sun/Oracle Hardware".

14. Hardware is further properly divided into two groups. The first group is comprised of Hardware that is absolutely critical to the proper functioning of its owner for legal, regulatory, or business reasons ("Critical Hardware"), and therefore requires extremely high support levels including guarantees of virtually immediate attention to any problems associated with the Critical Hardware. Examples of Critical Hardware include Hardware running customer-facing applications and Hardware subject to federal or state regulation.

15. The second group is comprised of Hardware that is not immediately critical to the proper functioning of its owner for legal, regulatory, or business reasons ("Non-Critical Hardware"), and therefore requires much lower levels of support or no support. Examples of Non-

Critical Hardware include Hardware used for testing or development purposes and Hardware used for long lead-time back-up purposes. The cost of providing the requisite support for Non-Critical Hardware is and at all relevant times has been much lower than the cost of providing the requisite support for Critical Hardware.

16. There are therefore eight total subsets of Hardware relevant to this litigation: (1) Critical Solaris Sun/Oracle Hardware; (2) Non-Critical Solaris Sun/Oracle Hardware; (3) Critical Non-Solaris Sun/Oracle Hardware; (4) Non-Critical Non-Solaris Sun/Oracle Hardware; (5) Critical Solaris Non-Sun/Oracle Hardware; (6) Non-Critical Solaris Non-Sun/Oracle Hardware; (7) Critical Non-Solaris Non-Sun/Oracle Hardware; and (8) Non-Critical Non-Solaris Non-Sun/Oracle Hardware.

17. TERiX is an independent third-party provider of multivendor maintenance and support to customers using Hardware, including Solaris Hardware and Sun/Oracle Hardware.

18. In particular, TERiX provides owners of Solaris Hardware both software (operating system or application) support services ("Solaris Software Support Services") and break/fix support for hardware defects ("Solaris Hardware Support Services"; collectively with Solaris Software Support Services, "Solaris Support Services"). Solaris Support Services are purchased from Oracle or from TERiX or other third-party support providers by virtually all owners of Solaris Hardware.

19. In addition to Solaris Support Services, many owners of Solaris Hardware desire to obtain software patches, updates, and bug fixes for the Solaris operating system, and other technical support files used on Oracle's Sun-branded computers (collectively, "Solaris Updates").[2] Prompt access to Solaris Updates is essential for many owners of Solaris Hardware since many of them address errors and security weaknesses, many of which were known by Sun and Oracle at the time of release and some of which were discovered after the release.

---

[2] "Solaris Updates" does not include so-called "open source" updates from third parties, which are not significant in number or importance compared to the Solaris Updates.

20. Oracle, as the creator and licensor of Solaris, is the only source of Solaris Updates and has a 100% share of the market for Solaris Updates. No competition is possible in that market because no other company has the legal right or the necessary technical resources to create, test, and release Solaris Updates.

21. In addition, TERiX provides owners of Sun/Oracle Hardware break/fix support for hardware defects ("Sun/Oracle Hardware Support Services"). Sun/Oracle Hardware Support Services are purchased from Oracle or from TERiX or other third-party support providers by virtually all owners of Non-Solaris Sun/Oracle Hardware Support Services.

22. In addition to Sun/Oracle Hardware Support Services, many owners of Sun/Oracle Hardware desire to obtain updated "firmware" for use in connection with their Sun/Oracle Hardware ("Sun/Oracle Firmware"). Access to Sun/Oracle Firmware is essential for many owners since parts/accessories without updated and corrected Sun/Oracle Firmware or with incorrect or alternative Sun/Oracle Firmware are of no value to the owner of Sun/Oracle Hardware, since such parts/accessories will not work and in some cases will even damage other components of the Sun/Oracle Hardware. Customers rely on an ability to add and change their hardware configuration during its life, and firmware is therefore essential to the use of the hardware system or added components to operate as intended. In some instances, Sun and Oracle have released Sun/Oracle Firmware with known bugs that Sun/Oracle knew would have to be fixed with new Sun/Oracle Firmware.

23. Oracle, as the licensor of Sun/Oracle Hardware, is the only source of Sun/Oracle Firmware and has a 100% share of the market for Sun/Oracle Firmware. No competition is possible in that market because no other company has the legal right or the necessary technical resources to create, test, and release Sun/Oracle Firmware.

24. For many owners of Solaris Sun/Oracle Hardware, therefore, access to *both* Solaris Updates and Sun/Oracle Firmware is essential.

II.      Historical Practices

25.      Before its acquisition by Oracle, Sun routinely permitted Sun hardware owners/Solaris licensees, and the third-party support providers servicing them, the ability to obtain Solaris Updates and Sun/Oracle Firmware promptly upon release for free or a reasonable and fair cost.  For Solaris 7, 8 and 9, Solaris Updates were provided promptly upon release to any requesting customer at no cost.  For Solaris 10, Solaris Updates that were drivers, related to security, or otherwise significant were provided promptly upon release to any requesting customer at no cost, with or without support in place, while the remaining Solaris Updates were provided promptly upon release to any requesting customer upon payment of a "time and materials" charge covering the time of Sun engineers but no fees or costs associated with the Solaris Updates themselves.

26.      Customers that obtained licensed copies of Solaris 7, 8, 9, and 10 by purchasing Sun/Oracle hardware running that Solaris version, or by otherwise obtaining a licensed version of Solaris including by download from a Sun/Oracle website, received "perpetual" license rights both to the obtained version of Solaris 7, 8, 9, or 10 and to any Solaris Updates subsequently provided for those versions of Solaris.  The license rights granted to licensees are set forth in original Solaris license documents that, by their terms, can only be modified by a written and executed amendment.

27.      Sun's historic license policies also confirm Sun's intent that the rights granted to licensees of the different versions of Solaris, through and including Solaris 10, included the perpetual right to use Solaris Updates for that version of Solaris.  For example, at the time of the release of Solaris 10 and the implementation and utilization of related license documents, Sun's website included a policy statement entitled "License Policies Regarding the Solaris Operating System" which confirmed that "[a] license to use a certain version of the software, such as Solaris 9, includes the right to use all current and future Solaris 9 updates, but does not include the right to use the later version such as Solaris 10."

28.      Sun/Oracle Firmware was made available to requesting customers at no cost until a point in time after Oracle's acquisition of Sun.

29. Customers have also historically been permitted to obtain different levels of Solaris Updates, Sun/Oracle Firmware, and Solaris Support Services for different pieces of Hardware. For example, available combined hardware/software support offerings included Sun Platinum, Sun Gold Plus, Sun Gold, Sun Silver, and Sun Bronze, and available Solaris-only support (no hardware support) offerings included Premium, Standard, and Basic.

30. In addition, customers were permitted to purchase support on a piece of Hardware by piece of Hardware basis, selecting for each machine from among multiple support offerings from Sun/Oracle and multiple support offerings from third-party service providers such as TERiX. One important effect of this policy (which was followed not only by Sun but by the other major OEMs including HP and IBM) was to permit a customer to have some support from the OEM and some third support from third-party service providers such as TERiX, depending upon the needs and preferences of the customer. That policy was particularly valuable to customers with a mix of Critical Hardware and Non-Critical Hardware.

31. Sun's historical approach, and Oracle's desire to change that approach in order to extract supracompetitive prices, is well documented. For example, in response to a formal antitrust inquiry by the Michigan Attorney General's office launched after the Sun acquisition, Oracle General Counsel (and named Oracle attorney in this action) Dorian Daley delivered a letter to the Michigan Assistant Attorney General dated February 17, 2011, which represented in pertinent part as follows:

> Upon acquiring Sun, Oracle carefully reviewed all of Sun's business practices and made changes where changes were needed. Oracle believes that Sun's struggles as an independent company were partly attributable to comparatively weak business practices, including a surprising departure from industry best practices concerning intellectual property (IP) licensing and customer support. One manifestation of this was that Sun's support policies gave away much of the competitive advantage that the developer of the Sun IP ought to have in servicing and supporting Sun products. Over the past year, Oracle has been engaged in a broad effort to improve the service and support for Sun hardware products, and also to realign Sun's IP and customer support policies with industry norms. To a very large degree, that effort simply brings Sun's policies in line with Oracle's pre-existing policy for support that it provides on its many software products. We appreciate that both efforts are frustrating to Independent Service Organizations (ISOs), who fared better when Sun was less competitive and less protective of its IP.

32. Ms. Daley's letter further represented as follows:

> SIA's letter is also highly misleading in suggesting the changes Oracle is making to Sun's support policies will foreclose ISOs from supporting existing Sun hardware systems. The policy changes are, for the most part, prospective, applying to systems purchased after March 16, 2010, not earlier . . . . Therefore, the immediate effects of the changes on ISO business ought to be very small, as nearly all of the business opportunity today and for at least the next few years is to support systems not subject to these policy changes.

33. As detailed herein, Ms. Daly's statements appear to have been either insincere or disingenuous, as Oracle's policies and actions clearly impact all Sun/Oracle Hardware and all Solaris Hardware, not merely Hardware purchased after March 16, 2010.

34. Other industry participants, such as IBM and HP, have also followed Sun's historical approach, including (1) providing prompt and inexpensive cost-based access to software updates and firmware to all customers, including those who purchased their support services from third-party service providers rather than the hardware manufacturers/software licensors, and (2) offering and permitting the purchase of different levels of support services from the manufacturer and/or from third-party service providers on a piece by piece basis.

## III. Markets

35. There is a single nationwide antitrust market for Solaris Updates. There is no practical substitute for Solaris Updates, since updates created for any other operating system (even a "related" one originally derived from UNIX) are not compatible with or usable on Solaris Hardware. Oracle enjoys a 100% share of this market.

36. There is a single nationwide antitrust market for Sun/Oracle Firmware. There is no practical substitute for Sun/Oracle Firmware, since firmware created for any other Hardware is not compatible with or usable in connection with Sun/Oracle Hardware. Oracle enjoys a 100% share of this market.

37. There is a single nationwide antitrust market for Solaris Support Services. There is no practical substitute for Solaris Support Services, since support for Hardware other than Solaris Hardware is of no utility to owners of Solaris Hardware.

38. There is a single nationwide antitrust market for Sun/Oracle Hardware Support Services. There is no practical substitute for Sun/Oracle Hardware Support Services, since support for Hardware other than Sun/Oracle Hardware is of no utility to owners of Sun/Oracle Hardware.

39. Historically, the market for Solaris Support Services has been competitive, with owners of Solaris Hardware having the choice of purchasing Solaris Support Services from Sun/Oracle or from third-party service providers such as TERiX. However, Oracle's wrongful conduct described in detail herein has recently allowed Oracle to increase its share of this market and Oracle is perilously close to monopolizing this market. Oracle's market power in the market for Solaris Support Services is evidenced by the fact that Oracle is able to and does charge supracompetitive prices for Solaris Support Services and also charges supracompetitive prices for the combination of (1) Solaris Hardware and/or licensing of Solaris, and (2) Solaris Support Services. For example, Oracle financial reports indicate that its Sun-related service margins increased from 44.5% in the fiscal quarter ended in November 2010 to 65.4% in the most recent fiscal quarter ended in February 2014.

40. Historically, the market for Sun/Oracle Hardware Support Services has been competitive, with owners of Sun/Oracle Hardware having the choice of purchasing Sun/Oracle Hardware Support Services from Sun/Oracle or from third-party service providers such as TERiX. However, Oracle's wrongful conduct described in detail herein has recently allowed Oracle to substantially increase its share of this market to levels that make it perilously close to monopolizing this market. Oracle's market power in the market for Sun/Oracle Hardware Support Services is evidenced by the fact that Oracle is able to and does charge supracompetitive prices for Sun/Oracle Hardware Support Services and also charges supracompetitive prices for the combination of (1) Sun/Oracle Hardware, and (2) Sun/Oracle Hardware Support Services.

41. Oracle's ability to exploit its market power in the markets for Solaris Updates and Sun/Oracle Firmware and its ability to charge supracompetitive prices in the markets for Solaris Updates, Sun/Oracle Firmware, Solaris Support Services, and Sun/Oracle Hardware

Support Services (which it does) is not limited by the possibility of competition in connection with the original purchase of Hardware or licensing of Solaris.

42. A customer considering the purchase of Hardware in most cases has the choice to purchase Solaris Hardware from Sun/Oracle, to purchase Solaris Hardware from a company other than Sun/Oracle, to purchase Non-Solaris Hardware from Sun/Oracle, or to purchase Non-Solaris Hardware from a company other than Sun/Oracle. The principal determining factors in making that choice are the cost and functionality of the available choices. Because of the high cost of Hardware compared to the price of Solaris Updates, Solaris Support Services, Sun/Oracle Firmware, and Sun/Oracle Hardware Support Services (and the price of analogous services, updates, and firmware provided by other manufacturers), customers seldom consider maintenance costs in their original purchasing decision.

43. Customers considering the purchase of Hardware almost never perform detailed "life-cycle cost" analyses because of the difficulty of obtaining the necessary information for all competing models, the time and expense of such detailed analysis would cost, and the lack of sophistication of many buyers. Further, the fact that the various support packages offered by OEMs and by third-party service providers change significantly and rapidly in this industry makes it extremely difficult, if not impossible, to predict the cost of support over the lifetime of Hardware. (In addition, "life-cycle cost" analyses by their nature cannot take into account post-sale changes in policy and conduct, such as Oracle's recent changes detailed herein.)

44. Once Hardware is purchased, it is prohibitively expensive if not impossible to discard the Hardware and replace it with new Hardware or to retain the Hardware but switch to a different operating system. The inability to switch and consequent "lock-in" effect is created both by the cost of the Hardware and operating systems themselves and because of the very substantial cost of modifying existing programs and applications to run in the environment of a different operating system even when such modification can be done effectively. Indeed, Sun SPARC Hardware will only run on Solaris, such that any customer that purchased Sun SPARC Hardware is forever bound to Solaris.

45. The markets for Solaris Updates, Sun/Oracle Firmware, Solaris Support Services, and Sun/Oracle Hardware Support Services each contain two distinct submarkets, and all six of those submarkets constitute nationwide antitrust markets in their own right. The first group of submarkets are those involving the provision of Solaris Updates, Solaris Support Services, Sun/Oracle Firmware, and Sun/Oracle Hardware Support Services to Critical Hardware.

46. The second group of submarkets are those involving the provision of Solaris Updates, Solaris Support Services, Sun/Oracle Firmware, and Sun/Oracle Hardware Support Services to Non-Critical Hardware.

IV. Customers

47. TERiX has at all relevant times provided Support Services at a lower cost than Oracle for most or all customers. In fact, it is generally accepted in the industry that "customers using third party maintenance can save as much as 50 percent off the support without sacrificing the level of service."[3] As one example, TERiX provided Support Services to Bank of New York – Mellon ("BNYM") at an annual cost of approximately 30% of what BNYM had to pay when Oracle's wrongful and extortionate conduct forced them to purchase Support Services from Oracle instead.

48. In addition, TERiX has at all relevant times provided higher quality Support Services than Oracle. This superiority is reflected in the fact that the vast majority of TERiX customers continued to choose TERiX as their provider of Support Services notwithstanding the option of obtaining Support Services from Oracle. In addition, surveys by neutral third parties such as Gabriel Consulting Group and Art Wittmann from InformationWeek have confirmed that service quality has dropped precipitously since Oracle's acquisition of Sun.

49. Further, certain third-party service providers, including TERiX, can provide Support Services for Hardware from more than one OEM, allowing a customer with Hardware

---

3 Chris Kanaracus, *Oracle's Mark Hurd, users weigh in on third-party software maintenance*, PC World, April 9, 2013, http://www.pcworld.com/article/2033683/oracles-mark-hurd-users-weigh-in-on-thirdparty-software-maintenance.html (last visited April 14, 2014).

from more than one OEM to purchase Support Services from a single provider instead of from multiple OEMs.

V. Oracle's Anticompetitive Conduct

50. In the period since its acquisition of Sun, Oracle has made three significant changes to its aftermarket-related policies. Each change was anticompetitive in design and effect, and each was made for anticompetitive purposes.

51. First, Oracle changed the prior practices regarding the provision of Solaris Updates. Unlike in the past, when any owner of Solaris Hardware could obtain Solaris Updates promptly upon release at any time either for free or by paying a reasonable "time and materials" fee, Oracle now refuses to allow customers to purchase Solaris Updates unless they also purchase Support Services from Oracle. The result has been that many customers are forced to purchase Software Support Services from Oracle because of the necessity of obtaining Solaris Updates in a timely manner.

52. This change of policy (before which there were several hundred Solaris Updates that were publicly available) is reflected in the dramatic change in the percentage of Solaris Updates that were maintained as "private". For example, 22% of all SPARC Solaris 8 Solaris Updates were "private" before the acquisition, compared with 93% a year later. The comparable figures for x86 Solaris 8, SPARC Solaris 9, x86 Solaris 9, SPARC Solaris 10, and x86 Solaris 10 were 13%-97%, 18%-92%, 13%-95%, 14%-78%, and 12%-74% respectively. In addition, as described above, even the "private" Solaris Updates were in most if not all cases available promptly upon release to any requesting customer upon payment of a "time and materials" charge covering the time of Sun engineers but no fees or costs associated with the Solaris Updates themselves.

53. Second, Oracle changed the prior practices regarding the provision of Sun/Oracle Firmware. Unlike in the past, when any owner of Sun/Oracle Hardware could obtain Sun/Oracle Firmware for no cost or at a nominal cost, Oracle turned off access to the free Solaris Firmware repository in Summer 2011, and now refuses to allow customers to obtain Sun/Oracle

Firmware unless they also purchase Solaris Updates and Solaris Software Support Services from Oracle. The result has been that many customers are forced to purchase Solaris Updates and Solaris Software Support Services from Oracle because of the necessity of obtaining Sun/Oracle Firmware for their systems.

54. In addition, because Oracle prices its Software Support Services so far above a competitive level, it can and does offer Hardware Support Services at an additional incremental price far below the actual cost of providing Hardware Support Services, such that customers forced to purchase Software Support Services from Oracle almost invariably also purchase Hardware Support Services from Oracle.

55. Specifically, Oracle currently offers two and only two support packages. The first is a package of Solaris Updates, Sun/Oracle Firmware, and Software Support Services for an annual fee equal to 8% of the original purchase price of the Hardware (this level of support is called "Oracle Premier Support for Operating Systems"). The second is a package of Solaris Updates, Sun/Oracle Firmware, Software Support Services, and Hardware Support Services for an annual fee equal to 12% of the original purchase price of the Hardware (this level of support is called "Oracle Premier Support for Systems").[4] Absent the purchase of Oracle Premier Support for Operating Systems or Oracle Premier Support for Systems, Oracle denies owners of Solaris Hardware access to Sun/Oracle Firmware and timely access to Solaris Updates.

56. The actual cost to provide Premier Support for Operating Systems is far less than the actual cost to provide the additional Hardware Support Services obtained by purchasing Premier Support for Systems, and certainly not twice as much. In fact, the actual cost of providing the additional Hardware Support Services is such a more significant component of the cost of providing Premier Support for Systems that it is effectively impossible for any third-party service provider to compete in the market for Hardware Support Services.

4 Until a recent change, Sun/Oracle Firmware was available only in the Oracle Premier Support for Systems package.

57. The purpose and effect of Oracle's (1) refusal to provide Solaris Updates and Sun/Oracle Firmware without the purchase of additional Software Support Services, and (2) pricing Premier Support for Operating Systems and Premier Support for Systems in the manner Oracle does is to force all customers who have a legal, regulatory, or business need for Solaris Updates and/or Sun/Oracle Firmware to purchase all Solaris Support Services from Oracle. Oracle's purposes in pursuing those policies are to extract supracompetitive prices from customers and to attempt to monopolize the market for Solaris Support Services.

58. In devising and implementing the new policies described above, Oracle has ignored and/or sought to obscure the scope of license rights already granted to Solaris license holders. Indeed, Oracle president Mark Hurd recently stated regarding its maintenance contracts that Oracle's "objective is to provide [the customer] with perpetual rights to the software."[5] In fact, as described herein, the original Solaris license documents already provide perpetual rights to the licensed version of the Solaris operating system, including the right to use all Solaris Updates relating to such version.

59. Third, Oracle changed its prior policies to require that any customer wishing to purchase support from Oracle for one or more pieces of its Solaris Hardware must also purchase support from Oracle for every single other piece of Solaris Hardware that it owns and that all such Hardware have the same level of support. Thus, all of a customer's Solaris Hardware, including all of the customer's Non-Critical Solaris Hardware, must be under Oracle support or Oracle will not provide support for *any* of the customer's Solaris Hardware. The result has been that many customers are forced to purchase Solaris Updates, Sun/Oracle Firmware, and Solaris Support from Oracle for significant number of pieces of Non-Critical Solaris Hardware because of the necessity of making such purchases for certain of their Critical Solaris Hardware. No other industry participant requires that customers support "all or none" of their Hardware, and no other

[5] Chris Kanaracus, *Oracle's Mark Hurd, users weigh in on third-party software maintenance*, PC World, April 9, 2013, http://www.pcworld.com/article/2033683/oracles-mark-hurd-users-weigh-in-on-thirdparty-software-maintenance.html (last visited April 14, 2014).

industry participant requires all supported Hardware to be covered by the same level of support. Oracle is the only major OEM to have made this change to the industry's historical practice; the other major OEMs including HP and IBM continue to permit customers to purchase some support from the OEM and some support from third-party service providers such as TERiX, depending upon the customer's needs and preferences.

60. Finally, the effects of Oracle's wrongful conduct are magnified by its policy of punishing customers that require reinstatement and/or back-maintenance. Specifically, a customer that wishes to purchase Support Services from Oracle for a piece of Hardware not previously supported by Oracle is required to pay (1) the amount such service *would have cost* (100% of value) if it had been purchased for the period it was not supported by Oracle, even though Oracle expended no support resources during that period; (2) an additional penalty of 50% of that amount; and (3) additional fees for a putative "re-certification" of the Hardware. Such customers are also required to comply with Oracle's "no support for *any* Hardware absent support for *all* Hardware" policy described in the preceding paragraph. The risk of such punitive measures creates a substantial disincentive to the purchase of support from a third-party provider such as TERiX.

61. Remarkably, Oracle's desire to bully its locked-in customers is so extreme that it is willing to jeopardize the security of all of its customers (and the customers of those customers, in the event of data breaches) by refusing even to accept bug or defect reports from users of Solaris Hardware who have not been coerced into purchasing Support Services from Oracle. This refusal even to accept freely-offered information that could help secure and improve its own product is hand-in-glove with Oracle's efforts to create fear, uncertainty and doubt in those customers who are considering whether or not to pay Oracle's inflated and supracompetitive prices for Support Services.

62. The effect of Oracle's wrongful and anticompetitive conduct has been substantial. Since the beginning of Oracle's campaign to destroy third party support providers, Oracle's share of the Solaris Support Services market has increased substantially. Also during that

period of time, Oracle has raised the prices it charges for Support Services, while simultaneously reducing both the service levels and the quality of the service it does provide.

63.     This reduction in service and increase in price to supracompetitive levels is not only evidenced by statements of individual customers, it is borne out by unbiased third party investigation.  For example, a 2010-11 report from Gabriel Consulting Group concluded that "Oracle [is] seen as trailing both IBM and particularly HP when it comes to O/S patches and update process," that "Respondents believe that Oracle systems come up short on Availability/Reliability features when compared to IBM/HP," and "75% of current Oracle customers were at least somewhat concerned about the company taking advantage of the installed base."  Similarly, a January 5, 2012 article in the *E-Commerce Times* reported that Oracle had raised customers' "ongoing maintenance costs significantly" and that "Oracle's price increases might be easier for customers to take *if* it were providing a high level of customer service and support [b]ut that hasn't been the case."

64.     In addition, Oracle financial reports indicate that its Sun-related service margins increased from 44.5% in the fiscal quarter ended in November 2010 to 65.4% in the most recent fiscal quarter ended in February 2014.  The fact that revenues remain flat while margins are increasing implies that prices have been increasing to customers, all in the context of a significant reduction in Hardware sales since the Sun acquisition.

65.     Similarly, Oracle has substantially increased the percentage of Sun/Oracle Hardware owners for which it provides Sun/Oracle Hardware Support Services, and has raised the price it charges for such services while simultaneously reducing both the service levels and the quality of service it does provide.

66.     The fact that Oracle's anticompetitive conduct described herein has been intentional and for the purpose of harming or destroying competition is further evidenced by the fact that Oracle's anticompetitive policies are not uniformly applied, but rather are most strictly applied with respect to customers where Oracle faces actual or potential competition from third-party service providers such as TERiX.

VI. Oracle's Tortious Conduct

67. In addition to adopting the anticompetitive policies and procedures and engaging in the anticompetitive conduct detailed above, Oracle took direct and intentional steps to destroy or damage TERiX's business and reputation by interfering with TERiX's actual and potential contractual relations with Hardware owners.

68. Oracle's first set of efforts to interfere with TERiX's actual and potential customers consisted of the implementation and enforcement of the anticompetitive and illegal policies and procedures set out above.

69. Oracle's second set of efforts to interfere with TERiX's actual and potential customers consisted of the deliberate spread of false information regarding TERiX, TERiX's policies and practices, and customers' rights under their licenses with Oracle. For example, Oracle has claimed to actual and potential TERiX clients (including without limitation BNYM and Royal Bank of Canada ("RBC") that (1) TERiX provides support services using improper parts, (2) TERiX illegally "traffics" in Oracle access credentials, and (3) customers do not have the contractual right to Solaris Updates under Oracle's changed policies, notwithstanding Oracle's knowledge that the original licenses grant customers those rights.

70. Those and other false and slanderous statements were made by Oracle with full knowledge of their falsity. They were also made by Oracle with full knowledge that the parties to whom Oracle was making the statements were current TERiX customers or were potential customers with whom TERiX already had a commercial relationship.

71. Oracle's purpose in making those false and slanderous statements to TERiX customers and potential customers was to interfere with and/or prevent the creation of a binding and enforceable contract between TERiX and the target company, in order to harm TERiX and benefit Oracle.

72. Oracle's use of false and slanderous statements to create "fear, uncertainty, and doubt" was successful in destroying certain of TERiX's contractual relationships (including, for example and without limitation, with BNYM) and in preventing the creation of certain other

TERiX contractual relationships (including, for example and without limitation, with BNYM and RBC).

First Cause of Action (Sherman Act § 1)

73. TERiX incorporates all preceding paragraphs.

74. Solaris Updates and Solaris Support Services are two distinct products/services.

75. There is a nationwide antitrust market for Solaris Updates and a nationwide antitrust market for Solaris Support Services that are distinct from each other.

76. Oracle requires customers who wish to purchase Solaris Updates from Oracle to also purchase Solaris Support Services from Oracle.

77. Oracle has sufficient market power in the antitrust market for Solaris Updates to coerce customers to purchase Solaris Support Services from Oracle even in situations in which customers would prefer to purchase Solaris Support Services from a third party such as TERiX.

78. Critical Server Solaris Support Services and Non-Critical Server Solaris Support Services are two distinct products/services.

79. There is a nationwide antitrust market for Critical Server Solaris Support Services and a nationwide antitrust market for Non-Critical Server Solaris Support Services that are distinct from each other.

80. Oracle requires customers who wish to purchase Critical Server Solaris Support Services from Oracle to also purchase Non-Critical Server Solaris Support Services from Oracle.

81. Oracle has sufficient market power in the antitrust market for Critical Server Solaris Support Services to coerce customers to purchase Non-Critical Server Solaris Support Services from Oracle even in situations in which customers would prefer to purchase Non-Critical Server Solaris Support Services from a third party such as TERiX.

82. Sun/Oracle Firmware and Sun/Oracle Hardware Support Services are two distinct products/services.

83. There is a nationwide antitrust market for Sun/Oracle Firmware and a nationwide antitrust market for Sun/Oracle Hardware Support Services that are distinct from each other.

84. By virtue of the way it structures its pricing, which is completely inconsistent with any measure of economic cost or value, Oracle effectively requires customers who wish to purchase Sun/Oracle Firmware from Oracle to also purchase Sun/Oracle Hardware Support Services from Oracle.

85. Oracle has sufficient market power in the antitrust market for Sun/Oracle Firmware to coerce customers to purchase Sun/Oracle Hardware Support Services from Oracle even in situations in which customers would prefer to purchase Sun/Oracle Hardware Support Services from a third party such as TERiX.

86. Oracle's conduct has affected a not insubstantial volume of commerce in the antitrust markets described above.

87. Oracle's conduct therefore constitutes a *per se* violation of the ban in Sherman Act § 1 on contracts, combinations, or conspiracies in restraint of trade or commerce.

88. Alternatively, Oracle's conduct constitutes an unreasonable restraint on trade in violation of Sherman Act § 1.

89. As a consequence of Oracle's wrongful conduct, TERiX has suffered antitrust injury, and damages in an amount to be proven at trial, currently estimated to be in excess of $10 million.

Second Cause of Action (Sherman Act § 2)

90. TERiX incorporates all preceding paragraphs.

91. Oracle's wrongful conduct detailed above constitutes predatory and/or anticompetitive conduct.

92. Oracle's wrongful conduct was undertaken with the specific intention of using that conduct to obtain a monopoly in the antitrust market for Solaris Support Services, the antitrust market for Non-Critical Server Solaris Support Services, and/or the antitrust market for Sun/Oracle Hardware Support Services.

93. Absent intervention by the Court, there is a dangerous probability that Oracle will achieve monopoly power in the antitrust market for Support Services, the antitrust market for Non-Critical Server Solaris Support Services, and/or the antitrust market for Sun/Oracle Hardware Support Services because of its wrongful conduct.

94. Alternatively, Oracle has already achieved monopoly power in the antitrust market for Support Services, the antitrust market for Non-Critical Server Solaris Support Services, and/or the antitrust market for Sun/Oracle Hardware Support Services because of its wrongful conduct.

95. Oracle's wrongful conduct occurred in and/or affected interstate commerce.

96. As a consequence of Oracle's wrongful conduct, TERiX has suffered antitrust injury, and damages in an amount to be proven at trial, currently estimated to be in excess of $10 million.

<u>Third Cause of Action (Lanham Act § 43)</u>

97. TERiX incorporates all preceding paragraphs.

98. By falsely informing customers, in commercial advertising and promotion, and in interstate commerce, that TERiX presently is falsely advertising itself and its services as being affiliated with Oracle or misrepresenting its affiliation or status with Oracle, Oracle is falsely advertising and falsely disparaging the nature, quality, and characteristics of TERiX's service, and offerings in violation of Section 43 of the Lanham Act, 15 U.S.C. § 1025.

99. By falsely informing customers, in commercial advertising and promotion, and in interstate commerce, that Solaris Updates and Sun/Oracle Firmware are only available from Oracle with the purchase of annual contracts for technical support services, Oracle is falsely

describing and misrepresenting the nature, quality, and characteristics of its own products, service, and offerings in violation of Section 43 of the Lanham Act, 15 U.S.C. § 1025.

100. By falsely informing customers, in commercial advertising and promotion, and in interstate commerce, that Solaris Updates and Sun/Oracle Firmware cannot be obtained on their behalf by TERiX and other third-party service providers, Oracle is falsely describing and misrepresenting the nature, quality, and characteristics of its own products, license agreements, service, and offerings in violation of Section 43 of the Lanham Act, 15 U.S.C. § 1025.

101. As a consequence of Oracle's wrongful conduct, TERiX has suffered damages in an amount to be proven at trial, currently estimated to be in excess of $10 million.

102. Oracle's misrepresentations and misleading statements described herein were made knowingly, willfully, intentionally, and maliciously, for the purposes of taking customers and contracts from TERiX and other third-party service providers and of monopolizing the relevant antitrust markets described herein, making this a willful and exceptional case of false advertising in which TERiX is entitled to treble damages and attorneys' fees pursuant to 15 U.S.C. § 1117(a).

Fourth Cause of Action (Cartwright Act (Cal. Bus. & Prof. Code §§ 16700 *et seq.*)

103. TERiX incorporates all preceding paragraphs.

104. Solaris Updates and Solaris Support Services are two distinct products/services.

105. There is a nationwide antitrust market for Solaris Updates and a nationwide antitrust market for Solaris Support Services that are distinct from each other.

106. Oracle requires customers who wish to purchase Solaris Updates from Oracle to also purchase Solaris Support Services from Oracle.

107. Oracle has sufficient market power in the antitrust market for Solaris Updates to appreciably restrain competition in the antitrust market for Solaris Support Services.

108. Critical Server Solaris Support Services and Non-Critical Server Solaris Support Services are two distinct products/services.

109. There is a nationwide antitrust market for Critical Server Solaris Support Services and a nationwide antitrust market for Non-Critical Server Solaris Support Services that are distinct from each other.

110. Oracle requires customers who wish to purchase Critical Server Solaris Support Services from Oracle to also purchase Non-Critical Server Solaris Support Services from Oracle.

111. Oracle has sufficient market power in the antitrust market for Critical Server Solaris Support Services to appreciably restrain competition in the antitrust market for Non-Critical Server Solaris Support Services.

112. Sun/Oracle Firmware and Sun/Oracle Hardware Support Services are two distinct products/services.

113. There is a nationwide antitrust market for Sun/Oracle Firmware and a nationwide antitrust market for Sun/Oracle Hardware Support Services that are distinct from each other.

114. By virtue of the way it structures its pricing, which is completely inconsistent with any measure of economic cost or value, Oracle effectively requires customers who wish to purchase Sun/Oracle Firmware from Oracle to also purchase Sun/Oracle Hardware Support Services from Oracle.

115. Oracle has sufficient market power in the antitrust market for Sun/Oracle Firmware to appreciably restrain competition in the antitrust market for Sun/Oracle Hardware Support Services.

116. Oracle's conduct has affected more than a *de minimis* volume of commerce in the antitrust markets described above in California (and in the United States).

117. Oracle's conduct therefore constitutes a *per se* violation of the ban in the Cartwright Act on tying contracts substantially lessening competition or tending to create a monopoly.

118. Alternatively, Oracle's conduct constitutes an unreasonable restraint on trade in violation of the Cartwright Act.

119. As a consequence of Oracle's wrongful conduct, TERiX has suffered antitrust injury, and damages in an amount to be proven at trial, currently estimated to be in excess of $10 million.

Fifth Cause of Action (Interference with Contract)

120. TERiX incorporates all preceding paragraphs.

121. TERiX had existing valid and enforceable contracts with multiple Hardware owners during the period of Oracle's wrongful conduct.

122. Oracle was aware both of the general fact that TERiX (and other third party hardware support providers) had such contracts and of certain of the specific contracts, including for example the contract between TERiX and BNYM.

123. Oracle intentionally interfered with those contracts through the conduct described above, with the purpose, intention, and effect of inducing TERiX customers (including for example BNYM) to breach their valid and enforceable contracts disrupting the relationships and denying TERiX the anticipated future benefits.

124. As a consequence of Oracle's wrongful conduct, TERiX has suffered damages in an amount to be proven at trial, currently estimated to be in excess of $10 million.

125. In acting as detailed herein, Oracle was guilty of oppression, fraud, and/or malice, entitling TERiX to exemplary and/or punitive damages pursuant to Cal. Civ. Code § 3294.

Sixth Cause of Action (Interference with Prospective Economic Advantage)

126. TERiX incorporates all preceding paragraphs.

127. TERiX had existing and/or prospective business relationships with multiple Hardware owners during the period of Oracle's wrongful conduct.

128. Each of those existing and/or prospective business relationships included a reasonable probability of future economic benefit and a reasonable expectation that such benefit would accrue to TERiX.

129. Oracle was aware both of the general fact that TERiX (and other third party hardware support providers) had such relationships and of certain of the specific relationships, including for example relationships with BNYM and RBC.

130. Oracle intentionally interfered with those relationships through the conduct described above, with the purpose, intention, and effect of disrupting the relationships and denying TERiX the anticipated future benefits.

131. Oracle's interference was independently wrongful, as it was in violation of statutes, recognized rules of common law, and/or an established standard of a trade or profession.

132. As a consequence of Oracle's wrongful conduct, TERiX has suffered damages in an amount to be proven at trial, currently estimated to be in excess of $10 million.

133. In acting as detailed herein, Oracle was guilty of oppression, fraud, and/or malice, entitling TERiX to exemplary and/or punitive damages pursuant to Cal. Civ. Code § 3294.

Seventh Cause of Action (Unfair Competition)

134. TERiX incorporates all preceding paragraphs.

135. Oracle's conduct described above was unlawful (violating federal and California statutory law and California common law) and/or unfair or fraudulent, and therefore in violation of California's Unfair Competition Law.

136. As a consequence of Oracle's wrongful conduct, TERiX has suffered damages and Oracle has been unjustly enriched, both in an amount to be proven at trial, currently estimated to be in excess of $10 million.

Eighth Cause of Action (Declaratory Relief)

137. TERiX incorporates all preceding paragraphs.

138. Oracle claims to own valid/enforceable copyrights for (1) "Solaris 8 (SPARC Platform Edition)" (June 19, 2000 Registration number TX 5-138-319), (2) "Solaris 8 (Intel Platform Edition)" (June 19, 2000 Registration number TX 5-196-384), (3) "Solaris 9 operating system" (August 7, 2002 Registration number TX 5-586-147), and (4) "Solaris 10 operating system" (April 19, 2005 Registration number TX 6-086-753).

139. Oracle further claims to own a valid/enforceable copyright for "Solaris 11 operating system" (February 19, 2014 Application number 1-1035264961) (collectively with the claimed copyrights listed in the preceding paragraph, "Oracle's Claimed Copyrights").

140. Oracle is misusing Oracle's Claimed Copyrights by (among other things) attempting to leverage its copyright monopoly(ies) to monopolize and/or improperly restrain trade in one or more markets, contrary to the public policy reflected in the copyright laws and to the detriment of both free competition and Oracle's competitors.

141. TERiX is therefore entitled to a declaration that Oracle's Claimed Copyrights are invalid and unenforceable.

## Prayer

Wherefore, TERiX prays that the Court enter judgment on its behalf, adjudging and decreeing that:

1. Oracle engaged in an illegal contract, combination, or conspiracy in restraint of trade or commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), and TERiX was injured in its business and property as a result of those violations;

2. Oracle engaged in illegal monopolization and/or attempted monopolization in violation of Section 2 of the Sherman Act (15 U.S.C. § 2), and TERiX was injured in its business and property as a result of those violations;

3. Oracle engaged in false advertising in violation of Section 43 of the Lanham Act (15 U.S.C. § 1025), and TERiX was injured in its business and property as a result of those violations;

4. Oracle engaged in a tying contract substantially lessening competition or tending to create a monopoly in violation of the Cartwright Act (Cal. Bus. & Prof. Code §§ 16700 *et seq.*), and TERiX was injured in its business and property as a result of those violations;

5. Oracle committed a tort under California law by intentionally interfering with contracts between TERiX and TERiX customers, and TERiX was injured in its business and property as a result of such interference.

6. Oracle committed a tort under California law by intentionally interfering with the prospective economic advantage TERiX otherwise would have received from TERiX's relationship with potential TERiX customers, and TERiX was injured in its business and property as a result of such interference.

7. Oracle engaged in conduct in violation of California's Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200 *et seq.*), and TERiX was injured in its business and property and Oracle was unjustly enriched as a result of those violations;

8. TERiX is entitled to recover damages it sustained, as provided by the Lanham Act, the Sherman Act, and the Cartwright Act, and judgment shall be entered against Oracle in that amount, to be trebled in accordance with such laws;

9. TERiX is entitled to recover damages it sustained, as provided by California common law related to interference with contracts and interference with prospective economic advantages, along with exemplary damages as provided in California Civil Code § 3294, and judgment shall be entered against Oracle in the that amount;

10. TERiX is entitled to recover restitution and disgorgement, as provided by the California Unfair Competition Law, and judgment shall be entered against Oracle in that amount;

11. Oracle and its subsidiaries, affiliates, successors, transferees, assignees, and their officers, directors, partners, agents, and employees, and all other persons acting or claiming to act on Oracle's behalf, shall be permanently enjoined from continuing the wrongful conduct detailed herein;

12. Oracle's Claimed Copyrights are invalid and unenforceable;

13. TERiX shall be awarded pre-judgment and post-judgment interest to the extent permitted by law;

14. TERiX shall recover its costs of this suit, including reasonable attorneys' fees, to the extent permitted by law; and

15. TERiX shall receive such other or further relief as may be just and proper.

Dated: April 14, 2014

ROBINSON & WOOD, INC.

By: */s/ Gabriel G. Gregg*
GABRIEL G. GREGG

- and -

RIMON P.C.
SCOTT R. RABER
RICHARD J. MOONEY

- and -

LARDIERE MCNAIR, LLC
CHRISTOPHER L. LARDIERE

*Attorneys for Counterclaimant*
TERIX COMPUTER COMPANY, INC.

Case5:13-cv-03385-PSG Document144 Filed04/14/14 Page29 of 29

**Demand for Jury Trial**

In accordance with Rule 38(b) of the Federal Rules of Civil Procedure, TERiX hereby demands a trial by jury of any issues so triable by right.

Dated: April 14, 2014

ROBINSON & WOOD, INC.

By: */s/ Gabriel G. Gregg*
GABRIEL G. GREGG

- and -

RIMON P.C.
SCOTT R. RABER
RICHARD J. MOONEY

- and -

LARDIERE MCNAIR, LLC
CHRISTOPHER L. LARDIERE

*Attorneys for Counterclaimant*
TERIX COMPUTER COMPANY, INC.

ROBINSON & WOOD, INC.
ATTORNEYS AT LAW

931812

29

5:13-CV-03385-PSG

COUNTERCLAIM OF TERiX COMPUTER COMPANY, INC.; JURY DEMAND