BINGHAM MCCUTCHEN LLP
Geoffrey M. Howard (SBN 157468)
geoff.howard@bingham.com
Thomas S. Hixson (SBN 193033)
thomas.hixson@bingham.com
Kyle Zipes (SBN 251814)
kyle.zipes@bingham.com
Three Embarcadero Center
San Francisco, CA 94111-4067
Telephone: 415.393.2000
Facsimile: 415.393.2286

ORACLE CORPORATION
Dorian Daley (SBN 129049)
dorian.daley@oracle.com
Deborah K. Miller (SBN 95527)
deborah.miller@oracle.com
500 Oracle Parkway
M/S 5op7
Redwood City, CA 94065
Telephone: 650.506.4846
Facsimile: 650.506.7114

LATHAM & WATKINS LLP
Daniel M. Wall (SBN 102580)
dan.wall@lw.com
Christopher B. Campbell (SBN 254776)
christopher.campbell@lw.com
505 Montgomery Street, Suite 2000
San Francisco, California  94111-6538
Telephone: 415.391.0600
Facsimile:  415.395.8095

ORACLE CORPORATION
Jeffrey S. Ross (SBN 138172)
jeff.ross@oracle.com
10 Van de Graaff Drive
Burlington, MA 01803
Telephone: 781.744.0449
Facsimile: 781.238.6273

Attorneys for Plaintiffs
Oracle America, Inc., and Oracle
International Corporation

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ORACLE AMERICA, INC., a Delaware corporation; ORACLE INTERNATIONAL CORPORATION, a Delaware corporation<br><br>Plaintiff,<br><br>v.<br><br>TERIX COMPUTER COMPANY, INC., a California corporation; MAINTECH INCORPORATED, a Delaware corporation; VOLT DELTA RESOURCES, LLC, a Nevada limited liability company; SEVANNA FINANCIAL, INC., a Nevada corporation; WEST COAST COMPUTER EXCHANGE, INC., a Nevada corporation; and DOES 1–50,<br><br>Defendants. | No. 5:13-cv-03385 PSG<br><br>**ORACLE'S NOTICE OF MOTION AND MOTION TO DISMISS DEFENDANTS' COUNTERCLAIMS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:        June 24, 2014<br>Time:        10:00 a.m.<br>Location:    Courtroom 5, 4th Floor<br>Judge:       Hon. Paul S. Grewal |

# TABLE OF CONTENTS

Page

NOTICE OF MOTION AND MOTION ........................................................................................ 1

STATEMENT OF RELIEF SOUGHT ....................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................. 2

I.      Introduction ................................................................................................................. 2

II.     Defendants Fail To State A Claim For Relief ............................................................. 4

        A.      Defendants Fail To State A Tying Claim Under The Antitrust Laws ................ 5

                1.      There Is No Tying "Market" For Oracle's Updates, Patches, Bug
                        Fixes or Firmware That Is Distinct From Oracle's Support
                        Offerings (Ties 1, 2, 3) ........................................................................ 6

                2.      Terix's Alleged "Critical" and "Non-Critical" Support Markets
                        Also Fail (Tie 4) ................................................................................. 13

                3.      Terix's Claimed Tie Between "Sun/Oracle Firmware" And
                        "Hardware Support Services" Fails To Allege Plausible Tying
                        Conduct (Tie 3) .................................................................................. 14

                4.      Maintech's Tying Claim Fails Because Maintech Does Not
                        Participate In The Alleged Tied Market (Tie 1) ................................. 17

                5.      Defendants' Tying Claims Are Largely Time Barred (Ties 1, 2, 4) ........ 18

        B.      Defendants Fail To State A Claim For Monopolization .................................... 20

        C.      Defendants Fail To State A Claim For Copyright Misuse ................................. 22

        D.      The Court Should Dismiss The Lanham Act Claims .......................................... 24

                1.      Maintech and Terix Fail to Identify Oracle's Commercial
                        Advertising ......................................................................................... 24

                2.      Maintech and Terix Fail to Identify How Oracle Disseminated the
                        Misstatements ..................................................................................... 24

                3.      Maintech and Terix Fail to Identify Specific Misrepresentations .......... 25

                4.      Maintech Cannot Base Its Claim on Alleged Misrepresentations
                        About Terix ........................................................................................ 26

        E.      The Court Should Dismiss In Part Terix's Intentional Interference With
                Contract Claim ................................................................................................. 26

        F.      The Court Should Dismiss Maintech's Trade Libel Claim ................................ 27

1               1.      Maintech Fails to Identify Specific Lost Customers or Transactions ...... 27

2               2.      Maintech Fails to Identify Specific False Statements ............................ 27

3               3.      Maintech Cannot Rely on Oracle's Legal Claims ................................. 28

4       G.      The Court Should Dismiss The Intentional Interference Claims ........................ 28

5               1.      Maintech and Terix Do Not Identify the Interfered-With
                        Customers ............................................................................. 28

6
                2.      Maintech and Terix Do Not Specify Oracle's Independently
7                       Wrongful Acts ....................................................................... 29

8       H.      The Court Should Dismiss The Unfair Competition Claims .............................. 30

9   III.    CONCLUSION ................................................................................................. 30

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

A/761

1

## <u>TABLE OF AUTHORITIES</u>

2

Page(s)

3

**Cases**

4

*AccuImage Diagnostics Corp. v. TeraRecon, Inc.,*
5
   260 F. Supp. 2d 941 (N.D. Cal. 2003) ............................................................26, 28

6

*AMF, Inc. v. General Motors Corp. (In re Multidistrict Vehicle Air Pollution),*
   591 F.2d 68 (9th Cir. 1979) ........................................................................20

7

*Apple Inc. v. Psystar Corp.,*
8
   586 F. Supp. 2d 1190 (N.D. Cal. 2008) ...............................................4, 13, 21, 23

9

*Apple Inc. v. Psystar Corp.,*
10
   658 F.3d 1150 (9th Cir. 2011) ..................................................................22, 23

11

*In re ATM Fee Antitrust Litig.,*
   768 F. Supp. 2d 984 (N.D. Cal. 2009) ..........................................................8, 13

12

*Auvil v. CBS "60 Minutes,"*
13
   67 F.3d 816 (9th Cir. 1995) ........................................................................27

14

*Batts v. Bankers Life & Cas. Co.,*
15
   2014 WL 296925 (N.D. Cal. Jan. 27, 2014) ........................................................29

16

*Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544 (2007)..................................................................................4, 5

17

*Blank v. Kirwan,*
18
   39 Cal. 3d 311 (1985) ................................................................................28

19

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.,*
20
   509 U.S. 209 (1993)...................................................................................16

21

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
   429 U.S. 477 (1977)...................................................................................18

22

*Cascade Health Solutions v. PeaceHealth,*
23
   515 F.3d 883 (9th Cir. 2008) ......................................................................16

24

*Celebrity Chefs Tour, LLC v. Macy's, Inc.,*
   2014 WL 1660674 (S.D. Cal. Apr. 25, 2014)......................................................26

25

*Chamilia, LLC v. Pandora Jewelry, LLC,*
26
   2007 WL 2781246 (S.D.N.Y. Sept. 24, 2007)......................................................25

27

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.,*
28
   173 F.3d 725 (9th Cir. 1999) .....................................................................24

*Digital Equip. Corp. v. Uniq Digital Techs., Inc.*,
   73 F.3d 756 (7th Cir. 1996) ....................................................................................8

*Eastman Kodak Co. v. Image Technical Services, Inc.*,
   504 U.S. 451 (1992)...............................................................................................10

*Eldorado Stone v. Renaissance Stone, Inc.*,
   2005 WL 5517731 (S.D. Cal. Aug. 10, 2005) .......................................................27

*Employers Ins. of Wausau v. United States*,
   764 F.2d 1572 (Fed. Cir. 1985)..............................................................................20

*Films of Distinction, Inc. v. Allegro Film Prods., Inc.*,
   12 F. Supp. 2d 1068 (C.D. Cal. 1998) ...................................................................27

*First Advantage Background Servs. Corp. v. Private Eyes, Inc.*,
   569 F. Supp. 2d 929 (N.D. Cal. 2008) ...................................................................28

*Graham v. U.S. Bank, N.A.*,
   2013 WL 2285184 (N.D. Cal. May 23, 2013) ........................................................30

*Ill. Tool Works Inc. v. Indep. Ink, Inc.*,
   547 U.S. 28 (2006)...................................................................................................8

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
   125 F.3d 1195 (9th Cir. 1997) ...............................................................................16

*Incorp Servs., Inc. v. IncSmart.biz, Inc.*,
   2013 WL 394023 (N.D. Cal. Jan. 30, 2013) ..........................................................25

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
   466 U.S. 2 (1984).......................................................................................... *passim*

*Korea Supply Co. v. Lockheed Martin Corp.*,
   29 Cal. 4th 1134 (2003) ....................................................................................28, 29

*Krantz v. BT Visual Images, L.L.C.*,
   89 Cal. App. 4th 164 (2001) ..................................................................................30

*Leonardini v. Shell Oil Co.*,
   216 Cal. App. 3d 547 (1989) ..................................................................................27

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   134 S. Ct. 1377 (2014)............................................................................................26

*LT Int'l Ltd. v. Shuffle Master, Inc.*,
   2014 WL 1248270 (D. Nev. Mar. 26, 2014) .....................................................24, 25

*Ludwig v. Superior Court*,
   37 Cal. App. 4th 8 (1995) .......................................................................................28

*Mann v. Quality Old Time Serv.*,
  120 Cal. App. 4th 90 (2004) .....................................................................................27

*Mattel, Inc. v. MGA Entm't, Inc.*,
  782 F. Supp. 2d 911 (C.D. Cal. 2011) .......................................................................20

*Newcal Indus., Inc. v. Ikon Office Solution*,
  513 F.3d 1038 (9th Cir. 2008) ...................................................................................21

*Nexsales Corp. v. Salebuild, Inc.*,
  2012 WL 216260 (N.D. Cal. Jan. 24, 2012) .............................................................26

*Oracle Am. v. Google Inc.*,
  2014 U.S. App. LEXIS 8744 (Fed. Cir. May 9, 2014) ...............................................2

*Ortho Diagnostic Sys., Inc. v. Abbott Labs., Inc.*,
  920 F. Supp. 455 (S.D.N.Y. 1996)..............................................................................17

*Pac. Gas & Elec. Co. v. Bear Stearns & Co.*,
  50 Cal. 3d 1118 (1990) ..............................................................................................26

*Pacific Bell Telephone Co. v. linkLine Communications, Inc.*,
  555 U.S. 438 (2009).........................................................................................15, 16, 17

*Paladin Assocs., Inc. v. Montana Power Co.*,
  328 F.3d 1145 (9th Cir. 2003) .....................................................................................5

*Practice Mgmt. Info. Corp. v. AMA*,
  121 F.3d 516 (9th Cir. 1997) .....................................................................................22

*Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*,
  508 U.S. 49 (1993)......................................................................................................21

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
  124 F.3d 430 (3d Cir. 1997).................................................................................8, 14

*Reudy v. Clear Channel Outdoors, Inc.*,
  693 F. Supp. 2d 1091 (N.D. Cal. 2010) .....................................................................29

*Samsung Elecs. Co. v. Panasonic Corp.*,
  2014 U.S. App. LEXIS 6256 (9th Cir. Apr. 4, 2014) ................................................19

*Southland Sod Farms v. Stover Seed Co.*,
  108 F.3d 1134 (9th Cir. 1997) ...................................................................................24

*Tat Tohumculuk, A.S. v. H.J. Heinz Co.*,
  2013 WL 6070483 (E.D. Cal. Nov. 14, 2013).............................................................29

*Tele Atlas N.V. v. Navteq Corp.*,
  397 F. Supp. 2d 1184 (N.D. Cal. 2005) .......................................................................5

*Times-Picayune Pub. Co. v. United States*,
 345 U.S. 594 (1953) ..................................................................................8

*Triad Systems Corp. v. Southeastern Express Co.*
 64 F.3d 1330 (9th Cir. 1995) ..................................................................23

*United States v. Microsoft Corp.*,
 253 F.3d 34 (D.C. Cir. 2001) (*en banc*).........................................8, 10

*Universal Grading Serv. v. eBay, Inc.*,
 2011 WL 846060 (N.D. Cal. Mar. 8, 2011)..........................................27

*Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*,
 42 Cal. App. 4th 507 (Cal. 1996) ..........................................................29

*William O. Gilley Enters. v. Atl. Richfield Co.*,
 588 F.3d 659 (9th Cir. 2009) ....................................................................4

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
 401 U.S. 321 (1971)...........................................................................18, 19

**Statutes**

15 U.S.C. § 1 ....................................................................................................5

15 U.S.C. § 15b ..............................................................................................18

15 U.S.C. § 1125(a)(1)(B) ............................................................................24

Cal. Bus. & Prof. Code § 16750.1 ...............................................................18

Cal. Bus. & Prof. Code § 17200 ..................................................................30

Cal. Civ. Code 47(b)(2) ................................................................................28

**Other Authorities**

Areeda and Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and
 Their Application*, § 1767a (2014 ed.) .................................................18

E. Elhauge, Research Handbook of the Economics of Antitrust Law 85
 (2012) .........................................................................................................9

Esri, *Enterprise License Agreements (ELA): How an ELA Works*,
 http://www.esri.com/industries/ela/how-ela-works (accessed, May 12, 2014) ........................6

**Rules**

F.R.C.P. 12(b)(6) ..............................................................................................1

A/761

1

## NOTICE OF MOTION AND MOTION

2

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

3            PLEASE TAKE NOTICE that on June 24, 2014 at 10:00 a.m. in Courtroom 5 of the

4   above-listed Court, or as soon thereafter as the matter may be heard, Plaintiffs Oracle America,

5   Inc. and Oracle International Corporation (together, "Oracle" or "Plaintiffs") will, and hereby do,

6   move for an order pursuant to Federal Rule of Civil Procedure 12(b)(6) dismissing all

7   counterclaims asserted by Defendants TERiX Computer Company, Inc. ("Terix"), Maintech,

8   Incorporated and Volt Delta Resources, LLC (both together, "Maintech") (collectively,

9   "Defendants").  This motion is based on this Notice and Motion, the Counterclaim of Terix

10  Computer Company, Inc. ("TCC"), the Counterclaims of Maintech Incorporated and Volt Delta

11  Resources, LLC ("MCC"), Oracle's Request for Judicial Notice, the pleadings on file in this

12  matter, and such oral argument as the Court permits.

13

## STATEMENT OF RELIEF SOUGHT

14           Oracle moves pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss with

15  prejudice all counterclaims asserted by Terix (Docket No. 144) and Maintech (Docket No. 145)

16  on the grounds that:

17           1.       Defendants' antitrust tying claims (TCC Claims 1, 4;  MCC Claims 1, 2) fail to

18  identify separate markets or products, fail to identify cognizable tying conduct, fail to allege

19  antitrust injury, and are time-barred;

20           2.       Defendants' monopolization and attempted monopolization claims (TCC Claim 2;

21  MCC Claim 3) either are premised wholly on their flawed tying allegations or are insufficiently

22  alleged;

23           3.       Defendants' copyright misuse claims (TCC Claim 8; MCC Claim 8) do not allege

24  any plausible "misuse";

25           4.       Defendants' Lanham Act claims (TCC Claim 3; MCC Claim 4) fail to identify

26  any commercial advertising or specific statements by Oracle;

27           5.       Terix's intentional interference with contract claim (TCC Claim 5) fails to

28  identify valid contracts between Terix and third parties;

ORACLE'S MOTION TO DISMISS COUNTERCLAIMS
CASE NO. 5:13-cv-03385 PSG

6.     Maintech's trade libel claim (MCC Claim 5) fails to identify specific lost customers or transactions and fails to identify specific false statements;

7.     Defendants' intentional interference claims (TCC Claim 6; MCC Claim 6) do not adequately identify the purportedly interfered-with customers or wrongful acts; and

8.     Defendants' claims under California's Unfair Competition Law (TCC Claim 7; MCC Claim 7) fail to the extent that they rely on Defendants' other claims.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.     INTRODUCTION

Oracle sued Terix and Maintech for engaging in a widespread, deliberate scheme to misappropriate and distribute copyrighted, proprietary Oracle software code.  The misappropriated software consists primarily of patches, updates, and bug fixes for Oracle's proprietary Solaris operating system (collectively, "Solaris Updates").  In the limited discovery thus far conducted, Terix and Maintech have not denied taking and distributing Solaris Updates.  Indeed, Defendants confirmed that they used Solaris Updates that Maintech and Terix acquired improperly as part of the support services Defendants provided to Sun/Oracle hardware customers.

Against this backdrop, it should come as no surprise that Terix and Maintech have now filed counterclaims that accuse Oracle of antitrust, copyright misuse, and other violations of law for enforcing its copyrights and other proprietary rights in the Solaris Updates.  Lacking any legitimate basis for misappropriating the software, they are desperate to find something that might excuse it—and protect the profits they have made from it.[1]

The counterclaims are all without merit.  The antitrust counterclaims principally take a set of Oracle licensing policies that have been in effect for many years—longer than the four-year antitrust statute of limitations—and claim they constitute tying arrangements.  But each of the tying arrangements Defendants assert (there are four of them) is based on artificial and

---

[1]   Of note, the Federal Circuit recently affirmed copyright protection of software code similar to the software at issue here.  *See Oracle Am. v. Google Inc.*, 2014 U.S. App. LEXIS 8744 (Fed. Cir. May 9, 2014).

indeed imaginary markets that, because they do not really exist, Defendants cannot plead properly.  They are based on disassembling real world products into "ties" of their components.  For example, Defendants allege that Solaris Updates are a distinct product sold in a separate "updates market" even though the counterclaims clearly allege that Oracle has consistently distributed these proprietary updates through support contracts, and Oracle's predecessor, Sun Microsystems, generally distributed updates for free to any Solaris licensee in good standing.  These allegations do not describe a distinct economic "updates market," let alone one that has somehow been bolted to a distinct service market through tying.

What Terix and Maintech really want—so they can continue with a business model that trades on Oracle's intellectual property—is to compel Oracle to make Solaris Updates available for free or at what they deem a "fair and reasonable" price.  Customers aren't asking Oracle to give away its intellectual property; competitors who have been stealing that intellectual property are.  Regardless, Oracle has no duty under the antitrust laws to do that.  There is nothing the least bit wrong with Oracle following the very common industry practice of offering its customers continuously updated software through the vehicle of a software support agreement.  No amount of deconstruction and reconstruction of Oracle's products into "tying" arrangements, no matter how creative, can make that practice illegal.

Defendants' new antitrust theories also contradict one of their key contentions in defending against Oracle's claims—that they and their customers had a "perpetual" license to Solaris updates.  If Solaris customers truly had a separate license to updates in perpetuity, there could be no "tying" of updates to service, as customers would already have had separate, enforceable rights to the updates themselves.  Defendants have to be making up the license defense, the tying claims, or (as is the case) both.

The copyright misuse counterclaim is just the tying claim with another label.  It fails under the law because there is no allegation that Oracle has adopted any license restrictions that have the effect of preventing others from developing competing software products.  No such allegation would even be relevant to Defendants' interests in this case.  It is clear that Defendants

ORACLE'S MOTION TO DISMISS COUNTERCLAIMS
CASE NO. 5:13-cv-03385-PSG

have no interest in shouldering the significant time and financial investment required to develop, test and distribute Solaris Updates or managing a comprehensive program to ensure that Solaris Updates are integrated with each other and the underlying Solaris operating system, as Oracle does at tremendous expense today.

The remaining counterclaims are likewise deficient.  Maintech and Terix have cobbled together a number of business tort counterclaims out of innuendo and conjecture.  These claims face the long-term problem that, if Oracle establishes that Maintech and Terix misused Oracle's intellectual property, then Maintech and Terix will be unable to prove their assumption that Oracle's alleged actions to counter Maintech and Terix's theft were improper.  That reality aside, there is no need to wait that long to determine that these counterclaims have no merit.  Maintech and Terix have failed to allege facts showing that the counterclaims are anything more than wishful thinking about hypothetical conduct leading to unspecified damages.  Federal pleading standards, as well as the applicable substantive law, require far more.

## II.   DEFENDANTS FAIL TO STATE A CLAIM FOR RELIEF

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims alleged. *Apple Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1195 (N.D. Cal. 2008).  Allegations of material fact are taken as true, but "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim." *Id.* (quoting *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996)).  "[A] plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotations omitted).  Rather, the plaintiff must "set forth factual allegations sufficient to establish *plausible* grounds for an entitlement to relief." *Psystar*, 586 F. Supp. 2d at 1195.  "[A] court must determine whether an antitrust claim is 'plausible' in light of basic economic principles" and common sense. *William O. Gilley Enters. v. Atl. Richfield Co.,* 588 F.3d 659, 662 (9th Cir. 2009).  A court may disregard internally inconsistent factual allegations. *See Psystar*, 586 F. Supp. 2d at 1200 (finding no independent

market alleged where allegations were "internally contradictory").

Courts are particularly wary of conclusory allegations in antitrust claims, because of the potential for needless and extremely burdensome discovery. "[A] district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed," particularly in light of the fact that "antitrust discovery can be expensive." *Twombly*, 550 U.S. at 558 (internal quotations omitted).

### A.   Defendants Fail To State A Tying Claim Under The Antitrust Laws

Defendants' claims under Section 1 of the Sherman Act and under the Cartwright Act rely exclusively on alleged "tying" by Oracle of Solaris Updates and support service offerings as detailed below. *See* TCC Claims 1, 4; MCC Claims 1, 2. "A tying arrangement is a device used by a competitor with market power in one market to extend its market power to an entirely distinct market. To accomplish this objective, the competitor agrees to sell one product (the tying product) but only on the condition that the buyer also purchase a different product (the tied product), or at least agrees that he will not purchase the tied product from any other supplier." *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1159 (9th Cir. 2003) (citations omitted); *see also Tele Atlas N.V. v. Navteq Corp.*, 397 F. Supp. 2d 1184, 1191 (N.D. Cal. 2005) (noting that "[s]imilar rules apply" under the Cartwright Act). Defendants allege four overlapping flavors of tying conduct:

- Tie 1 (Maintech): "patches, bug fixes and updates" for Solaris and firmware to "support packages for hardware and software running on Oracle/Sun systems," MCC ¶ 47;

- Tie 2 (Terix): "Solaris Updates" to "Solaris Support Services," TCC ¶ 76;

- Tie 3 (Terix): "Sun/Oracle Firmware" to "Sun/Oracle Hardware Support Services," TCC ¶ 84; and

- Tie 4 (Terix): "Critical Server Solaris Support Services" to "Non-Critical Server Solaris Support Services," TCC ¶ 80.

These allegations rely on "markets" made up by Terix and Maintech for purposes of this

litigation and similarly made up "ties" between them that, if followed to their logical conclusion, would greatly compromise our system of software copyright protection and prevent companies from capturing the significant value they bring to the market through their products. Defendants do not allege even a modicum of facts to establish the existence of any of these alleged "tying" markets, and can't because the facts do not exist. Moreover, the majority of the alleged tying claims accrued outside the statute of limitations and are time-barred. As a result, each of Defendants' tying claims must be dismissed.

1.    There Is No Tying "Market" For Oracle's Updates, Patches, Bug Fixes or Firmware That Is Distinct From Oracle's Support Offerings (Ties 1, 2, 3)

Defendants' tying claims fail the basic requirement that the "tying" and "tied" product markets be separate and distinct. The first example is Defendants' primary theory: that Oracle leverages its power in the supposed "tying markets" for "Solaris Updates" or "Sun/Oracle Firmware" to force customers also to purchase Oracle's products in the separate "tied market" for Solaris software and hardware support services.[2]  TCC ¶¶ 76-77, 84-85; MCC ¶¶ 47, 51.

These tying claims target the common practice in the enterprise software industry of licensing software "perpetually" through a combination of a one-time up front license payment and annual "support" payments. In this model, software support payments set as a percentage of the original hardware price entitle the customer to ongoing modifications to the software, be it simple bug fixes, more substantial "patches" or the next version of the software ("updates"). *See, e.g.*, TCC ¶ 55; *see also* Esri, *Enterprise License Agreements (ELA): How an ELA Works*, http://www.esri.com/industries/ela/how-ela-works (last visited May 12, 2014). In this case the software updates are modifications to the Solaris operating system software first delivered to the customer. TCC ¶ 19; *see also* MCC ¶ 44 ("patches, bug fixes and updates to Solaris"). Likewise, the relevant firmware is "updated 'firmware,'" meaning modifications to the firmware

---

[2]    Terix defines an alleged tying market for "Solaris Updates" that includes "software patches, updates, and bug fixes for the Solaris operating system" and a separate alleged tying market for "Sun/Oracle Firmware." TCC ¶¶ 19, 22. Maintech refers to its alleged tying market as "patches, bug fixes and updates to Solaris and firmware." MCC ¶ 44. These alleged tying markets are materially equivalent.

contained in Sun/Oracle servers when first sold.  TCC ¶¶ 22; *see also* MCC ¶ 44.

The reason for this lawsuit is that the "support" products offered by Defendants have included access to Solaris Updates—Oracle software that they have misappropriated.  They have not limited the support services provided to customers to the non-infringing components of a support package, such as telephone help line service, system error diagnosis or break-fix service on the physical device.  Furthermore, as far as Oracle is concerned, there is no such thing as Oracle "Software Support Services" distinct from the unitary product that includes access to Oracle's latest Solaris updates and other proprietary assets.  That is, Oracle sees its branded support offering called "Oracle Premier Support for Operating Systems" (described at TCC ¶ 55) as *principally* Solaris software and firmware updates for as long as the customer continues its subscription.[3]  There are technical support, remote diagnostics and "help line" components to the product as well, but customers do not pay 8% of the hardware price per year for that.  The Solaris Updates are the core support product being sold under this offering.  Oracle also believes the components of the support package are indivisible from an efficiency perspective, since, for example, often the solution to a problem diagnosed by a technician is to install a patch.

Defendants are of course not bound by Oracle's perspective, but if they wish to challenge it they must plead their claims properly.  In order to allege tying, Defendants have disassembled "Oracle Premier Support for Operating Systems" into two allegedly distinct products sold in allegedly separate markets.  First they claim there are distinct economic markets for Solaris Updates and firmware updates (the "tying markets").  Oracle is alleged to have a "natural monopoly" in these markets because it is *impossible* for Oracle to face competition in them.  *See* TCC ¶ 20 ("No competition is possible in [the market for Solaris Updates] because no other company has the legal right or the necessary technical resources to create, test, and release Solaris Updates."); MCC ¶ 30 ("Oracle has a 100% monopoly in the market for its own proprietary software, as well as in the market for supplying the patches, bug fixes and updates to

---

[3]   "Oracle Premier Support for Systems" is the exact same thing but with the additional option of hardware support, often referred to as "break-fix" support but which generally encompasses any service (software- or hardware-related) performed on the device.

this software.").  Of course, by the same logic *any* software vendor would have a monopoly, given that copyrighted software cannot usually be modified lawfully by anyone else absent permission from the copyright owner to use the copyrighted software code to do so.  Defendants then allege that Oracle has tied Solaris Updates and Firmware to other unspecified software and hardware support services.

These tying claims are based on "markets" that exist only in the imaginations of Defendants' lawyers, not in the real world.  It has long been a key legal and economic requirement of tying claims that the "tying" and "tied" products be sold in separate and distinct markets.  "[A] tying arrangement cannot exist unless two separate product markets have been linked."  *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 21 (1984), *abrogated in part on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006).  Therefore, the "common core of the adjudicated unlawful tying arrangements is the forced purchase of a *second distinct commodity* with the desired purchase of a dominant 'tying' product, resulting in economic harm to competition in the 'tied' market."  *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 614 (1953) (emphasis added).  One may not create a tying arrangement by reimagining the components of a single product as separate products sold in separate antitrust markets.  *See, e.g.*, *Digital Equip. Corp. v. Uniq Digital Techs., Inc.*, 73 F.3d 756, 761 (7th Cir. 1996) (Easterbrook, J.) (rejecting the claim that bundling an operating system with a computer is a tie of two separate products).  The antitrust plaintiff or counterclaimant must plead (and eventually prove) that the products linked by the alleged tie exist in fact in economically distinct markets where there is sufficient separate demand such that "it is efficient to offer [one] separately from [the other]."  *Jefferson Parish*, 466 U.S. at 21-22; *United States v. Microsoft Corp.*, 253 F.3d 34, 86-87 (D.C. Cir. 2001) (*en banc*).  A complaint may be dismissed if the market definition is "facially unsustainable."  *In re ATM Fee Antitrust Litig.*, 768 F. Supp. 2d 984, 994 (N.D. Cal. 2009) (citation omitted); *see also Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997).

In fact, Defendants have failed to plead that either side of the alleged tie is a distinct

product sold in a real world market.

### a.   Updates Are Not A Separate Product Market

It is hard to imagine how software updates could ever be a distinct market in the antitrust sense, meaning the relevant "arena of competition."  E. Elhauge, RESEARCH HANDBOOK OF THE ECONOMICS OF ANTITRUST LAW 85 (2012).  Defendants specifically allege that no one can or does compete with Oracle in this so-called market because Oracle has a proprietary right over the original software code and all updates.  TCC ¶ 20; MCC ¶ 30.  Furthermore, updating a software product, fixing bugs and issuing patches is merely one part of the broader lifecycle that applies to almost all software, and certainly all enterprise software where customers are making long-term commitments to the technologies they implement.  The so-called updates "product" exists because customers expect enterprise software to be continuously updated and improved.  Perhaps the software vendor could, theoretically, exploit this "updates monopoly" by selling updates as a distinct product for whatever the market would bear (which by hypothesis would be a monopoly price), but that's not what the counterclaims allege.  The allegations are that Oracle provides updates through software support contracts (the industry norm), and that Sun gave away most updates for free or sold them at cost.[4]  Neither Sun nor Oracle are alleged to have sold updates *a la carte* at market prices, as would be expected were there a distinct updates market.[5]

Under these circumstances, there is no basis for saying that "two separate product markets have been linked" through tying.  *Jefferson Parish*, 466 U.S. at 21.  Consider *Jefferson Parish* itself, where the Supreme Court was willing to consider anesthesiological services a separate product from surgical care (the market in which the defendant hospital had market power).  *Id.* at 21-22.  The principal reason was because anesthesiologists were not usually employed by hospitals and anesthesiological services were not usually bundled with other

---

[4]   Indeed, Defendants' primary defense in this action is that Sun perpetually licensed Solaris Updates when it sold customers their systems.  While incorrect, this contention shows how artificial it is for Defendants to argue there is a distinct updates market.

[5]   Terix also makes clear that Sun did not treat all updates so generously.  It states that "22% of all SPARC Solaris 8 Solaris Updates were 'private, before the [Oracle] acquisition," and that only "most," not all, "private" updates were available for free or nominal cost.  TCC ¶ 52.

hospital services.  *Id.*; *see also Microsoft*, 253 F.3d at 86-87.  There were plainly separate businesses of providing anesthesiological services and surgical care, and plenty of separate demand to support efficient separate markets.  *Jefferson Parish*, 466 U.S. at 21-22.  The same cannot be said of the alleged markets for "Solaris Updates" or "Sun/Oracle Firmware" as compared to the fictional "Software Support Services" market.  There are no allegations that the alleged separateness of these markets exists in fact.

This case is also nothing like *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992), where the Supreme Court found there was a triable issue as to whether copier parts were a separate market from copier service.  *Kodak* is plainly the inspiration for the counterclaims, but in that case there was clear evidence that Kodak had organized its business so that "service and parts have been sold separately in the past and [parts] still are sold separately to self-service equipment owners."  *Id.* at 462.   The Court gave particular weight to the fact that "some consumers would purchase service without parts, because some service does not require parts, and some consumers, those who self-service for example, would purchase parts without service."  *Id.* at 463.  Indeed, not only had Kodak run parts as a distinct business, it had competition in that business from OEMs, brokers, and customers themselves selling excess and used parts.  *Id.* at 458 and n.2.  The parts market, in other words, was a real world market, and it was Kodak that, in the Supreme Court's view, was denying its existence with theoretical arguments.  Here, by contrast, Oracle is (and has always been) the only legitimate source of Solaris Updates and never ran an "updates business" remotely similar to Kodak's parts business.

What Defendants really argue is that antitrust law does not allow Oracle to change Sun's allegedly liberal policies with respect to updates, *i.e.*, that including updates in software support contracts, no matter how common generally, constitutes tying if updates were previously available separately.  *See, e.g.*, TCC ¶¶ 51-53 (emphasizing policy changes).  In the tying context, however, the question is not whether the alleged tying product was available— particularly because it was allegedly being given away—but rather whether it was available in a distinct economic market.  *Jefferson Parish*, 466 U.S. at 21-22.  That has not and cannot be

pleaded here.

### b. Updates Are Not Distinct From Oracle's Support Packages

Not only are updates not a cognizable market in their own right, Defendants do not plead any facts to show that the tied product—so-called "software support services"—are, in fact, a distinct product sold in a distinct market. It is not even clear from the counterclaims what this second product might be.

Defendants allege that Oracle provides two support service packages to customers: "Premier Support for Operating Systems" (which includes Solaris Updates, firmware and what Defendants call "Software Support Services") and "Premier Support for Systems" (which includes Solaris Updates, firmware, "Software Support Services" and "Hardware Support Services"). TCC ¶ 55; *see also* MCC ¶ 31. The only difference between the packages is that "Support for Systems" includes hardware support and "Support for Operating Systems" does not. *Id.* These allegations admit that Oracle does *not* tie Solaris Updates or firmware to hardware services because customers are free to purchase "Premier Support for Operating Systems" (which includes Solaris Updates and firmware) without *any* hardware services at all.

So what then are the "Software Support Services" that are allegedly distinct from and tied to Solaris Updates? Defendants do not say. Maintech denies providing operating system support, MCC ¶ 10, and Terix, despite a pleading rife with definitions and every possible deconstruction of Oracle's service offerings, never describes the services *other than providing Oracle's bug fixes, patches and updates* that comprise the allegedly distinct "Software Support Services" product. *See* TCC ¶ 55 (alleging only that Oracle offers "a package of Solaris Updates, Sun/Oracle Firmware, and Software Support Services" and that "this level of support is called 'Oracle Premier Support for Operating Systems,'" but not distinguishing the "updates" from the "Software Support Services").

This is inadequate. Defendants are required to plead evidentiary facts describing the product, the market, and the basis for its alleged separateness. If they cannot even describe the product, it is hard to avoid the conclusion that it exists only through a mental process of

ORACLE'S MOTION TO DISMISS COUNTERCLAIMS
CASE NO. 5:13-cv-03385 PSG

disassembly—a software support package *minus* updates.  That is not enough to start the wheels of antitrust litigation rolling.[6]  If Defendants' ultimate theory of relief is that updates and service without updates were separate, real world economic product markets but are now "tied" together, they are required to plead more than tying buzz words like "separate" and "distinct."  They must plead facts sufficient to identify the separate products within the support package, and do so in a manner that will meet the standards under *Jefferson Parish* for separate markets.  They have not. As the pleadings stand, there is nothing to suggest that Oracle's software support packages are anything other than what Oracle says they are—a means to distribute software updates to customers, capturing the annuity value of Oracle's efforts to develop and continuously improve the underlying software.

Allowing Defendants to plead an antitrust case based on the fiction of separate "updates markets" is not only contrary to the law, it is profoundly dangerous.  Firms spend fortunes to develop and deploy cutting-edge, competitive software that can consistently operate at the high level that information technology markets demand.  These investments are typically ongoing, so that software products stay up to date with constantly changing environments, and so the inevitable bugs and glitches can be addressed in a timely manner.  Enterprise software firms almost always capture the value of those updates by distributing them through software support agreements.  If Defendants' argument is accepted, so that every software vendor's updates are a distinct "monopoly" product that cannot be "tied" to anything else, it would create enormous legal risk for an ordinary software industry practice.  After all, if it is true that as a consequence of being "the creator and licensor of Solaris," Oracle has absolute monopoly power over a market for Solaris Updates, how could any software vendor *not* be a monopolist in its own updates "market"?  The logic of the counterclaims leads to absurd results, where firms that have no appreciable market power in their primary software markets (*e.g.*, server operating systems)

---

[6]   The fact that Maintech denies providing operating system support is a strong indication that there is *not* a viable separate product for supporting Solaris unless one is really providing access to Solaris Updates.  MCC ¶ 10.  There is no logical reason why Maintech would avoid that "market" if it could participate in it without trading in Oracle's intellectual property.

are nevertheless monopolists in some separate "updates market."  *Cf. Psystar*, 586 F. Supp. 2d at 1198 ("'In general, a manufacturer's own products do not themselves comprise a relevant product market'" (quoting *Green Country Food Mkt., Inc. v. Bottling Grp.*, 371 F.3d 1275, 1282 (10th Cir. 2004)); *see also In re ATM Fee Antitrust Litig.*, 768 F. Supp. 2d at 997 (dismissing claim based on alleged single brand relevant market that "contravene[d] the pertinent legal standards" (internal quotation omitted)).

Because Defendants have not alleged separate, viable markets, their tying claims should be dismissed.

> 2.   Terix's Alleged "Critical" and "Non-Critical" Support Markets Also Fail (Tie 4)

Terix also alleges that Oracle ties "Non-Critical Server Solaris Support Services" to "Critical Server Solaris Support Services," each of which Terix claims is an independent and distinct "nationwide antitrust market."  TCC ¶¶ 78-80.  Just like the "update market," Terix's alleged "Critical" and "Non-Critical" markets are an illusion.

Terix's claim relates to a specific business problem:  Oracle, in order to prevent customers from placing one computer under a service contract and then using that relationship to obtain updates for all of its other computers, does not generally allow customers to put just some of its computers on service.[7]  That is in no way, shape or form a tying arrangement, but Terix contends that it is by imagining that service for the computers the customer wants to have on support is one product while service on its remaining computers is another.  A made-up notion of "criticality" defines the two "products."  Terix alleges that the first (tying) product "is comprised of Hardware that is absolutely critical to the proper functioning of its owner for legal, regulatory, or business reasons ('Critical Hardware')," TCC ¶ 14; and the second (tied) product "is comprised of Hardware that is not immediately critical to the proper functioning of its owner for legal, regulatory, or business reasons ('Non-Critical Hardware')," *id.* ¶ 15.

---

[7]   *See* TCC ¶ 59 (claiming that the result of this alleged policy is that "customers are forced to purchase Solaris Updates, Sun/Oracle Firmware, and Solaris Support from Oracle for significant number of pieces of Non-Critical Solaris Hardware because of the necessity of making such purchases for certain of their Critical Solaris Hardware").

ORACLE'S MOTION TO DISMISS COUNTERCLAIMS
CASE NO. 5:13-cv-03385 PSG

This obviously contrived definition does not describe two separate product markets.  It does not turn on what sellers offer in the marketplace or the "character of the demand" for the allegedly separate products.  *Jefferson Parish*, 466 U.S. at 19.  Instead, it turns on how much of the single product offered by Oracle a customer might choose to buy if it were free to buy that product based on its own judgment as to whether certain hardware is "absolutely critical" or "not immediately critical" based on its current use.  *See* TCC ¶ 59 ("customers are forced to purchase Solaris Updates, Sun/Oracle Firmware, and Solaris Support from Oracle for significant number of pieces of Non-Critical Solaris Hardware").  That is not even in the ballpark of what matters for antitrust market definition.  Indeed, for all that Terix alleges, these more/less critical categories encompass exactly the same hardware and software that require exactly the same types of service, but which a customer has decided for whatever reason to deploy in two more/less critical ways.  In other words, taking Terix's allegations at face value, the *exact same servers* fit in both the "Critical" and "Non-Critical" categories, and the *exact same services* are available and provided for both.  This is the *opposite* of a distinct market, because it makes clear that there *is* cross-substitutability of products between the two alleged markets and, indeed, that they are one and the same.  *Queen City Pizza*, 124 F.3d at 436.

3.  Terix's Claimed Tie Between "Sun/Oracle Firmware" And "Hardware Support Services" Fails To Allege Plausible Tying Conduct (Tie 3)

Terix's attempt to plead a tying claim between "Sun/Oracle Firmware" and "Hardware Support Services" is also insufficient.  As discussed above, Terix cannot plead a viable market for "Sun/Oracle Firmware."  *See supra* Part II.A.1.  But in addition, this claim fails because Terix's allegations do not even arguably describe a tying claim, or any other viable antitrust theory.

It takes some effort to understand the logic of this claim.  Fundamentally, it is an imaginative way to claim that Oracle ties-up the hardware support services market even though, as Terix acknowledges, Oracle sells "Hardware Support Services" separately and does not require customers to purchase such services in order to gain access to "Sun/Oracle Firmware."  *See* TCC ¶ 55.  Terix therefore alleges that "[b]y virtue of the way it structures its pricing, which

ORACLE'S MOTION TO DISMISS COUNTERCLAIMS
CASE NO. 5:13-cv-03385-PSG

is completely inconsistent with any measure of economic cost or value, Oracle effectively requires customers who wish to purchase Sun/Oracle Firmware from Oracle to also purchase Sun/Oracle Hardware Support Services from Oracle."  TCC ¶ 84.  Terix is very clear that this is due to Oracle's *pricing*:  "because Oracle prices its Software Support Services so far above a competitive level, it can and does offer Hardware Support Services at an additional incremental price far below the actual cost of providing Hardware Support Services, such that customers forced to purchase Software Support Services from Oracle almost invariably also purchase Hardware Support Services from Oracle."  *Id.* ¶ 54.

On its face this is a claim about a "price squeeze," a monopolization theory eviscerated by the Supreme Court in *Pacific Bell Telephone Co. v. linkLine Communications, Inc.,* 555 U.S. 438 (2009).  In *linkLine*, AT&T supplied plaintiffs with inputs for the DSL market and also provided its own DSL service to retail customers.  *Id.* at 443.  The plaintiffs claimed that AT&T raised the price of wholesale inputs while simultaneously lowering its own retail prices, thereby generating a "squeeze" on plaintiffs' margins that hindered competition.  *Id.*  The Supreme Court held that the claim failed because AT&T had no antitrust duty to deal with the plaintiffs in the wholesale market at all.  "As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."  *Id.* at 448.  Thus, "if a firm has no antitrust duty to deal with its competitors at wholesale, it certainly has no duty to deal under terms and conditions that the rivals find commercially advantageous."  *Id.* at 450 (citing *Verizon Commc'ns. Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004)).

Terix's claim that Oracle *over*prices its firmware (an "input" that Terix alleges is necessary to its own hardware services) and then *under*prices its competing retail hardware support is in substance the same claim rejected in *linkLine*.  *See* TCC ¶¶ 54-55, 112-14.  And as a price squeeze claim, it would fail for the same reason that linkLine's claim failed:  because Oracle's pricing with respect to its proprietary firmware and updates is legally irrelevant unless Oracle has some "antitrust duty" to provide Terix with those products.  *See linkLine*, 555 U.S. at 450.  Terix does not allege such a duty.  Terix agrees that Oracle is the sole "licensor of

Sun/Oracle Hardware" and holds the "legal right . . . to create, test, and release Sun/Oracle Firmware."  TCC ¶ 23.  Oracle thus has the legal right to charge the full "monopoly" price for its copyrighted software, meaning whatever "the market will bear."  *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1226 (9th Cir. 1997) (reversing, in part, injunction that required manufacturer to sell replacement parts covered by intellectual property rights at "reasonable" prices).[8]

Terix also has no claim based on the allegedly low price of Oracle's hardware services. It is black-letter antitrust law that low prices, unless "predatory," are procompetitive and lawful. *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222 (1993) ("[A] plaintiff seeking to establish competitive injury resulting from a rival's low prices must prove that the prices complained of are below an appropriate measure of its rival's costs.").  To state a claim for predatory pricing, a plaintiff must allege and prove that (1) its rival's low prices were below its average variable costs; and (2) its rival had a "reasonable prospect . . . of recouping its investment in below-cost prices."  *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 898 (9th Cir. 2008) (internal quotations omitted).  Terix does not come close to pleading these elements.  Terix makes a conclusory allegation that the prices of Oracle's hardware services are "far below the actual cost," but alleges no facts to support that claim.  TCC ¶ 54.  And Terix alleges *nothing* with regard to whether Oracle could have recouped its supposed below-cost pricing.

Terix's strategy seems to be to avoid the daunting requirements of *linkLine* and *Cascade* altogether by styling its claim as "tying."  Antitrust law would never elevate form over substance like that, and there is no tie actually pleaded anyway.  Terix is not arguing that hardware support *becomes less expensive* if it is purchased in a package with software support.  If it were, one might ask whether the package price for the bundle of software and hardware support together is

---

[8]   In fact, if the market is working as it should, one would expect a higher price to prevail for those products protected by Oracle's copyright, and a lower price for those products that are not.  And that is precisely what Terix claims:  that Oracle charges more for its proprietary firmware and software updates and less for hardware "break/fix" support, a commoditized offering over which Oracle has no control.  TCC ¶ 54.

ORACLE'S MOTION TO DISMISS COUNTERCLAIMS
CASE NO. 5:13-cv-03385 PSG

"the only viable economic option" and thus an implicit tying arrangement.  *See, e.g.*, *Ortho Diagnostic Sys., Inc. v. Abbott Labs., Inc.*, 920 F. Supp. 455, 471 (S.D.N.Y. 1996) ("Ortho may prevail only if it establishes, in addition to the other elements of a tying violation, that Abbott's pricing structure makes purchase of the tying and tied products together the only viable economic option.").  Its complaint is that the cost to obtain hardware support (another 4% of the hardware cost per year) is too low.  That is not tying, but rather, as in *linkLine*, "nothing more than an amalgamation of a meritless claim at the retail level and a meritless claim at the wholesale level." *linkLine*, 555 U.S. at 452.

4.    Maintech's Tying Claim Fails Because Maintech Does Not Participate In The Alleged Tied Market (Tie 1)

Maintech alleges that Oracle "conditioned the purchase of patches, bug fixes and updates (the 'tying products') on the purchase of support packages for hardware and software running on Oracle/Sun systems (the 'tied products')."  MCC ¶ 47.  There is a fatal disconnect, however, between what Maintech alleges it does and its description of the alleged tie.  On the one hand, Maintech acknowledges that customers do not need to purchase what it sells—hardware support—to obtain access to Solaris updates.  They may instead purchase "a service package for *operating system support*."  MCC ¶ 32 (emphasis added).  That means the "tie" is at most to operating system support, not hardware support, which Maintech nevertheless contends is one of the products tied and which renders its claim defective.  Yet Maintech also strenuously denies participating in that operating system support market:

> As an ISO, Maintech provides hardware "break/fix" computer hardware support for its customers. Unlike Terix and some other ISOs, Maintech *does not directly provide any operating system or application software support for any OEM equipment to its customers*. . . . Maintech personnel are not authorized to perform operating system support of any kind for Oracle/Sun equipment or for the Solaris operating system, and Maintech does not train its personnel for such operating system support.  Any operating system support by Maintech personnel for Oracle/Sun systems or the Solaris operating system is not authorized by Maintech management, and if any, has been performed without the knowledge of management.

MCC ¶ 10 (emphasis added).

This is fatal to Maintech's claim.  Like all antitrust claims, Maintech must plead and prove that it suffered antitrust injury, meaning "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).  In the tying context, "[i]njury to the foreclosed rival occurs, of course, only because a tie has forced buyers to purchase the defendant's tied product rather than the rival's."  Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, § 1767a (2014).  Here, that has not happened because Maintech contends that it does not provide *any* services in the supposedly "tied" market for software support.  Thus, even if Maintech establishes that Oracle tied software services to its patches, bug fixes and updates, Maintech cannot possibly have been harmed.  Maintech's claim therefore fails.

> 5.      Defendants' Tying Claims Are Largely Time Barred (Ties 1, 2, 4)

Separate from the core market definition and other flaws discussed above, Defendants' tying claims are also largely time barred under the four-year statute of limitations that applies to both Sherman Act and Cartwright Act claims.  15 U.S.C. § 15b; Cal. Bus. & Prof. Code § 16750.1; *see also Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971) ("Generally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business.").  To be timely, these claims must have accrued no earlier than April 14, 2010.

Ties 1, 2 and 4 clearly arose before that date.[9]  Maintech and Terix both allege that these alleged ties arose either at the time Oracle's acquisition of Sun closed on January 27, 2010, or shortly thereafter.  Both Defendants allege that, at that time, Oracle announced a change in its policy that supposedly tied the availability of software updates and/or "critical" support services

---

[9]   Tie 3, Terix's claim regarding the provision of "Sun/Oracle Firmware," relies on allegations that are within the four-year statute of limitations period.  *See* TCC ¶ 53 ("Oracle turned off access to the free Solaris Firmware repository in Summer 2011 and now refuses to allow customers to obtain Sun/Oracle Firmware unless they also purchase Solaris Updates and Solaris Software Support Services from Oracle.").  Although that claim should be dismissed for the reasons discussed above, *supra* Part II.A.1., accepting Terix's allegations as true, the claim alleges conduct within the limitations period.

to its hardware and software service offerings.  TCC ¶¶ 1-2; MCC ¶¶ 22, 25.  This change went into effect no later than March 16, 2010—as Terix's counterclaims plainly allege.  TCC ¶ 33 ("Oracle's policies and actions clearly impact all Sun/Oracle Hardware and all Solaris Hardware, not merely Hardware purchased after March 16, 2010.").

Defendants' claims accrued at the moment they would have felt any harm from this alleged conduct.  *See Zenith Radio*, 401 U.S. at 338.  By their own allegations, this would have happened immediately after Oracle widely disseminated its alleged policy change regarding updates and support among the ISO community and customers.  *See* TCC ¶ 2.  The logic of the counterclaims is that, following this news, customers would have immediately made purchasing decisions for hardware and software support based on the implications of Oracle's new policy. ISOs, including Terix and Maintech, would have concurrently experienced the effects of those decisions.  Indeed, Terix alleges that "*[s]ince the beginning* of Oracle's campaign to destroy third party support providers, Oracle's share of the Solaris Support Services market has increased substantially."  TCC ¶ 62 (emphasis added).  Nevertheless, Defendants did not file their antitrust counterclaims until April 14, 2014—over four years later—and obviously then only because Oracle had sued them.

The four-year statute of limitations has expired.  Defendants cannot argue that their claims accrued at some later date, for example under the continuing violation theory articulated in *Zenith Radio*.  401 U.S. at 338.[10]  As the Ninth Circuit recently explained, to state a continuing violation, a party must allege that the violator completed an overt act during the limitations period that (1) is a "new and independent act that is not merely a reaffirmation of a previous act;" and (2) inflicts "new and accumulating injury on the [party]."  *Samsung*, 2014 U.S. App. LEXIS 6256, at *6-7 (internal quotation omitted).  Here, Defendants make no allegations of a new and independent act or injury related to Oracle's alleged Ties 1, 2, and 4 within the limitations

---

[10]  Defendants make no allegations that their harm was uncertain or speculative at the time of Oracle's policy change on March 16, 2010, and cannot therefore argue for a later accrual date on that basis, either.  *See Samsung Elecs. Co. v. Panasonic Corp.*, 2014 U.S. App. LEXIS 6256, at *12-13 (9th Cir. Apr. 4, 2014).

period.  Rather, they allege that Oracle made a global policy change between January and March 2010, and then consistently followed that new policy thereafter.  TCC ¶ 1 ("Since [January 27, 2010], Oracle has pursued a deliberate policy of attempting to eliminate competition . . . ."); MCC ¶ 25 ("In 2010, Oracle began putting in place new policies aimed at monopolizing the market for support for Sun hardware systems by taking business away from the ISOs.").  *See AMF, Inc. v. General Motors Corp. (In re Multidistrict Vehicle Air Pollution)*, 591 F.2d 68, 72 (9th Cir. 1979) (statute of limitations ran from when defendants "indicated clearly and irrevocably" their decision not to use AMF's devices for emission control).

Of course the alleged Ties 1, 2, and 4 continued into the limitations period and thus, according to Defendants, caused additional harm.  For example, Terix alleges that Oracle "implement[ed] and enforce[d] . . . the anticompetitive and illegal policies and procedures."  TCC ¶ 68.  That does not matter.  Any later injuries to Defendants "necessarily resulted from" and "were but unabated inertial consequences of" Oracle's pre-limitations policy change and, as such, do not revive the claim.  *See AMF*, 591 F.2d at 72 (internal quotations omitted).[11]

The timing of Defendants' antitrust counterclaims is no accident:  they were filed because (and only because) Defendants were sued by Oracle.  Defendants have known about Oracle's policy since shortly after the Sun acquisition in early 2010, and did not do anything about it until now.  As it happens, that delay renders time-barred all theories based on Ties 1, 2, and 4 found in Terix's Counterclaims 1, 2 and 3 and Maintech's Counterclaims 1, 2 and 3.

## B.      Defendants Fail To State A Claim For Monopolization

Terix alleges that Oracle attempted to monopolize or did monopolize the "market for Solaris Support Services," the "market for Non-Critical Server Solaris Support Services," and the

---

[11]  Defendants cannot argue that their counterclaims "relate back" to the date that Oracle filed its complaint because their counterclaims are permissive, not compulsory.  *See Employers Ins. of Wausau v. United States*, 764 F.2d 1572, 1576 (Fed. Cir. 1985) ("The institution of a plaintiff's suit suspends the running of limitations on a compulsory counterclaim while the suit is pending . . . . On the other hand, a permissive counterclaim does not generate a like tolling period.") (citations omitted); *see also Mattel, Inc. v. MGA Entm't, Inc.*, 782 F. Supp. 2d 911, 1044 (C.D. Cal. 2011) (citing *Employers Ins.*).

"market for Sun/Oracle Hardware Support Services" in violation of Section 2 of the Sherman Act.  TCC ¶ 92.  Maintech alleges that Oracle attempted to monopolize the market for "hardware and software support for Oracle/Sun computer systems."  MCC ¶ 75.  These claims also fail.

Terix's Section 2 claim relies exclusively on the tying conduct it alleges under Section 1.  TCC ¶ 91.  Its Section 2 allegations are thus insufficient for many of the reasons discussed above.  For example, Terix again asserts a supposed market for "Non-Critical Server Solaris Support Services" that, as discussed *supra*, is not adequately pleaded.  Because the Sherman Act's market requirement "appl[ies] identically" under Section 1 and Section 2, this also dooms Terix's claim under Section 2.  *See Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1044 n.3 (9th Cir. 2008) (noting that "market allegations are either sufficient or insufficient for" all Section 1 and Section 2 claims); *Psystar*, 586 F. Supp. 2d at 1195-96 ("'Failure to identify a relevant market is a proper ground for dismissing a Sherman Act claim'" (quoting *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001)).

Maintech's Section 2 claims are mostly a repeat of its tying claims, and to that extent would also fail.  Maintech's remaining theories under Section 2 fail because they are alleged in an entirely cursory fashion with little to no factual basis.  *See* MCC ¶ 75.  For example, Maintech alleges that Oracle's anticompetitive conduct includes "[b]ringing pretextual lawsuits against ISOs."  *Id.*  Not only is that claim devoid of even the most basic information Oracle would need to defend itself, it is also wholly insufficient under the law.  Lawsuits, as acts of petitioning the government, are "generally immune from antitrust liability."  *See Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56 (1993).  Indeed, filing a lawsuit can only implicate the antitrust laws if the lawsuit is "objectively baseless" and the litigant's "subjective motivation" consists of "an attempt to interfere *directly* with the business relationships of a competitor . . . through the use [of] the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon."  *Id.* at 60-61 (emphasis original; internal quotations omitted).  Maintech's bare allegation that Oracle's lawsuits are "pretextual" utterly fails to meet

this standard.[12]

Absent additional factual allegations or a more clear and cohesive theory, Defendants' allegations are insufficient to state a claim under Section 2.

### C.     Defendants Fail To State A Claim For Copyright Misuse

Defendants also allege that Oracle's conduct constitutes copyright misuse.  Maintech alleges that Oracle's "illegal tying and enforcement of support policies that deprive licensees to their rights to patches, bug fixes and updates" constitutes copyright misuse because "Oracle is attempting to use the Oracle Copyrights on the Solaris operating system in a manner adverse to the public policy behind the copyright laws."  MCC ¶ 104.  Terix similarly alleges that Oracle is "misusing Oracle's Claimed Copyrights by (among other things) attempting to leverage its copyright monopoly(ies) to monopolize and/or improperly restrain trade in one or more markets, contrary to the public policy in the copyright laws and to the detriment of both free competition and Oracle's competitors."  TCC ¶ 140.  Defendants make no effort to define what public policy they are relying on or how Oracle violates it.  But in any event, such allegations cannot support a copyright misuse defense.

The copyright misuse doctrine does not prohibit using conditions to control the use of a firm's copyrighted material.  *Apple Inc. v. Psystar Corp.*, 658 F.3d 1150, 1159 (9th Cir. 2011).  To the contrary, it is used "sparingly" and applies only where a copyright is used to stifle competition.  *Id.* at 1157.  To date, the Ninth Circuit has only upheld its application in situations where a customer is *prohibited* from using the products of any other competitors.  *See Practice Mgmt. Info. Corp. v. AMA*, 121 F.3d 516, 521 (9th Cir. 1997) (finding misuse where the copyright holder "[c]ondition[ed] the license on [the customer's] promise not to use competitors' products"); *see also Psystar*, 658 F.3d at 1157 (noting that the "decision in *Practice Management* is the only case in which we upheld a copyright misuse defense").

---

[12]   Notably, Oracle has obtained several judgments against other ISOs on virtually identical grounds to those asserted against Terix and Maintech here, including a case involving Maintech's counsel.  Oracle's Request For Judicial Notice, Exs. 1-3.  It is pure gamesmanship for Defendants' counsel to stipulate to a judgment on essentially the same theories, and then call such lawsuits "pretextual" and a violation of the antitrust laws.

ORACLE'S MOTION TO DISMISS COUNTERCLAIMS
CASE NO. 5:13-cv-03385 PSG

On the other hand, the Ninth Circuit has rejected copyright misuse theories on facts similar to those asserted here.  For example, in *Triad Systems Corp. v. Southeastern Express Co.*, the plaintiff (Triad) designed computers for use in the automotive industry, and licensed unique diagnostic software to service those computers.  64 F.3d 1330, 1333 (9th Cir. 1995).  The defendant was an independent service organization that serviced Triad computers.  *Id.*  Triad sued the defendant for copyright infringement, asserting that, in servicing Triad computers, the defendant necessarily copied Triad's proprietary software to the computer's random access memory and thereby infringed Triad's copyright.  *Id.*  Affirming a preliminary injunction, the Ninth Circuit rejected the defendant's copyright misuse claim because "Triad did not attempt to prohibit [the defendant] or any other ISO from developing its own service software to compete with Triad."  *Id.* at 1337.  As the Ninth Circuit recently explained, *Triad* stands for the proposition that a "software licensing agreement may reasonably restrict use of the software as long as it does not prevent the development of competing products."  *Psystar*, 658 F.3d at 1159.[13]

Defendants' allegations unquestionably fall short under these standards.  Defendants do not allege that Oracle prohibits its customers from accepting Solaris software or hardware services from Maintech, Terix or any other ISO.  Defendants also do not allege that Oracle prohibits Defendants from developing any "competing products" that might help them provide such services—except of course from infringing on products covered by Oracle's copyrights.  Indeed, Defendants' claims go no further than a bare assertion that Oracle's exercise of its right to license Solaris and Solaris Updates to customers "constitutes misuse."  MCC ¶ 104; *see also* TCC ¶ 140.  Absent alleged facts showing, for example, that Oracle prohibits customers from doing business with Defendants or otherwise restrains its licensees from participating in the

---

[13]  As noted in *Psystar*, the legislature subsequently changed the copyright law with respect to cases where an authorized copy of software is copied temporarily to a computer's memory as a necessary part of  providing service.  *Psystar*, 658 F.3d at 1159.  "Temporary copying" is certainly not what Oracle alleges in this case and, nonetheless, *Triad*'s core misuse holding remains the law of the Ninth Circuit.

software and hardware service markets in which Defendants compete, Defendants' claims for copyright misuse fail as a matter of law.

**D.    The Court Should Dismiss The Lanham Act Claims**

To sustain a Lanham Act false advertising counterclaim, Maintech and Terix must allege, among other things, that Oracle made a false or misleading representation of fact about its or another's product in a commercial advertisement or promotion. *See* 15 U.S.C. § 1125(a)(1)(B); *see also, e.g., Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997). To constitute commercial advertising or promotion, Oracle's statement must be commercial speech, made for the purpose of influencing consumers to buy Oracle's goods or services, and disseminated sufficiently to the relevant purchasing public. *See, e.g., Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 734-35 (9th Cir. 1999). Maintech and Terix's claims fail because they do not allege facts showing that Oracle made particular specific misrepresentations, that it made them as part of its commercial advertising, or that it disseminated them sufficiently to the relevant consumers. In addition, Maintech cannot recover for misstatements Oracle allegedly made about Terix.

**1.    Maintech and Terix Fail to Identify Oracle's Commercial Advertising**

Neither Maintech nor Terix alleges any facts about the commercial advertising or promotions in which Oracle's alleged misstatements appeared. Terix repeats three times that Oracle made the paraphrased misstatements in paragraphs 99-100 "in commercial advertising and promotion," and does not allege that the paraphrased misstatements in paragraph 69 were part of advertising *at all*. TCC ¶¶ 69, 98-100. Maintech alleges vaguely that Oracle made the alleged misstatements "in its marketing efforts." MCC ¶ 84. These allegations, just recitations of the Lanham Act element without supporting facts, are insufficient. *See supra* Section II; *see also, e.g., LT Int'l Ltd. v. Shuffle Master, Inc.*, 2014 WL 1248270, at *5 (D. Nev. Mar. 26, 2014).

**2.    Maintech and Terix Fail to Identify How Oracle Disseminated the Misstatements**

Next, neither Maintech nor Terix alleges facts showing that Oracle spread its alleged misstatements sufficiently to the relevant group of consumers. Terix says that Oracle made some

of the paraphrased statements to "customers," TCC ¶¶ 98-100, and others "to actual and potential

TERiX clients," TCC ¶ 69, while Maintech refers to marketing "directed to customer[s] and

potential customers of Maintech and Terix."  MCC ¶ 84.  Without at least some facts showing

who makes up the relevant group of customers, and how Oracle widely spread its misstatements

to that group, both Maintech's and Terix's claims fail.  *See, e.g., Chamilia, LLC v. Pandora

Jewelry, LLC*, 2007 WL 2781246, at *9 (S.D.N.Y. Sept. 24, 2007); *LT Int'l*, 2014 WL 1248270,

at *5.

>           3.           Maintech and Terix Fail to Identify Specific Misrepresentations

Moreover, Maintech and Terix paraphrase and generalize Oracle's alleged

misrepresentations, rather than identifying specific statements precisely.  Terix claims Oracle

made three categories of paraphrased false statements: that Terix falsely advertises itself as being

affiliated with Oracle, that Oracle provides Solaris Updates and Oracle/Sun Firmware only to

purchasers of annual support contracts, and that Terix and other providers cannot obtain Solaris

Updates and Oracle/Sun Firmware on a customer's behalf.  TCC ¶¶ 98-100.  Elsewhere, Terix

also alleges that Oracle has claimed that Terix uses improper parts in its support services, that

Terix traffics in Oracle access credentials, and that Oracle customers do not have rights to Solaris

Updates under Oracle licenses.  *See* TCC ¶ 69.  (Terix does not repeat these categories in its

actual Lanham Act claim.  *See* TCC ¶¶ 98-100.)  Meanwhile, Maintech alleges that Oracle has

made misrepresentations that "Maintech and Terix cannot provide legal and effective support

services for Oracle/Sun systems," as well as "regarding the importance of patches, bug fixes and

updates, the need for support agreements with Oracle in order to obtain these, and the inability of

ISOs such as Maintech and Terix to provide these legally."  MCC ¶ 83.

All of these allegations founder on the same issue: nowhere do Maintech or Terix identify

any *actual statements* made by Oracle or provide sufficient information to suggest that Oracle

made actual statements that meet the Lanham Act's requirements.  *See, e.g.*, *Incorp Servs., Inc. v.*

*IncSmart.biz, Inc.*, 2013 WL 394023, at *3 (N.D. Cal. Jan. 30, 2013).  Each claim describes

broad categories of statements, but a Lanham Act claim focuses on the falsity of specific

statements.  *See, e.g.*, *AccuImage Diagnostics Corp. v. TeraRecon, Inc.*, 260 F. Supp. 2d 941, 948-49 (N.D. Cal. 2003).  These summary allegations do not put Oracle on notice of the nature of Maintech's and Terix's claims and so do not pass *Twombly*'s minimum requirements.  *See supra* Section II.

> 4.    Maintech Cannot Base Its Claim on Alleged Misrepresentations About Terix

Maintech's claim also refers to, and relies on, Oracle's alleged misrepresentations about Terix.  *See* MCC ¶¶ 83-88 (referring to Oracle's misrepresentations about Terix).  Maintech does not have standing to bring a claim based on Oracle's alleged misrepresentations about Terix, because Maintech has not alleged facts showing that those misrepresentations proximately caused injury to *Maintech's* commercial interest in sales or business reputation.  *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1395 (2014).  Instead, Maintech must show "economic or reputational injury flowing directly from the deception wrought by the defendant's advertising . . . That showing is generally not made when the deception produces injuries to a fellow commercial actor that in turn affect the plaintiff."  *Id.* at 1391.

**E.    The Court Should Dismiss In Part Terix's Intentional Interference With Contract Claim**

To establish its claim for intentional interference with contract, Terix must allege (1) a valid contract between Terix and a third party, (2) Oracle's knowledge of that contract, (3) Oracle's intentional conduct designed to cause a breach or disruption of that contract, (4) actual breach or disruption, and (5) damages to Terix.  *See, e.g., Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990).

Although Terix mentions only one specific contract – that between Terix and BNYM – it refers to other unknown "valid and enforceable contracts with multiple Hardware owners."  TCC ¶ 121.  Terix cannot plead contracts in the abstract: it must identify the particular valid contracts with which it claims Oracle interfered, as well as Oracle's knowledge of those specific contracts. *Nexsales Corp. v. Salebuild, Inc.*, 2012 WL 216260, at *4 (N.D. Cal. Jan. 24, 2012); *Celebrity Chefs Tour, LLC v. Macy's, Inc.*, 2014 WL 1660674, at *7 (S.D. Cal. Apr. 25, 2014).  This

makes sense; Oracle cannot defend against the claim if Terix cannot identify which of its own existing contracts Oracle affected.  The Court should therefore dismiss the contract interference claim to the extent it relies on any other contract besides that between Terix and BNYM.

### F.    The Court Should Dismiss Maintech's Trade Libel Claim

To state a claim for trade libel, Maintech must allege Oracle intentionally, and falsely, disparaged the quality of Maintech's products or services, and thereby caused Maintech pecuniary harm.  *See, e.g.*, Restatement (Second) of Torts § 626; *Leonardini v. Shell Oil Co.*, 216 Cal. App. 3d 547, 572 (1989).  Since Maintech does not identify particular lost transactions or specific false statements, and appears to rely on privileged statements, the claim fails.

#### 1.    Maintech Fails to Identify Specific Lost Customers or Transactions

Maintech has not alleged, as it must, the particular customers and transactions it lost as a result of the statements.  MCC ¶ 90.  Maintech must allege specific lost sales, not a general decline in business, as well as facts showing that the false statements played "a material and substantial part in inducing" particular customers not to deal with Maintech.  *See Universal Grading Serv. v. eBay, Inc.*, 2011 WL 846060, at *9-*10 (N.D. Cal. Mar. 8, 2011); *Mann v. Quality Old Time Serv.*, 120 Cal. App. 4th 90, 109 (2004).  Since Maintech does not point to a single particular lost customer, *see* MCC ¶ 90, much less explain how the alleged false statements materially and substantially induced such a customer to refuse to deal with Maintech, the Court should dismiss the claim.

#### 2.    Maintech Fails to Identify Specific False Statements

As with its Lanham Act claim, Maintech fails to satisfy the specific statements requirement, referring vaguely instead to "false and disparaging statements about the services and business practices of Maintech."  MCC ¶ 90.  *See, e.g., Auvil v. CBS "60 Minutes,"* 67 F.3d 816, 822 (9th Cir. 1995); *Films of Distinction, Inc. v. Allegro Film Prods., Inc.*, 12 F. Supp. 2d 1068, 1082 (C.D. Cal. 1998).  Maintech does not refer to a single specific statement in its counterclaim, much less identify when Oracle made the statements, or to whom, or how. Without these facts, the Court should dismiss the claim.  *See, e.g., Eldorado Stone v.*

*Renaissance Stone, Inc.*, 2005 WL 5517731 at *3 (S.D. Cal. Aug. 10, 2005); *First Advantage Background Servs. Corp. v. Private Eyes, Inc.*, 569 F. Supp. 2d 929, 937 (N.D. Cal. 2008).

### 3.   Maintech Cannot Rely on Oracle's Legal Claims

The closest that Maintech comes to a specific, allegedly disparaging Oracle statement is a reference to Oracle's alleged statements that Maintech is "infringing Oracle's copyrights."  MCC ¶ 90.  To the best of Oracle's knowledge, given the lack of any detail in the allegations, these statements appear only in Oracle's pleadings in this lawsuit.  Maintech cannot base a trade libel claim on Oracle's statements in its Complaint and First Amended Complaint, as such statements are privileged.  *See Ludwig v. Superior Court*, 37 Cal. App. 4th 8, 21 (1995); *see also* Cal. Civ. Code 47(b)(2).

### G.   The Court Should Dismiss The Intentional Interference Claims

To state a claim for intentional interference with prospective economic advantage, a plaintiff must allege facts demonstrating (1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff, (2) the defendant's knowledge of that relationship, (3) the defendant acted intentionally to disrupt the relationship, by independently wrongful conduct, (4) actual disruption of the relationship, and (5) economic harm to the plaintiff proximately caused by the defendant's actions.  *See Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153-54 (2003).  Maintech and Terix's allegations about the affected relationships, and Oracle's wrongful conduct, fail these elements.

### 1.   Maintech and Terix Do Not Identify the Interfered-With Customers

While Maintech and Terix identify a few customers with which they claim Oracle specifically interfered, they also seek to recover for allegedly lost relationships with unidentified and unidentifiable customers.  *See* MCC ¶ 96; TCC ¶ 127.  But it is not enough to refer generally, as Maintech and Terix do here, to an unbounded and unknown group of potential customers, from which they hoped to benefit; Maintech and Terix must allege facts showing that there is a particular group of existing relationships that Oracle's conduct allegedly affected.  *See, e.g., AccuImage*, 260 F. Supp. at 956-57; *Blank v. Kirwan*, 39 Cal. 3d 311, 330-31 (1985).

Maintech and Terix, of course, know all about this requirement, as Maintech moved to dismiss Oracle's interference claim on the same grounds.  *See* Maintech Mot. To Dismiss, D.I. 23, at 31-32.  But Oracle alleged Maintech and Terix interfered with a knowable, and known, group of existing, identified customer relationships – Oracle's established hardware customers that became Maintech's and/or Terix's hardware support customers.  *See* Oracle's First Amended Complaint, D.I. 99, ¶¶ 1, 27-28, 48, 62, 102.  Here, by contrast, Maintech alleges Oracle interfered with its "hardware support customers," MCC ¶ 95, while Terix claims Oracle interfered with "multiple Hardware owners."  TCC ¶ 127.  Other than the few customers that Maintech and Terix identified, Oracle cannot tell *which customers are at issue* – were these Maintech or Terix customers that returned to Oracle for hardware support, or are they customers that might have become Maintech or Terix customers but did not because of the alleged interference?  As alleged, the claims simply refer to inchoate potential customers, for which Maintech and Terix cannot have had a legally recognized expectation of future benefit.  *See, e.g.*, *Reudy v. Clear Channel Outdoors, Inc.*, 693 F. Supp. 2d 1091, 1123 (N.D. Cal. 2010); *Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*, 42 Cal. App. 4th 507, 523 (Cal. 1996).

    2.  Maintech and Terix Do Not Specify Oracle's Independently Wrongful Acts

An interference plaintiff must allege that the defendant's interference with the customer relationship was independently wrongful, *i.e.*, outside the fact of interference itself.  *See Korea Supply*, 29 Cal. 4th at 1154.  Maintech states that Oracle's interference consisted of "threatening and coercing Maintech's customers with the purpose and intent of diverting the benefits and profits of such relationships away from Maintech to Oracle."  MCC ¶¶ 96.  That is a restatement of the interference claim, not an independently wrongful act.  *Batts v. Bankers Life & Cas. Co.*, 2014 WL 296925, at *4 (N.D. Cal. Jan. 27, 2014); *Tat Tohumculuk, A.S. v. H.J. Heinz Co.*, 2013 WL 6070483, at *6 (E.D. Cal. Nov. 14, 2013).  Terix similarly alleges only that Oracle acted "in violation of statutes, recognized rules of common law, and/or an established standard of a trade or profession."  TCC ¶ 131.  This rote pleading does not pass muster.  *See supra* Section II.

**H.    The Court Should Dismiss The Unfair Competition Claims**

Terix and Maintech's claims under California Business and Professions Code section 17200 piggyback off their other counterclaims.  *See* TCC ¶¶ 134, 135 ("Oracle's conduct described above" violates section 17200); MCC ¶¶ 99, 100 (similar).  Neither section 17200 claim pleads any additional facts or different legal theories from Maintech or Terix's other claims.

Where, as here, a claim "for relief under the unfair competition law" is "incidental to and depend[s] upon the validity . . . of the preceding claims for relief," the section 17200 claim "stand[s] or fall[s] on the fate of the antecedent substantive causes of action."  *Krantz v. BT Visual Images, L.L.C.*, 89 Cal. App. 4th 164, 179 (2001); *see also Graham v. U.S. Bank, N.A.*, 2013 WL 2285184, *8 (N.D. Cal. May 23, 2013) (similar).  Accordingly, if the Court dismisses Terix and Maintech's other counterclaims, it should dismiss the section 17200 claim as well.

**III.    CONCLUSION**

For these reasons, Defendants respectfully request that the Court dismiss with prejudice all counterclaims asserted by Defendants.

Dated:  May 12, 2014                    Respectfully submitted,


By:  _____/s/ Geoffrey M. Howard_____
                    Geoffrey M. Howard

BINGHAM MCCUTCHEN LLP
Three Embarcadero Center
San Francisco, CA  94111-4067
Telephone: 415.393.2000
Facsimile:  415.393.2286
Geoff.howard@bingham.com

LATHAM & WATKINS LLP
Daniel M. Wall (SBN 102580)
Christopher B. Campbell (SBN 254776)
505 Montgomery Street, Suite 2000
San Francisco, California  94111-6538
Telephone:  415.391.0600
Facsimile:   415.395.8095
dan.wall@lw.com
christopher.campbell@lw.com

Attorneys for Plaintiffs
Oracle America, Inc. and Oracle International Corporation