1   Valerie M. Wagner, CA State Bar No. 173146
    Jill F. Kopeikin, CA State Bar No. 160792
2   GCA LAW PARTNERS LLP
    2570 W. El Camino Real, Suite 510
3   Mountain View, CA 94040
    Tel:  (650) 428-3900
4   Fax:  (650) 428-3901
    jkopeikin@gcalaw.com
5   vwagner@gcalaw.com

6
    Janella K. Simpson, CA State Bar No. 86476
7   MAINTECH INCORPORATED
    VOLT DELTA RESOURCES LLC
8   2401 North Glassell Street, 2nd Floor
    Orange, CA 92865
9   Tel: (714) 921-5416
    jsimpson@volt.com
10
    Attorneys for Defendants and Counterclaimants
11  MAINTECH INCORPORATED and
    VOLT DELTA RESOURCES, LLC

12              UNITED STATES DISTRICT COURT

13            NORTHERN DISTRICT OF CALIFORNIA

14                   SAN JOSE DIVISION

15
    ORACLE AMERICA, INC., a Delaware         Case No.:  5:13-cv-03385-PSG
16  corporation;  ORACLE
    INTERNATIONAL CORPORATION, a             OPPOSITION OF MAINTECH
17  Delaware corporation,                    INCORPORATED AND VOLT DELTA
                                             RESOURCES, LLC TO ORACLE'S
18                  Plaintiffs,              MOTION TO DISMISS DEFENDANTS'
                                             COUNTERCLAIMS
19        v.

20  TERIX COMPUTER COMPANY, INC., a          Date:      June 24, 2014
    California corporation; MAINTECH         Time:      10:00 a.m.
21  INCORPORATED, a Delaware                 Courtroom: 5, 4th Floor
    corporation; VOLT DELTA                  Judge:     Hon. Paul S. Grewal
22  RESOURCES, LLC, a Nevada limited
    liability company; SEVANNA
23  FINANCIAL, INC., a Nevada corporation;
    WEST COAST COMPUTER
24  EXCHANGE, INC., a Nevada corporation
    and DOES 1- 50,
25
                  Defendants.
26

27

28

GCA Law Partners LLP
2570 W. El Camino Real
Suite 510
Mountain View, CA  94043
(650)428-3900

OPPOSITION OF MAINTECH INCORPORATED AND VOLT DELTA RESOURCES, LLC TO
MOTION TO DISMISS DEFENDANTS' COUNTERCLAIMS; CASE NO. 5:13-CV-03385-PSG

1

# TABLE OF CONTENTS

2

Page No.

3    I.       INTRODUCTION ............................................................................    1

4    II.      STANDARDS FOR A MOTION TO DISMISS UNDER RULE 12(B)(6) ......    1

5    III.     MAINTECH HAS STATED CLAIMS FOR ILLEGAL TYING .....................    3

6            A. Tying Under the Sherman Act…………………………….………    3

7            B. Trying under the Cartwright Act........................................................    5

8            C. Aftermarket Tying under the Supreme Court's Decision in *Kodak* ..    5

9            D. Maintech Has Alleged All Elements of a Tying Claim.....................    8

10           E. There is a Separate Tying Market for Updates, Patches and Bug

11               Fixes …………………………………………………………    9

12           F. Maintech Alleged that It Competes in the Tied Market …………….    13

13           G. Maintech's Tying Claims are Not Time Barred ...............................    13

14   IV.      MAINTECH HAS ALLEGED ATTEMPTED

15            MONOPOLIZATION ......................................................................    15

16   V.       MAINTECH HAS STATED A CLAIM FOR COPYRIGHT MISUSE............    16

17   VI.      MAINTECH HAS STATED A CLAIM UNDER THE LANHAM ACT ........    17

18           A. The Court Need Not Even Reach the Merits: The Doctrine of

19               Judicial Estoppel Should Bar Oracle's Motion to Dismiss ...............    18

20               (1). Pleading Specific False Statements .............................................    19

21               (2). the Application of Rule 9(b) to Lanham Act Claims.................    19

22           B. Maintech Identified Specific False Commercial Promotions by

23               Oracle .............................................................................................    20

24           C. Maintech Has Alleged the Dissemination of False

25               Statements to Customers, and the Sufficiency of These

26               Allegations are Jury Issues .............................................................    21

27           D. Maintech Can Rely Upon *All* False Advertising from Which

28               Injury Flows.....................................................................................    21

GCA Law Partners LLP
2570 W. El Camino Real, Suite 510
Mountain View, CA 94040
(650)428-3900

1

VII.     MAINTECH HAS STATED A CLAIM FOR TRADE LIBEL ........................ 22

VIII.   MAINTECH HAS STATED A CLAIM FOR INTENTIONAL
INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE ......... 23

       A. Maintech Identified "Interfered With Customers"
          and Interference ................................................................................. 23

       B. Maintech Alleged "Independently Wrongful Acts" by Oracle .......... 24

IX.     MAINTECH HAS STATED A CLAIM FOR UNFAIR COMPETITION ....... 24

X.      CONCLUSION ................................................................................................. 25

GCA Law Partners LLP
2570 W. El Camino Real, Suite 510
Mountain View, CA 94040
(650)428-3900

1

**TABLE OF AUTHORITIES**

2

<u>Cases</u>                                                                                                                Page No.

3

*Airweld, Inc. v. Airco, Inc.,*

4
     742 F.2d 1184 (9th Cir. 1984) ................................................................ 14

5

*Anthony v. Yahoo! Inc.*

6
     421 F. Supp. 2d 1257 (N.D. Cal. March 17, 2006) ............................... 2

7

*Apple v. Pystar Corp.,*

8
     658 F.3d 1150 (9th Cir. 2011) ..................................................... 5, 16, 17

9

*Arizona v. Shamrock Foods Co.,*

10
     729 F.2d 1208 (9th Cir. 1984) ............................................................... 19

11

*Aurora Enterprises, Inc. v. National Broadcasting Co.,*
     688 F.2d 689 (9th Cir. 1982) ................................................................ 14

12

*Avaya, Inc. v. Telecom Labs, Inc.,*

13
     2008 WL 4117957 (D.N.J. Aug. 29, 2008) .......................................... 3, 16

14

*Balistrieri v. Pacifica Police Dept.,*

15
     901 F.2d 696, 699 (9th Cir. 1990) ......................................................... 2

16

*Betaseed, Inc. v. U and I, Inc.,*

17
     681 F.2d 1203 (9th Cir. 1982) ............................................................... 4

18

*Business Elecs. Corp. v. Sharp Elecs. Corp.,*

19
     485 U.S. 717 (1988) ............................................................................. 2, 3

20

*Balistreri v. Pacifica Police Dept.,*
     901 F.2d 696 (9th Cir. 1990) ................................................................ 2

21

*Cascade Health Solutions v. PeaceHealth,*

22
     515 F.3d 883 (9th Cir. 2008) ................................................................ 3, 4

23

*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.,*

24
     20 Cal. 4th 163 (1999) ......................................................................... 25

25

*Classen v. Weller,*

26
     145 Cal. App. 3d 27 (1983) .................................................................. 5

27

*Coastal Abstract Serv., Inc. v. First Am. Title Co.,*

28
     173 F.3d 725 (9th Cir. 1999) ................................................................ 20, 21

GCA Law Partners LLP
2570 W. El Camino Real, Suite 510
Mountain View, CA 94040
(650)428-3900

*Conley v. Gibson,*
    355 U.S. 41 (1957) ................................................................. 2

*Continental T.V., Inc. v. GTE Sylvania Inc.,*
    433 U.S. 36 (1977) ................................................................. 2, 3

*County of Tuolumme v. Sonora Community Hosp.,*
    236 F.3d 1148 (9th Cir. 2001) ........................................... 4

*Datel Holdings Ltd. v. Microsoft Corp,*
    *712 F. Supp. 2d 974 (N.D. Cal. 2010)*.................................... 8

*DCD Programs, Ltd. v. Leighton,*
    833 F.2d 183 (9th Cir. 2006) ............................................. 3

*Digital Equip. Corp. v. Uniq Digital Tech., Inc.,*
    73 F.3d 756 (7th Cir. 1996) ............................................... 5

*Doe v. United States,*
    58 F.3d 494 (9th Cir. 1995) ............................................... 2

*Eastman Kodak Co. v. Image Technical Services, Inc.,*
    504 U.S. 451 (1992) .......................................................... *passim*

*Edwards v. Arthur Anderson LLP*
    *44 Cal.4th 937, 944 (2008).* ............................................. 24

*Eminence Capital, LLC v. Aspeon, Inc.,*
    316 F.3d 1048 (9th Cir. 2003) ........................................... 22

*Erlich v. Etner,*
    *224 Cal. App. 2d 69 (1964)* ............................................... 2, 3

*Gen. Conf. Corp. of Seventh Day Adventists v. Seventh Day Adventist
Congregational Church,*
    877 F.2d 2285 (9th Cir. 1989) ........................................... 2

*Gonzalez v. Allstate Insurance Co.,*
    2005 WL 5891935 (C.D. Cal. Aug. 2, 2005) ...................... 21

*Grumman Systems Support Corp. v. Data General Corp.*
    *125 F.R.D. 160 (N.D. Cal. 1998).*
    ........................................................................................ 15

GCA Law Partners LLP
2570 W. El Camino Real, Suite 510
Mountain View, CA 94040
(650)428-3900

*GSI Technology v. United Memories, Inc.,*
    2014 WL 1572358 (April 18, 2014) ................................................................ 24, 25

*Incorp. Servs. Inc. v. IncSmart,biz, Inc.,*
    2013 WL 394023 (N.D. Cal. Jan. 30, 2013) ........................................... 20

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde,*
    466 U.S. 2 (1984) ................................................................ 4, 6

*Korea Supply Co. v. Lockheed Martin Corp.,*
    29 Cal. 4th 1134 (2003) ................................................................ 23, 24

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
    134 S. Ct. 1377 (March 25, 2014) ................................................... 21

*Lozano v. AT&T Wireless Servs. Inc.,*
    504 F.3d 718 (9th Cir. 2007) ................................................... 25

*LT Int'l Ltd. v. Shuffle Master, Inc.,*
    2014 WL 1248270 (D. Nev. Mar. 26, 2014) ........................................... 20

*Ludwig v. Superior Court,*
    37 Cal. App. 4th 8 (1995) ................................................... 22

*MacDonald v. Ford Motor Co.,*
    2014 WL 1340339 (N.D. March 31, 2014) ........................................... 25

*MGA Entertainment, Inc. v. Mattel, Inc.,*
    2012 WL 569389 (C.D. Cal. Feb.. 21, 2012) ........................................... 15

*Morrison v. Viacom, Inc.,*
    66 Cal. App. 4th 534 (1998) ................................................... 5

*National Soc'y of Prof'l Eng'rs v. United States,*
    435 U.S. 679 (1978) ................................................... 4

*Newcal Indus., Inc. v. IKON Office Solution,*
    *513 F.3d 1038, 1049 (9th Cir. 2008)* ................................................... 7

*Northern Pacific R.R. Co. v. United States,*
    356 U.S. 1 (1958) ................................................... 4

*Oracle America, Inc. v. Service Key, LLC,*
    N.D. Cal. Case No. 4:12-cv-00790-SBA ........................................... 15

GCA Law Partners LLP
2570 W. El Camino Real, Suite 510
Mountain View, CA 94040
(650)428-3900

*Oracle America, Inc. v. Stratiscom, LLC,*
     N.D. Cal. Case No. 3:14-cv-0356-CRB ................................................. 15

*Pace Industries, Inc. v. Three Phoenix Co.,*
     813 F.2d 234 (9th Cir. 1987) ................................................................. 14

*Paladin Assocs., Inc. v. Mont. Power Co.,*
     328 F.3d 1145 (9th Cir. 2003) ............................................................... 3

*Pochiro v. Prudential Ins. Co. of America*
     827 F.2d 1246 (9th Cir. 1987) ............................................................... 15

*Practice Mgmt. Info. Corp. v. Am. Med. Ass'n.,*
     121 F.3d 516 (9th Cir. 1997) ................................................................. 16

*Qad, Inc. v. ALN Associates, Inc.,*
     770 F. Supp. 1261 (N.D. Ill. 1991) ...................................................... 15

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.,*
     124 F.3d 430 (3rd Cir. 1997) ............................................................. 7, 16

*Red Lion Med. Safety, Inc v. Ohmeda, Inc,*
     63 F. Supp 2d 1218 (E.D. 1999)............................................................. 7

*Reeves v. Hanlon,*
     33 Cal. 4th 1140 (2004) ......................................................................... 24

*Rick-Mik Enters. v. Equilon Enters.,*
     532 F.3d 963 (9th Cir. 2008) ................................................................. 4

*Rockwell Int'l Corp. v. Hanford Atomic Metal Trades Council,*
     851 F.2d 1208 (9th Cir. 1988) ............................................................... 19

*Russell v. Rolfs,*
     893 F.2d 1033 (9th Cir. 1990) ............................................................... 19

*Samsung Electronics Co., Ltd. v. Panasonic Corp.,*
     747 F.3d 1199 (9th Cir. 2014) ............................................................... 14

*Simpson Strong-Tie Co. v. Gore,*
     162 Cal. App. 4th 737 (2008) ............................................................... 20

*Smith v. eBay Corp.,*
     2012 WL 27718 (N.D. Cal. Jan. 5, 2012) ............................................. 14

GCA Law Partners LLP
2570 W. El Camino Real, Suite 510
Mountain View, CA 94040
(650)428-3900

*Spectrum Sports v. McQuillan,*
    506 U.S. 447 (1993) ....................................................................... 16

*Triad Systems Corp. v. Southeastern Express Co.,*
    64 F.3d 1330 (9th Cir. 1995) ...................................................... 17

*United States v. Brown Univ.,*
    5 F.3d 658 (3d Cir. 1993) .............................................................. 3

*United States v. Grinnell Corp.,*
    384 U.S. 563 (1966) ................................................................. 14, 15

*United States v. Redwood City,*
    650 F.3d 963 (9th Cir. 1981) ......................................................... 2

*United States v. Webb,*
    655 F.2d 977 (9th Cir. 1981) ......................................................... 3

*Van Buskirk v. Cable News Network, Inc.,*
    284 F.3d 977 (9th Cir. 2002) ......................................................... 2

*Visto Corp. v. Sproquit Technologies, Inc.,*
    360 F. Supp. 2d 1064, 1067 (N.D. Cal. Mar. 17, 2005) ................. *

*Virtual Maintenance, Inc. v. Prime Computer, Inc.,*
    11 F.3d 660 (9th Cir. 1994) ........................................................... 7

*White Motor Co. v. United States,*
    372 U.S. 253 (1963) ....................................................................... 4

*Zeinith Radio Corp. v. Hazeltine Research, Inc.,*
    401 U.S. 321 (9th Cir. 1971) ....................................................... 14


**Statutes**                                                  Page No.

15 U.S.C. § 1 (SHERMAN ACT) .............................................................. Passim

15 U.S.C. § 2 (SHERMAN ACT) .............................................................. Passim

15 U.S.C. § 1125 (LANHAM ACT) ........................................................... Passim

17 U.S.C. § 117(C) .................................................................................. 15

California Business & Professions Code § 16720 (Cartwright Act) ...................... 5

GCA Law Partners LLP
2570 W. El Camino Real, Suite 510
Mountain View, CA 94040
(650)428-3900

California Business & Professions Code § 17200.................................................. 23, 24, 25

Cal. Civ. Code § 47(b) ........................................................................... 21


**<u>Rules</u>**                                                                    <u>Page No.</u>

Federal Rules of Civil Procedure 12(b)(6)                                            1, 2

Federal Rules of Civil Procedure 13(a) .............................................................   15

Federal Rules of Civil Procedure 9(b) .............................................................   19


**<u>Miscellaneous</u>**                                                            <u>Page No.</u>

Moore's Federal Practice, Page 405 at 238-42 (2nd Ed. 1988)...............................   19

GCA Law Partners LLP
2570 W. El Camino Real, Suite 510
Mountain View, CA 94040
(650)428-3900

1    **I.      INTRODUCTION.**

2              Defendants and Counterclaimants Maintech Incorporated ("Maintech") and Volt Delta

3    Resources LLC ("Volt Delta") (collectively "Maintech") oppose the Motion to Dismiss

4    Defendants' Counterclaims of Plaintiffs and Counter-Defendants Oracle America, Inc. and

5    Oracle International Corporation (collectively "Oracle") on the grounds that this Court should

6    deny it – Maintech's allegations are sufficient to state the claims for relief in the

7    counterclaims.  Oracle attempts to turn is motion to dismiss in to motion for summary

8    judgement, but one that is not even based on an evidentiary record, but instead on Oracle's

9    averments of fact that are nowhere to be found in the record on this motion.  This Court

10   should deny Oracle's motion as to Maintech's counterclaims in its entirety.

11             In addition to its wholesale factual assumptions based on a nonexistent evidentiary

12   record, which would be inappropriate on a Rule 12(b)(6) motion in any event, Oracle seeks to

13   have this Court apply heightened pleading standards to virtually every claim – and in the case

14   of the Lanham Act counterclaim, pleading standards that Oracle opposed with respect to the

15   motions to dismiss its Complaint.  This Court should stick to the law, and the facts as pled,

16   and reject Oracle's efforts to apply Rule 9 like pleading standards to claims for relief that do

17   not require such specificity.

18             The gravamen of Maintech's counterclaims, and those of Defendant and

19   Counterclaimant Terix Computer Company, Inc. ("Terix"), is that Oracle has systematically

20   engaged in monopolistic, misleading and unfair business conduct in a concerted effort to force

21   independent service organizations ("ISOs") out of the market for support services on Oracle

22   computer systems.  Oracle's conduct has been wrongful and this Court should allow the

23   counterclaims to proceed.  In the event the Court determines that any of Maintech's

24   counterclaims are subject to dismissal, it should be without prejudice and with leave to

25   amend.

26   **II.     STANDARDS FOR A MOTION TO DISMISS UNDER RULE 12(B)(6).**

27             A motion to dismiss under Rule 12(b)(6) is a challenge to the pleadings in which the

28   moving party asserts that the pleading "fails to state a claim upon which relief can be

GCA Law Partners LLP
2570 W. El Camino Real
Suite 510
Mountain View, CA  94043
(650)428-3900

OPPOSITION OF MAINTECH INCORPORATED AND VOLT DELTA RESOURCES, LLC TO
MOTION TO DISMISS DEFENDANTS' COUNTERCLAIMS; CASE NO. 5:13-CV-03385-PSG          1

granted." Fed. R. Civ. Proc. 12(b)(6). A complaint may properly be dismissed only when it "exhibits a lack of cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Anthony v. Yahoo! Inc.,* 421 F.Supp.2d 1257, 1260 (N.D. Cal. 2006) (internal quotations omitted). When ruling on a motion under Rule 12(b)(6), the court must accept all material allegations in the complaint as true and construe them in the light most favorable to the moving party. *Balistrieri v. Pacifica Police Dept.,* 901 F.2d 696, 699 (9th Cir. 1990). Furthermore, all inferences reasonably drawn from the facts pled must be construed in favor of the claimant. *Gen. Conference Corp. of Seventh Day Adventists v. Seventh Day Adventist Congregational Church*, 877 F.2d 228, 230 (9th Cir. 1989). A court must not dismiss a complaint for failure to state a claim unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *see also United States v. Redwood City*, 650 F.3d 963, 966 (9th Cir. 1981). Because a motion under Rule 12(b)(6) focuses on the sufficiency of the claims, and not their substantive merit, "[o]rdinarily a court may only look at the face of the complaint to decide a motion to dismiss." *Van Buskirk v. Cable News Network, Inc.,* 284 F.3d 977, 980 (9th Cir. 2002). Courts apply two methods to evaluate claims under the Sherman Act: the "*per se* rule" and the "rule of reason." Under the *per se* rule, certain conduct is considered "'manifestly anticompetitive'" and is presumed to be unreasonable. *See, e.g., Business Elecs. Corp. v. Sharp Elecs. Corp.,* 485 U.S. 717, 723 (1988) ("*per se* rules are appropriate only for 'conduct that is manifestly anticompetitive' ") (*quoting Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 50 (1977)).

If a court dismisses a complaint for failure to state a claim, it should grant, "with extreme liberality," leave to amend "unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995); *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051-1052 (9th Cir. 2003) (internal citations omitted). The Ninth Circuit has dictated that "[i]n exercising its discretion, 'a court must be guided by the underlying purpose of Rule 15 – to facilitate decision on the merits rather than on the pleadings or technicalities.'" *DCD Programs, Ltd. v. Leighton*, 833

GCA Law Partners LLP
2570 W. El Camino Real
Suite 510
Mountain View, CA  94043
(650)428-3900

OPPOSITION OF MAINTECH INCORPORATED AND VOLT DELTA RESOURCES, LLC TO
MOTION TO DISMISS DEFENDANTS' COUNTERCLAIMS; CASE NO. 5:13-CV-03385-PSG                    2

F.2d 183, 186 (9th Cir. 2006) (*quoting United States v. Webb*, 655 F.2d 977, 79 (9th Cir.

1981)).  "Dismissal with prejudice and without leave to amend is not appropriate unless it is

clear on de novo review that the complaint could not be saved by amendment.  *Eminence*

*Capital, LLC v. Aspeon, Inc., 316 F.3d at 1052.*

## III.   MAINTECH HAS STATED CLAIMS FOR ILLEGAL TYING.

### A.   Tying Under the Sherman Act.

Section 1 of the Sherman Act prohibits any "contract, combination in the form of trust

or otherwise, or conspiracy, in the restraint of trade or commerce . . .."  15 U.S.C. § 1.  Courts

apply two methods to evaluate claims under the Sherman Act: the "per se rule" and the "rule

of reason."  Under the per se rule, certain conduct is considered "'manifestly

anticompetitive'" and is presumed to be unreasonable.  *See, e.g., Business Elecs. Corp. v.*

*Sharp Elecs. Corp.*, 485 U.S. 717, 723 (1988) ("per se rules are appropriate only for 'conduct

that is manifestly anticompetitive' ") (*quoting Continental T.V., Inc. v. GTE Sylvania Inc.*,

433 U.S. 36, 50 (1977)).  In the case of conduct that falls short of being *per se*

anticompetitive, courts apply the more involved "rule of reason" analysis that looks at the

effect of a restraint of trade on competition in a relevant market.  *See, e.g. Avaya, Inc. v.*

*Telecom Labs, Inc.*, 2008 WL 4117957, *8 (D.N.J. Aug. 29, 2008) (*citing Continental T.V.,*

*Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 49 (1977); *United States v. Brown Univ.,* 5 F.3d 658,

672 (3d Cir.1993)).

The Ninth Circuit has defined a tying arrangement as "a device used by a seller with

market power in one product market to extend its market power to a distinct product market.

To accomplish this objective, the seller conditions the sale of one product (the tying product)

on the buyer's purchase of a second product (the tied product)."  *Cascade Health Solutions v.*

*PeaceHealth*, 515 F.3d 883, 912 (9th Cir. 2008) (*citing Paladin Assocs., Inc. v. Mont. Power*

*Co.,* 328 F.3d 1145, 1159 (9th Cir.2003) and *Eastman Kodak Co. v. Image Technical*

*Services, Inc.,* 504 U.S. 451, 461 (1992)).  In *Cascade* Health, the Ninth Circuit recognized

that "the Supreme Court has condemned tying arrangements when the seller has the market

power to force a purchaser to do something that he would not do in a competitive market."

GCA Law Partners LLP
2570 W. El Camino Real
Suite 510
Mountain View, CA  94043
(650)428-3900

OPPOSITION OF MAINTECH INCORPORATED AND VOLT DELTA RESOURCES, LLC TO
MOTION TO DISMISS DEFENDANTS' COUNTERCLAIMS; CASE NO. 5:13-CV-03385-PSG        3

*Cascade Health,* 515 F.3d at 915 (*citing Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 17 (1984).

Under Ninth Circuit and Supreme Court precedent, a tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Kodak*, 504 U.S. at 461 (quoting *Northern Pacific R.R. Co. v. United States*, 356 U.S. 1, 5-6 (1958)). A tying arrangement is a *per se* violation if: (1) the seller possesses appreciable economic power in the tying product market; (2) the alleged arrangement affects a substantial volume of commerce in the tied market; (3) the two products (in this case, a product and service) are distinct; and (4) the defendant actually tied the sale of the two products. *Kodak*, 504 U.S. at 462; *see Jefferson Parish*, 466 U.S. at 15-16. Without market power in the tying product, a tying arrangement will violate the Rule of Reason if the claimant can show that the tying arrangement harmed competition in a relevant market. *White Motor Co. v. United States,* 372 U.S. 253, 262-63 (1963); *Northern Pacific Rwy. Co. v. United States,* 356 U.S. 1, 6-7 (1958); *see also Betaseed, Inc. v. U and I, Inc.*, 681 F.2d 1203, 1229 (9th Cir. 1982).

A claim for *per se* tying in the Ninth Circuit must allege: "(1) that the Defendant tied together the sale of two distinct products or services; (2) that the Defendant possesses enough economic power in the tying product market to coerce its customers into purchasing the tied-product; and (3) that the tying arrangement affects a 'not insubstantial volume of commerce' in the tied-product market." *See Rick-Mik Enters. v. Equilon Enters., LLC,* 532 F.3d 963, 971 (9th Cir. 2008) (*quoting Cascade Health Solutions,* 515 F.3d at 912). Even if a tying arrangement is not *per se* illegal, "it must still be assessed for invalidity under the rule of reason" by evaluating whether the "'challenged agreement is one that promotes competition or one that suppresses competition.'" *County of Tuolumne v. Sonora Community Hosp.*, 236 F.3d 1148, 1158 (9th Cir. 2001) (quoting *National Soc'y of Prof'l Eng'rs v. United States,* 435 U.S. 679, 692 (1978)).

GCA Law Partners LLP
2570 W. El Camino Real
Suite 510
Mountain View, CA  94043
(650)428-3900

OPPOSITION OF MAINTECH INCORPORATED AND VOLT DELTA RESOURCES, LLC TO
MOTION TO DISMISS DEFENDANTS' COUNTERCLAIMS; CASE NO. 5:13-CV-03385-PSG          4

**B.      Tying under the Cartwright Act.**

Tying can also constitute a *per se* violation of the Cartwright Act, California Business & Professions Code section 16720.  "The elements of a *per se* tying arrangement violative of section 16720 are: '(1) a tying agreement, arrangement or condition existed whereby the sale of the tying product was linked to the sale of the tied product or service; (2) the party had sufficient economic power in the tying market to coerce the purchase of the tied product; (3) a substantial amount of sale was affected in the tied product; and (4) the complaining party sustained pecuniary loss as a consequence of the unlawful act." *Classen v. Weller*, 145 Cal. App. 3d 27, 37-38 (1983).  California courts can look to federal cases regarding tying under the Sherman Act as "useful when addressing issues arising under section 16720." *Morrison v. Viacom, Inc.*, 66 Cal. App. 4th 534, 541 (1998).

**C.      Aftermarket Tying under the Supreme Court's Decision in *Kodak*.**

Oracle's Motion (at page 10) devotes only one paragraph to the most prominent case on tying under the Sherman Act, a case originating in this District that specifically addressed a hardware maintenance aftermarket relating to a single brand of equipment, *Eastman Kodak Co. v. Image Technical Services, Inc.,* 504 U.S. 451.  This is no mistake; the *Eastman Kodak* case is fatal to Oracle's Motion.  In the *Kodak* case, ISOs who had been servicing Kodak photocopiers sued Kodak over its "policy of selling replacement parts . . . only to buyers of Kodak equipment who use Kodak service or repair their own machines." *Id.* at 458.

The ISOs alleged that "Kodak had unlawfully tied the sale of service for Kodak machines to the sale of parts, in violation of § 1 of the Sherman Act, and had unlawfully monopolized and attempted to monopolize the sale of service for Kodak machines, in violation of § 2 of that Act." *Id.* at 459.  Unlike the decisions relied upon by Oracle – *Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1199 (N.D. Cal. 2008), and *Digital Equip. Corp. v. Uniq Digital Techs, Inc.*, 73 F.3d 756 (7th Cir. 1996) – the ISOs in *Kodak* were not alleging a tying arrangement between computer hardware and operating system, but like Maintech, the tying of the derivative market for software parts with the market for support services.  *Id.*

GCA Law Partners LLP
2570 W. El Camino Real
Suite 510
Mountain View, CA  94043
(650)428-3900

OPPOSITION OF MAINTECH INCORPORATED AND VOLT DELTA RESOURCES, LLC TO
MOTION TO DISMISS DEFENDANTS' COUNTERCLAIMS; CASE NO. 5:13-CV-03385-PSG          5

In *Kodak*, the Supreme Court first looked at the issue raised in Oracle's Motion, *i.e.*, whether parts and service, the allegedly tying and tied markets, were "two distinct products." *Id.* at 462.  The Supreme Court held that for separate markets to exist in such cases, there "must be sufficient consumer demand so that it is efficient for a firm to provide service separately from parts."  *Id.* at 463 (*citing Jefferson Parish Hospital Dist. No. 2 v. Hyde,* 466 U.S. 2, 21–22 (1984)).  In evaluating this issue, the Supreme Court found it significant that Kodak had at one time sold parts and service separately, and had subsequently changed its policy.  The Court also noted that, "[i]ndeed, ***the development of the entire high-technology service market is evidence of the efficiency of a separate market for service***."  *Id.* (emphasis added).  The Court rejected Kodak's argument that there was a single, unified market for parts and service, finding that "[a]t least some consumers would purchase service without parts, because some service does not require parts, and some consumers, those who self-service for example, would purchase parts without service."  *Id.*

The Supreme Court next examined "the other necessary feature of an illegal tying arrangement: appreciable economic power in the tying market."  *Id.* at 464.  The Court noted that the "existence of such power ordinarily is inferred from the seller's possession of a predominant share of the market."  *Id.*  The Court found persuasive evidence of such market power that "certain parts are available exclusively through Kodak," and "consumers have switched to Kodak service even though they preferred ISO service, that Kodak service was of higher price and lower quality than the preferred ISO service, and that ISO's were driven out of business by Kodak's policies."  *Id.* at 464-65.

Kodak countered by arguing that even if it had a monopoly in the parts market, it could not exercise market power due to competition in the market at large for photocopiers, such that price increases in the parts market would reduce sales of Kodak copiers.  465-71.  The Supreme Court was skeptical that consumers necessarily acquired and processed this information efficiently.  *Id.* at 473-75.  But the Court also focused on "the cost to current owners of switching to a different product."  *Id.* at 476.

GCA Law Partners LLP
2570 W. El Camino Real
Suite 510
Mountain View, CA  94043
(650)428-3900

OPPOSITION OF MAINTECH INCORPORATED AND VOLT DELTA RESOURCES, LLC TO
MOTION TO DISMISS DEFENDANTS' COUNTERCLAIMS; CASE NO. 5:13-CV-03385-PSG

6

In the years following the *Kodak* decision, the concepts regarding aftermarkets for single-brand products and corresponding market power have remained alive and well in the Ninth Circuit.  In *Virtual Maintenance, Inc. v. Prime Computer, Inc.*, 11 F.3d 660 (9th Cir. 1994), the Ninth Circuit addressed another derivative aftermarket situation involving a defendant who required customers to purchase both software updates and software support.  *Id.* at 662, 664.  In *Virtual Maintenance*, the Ninth Circuit followed *Kodak* in holding that even though the defendant did not have controlling market power in the overall software product market, the particular customers were locked in by means of defendant's exclusive deal with plaintiffs' customer, Ford Motor Company.  *Id.* at 666.  Notably, the Court did not require that plaintiff, an ISO, prove that defendant had implemented any post-sale change in policy after the customer bought the original software.

In *Red Lion Med. Safety, Inc. v. Ohmeda, Inc.*, 63 F. Supp. 2d 1218 (E.D. 1999), the district court went a step further by expressly holding that the plaintiff was not required to prove a post-sale change in policy to establish the requisite lock-in under *Kodak*.  *Id.* at 1230.  The Court reasoned that it was not actually the policy change that had created the lock-in in *Kodak*, but the high cost of switching to competing products.  *Id.*

More recently, the Ninth Circuit has distinguished tying scenarios such as those presented by the counterclaims of Maintech and Terix where the tying market of parts (or patches, in this case) is derivative of the market for software and machinery, and there would not otherwise exist.  *Newcal Indus., Inc. v. IKON Office Solution*, 513 F.3d 1038, 1049 (9th Cir. 2008) (distinguishing such a derivative market from the independently existing market for pizza ingredients in *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir. 1997)).  In such derivative markets, the supplier of the original product "held a natural monopoly in the submarket for . . . parts, which gave it a unique position in the wholly derivative aftermarket for . . . replacement parts, which gave it a unique position in the wholly derivative aftermarket for services contracts."  *Id.*  This is precisely the position that Oracle is in with respect to the derivative market for patches, updates and bug fixes, and the derivative market for support contracts.

GCA Law Partners LLP
2570 W. El Camino Real
Suite 510
Mountain View, CA  94043
(650)428-3900

OPPOSITION OF MAINTECH INCORPORATED AND VOLT DELTA RESOURCES, LLC TO
MOTION TO DISMISS DEFENDANTS' COUNTERCLAIMS; CASE NO. 5:13-CV-03385-PSG

7

The Ninth Circuit also focused in the *Newcal* case on whether market imperfections and misleading statements by IKON "prevent customers from realizing that their choice in the initial market will impact their freedom to shop in the aftermarket." *Id.* at 1050. This District, in a case involving Microsoft's Xbox and aftermarket memory cards, has also addressed such situations when the customers have imperfect information about the nature of their choices. *Datel Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974 (N.D. Cal. 2010). In *Datel*, Magistrate Judge Laporte held that ***ambiguous language*** in Microsoft's warranty, licenses and terms of use prevented customers from understanding the nature of the tying arrangement they were purportedly accepting. *Datel*, 712 F. Supp. 2d at 998-90.

**D.     Maintech Has Alleged All Elements of A Tying Claim.**

Maintech has alleged each requisite element of a tying claim under both the Sherman Act and the Cartwright Act, pursuant to the Supreme Court doctrine enunciated in *Kodak*:

- **Maintech Participates in the Tied Market:** Maintech is an ISO provider of repair and maintenance services for Oracle systems (Dkt. 145 at ¶¶ 8, 11);

- **Customers Would Choose Not to be Tied:** Customers prefer to work with ISOs like Maintech because they are more competitive on price, offer better customer service, increased flexibility and better trained technicians, can support the computer systems of different OEMs so that a customer has a single point of contact for IT support, and have no economic incentive to recommend unnecessary replacement or upgrade of equipment (*id.* at ¶ 9);

- **Separate Markets, Tying and Tied:** The market for patches, updates and bug fixes for Solaris and firmware is separate from the market for support services (*id.* at ¶¶ 44, 46; *see also id.* at ¶¶ 9, 18, 21, 25);

- **Separate Market:** There is no technological reason why patches, upgrades and bug fixes cannot be sold separately from support on Oracle/Sun hardware systems (*id.* at ¶ 46, 62)

- **Tying Arrangement:** Oracle requires that customers purchase software support in order to obtain patches, updates and bug fixes for the Solaris operating system (*id.* at ¶¶ 25, 31, 32);

- **Tying Arrangement:** Oracle requires that customers purchase a comprehensive support package including both software and hardware support in order to obtain patches, updates and bug fixes for firmware (*id.* at ¶¶ 25, 31, 32, 34);

- **Market Power:** Oracle dominates and controls the market for support services on Oracle/Sun hardware systems (*id.* at ¶ 30, 53);

GCA Law Partners LLP
2570 W. El Camino Real
Suite 510
Mountain View, CA  94043
(650)428-3900

OPPOSITION OF MAINTECH INCORPORATED AND VOLT DELTA RESOURCES, LLC TO
MOTION TO DISMISS DEFENDANTS' COUNTERCLAIMS; CASE NO. 5:13-CV-03385-PSG          8

- **Market Power:** Oracle has sufficient market power in the market for patches, updates and bug fixes to coerce customers to purchase support packages from Oracle (*id.* at ¶ 51, 67);

- **Market Imperfections:**  The market is imperfect because there are significant economic obstacles preventing customers from switching to competing hardware systems and freeing themselves from Oracle's onerous tying policies (*id.* at ¶ 35);

- **Tying:**  Oracle told the Bank of New York Mellon, a Maintech customer for hardware support, that it could not obtain patches, bug fixes or updates for Solaris or firmware because it did not have certain types of support contracts with Oracle (*id.* at ¶ 47, 63)

- **Market Power:**  Oracle has a monopoly in the market for the patches, bug fixes and updates for Solaris and the firmware running on Oracle/Sun hardware systems (*id.* at ¶¶ 30, 49, 53, 65, 69)

- **Change in Policy, Lock-In:**  Oracle's changes to its support policies were a departure from previous practices by Sun who made patches, updates and bug fixes available for free or on a time and materials basis (*id.* at ¶¶ 18, 21, 25, 48)

- **Lock-In:**  Customers with Oracle hardware systems are unlikely to switch to competing systems due to the cost of acquiring new hardware (*id.* at ¶ 35);

- **Market Power:**  Oracle's control over the market for patches, updates and bug fixes for Solaris and firmware are evidenced by the significantly higher price it charges for support packages that are otherwise comparable to (or inferior to) what is offered by ISOs like Maintech (*id.* at ¶ 36);

- **Economic Harm:**  Maintech (and other ISOs) have been harmed by Oracle's illegal tying arrangements (*id.* at ¶¶ 43, 52, 56);

- **Substantial Volume of Commerce:**  Oracle's illegal tying affected a substantial volume of commerce as Oracle reported approximately $1.1 billion in hardware systems support revenue in the "Americas" in its fiscal year 2013 (*id.* at ¶ 57).

## E.    There is a Separate Tying Market for Updates, Patches and Bug Fixes.

In its moving papers, Oracle denies there is a market for support on Solaris and firmware patches that is separate from a market for support service on Oracle computer systems.  Oracle even goes so far as to call these separate markets a figment of counsel's imagination.  The customers that Oracle is forcing to buy expensive, substandard support services would beg to disagree.  So would the ISOs that Oracle is trying to put out of business.  The efforts by Oracle to exclude ISOs from servicing Oracle hardware and software in a more flexible and cost-effective manner than Oracle is willing to do are, unfortunately, not imaginary.

OPPOSITION OF MAINTECH INCORPORATED AND VOLT DELTA RESOURCES, LLC TO MOTION TO DISMISS DEFENDANTS' COUNTERCLAIMS; CASE NO. 5:13-CV-03385-PSG          9

Oracle denies that there is a separate market for support services, and yet, Oracle itself describes in its Motion the separate support market it contends does not exist as "telephone help line service, system error diagnosis or break-fix service on the physical device." Oracle even characterizes such support activities as "non-infringing" and apparently considers them legitimate undertakings for independent service organizations ("ISOs"). *See* Motion at 7:3-6. The existence of this market for support service that is separate from the market for software and firmware updates defeats Oracle's own argument, as the Supreme Court noted in *Kodak*, by "the development of the entire high-technology service market is evidence of the efficiency of a separate market for service. *Kodak*, 504 U.S. at 463. But Oracle will, unless stopped by this Court, exclude ISOs like Maintech from providing what Oracle acknowledges are legitimate, non-infringing services by tying the occasional need by a customer for a software or firmware update (once offered for free or *a la carte* by Sun) to an onerous service contract with Oracle.

Oracle also mischaracterizes the nature of its support offerings and how it has enforced its support policies. As alleged in Maintech's Counterclaims, and as Oracle has told at least one customer at issue in this case, Oracle's Premier Support for Operating Systems ("Software Support") does not include firmware updates, and "Oracle has . . . taken the position that customers cannot obtain firmware updates for Oracle/Sun hardware systems unless they have a comprehensive support policy such as Premier Support for Systems" ("System Support"). Dkt. 145 at ¶ 32. In other words, Oracle contends that a customer must pay for System Support, which includes **both** Software Support and hardware support in one package, to have access to any firmware patches for the hardware. This requirement is no small thing, as the expenses of full System Support can be astronomical; Oracle's "Matching Service Levels" policy requires that "all hardware systems must be supported . . . or all hardware systems must be unsupported," including any system that so much as shares parts with a hardware system on Oracle support, and requires that each of these systems must be compliance with Oracle's own "certification" process for hardware that was not previously covered for that level of service. Maintech Request for Judicial Notice ("RJN"), Exh. A at 2,

GCA Law Partners LLP
2570 W. El Camino Real
Suite 510
Mountain View, CA  94043
(650)428-3900

OPPOSITION OF MAINTECH INCORPORATED AND VOLT DELTA RESOURCES, LLC TO
MOTION TO DISMISS DEFENDANTS' COUNTERCLAIMS; CASE NO. 5:13-CV-03385-PSG

10

1   Oracle Hardware and Systems Support Policies, Effective Date: 2-May-2014,

2   http://www.oracle.com/us/support/library/ hardware-systems-support-policies-069182.pdf.

3          What this ultimately means is that a customer with 1000 Oracle servers that do not

4   even run the Solaris operating system must purchase all-inclusive System Support, covering

5   support for Solaris and break-fix on hardware, for the entire 1000 servers just to obtain a

6   single firmware patch for a single server. This is the epitome of a tied market. There has

7   already been discovery in this case that only a small percentage of Defendants' customers

8   have ever sought an update, bug fix or patch for Solaris or firmware, and that when they did it

9   was for a specific system – not all of their systems. And yet, Oracle would have this Court

10  believe that it is not holding these customers hostage by tying access to a single patch for a

11  single system to service on thousands of systems that may never need a patch. This simply

12  defies logic and ignores the allegations in Maintech's counterclaims.

13         Oracle also claims, incorrectly, that unlike Kodak, Oracle "never ran an 'update

14  business" like Kodak's separate parts business. As alleged in Maintech's counterclaims,

15  however, Sun provided Solaris and firmware patches, bug fixes and updates either for free

16  and/or on a time and materials basis. Dkt. 145 at ¶¶ 21, 25. This is precisely the type of

17  earlier conduct that the Supreme Court found indicative of a separate market for parts. And it

18  defies logic that a customer would not buy a single firmware or Solaris update from Oracle in

19  return for the freedom to contract for superior and less expensive support services from ISOs

20  like Maintech.

21         The Court may wonder why a customer would not want to obtain support services

22  directly from the Oracle, the OEM, rather than contract with an ISO. The answer to this

23  question is in the allegations in Maintech's counterclaims, and on the face of Oracle's own

24  support policies. ISO support services can be cheaper, more flexible, and of higher quality.

25  Dkt. 145 at ¶¶ 9, 31, 36, 51. In addition to Oracle's inflated prices for support, Oracle's

26  support policies:

27         a.   Require all of the customer's systems to be on support, whether they need it or not,
               even machines that only share parts with a covered machine;

28

GCA Law Partners LLP
2570 W. El Camino Real
Suite 510
Mountain View, CA 94043
(650)428-3900

OPPOSITION OF MAINTECH INCORPORATED AND VOLT DELTA RESOURCES, LLC TO
MOTION TO DISMISS DEFENDANTS' COUNTERCLAIMS; CASE NO. 5:13-CV-03385-PSG          11

b. Impose punitive reinstatement and back support fees, as well as an expensive "service ready" qualification process, when support lapses on a system for more than 90 days;

c. Require the customer "to establish and maintain the organizations and processes to provide 'First Line'" IT support on their covered systems to address technical problems and questions before Oracle support will even get involved;

d. Does not cover problems caused by third-party software or components; and

e. Prohibits the transfer of parts from a system covered by an Oracle support contract to a system that is not covered.

RJN Exh. A at 2-5. No automobile owner would choose to acquiesce to such onerous restrictions, but Oracle requires that owners of its servers do so that they can access the occasional patch, bug fix or upgrade. This Court has the opportunity to put a stop to such anticompetitive practices.

Oracle argues that counterclaims by Maintech and Terix are not merely inadequately pled, but "profoundly dangerous" because they somehow put the entire software industry at risk. Motion at 12. This is not merely hyperbole, but hyperbole from the other side of the looking glass. "The relevant market for antitrust purposes is determined by the choices available to [the] equipment owners." *Kodak,* 504 U.S. at 481-82. For decades, owners of Oracle/Sun equipment had the option of using ISOs for their hardware and software support needs, and customers chose to do so. During that time, Sun Microsystems climbed to the apex of the technology industry despite the existence of ISO, and perhaps aided by them. In recent years, the lucrative margins that computer OEMs once enjoyed began to narrow as they faced increased and global competition, and the situation has not improved as customers increasingly turn to cloud-based solutions. It is not these counterclaims or the existence of ISOs that threaten computer OEMs, but competition among the OEMs themselves. Oracle itself is only recently an OEM, having spent the first decades of its existence as a software – not a computer hardware – company. It belatedly and voluntarily acquired Sun's competitive dilemma, and since then has tried to fix it on the backs of the long-established ISO industry. It is Oracle's anticompetitive practices that are the real threat, both to ISOs and to the customers who rely on them.

GCA Law Partners LLP
2570 W. El Camino Real
Suite 510
Mountain View, CA 94043
(650)428-3900

OPPOSITION OF MAINTECH INCORPORATED AND VOLT DELTA RESOURCES, LLC TO
MOTION TO DISMISS DEFENDANTS' COUNTERCLAIMS; CASE NO. 5:13-CV-03385-PSG    12

**F.      Maintech Alleged that It Competes in the Tied Market.**

Oracle's argument that Maintech does not participate in the alleged tied market – support for Oracle/Sun hardware systems – is wholly lacking in merit.  As described above and alleged in the Maintech's Counterclaims, Oracle ties the supply of patches, updates and bug fixes for both Solaris and firmware to its support policies – and not just for any one particular system, but for *every* Oracle/Sun system that a customer owns.  Maintech is in the support business.  The fact that Maintech does not provide Solaris support, a factual assertion that Oracle has rejected throughout this litigation, does not mean that Maintech falls outside the scope of Oracle's anticompetitive policies.  In order for a customer to obtain firmware for a Sun/Oracle hardware system serviced by an ISO, the customer must have an active System Support contract with Oracle that is itself typically much more expensive than ISO support, and it must have support contracts on all of its systems, not just those that need firmware updates.  As such, Oracle's support polices directly impact Maintech and its hardware maintenance business.

**G.      Maintech's Tying Claims are Not Time Barred.**

Oracle argues that because Maintech alleged that Oracle began to change its policies regarding patches, updates and bug fixes at an unspecified time after the Sun acquisition in early 2010, Maintech's tying claims are barred under the four year statute of limitations.  First, Maintech has simply alleged that at *some point* in "2010, Oracle *began* putting in place new policies aimed at monopolizing the market for support for Sun hardware systems by taking business away from the ISOs."  Dkt. 145 at ¶ 25.  Maintech did not plead that all of these policies were in place before April 14, 2010, or that the policies remained unchanged in any manner over the subsequent years.  In other words, Maintech's allegations on their face do not even arguably place its claims outside of the four year time period.

Moreover, as Oracle clearly understands, there is a well-established exception to the statute of limitations for tying claims when there have been continuing violations of the laws prohibiting tying.  *See* Motion at 19:17-20:8.  "The effect of a continuing violation is to restart the statute of limitations," such that "the cause of action will begin to run anew whenever the

GCA Law Partners LLP
2570 W. El Camino Real
Suite 510
Mountain View, CA  94043
(650)428-3900

OPPOSITION OF MAINTECH INCORPORATED AND VOLT DELTA RESOURCES, LLC TO
MOTION TO DISMISS DEFENDANTS' COUNTERCLAIMS; CASE NO. 5:13-CV-03385-PSG      13

defendant commits an overt act in furtherance of the conspiracy" or "when a defendant actively enforces an illegal contract." *Airweld, Inc. v. Airco, Inc.*, 742 F.2d 1184, 1190 (9th Cir. 1984) (*citing Zenith Radio Corp v. Hazeltine Research, Inc.,* 401 U.S. 321, 338 (9th Cir. 1971), and *Aurora Enter., Inc. v. Nat'l Broadcasting Co.,* 688 F.2d 689, 694 (9th Cir.1982)).

Oracle cites to the Ninth Circuit's recent decision in *Samsung Electronics Co., Ltd. v. Panasonic Corp.*, 747 F.3d 1199 (9th Cir. 2014), but this case hurts its arguments rather than helps them. The Court in *Samsung* first reiterated that legal actions, such as lawsuits to enforce contracts in violation of antitrust laws, "were sufficient to restart the statute of limitations." *Id.* at 1203 (*citing* and discussing *Pace Industries, Inc. v. Three Phoenix Co.,* 813 F.2d 234, 237 (9th Cir.1987)). The Court then clarified that it is also the case that "non-legal actions taken pursuant to a pre-limitations period contract can lead a new cause of action to accrue." *Id.* As a result, the Court in *Samsung* held that the statute of limitations was restarted when Panasonic extended the license in question to another product, and when it attempted to enforce the license by collecting royalties." *Id.* Under the very authority cited by Oracle, Oracle has restarted the statute of limitations every time it applied its tying support policies to sales of a new product or a new customer, and when it sued ISOs like Maintech.

The Honorable Jeffrey White of this District addressed a similar situation on a motion to dismiss in *Smith v. eBay Corp.*, 2012 WL 27718 (N.D. Cal. Jan. 5, 2012). In the *eBay* case, plaintiffs alleged an illegal tying arrangement between eBay's online auction services and the payment services of its own online payment service, PayPal. *Id.* at *2. eBay argued that since it acquired PayPal in 2002, eight years before plaintiffs filed suit, their claims were time barred. Judge White held that since eBay "continued to refine its Accepted Payment Policy to restrict acceptable forms of payment . . . within the limitations period," the claims fell within the statute of limitations. *Id.* at *4.

Like eBay, Oracle has modified its support policies repeatedly since 2010, as evidenced by the 14-page Statement of Changes document posted on Oracle's website, which details the 27 different versions of the Oracle Hardware and Systems Support Policies in effect since May 19, 2010. RJN, Exh. B, http://www.oracle.com/us/support/policies/

GCA Law Partners LLP
2570 W. El Camino Real
Suite 510
Mountain View, CA  94043
(650)428-3900

OPPOSITION OF MAINTECH INCORPORATED AND VOLT DELTA RESOURCES, LLC TO
MOTION TO DISMISS DEFENDANTS' COUNTERCLAIMS; CASE NO. 5:13-CV-03385-PSG          14

hardware-support-policies-soc-071440.pdf.  This document from Oracle's website indicates that Oracle instituted its new policies in May 2010, within the four-year statute of limitations period.  Even if Oracle implemented all of these policies before April 2010, it committed continuous violations by putting out almost 30 different modifications to its policies in the subsequent years, the most recent of which is less than a month old.  Likewise, Maintech has alleged specific statements by Oracle to Bank of New York Mellon that occurred since the institution of this litigation, and efforts by Oracle in the last two years to enforce its policies through other litigations that are a matter of public record in this District.  *See* Dkt. 145 at ¶ 27, 47; *Oracle America, Inc. v. Service Key, LLC*, N.D. Cal. Case No. 4:12-cv-00790-SBA; *Oracle America, Inc. v. Stratiscom, LLC,* N.D. Cal. Case No. 3:14-cv-0356-CRB.

Finally, to the extent it had begun to run, the limitation period on Maintech's claims was tolled on July 19, 2013 when Oracle filed the instant action because the instant claims are compulsory to Oracle's pursuant to Federal Rule of Civil Procedure 13(a).  As briefed more fully by Terix, and incorporated herein by this reference, the holdings of *Grumman Systems Support Corp. v. Data General Corp.* 125 F.R.D. 160 (N.D. Cal. 1998), *Pochiro v. Prudential Ins. Co. of America*, 827 F.2d 1246 (9th Cir. 1987); and *MGA Entertainment, Inc. v. Mattell, Inc*. 2012 WL 569389, *14-15 (C. D. Cal. Feb. 21, 2012), are controlling.  *See* Dkt. 182, at pg. 15-16.  The "essential factual" underpinnings of Oracle's claim on the one hand and Maintech's (and Terix's) claims on the other hand require the very same factual inquiry.  The risk if inconsistent rulings and waste of judicial resources would be profound if these cases were not tried together.

## IV.    MAINTECH HAS ALLEGED ATTEMPTED MONOPOLIZATION.

Section 2 of the Sherman Act prohibits monopolization and attempted monopolization in domestic and international commerce.  A claim for monopolization must allege "(1) the possession of monopoly power in a relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident."  *Eastman Kodak Co. v. Image Technical Services, Inc.,* 504 U.S. 451, 481 (1992) (*citing United States v. Grinnell Corp.,*

GCA Law Partners LLP
2570 W. El Camino Real
Suite 510
Mountain View, CA  94043
(650)428-3900

OPPOSITION OF MAINTECH INCORPORATED AND VOLT DELTA RESOURCES, LLC TO
MOTION TO DISMISS DEFENDANTS' COUNTERCLAIMS; CASE NO. 5:13-CV-03385-PSG        15

384 U.S. 563, 570-71 (1966)).  A claim – like Maintech's – for attempted monopolization must allege "(1) predatory or anticompetitive conduct; (2) specific intent to monopolize; and (3) a dangerous probability of achieving monopoly power." *Avaya,* 28 WL 4117957 at *9 (*citing  Spectrum Sports v. McQuillan,* 506 U.S. 447, 456 (1993); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.,* 124 F.3d 430, 442 (3d Cir.1997).

 Maintech's claim for attempted monopolization pleads all the requisite elements:

- Oracle engaged in anticompetitive conduct designed to eliminate competition by ISOs (Dkt. 145 at ¶¶ 25, 31, 32, 34, 47, 63);

- Oracle's specific intent to monopolize the market for support on Oracle/Sun hardware systems (*id.* at ¶¶ 23-27, 76); and

- The probability that Oracle will succeed in achieving this monopoly power (*id.* at ¶ 79).

To the extent the Court believes that Maintech should provide more detail concerning these elements, the Court should grant Maintech leave to amend its counterclaims.[1]

## V. MAINTECH HAS STATED A CLAIM FOR COPYRIGHT MISUSE.

 As the Ninth Circuit has explained, "[c]opyright misuse is a judicially crafted affirmative defense to copyright infringement, derived from the long-standing existence of such a defense in patent litigation."  *Apple, Inc. v. Psystar Corp.,* 658 F.3d 1150, 1157 (9th Cir. 2011).  As with patent misuse, "when a copyright holder attempts to use legal proceedings to protect an improper extension of a copyright, the court may refuse to enforce the copyright."  *Qad, Inc. v. ALN Associates, Inc.*, 770 F. Supp. 1261, 1266 (N.D. Ill. 1991).  The Ninth Circuit recognized the defense, and found it applicable, in *Practice Mgmt. Info. Corp. v. Am. Med. Ass'n,* 121 F.3d 516, 521 (9th Cir.1997), *amended by* 133 F.3d 1140 (9th Cir.1998).  In *Practice Management,* the Ninth Circuit found that license restrictions prohibiting licensees from using competitors' products constituted copyright misuse.  *Practice Management*, 121 F.3d at 521.  Oracle has not literally done the same thing, but it has engaged in anticompetitive conduct that has effectively had the same result.

---

[1] Allowing amendment would be particularly appropriate in this case because Oracle did not produce virtually any of the relevant documents until after Defendants filed their Counterclaims in mid-April.

GCA Law Partners LLP
2570 W. El Camino Real
Suite 510
Mountain View, CA  94043
(650)428-3900

OPPOSITION OF MAINTECH INCORPORATED AND VOLT DELTA RESOURCES, LLC TO
MOTION TO DISMISS DEFENDANTS' COUNTERCLAIMS; CASE NO. 5:13-CV-03385-PSG  16

In opposing Maintech's copyright misuse claim, Oracle takes obvious comfort from the fact that the doctrine has seen little success in the Ninth Circuit. Oracle's comfort is misplaced because the allegations in Maintech's Counterclaims are substantively different from those in cases where the courts have held the doctrine does not apply. *See Apple,* 658 F.3d at 1159 (copyright misuse defense failed as it was a *de facto* effort to apply the first sale doctrine to a software license); *Triad Systems Corp. v. Southeastern Express Co.,* 64 f.3d 1330, 1333 (9th Cir. 1995) (ISO's use of copyrighted software not subject to misuse defense in case later abrogated by 17 U.S.C. § 117(c)).

In trying to wedge Maintech declaratory relief claim into the same silos the Ninth Circuit have found do not qualify as copyright misuse, Oracle ignores the underlying bases for Maintech's claim, namely that Oracle has misused its copyrights not simply by controlling access to its copyrighted works via license agreements, but by denying rightful access by customers who already have license rights granting them such access. *See, e.g.,* Dkt. 145 at ¶¶ 16, 17. Oracle's refusal to recognize the pre-existing rights of its customers to Solaris patches, updates and bug fixes, is not a legitimate control of Oracle copyrights, but an unlawful extension of them. Moreover, Oracle's misuse is intended not only to extract additional revenue from customers, who must purchase costly support plans from Oracle that they do not need or want, but also to extinguish competition in the market for support on Oracle/Sun hardware. In fact, the very basis for Oracle's copyright infringement claims against the Defendants is that they allegedly assisted customers in obtaining allegedly copyrighted Solaris patches, updates and bug fixes that were already covered by the customers' underlying Solaris licenses. In so doing, Oracle seeks and has succeeded in stifling competition. This is the very heart of copyright misuse and Maintech has sufficiently pled it.

## VI.   MAINTECH HAS STATED A CLAIM UNDER THE LANHAM ACT.

In support of its Lanham Act claim, Maintech alleged numerous false statements by Oracle in commercially promoting sales of its own products, and in opposing sales by ISOs, including Maintech:

GCA Law Partners LLP
2570 W. El Camino Real
Suite 510
Mountain View, CA 94043
(650)428-3900

OPPOSITION OF MAINTECH INCORPORATED AND VOLT DELTA RESOURCES, LLC TO
MOTION TO DISMISS DEFENDANTS' COUNTERCLAIMS; CASE NO. 5:13-CV-03385-PSG          17

- Falsely telling customers of the need for and critical nature of patches, bug fixes and updates to avoid technical problems or security vulnerabilities, and withholding those items unless the customers purchase support directly from Oracle. Dkt. 145, ¶37 and at 19:1-3

- Falsely telling customers that they are not entitled to receive patches, bug fixes and updates to Solaris even though Oracle knows that these customers generally already have licenses to Solaris that include patches, bug fixes and updates. *Id.* 145 at ¶ 38 (even after acknowledging its obligation to honor rights flowing from Sun agreements, *see id.* at ¶ 28)

- Falsely telling customers that "Maintech and Terix cannot provide legal and effective support services" (*Id.* at ¶ 39) and "that these ISOs are violating Oracle's intellectual property rights" (*Id.* at ¶ 83).

- "Oracle told BNYM that Maintech and Terix did not have the right to assist BNYM in accessing patches, bug fixes and updates for Solaris and firmware as part of either Solaris support or hardware support on Oracle/Sun systems." *Id.* at ¶ 40.

- Additionally, that "Maintech is informed and believes, and based thereon alleges, that Oracle has made similar misrepresentations to other customers and potential customers of Maintech such as the Royal Bank of Canada and Sony." *Id.*

Maintech further alleged that these false statements were in furtherance of new software and hardware support policies Oracle implemented after acquiring Sun, and that these policies were aimed at monopolizing the market for support for Sun hardware systems by taking away business from ISOs like Maintech. *Id.* at ¶ 25. In the words of Oracle's own Senior Vice President of Customer Support Services in an address to the Technology Services World conference, Oracle's changes in licensing policies were part and parcel of Oracle's "aggressive competition with independent service organizations." *Id.* at 7:18-20. Maintech has further alleged that these false commercial promotions have caused Maintech to suffer injury in the form of monetary damages and will cause irreparable harm if not stopped. Id. at ¶¶ 86-87. Maintech has therefore met its pleading burden and, as discussed more fully below, Oracle's challenges to the Lanham Act claim are substantively flawed and must be denied.

### A.   The Court Need Not Even Reach the Merits:  The Doctrine of Judicial Estoppel Should be Applied to Bar Oracle's Motion to Dismiss.

Judicial estoppel, also known as the doctrine of preclusion of inconsistent positions, is invoked to prevent a party from changing its position over the course of judicial proceedings when such positional changes have an adverse impact on the judicial process. *See* 1B

GCA Law Partners LLP
2570 W. El Camino Real
Suite 510
Mountain View, CA  94043
(650)428-3900

OPPOSITION OF MAINTECH INCORPORATED AND VOLT DELTA RESOURCES, LLC TO
MOTION TO DISMISS DEFENDANTS' COUNTERCLAIMS; CASE NO. 5:13-CV-03385-PSG

18

*Moore's Federal Practice* p .405, at 238-42 (2d Ed. 1988).  The policies underlying judicial estoppel are "general consideration[s] of the orderly administration of justice and regard for the dignity of judicial proceedings."  *Arizona v. Shamrock Foods Co*., 729 F.2d 1208, 1215 (9th Cir.1984), *cert. denied*, 469 U.S. 1197 (1985) (citations omitted).  Judicial estoppel is intended to protect against a litigant playing "fast and loose with the courts." *Rockwell International Corp. v. Hanford Atomic Metal Trades Council*, 851 F.2d 1208, 1210 (9th Cir.1988) (citations omitted); *and see Russell v. Rolfs,* 893 F.2d 1033, 1037 (9th Cir. 1990).

Oracle's two primary attacks on the Lanham Act claims should be barred by judicial estoppel:  (1) **Pleading Specific False Statements**.  On the defense, Oracle argued the Lanham Act did *not* require that a plaintiff plead specific false commercial advertisements or promotions and that it had met its burden notwithstanding Maintech's undisputed showing that there was "simply no false advertising to which Oracle can point."  This Court adopted Oracle's argument, finding that no specific false statement was necessary because Oracle had met its pleading burden by alleging that Maintech's website viewed as a whole, might be interpreted as misleading.  *See* Dkt. No. 61 at 19:1-9.  Now Oracle argues the opposite:

> "All of [Defendants'] allegations founder on the same issue:  nowhere do Maintech or Terix identify any *actual statements* made by Oracle or provide sufficient information to suggest that Oracle made actual statements that meet the Lanham Act's requirements.  *See*, *e.g*., *Incorp. Servs. Inc. v. IncSmart.biz, Inc.,* 2013 WL394023, at *3 (N.D. Cal. Jan. 30, 2013).  Each claim describes broad categories of statements, but a Lanham Act claim focuses on the falsity of specific statements."  Dkt.  173 at 25:23-26 (citation omitted). [2]

**(2) The Application of Rule 9(b) to the Lanham Act Claims.** Oracle argued against the application of Rule 9(b) to Lanham Act claims, arguing that level of specificity was not required.  Again, this Court agreed, expressly rejecting application of Rule 9(b) to the Lanham Act claims.  *See* Dkt. No. 61 at 20:5-9 ("Nor does the court see any reason to apply Rule 9(b) to [the Lanham Act] claim.  While the court respects that other district courts in the Ninth Circuit have concluded otherwise, as Defendants acknowledge, the Ninth Circuit has never

---

[2]  This statement is false; Maintech alleged false statements to both its hardware customers generally to BNYM, Royal Bank of Canada and Sony particularly.  *See e.g.,* Dkt. 145 at ¶ 40.

GCA Law Partners LLP
2570 W. El Camino Real
Suite 510
Mountain View, CA  94043
(650)428-3900

1   held as such.").  Yet Oracle now urges the Court to adopt a specificity standard based upon

2   two cases that expressly applied Rule 9(b).  *See* Motion at 24:22-25 (*citing LT Int'l Ltd.*

3   *Shuffle Master, Inc.*, 2014 WL 1248270, *5 (D. Nev. Mar. 26, 2014)), and Motion at 25:25-27

4   (*citing Incorp. Servs., Inc. v. Inc.Smart.biz, Inc.,* 2013 WL 394023, *3 (N.D. Cal. Jan. 30,

5   2013)).  This is a classic example of the type of "fast and loose" litigation conduct that

6   judicial estoppel is meant to curb.  Oracle already profited by taking positions to the contrary.

7   Judicial estoppel should be invoked to bar Oracle from profiting from this about-face.

8   **B.      Maintech Identified Specific False Commercial Promotions by Oracle**

9          Oracle argues Maintech's allegations of false representations do not fall within a Lanham

10   Act claim because they are not "part of advertising *at all.*"  Motion at 24:20-22.  As an initial

11   matter, to the extent Oracle's is implying that the false statements Maintech alleged do not

12   constitute a "commercial" promotion because they were not identified as a specific piece of

13   advertising, Oracle misconstrued the law.  To be an actionable "commercial advertising or

14   promotion" under Section 43(a)(1)(B), "the representations need not be made in a 'classic

15   advertising campaign,' but may consist instead of more informal types of 'promotion,'

16   …[and] must be disseminated sufficiently to the relevant purchasing public to constitute

17   "advertising" or "promotion" within that industry."  *Coastal Abstract Serv., Inc. v. First Am*

18   *Title Ins. Co*. 173 F.3d 725, 735 (9th Cir. 1999) (citation omitted).  Moreover, as explained in

19   *Coastal Abstract*, a promotion that is distributed directly to only one potential customer may

20   be sufficient if a type of promotion that is used within that industry.  Here, Maintech has

21   alleged – and Oracle does not dispute – that Oracle's promotion of its post-Sun support

22   policies as mission critical to customer use of the Sun/Oracle Hardware are precisely the type

23   of promotion that Oracle employs in its "aggressive competition with independent service

24   organizations."  *See* Dkt. 145, ¶ 25.

25   **C.      Maintech Alleged Dissemination of False Statements to Customers, the
            Sufficiency of which is a Jury Issues.**

26

27          Oracle argues that Defendants' Lanham Act claims fail because they did not allege

28   facts showing that "Oracle spread its alleged misstatements ***sufficiently*** to the relevant group

GCA Law Partners LLP
2570 W. El Camino Real
Suite 510
Mountain View, CA  94043
(650)428-3900

OPPOSITION OF MAINTECH INCORPORATED AND VOLT DELTA RESOURCES, LLC TO
MOTION TO DISMISS DEFENDANTS' COUNTERCLAIMS; CASE NO. 5:13-CV-03385-PSG        20

of consumers" (Motion at 25:27-28 (emphasis added), and failed to show "**how Oracle widely**

spread its misstatements to that group." *Id*. at 25:5-6 (emphasis added).  But the question of

whether false statements are "sufficiently disseminated is a disputed issue of fact" and

"[d]efining the relevant purchasing public is a task for the jury." *Gonzalez v. Allstate*

*Insurance Company*, 2005 WL 5891935, *9 (C.D. Cal. Aug. 2, 2005) (*citing Coastal*

*Abstract*, *supra*, 173 F.3d at 735 (approving jury instruction related to the definition of the

relevant purchasing public and rejecting a finding that there was no "promotion" as a matter

of law)).  Here, Maintech has explained how the false statements were disseminated to and

affected purchasing decisions of the customers for hardware support, and even identified

specific individual customers.  Maintech has met its burden.

> ### D.      Maintech Can Rely On *All* False Advertising From Which Injury Flows.

As an initial matter, Maintech has alleged harm that it suffered as a result of Oracle's

false representations about Maintech and (as Oracle effectively concedes) has standing to

pursue recover under the Lanham Act for that injury.  Additionally, Maintech is entitled to

recover for injury even if the false statement was directed to Terix and Maintech "merely

suffered collateral damage." *Lexmark Inter., Inc. v. Static Control Components, Inc*., 134

S.Ct. 1377, 1394 (March 25, 2014).  The example of two rival carmakers that the United

States Supreme Court's provided in Lexmark is instructive.  There, the Court explained that a

first carmaker's false proclamation that the airbags used in the second carmaker's vehicles

were defective gave rise to an actionable Lanham Act claim for both the second carmaker and

the airbag manufacturer.  The Court explained that "there is no reasons to regard either party's

injury as derivative of the other's; each is directly and independently harmed by the attack on

its merchandise. *Id*.  Oracle accuses Terix and Maintech jointly and independently of

violating Oracle's property and intellectual property rights and engaging in illegal support of

Oracle's hardware and Solaris operating systems.  The false advertising perpetrated by Oracle

against Maintech and Terix jointly, as well as false advertising that disparages either of them

independently, is nonetheless actionable by each to the extent they suffered cognizable harm.

Thus, again, the question becomes one of proof at trial.

1      **VII.    MAINTECH HAS STATED A CLAIM FOR TRADE LIBEL.**

2              Trade libel is defined as "an intentional disparagement of the quality of property,

3      which results in pecuniary damage...." *Erlich v. Etner*, 224 Cal. App. 2d 69, 73

4      (1964).  Oracle challenges the specificity of Maintech's trade libel allegations, claiming that

5      Maintech needed to identify specific customers and specific losses, and argues that

6      Maintech's claim cannot rest on Oracle's assertion of alleged rights in this action.  Each of

7      Oracle's arguments is misplaced and its motion should be denied.

8              As discussed above, Maintech identified specific customers targeted by Oracle -

9      BYNM, Royal Bank and Sony- and alleged that by targeting them, Oracle caused Maintech

10     specific pecuniary losses.  *See* Dkt. 145 at ¶¶ 96-97.  Thus, Maintech notified Oracle of the

11     specific claims against it and met its pleading burden.  Similarly discussed above are the false

12     statements Oracle made about Defendants that led to specific pecuniary reputational harm to

13     Maintech.  Maintech has amply pled the factual support for this claim.

14             Moreover, Oracle's argument about privilege is a red herring.  California law does

15     make privileged a publication by a party in the course of a legislative, judicial or other official

16     proceeding.  *See* Cal. Civ. Code § 47(b).  But unlike the defendant in the *Ludwig* case that

17     Oracle relies on in its Motion, the claims against Oracle here are not based upon the exercise

18     of the right to petition the government.  In that case, the 'publications' in question involved

19     the submission of questions and comment at public hearing, and the Court found those

20     activities to be privilege.  *See Ludwig v. Superior Court*, 37 Cal. App. 4th 8, 21 (1995).  That

21     has nothing to do with Oracle's use of its unfair market power to frighten and coerce

22     customers, while eliminating the competition by libeling the competition.  Thus, Oracle's

23     'privilege' argument and authority are inapplicable here and do not serve as a basis for

24     dismissing Maintech's Trade Libel claim.

25             Moreover, as this Court recognized in ordering Oracle not to use confidential

26     discovery information to send out cease and desist letter (Dkt. 127), the filing of a lawsuit

27     does not give a litigant the green light to make any publication it wishes regarding anything

28     that is touched upon in the litigation.  Maintech has alleged that Oracle stated that "Maintech

GCA Law Partners LLP
2570 W. El Camino Real
Suite 510
Mountain View, CA  94043
(650)428-3900

OPPOSITION OF MAINTECH INCORPORATED AND VOLT DELTA RESOURCES, LLC TO
MOTION TO DISMISS DEFENDANTS' COUNTERCLAIMS; CASE NO. 5:13-CV-03385-PSG          22

and Terix did not have the right to assist BNYM in accessing patches, bug fixes and updates for Solaris and firmware as part of either Solaris support or hardware support on Oracle/Sun systems." *Id*. at ¶ 40.  Oracle is also accused of falsely disparaging customers by telling them that Maintech and Terix "are violating Oracle's intellectual property and other rights by providing illegal support services on Oracle/Sun systems." Dkt. 145 at ¶ 39.  Oracle cannot absolve itself of liability its false and disparaging representations to the customers of Terix and Maintech that it would be illegal for these ISOs to provide support services to the client for Sun/Oracle Hardware simply by including those accusations in a complaint.

## VIII.   MAINTECH HAS STATED A CLAIM FOR INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE.

The charging elements for a claim for intentional interference with prospective economic advantage under California law are:  "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003) (internal quotations and citations omitted).  Maintech's allegations meet each element.

### A.     Maintech Identified "Interfered-With Customers" *and* Interference.

In addition to the more general allegations of interference with relationships that Oracle complains of in its Motion, Maintech alleged relationships between Maintech on the one hand and a number of specifically-identified customers on the other hand - BNYM, Royal Bank of Canada and Sony.  Dkt. 145, ¶¶ 40 and 96.  Additionally, Maintech alleged Oracle's intentional acts by Oracle to interfere with those relationships.  *See e.g.*, Dkt. 145, ¶ 96 ("threatening and coercing"), ¶ 37-39 (false representations), ¶¶ 43-51, 59-73 and 75-76 (tying, actual and attempted monopolization).  Finally, with regard to BNYM, Royal Bank of Canada and Sony, Maintech alleged that "Oracle directly and proximately caused damage to Maintech in that these economic relationships have been disrupted." *Id*. at ¶ 97.

GCA Law Partners LLP
2570 W. El Camino Real
Suite 510
Mountain View, CA  94043
(650)428-3900

OPPOSITION OF MAINTECH INCORPORATED AND VOLT DELTA RESOURCES, LLC TO MOTION TO DISMISS DEFENDANTS' COUNTERCLAIMS; CASE NO. 5:13-CV-03385-PSG       23

**B.      Maintech Alleged "Independently Wrongful Acts" by Oracle.**

Under California law, an act is "independently wrongful" where "it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable standard." *Edwards v. Arthur Anderson* LLP, 44 Cal. 4th 937, 944 (2008); *Korea Supply*, 29 Cal. 4th at 1159, n.11; *Reeves v. Hanlon* 33 Cal. 4th 1140, 1145 (2004)).  "The plaintiff need not prove that the defendant acted with the specific intent or purpose of disrupting the plaintiff's prospective economic advantage, as long as the defendant knew the interference was certain or substantially certain to occur as a result of its action."  *Korea Supply*, 29 Cal. 4th at 1153. This standard is readily met in cases involving false statements by the interfering party to the third party with whom the claimant has an economic relationship.  *See, e.g.*, *Visto Corp. v. Sproquit Technologies, Inc*., 360 F. Supp. 2d 1064, 1067 (N.D. Cal. 2005) (independently wrongful conduct adequately pled where the "alleged that [counterdefendant's] allegations of patent infringement are false and/or defamatory").  As such, Maintech has amply alleged independently wrongful acts.  Moreover, Maintech has alleged the violation of the Sherman Act, the Cartwright Act and violations of the Lanham Act.  These allegations meet Maintech's pleading burden and its claim should stand.

## IX.      MAINTECH HAS STATED A CLAIM FOR UNFAIR COMPETITION.

Oracle waives off Defendants' unfair competition claims as vestigial; "Terix's and Maintech's claims under California Business and Professions Code section 17200 piggyback off their other counterclaims."  Motion at 30:2-3.  Oracle argues that, if the other counterclaims are dismissed, this claim fails too.  *Id*. at 30:11-12.  Not so fast.  It is true that Maintech's unfair competition claim may properly draw from the wrongdoing that substantively supports the other claims.  However, it does not depend on their survival.

Under California law "unfair competition" means "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."  Cal. Bus. & Prof. Code § 17200.  Thus, "Section 17200 provides three avenues of relief under the Unfair Competition Law: an unfair prong, an unlawful prong, and a fraudulent prong. The statute was designed to reach sketchy business practices that fall outside the precise contours of existing torts and statutory violations."  *GSI Technology v. United Memories, Inc*., 2014 WL

GCA Law Partners LLP
2570 W. El Camino Real
Suite 510
Mountain View, CA  94043
(650)428-3900

OPPOSITION OF MAINTECH INCORPORATED AND VOLT DELTA RESOURCES, LLC TO MOTION TO DISMISS DEFENDANTS' COUNTERCLAIMS; CASE NO. 5:13-CV-03385-PSG                24

1572358 (April 18, 2014). When analyzing Section 17200 claim, "courts consider each of the three prongs to determine whether a practice is unlawful, unfair, or fraudulent." *MacDonald v. Ford Motor Co.* 2014 WL 1340339, *7 (N.D. March 31, 2014)(*citing Cel–Tech Comms., Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal.4th 163, 180 (1999)). "A claim that sufficiently pleads any one of these prongs survives a motion to dismiss." *Id.* (citations omitted).

Under the "unfair" prong, a claim need not rise to the level of a violation of law. *Cel-Tech*, *supra*, 20 Cal. 4th at 187 ("the word 'unfair' in [Section 17200] means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition."); *in accord Lozano v. AT & T Wireless Servs. Inc.*, 504 F.3d 718, 736 (9th Cir.2007); *and MacDonald v. Ford Motor Co.* 2014 WL 1340339, *7. Here, Oracle's anti-competitive policies were designed to eliminate competition, drive up the consumer costs and artificially inflate Oracle's profit margins. This is just the type of scheme that "smacks of antitrust-like misconduct" such that it is appropriately considered under an unfair competition claim between competitors." *See e.g., GSI Technology v. United Memories, Inc.,* 2014 WL 1572358, *8. Oracle is therefore liable under the unfair practices act at a minimum.

Finally, Maintech may prevail under this claim on the fraudulent prong.

## X.   CONCLUSION.

For the reasons set forth above, and in Maintech's Request for Judicial Notice, this Court should deny Oracle's Motion to Dismiss in its entirety. If this Court does grant any portion of Oracle's Motion, it should do so without prejudice and with leave to amend.

Dated: May 30, 2014                    GCA LAW PARTNERS LLP

                                       /s/ Valerie M. Wagner
                                         Valerie M. Wagner
                                       Attorneys for Defendants and Counterclaimants
                                       MAINTECH INCORPORATED and VOLT DELTA
                                       RESOURCES LLC

GCA Law Partners LLP
2570 W. El Camino Real
Suite 510
Mountain View, CA 94043
(650)428-3900

OPPOSITION OF MAINTECH INCORPORATED AND VOLT DELTA RESOURCES, LLC TO MOTION TO DISMISS DEFENDANTS' COUNTERCLAIMS; CASE NO. 5:13-CV-03385-PSG                    25