BINGHAM MCCUTCHEN LLP
  Geoffrey M. Howard (SBN 157468)
  Thomas S. Hixson (SBN 193033)
  Kyle Zipes (SBN 251814)
Three Embarcadero Center
San Francisco, CA 94111-4067
Telephone: 415.393.2000
Facsimile: 415.393.2286
Email: geoff.howard@bingham.com
        thomas.hixson@bingham.com
        kyle.zipes@bingham.com

LATHAM & WATKINS LLP
  Daniel M. Wall (SBN 102580)
  Christopher B. Campbell (SBN 254776)
505 Montgomery Street, Suite 2000
San Francisco, California  94111-6538
Telephone: 415.391.0600
Facsimile: 415.395.8095
Email: dan.wall@lw.com
        christopher.campbell@lw.com

ORACLE CORPORATION
  Dorian Daley (SBN 129049)
  Deborah K. Miller (SBN 95527)
500 Oracle Parkway
M/S 5op7
Redwood City, CA 94065
Telephone: 650.506.4846
Facsimile: 650.506.7114
Email: dorian.daley@oracle.com
        deborah.miller@oracle.com

ORACLE CORPORATION
  Jeffrey S. Ross (SBN 138172)
10 Van de Graaff Drive
Burlington, MA 01803
Telephone: 781.744.0449
Facsimile: 781.238.6273
Email:  jeff.ross@oracle.com

Attorneys for Plaintiffs
Oracle America, Inc., and Oracle
International Corporation

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ORACLE AMERICA, INC., a Delaware corporation; ORACLE INTERNATIONAL CORPORATION, a Delaware corporation<br><br>Plaintiffs,<br><br>v.<br><br>TERIX COMPUTER COMPANY, INC., a California corporation; MAINTECH INCORPORATED, a Delaware corporation; VOLT DELTA RESOURCES, LLC, a Nevada limited liability company; SEVANNA FINANCIAL, INC., a Nevada corporation; WEST COAST COMPUTER EXCHANGE, INC., a Nevada corporation; and DOES 1–50,<br><br>Defendants. | No. 5:13-cv-03385 PSG<br><br>**ORACLE'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS DEFENDANTS' COUNTERCLAIMS**<br><br>Date:       June 24, 2014<br>Time:       10:00 a.m.<br>Location:  Courtroom 5, 4th Floor<br>Judge:      Hon. Paul S. Grewal |

SF\5767290

# **TABLE OF CONTENTS**

Page

I.    INTRODUCTION ................................................................................................. 1

II.   DEFENDANTS FAIL TO STATE A CLAIM FOR RELIEF.................................. 3

      A.    Defendants Misrepresent The Motion To Dismiss Standard................................ 3

      B.    Defendants' Tying Allegations Fail ..................................................................... 5

            1.    Defendants Fail To Plead A Tying "Market" for Oracle's
                  Updates, Patches, Bug Fixes And Firmware (Ties 1, 2, 3)......................... 5

            2.    Terix's Tying Claim Based On "Critical" and "Non-
                  Critical" Markets Fails (Tie 4).................................................................... 7

            3.    Terix's Alleged "Economic" Tie Between "Sun/Oracle
                  Firmware" and "Sun/Oracle Hardware Support Services"
                  Fails (Tie 3).................................................................................................. 8

            4.    Maintech's Tying Claim Fails (Tie 1) ........................................................ 9

            5.    Defendants' Tying Claims Are Largely Time Barred ............................... 10

      C.    Defendants' Monopolization Claims Fail ........................................................... 13

      D.    Defendants' Copyright Misuse Claims Fail........................................................ 14

      E.    Defendants' Lanham Act Claims Fail................................................................. 15

            1.    Maintech And Terix Fail To Identify Oracle's Commercial
                  Advertising Or How It Was Disseminated Widely.................................... 16

            2.    Maintech And Terix Fail To Identify Specific
                  Misrepresentations .................................................................................... 17

            3.    Maintech Has No Standing to Assert Alleged
                  Misstatements About Terix........................................................................ 17

      F.    Maintech's Trade Libel Claim Fails .................................................................. 17

      G.    Defendants' IPEA Claims Fail........................................................................... 18

      H.    The Court Should Dismiss In Part Terix's Intentional Interference
            With Contract Claim .......................................................................................... 19

      I.    Defendants' Unfair Competition Claims Fail .................................................... 20

III.  CONCLUSION.................................................................................................... 20

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

### CASES

3

4
*AccuImage Diagnostics Corp. v. TeraRecon, Inc.*,
  260 F. Supp. 2d 941 (N.D. Cal. 2003) .......................................................................... 17, 18

5
*Align Tech., Inc. v. Bao Tran*,
  179 Cal. App. 4th 949 (2009) ................................................................................................ 13

6

7
*AMF, Inc. v. General Motors Corp. (In re Multidistrict Vehicle Air Pollution)*,
  591 F.2d 68 (9th Cir. 1979) .............................................................................................. 11, 12

8
*Apple Inc. v. Psystar Corp.*,
  586 F. Supp. 2d 1190 (N.D. Cal. 2008) .................................................................................. 4

9

10
*Apple Inc. v. Psystar Corp.*,
  658 F.3d 1150 (9th Cir. 2011) ......................................................................................... 15, 16

11
*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .................................................................................................... 1, 4, 7, 18

12

13
*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ...................................................................................................... 2, 16, 18

14
*Cascade Health Solutions v. PeaceHealth*,
  515 F.3d 883 (9th Cir. 2008) .................................................................................................... 9

15

16
*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
  20 Cal. 4th 163 (1999) ............................................................................................................ 21

17
*Chavez v. Whirlpool Corp.*,
  93 Cal. App. 4th 363 (2001) ................................................................................................... 21

18

19
*Coastal Abstract Serv., Inc., v. First Am. Title Ins. Co.*,
  173 F.3d 725 (9th Cir. 1999) ................................................................................................... 17

20
*Datel Holdings Ltd. v. Microsoft Corp.*,
  712 F. Supp. 2d 974 (N.D. Cal. 2010) ..................................................................................... 6

21

22
*Eastman Kodak Co. v. Image Technical Servs., Inc.*,
  504 U.S. 451 (1992) ................................................................................................................... 6

23
*Eldorado Stone v. Renaissance Stone, Inc.*,
  2005 WL 5517731 (S.D. Cal. Aug. 10, 2005) ...................................................................... 18

24

25
*First Advantage Background Servs. Corp. v. Private Eyes, Inc.*,
  569 F. Supp. 2d 929 (N.D. Cal. 2008) ................................................................................... 18

26
*Gonzalez v. Allstate Ins. Co.*,
  2005 WL 5891935 (C.D. Cal. Aug. 2, 2005) ........................................................................ 17

27

28
*Grumman Systems Support Corp. v. Data General Corp.*,
  125 F.R.D. 160 (N.D. Cal. 1988) ........................................................................................... 13

*Hydranautics v. FilmTec Corp.*,
   70 F.3d 533 (9th Cir. 1995) ............................................................................ 13

*Ill. Tool Works Inc. v. Indep. Ink, Inc.*,
   547 U.S. 28 (2006) ......................................................................................... 14

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
   466 U.S. 2 (1984)............................................................................... 1, 2, 5, 6

*Kendall v. Visa U.S.A., Inc.*,
   518 F.3d 1042 (9th Cir. 2008) .......................................................................... 2

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   134 S. Ct. 1377 (2014)..................................................................................... 18

*MedioStream, Inc. v. Microsoft Corp.*,
   869 F. Supp. 2d 1095 (N.D. Cal. 2012) ........................................................... 13

*Metromedia Broad. Corp. v. MGM/UA Entm't Co.*,
   611 F. Supp. 415 (C.D. Cal. 1985) .................................................................... 7

*Newcal Indus., Inc. v. IKON Office Solution*,
   513 F.3d 1038 (9th Cir. 2008) .......................................................................... 6

*Pacific Bell Telephone Co. v. linkLine Communications, Inc.*
   555 U.S. 438 (2009)....................................................................................... 8, 9

*Practice Mgmt. Info. Corp. v. Am. Med. Ass'n*,
   121 F.3d 516 (9th Cir. 1997) ..................................................................... 15, 16

*Red Lion Med. Safety, Inc. v. Ohmeda, Inc.*,
   63 F. Supp. 2d 1218 (E.D. Cal. 1999)............................................................... 6

*S. Pines Chrysler-Plymouth, Inc. v. Chrysler Corp.*,
   826 F.2d 1360 (4th Cir. 1987) ...................................................................... 3, 7

*Samsung Elecs. Co. v. Panasonic Corp.*,
   747 F.3d 1199 (9th Cir. 2014) ........................................................................ 12

*Schneider v. Cal. Dep't of Corrections*,
   151 F.3d 1194 (9th Cir. 1998) .......................................................................... 8

*Seltzer v. Green Day, Inc.*,
   725 F.3d 1170 (9th Cir. 2013) ........................................................................ 21

*Sidney v. Superior Court*,
   198 Cal. App. 3d 710 (1988) ........................................................................... 13

*Smith v. eBay Corp.*,
   2012 WL 27718 (N.D. Cal. Jan. 5, 2012) ........................................................ 12

*Souza v. Estate of Bishop*,
   821 F.2d 1332 (9th Cir. 1987) .......................................................................... 2

*Thurman Indus., Inc. v. Pay N' Pak Stores, Inc.*,
 875 F.2d 1369 (9th Cir. 1989) .................................................................. 8

*Times-Picayune Pub. Co. v. United States*,
 345 U.S. 594 (1953) ................................................................................. 5

*United States v. Grinnell Corp.*,
 384 U.S. 563 (1966) ............................................................................... 14

*United States v. Microsoft Corp.*,
 253 F.3d 34 (D.C. Cir. 2001) ................................................................... 5

*Universal Grading Serv. v. eBay, Inc.*,
 2011 WL 846060 (N.D. Cal. Mar. 8, 2011) ........................................... 18

*Virtual Maint., Inc. v. Prime Computer, Inc.*,
 11 F.3d 660 (9th Cir. 1994) ...................................................................... 6

*William O. Gilley Enters. v. Atl. Richfield Co.*,
 588 F.3d 659 (9th Cir. 2009) .................................................................... 4

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
 401 U.S. 321 (1971) ............................................................................... 11

## STATUTES

Cal. Bus. & Prof. Code § 17200 ....................................................................... 21

## OTHER AUTHORITIES

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust
 Principles and Their Application*, § 1767a (2014) .................................... 9

# I.     INTRODUCTION

Defendants, who have not denied Oracle's core allegation that they improperly took and distributed patches, updates and bug fixes for Oracle's proprietary Solaris operating system ("Solaris Updates"), want Oracle to make Solaris Updates separately available "for free or a reasonable and fair cost." *See* TCC ¶ 25.  Oracle wants to sell Solaris Updates in the same way it sells updates for all of its other software products:  as a component of a subscription offering that entitles the customer to obtain updates for so long as it is on support.  The primary legal question presented by this motion is whether Defendants have stated a claim that Oracle's preferred approach is *unlawful* because it constitutes a tying arrangement.  That can only be true if "updates" and "support" exist in distinct markets, *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 21-22 (1984), so it is Defendants' burden to plead facts indicating that they do.

It is hard to imagine how Defendants hope to meet that burden in the long run since their primary copyright infringement defense is that customers received a "perpetual" license to updates at the time they acquired licenses to Solaris itself.  Solaris Updates, in other words, were allegedly bundled with Solaris.  There is no possible way to reconcile that license defense with the contention that there was a distinct separate market for Solaris Updates alone, which Oracle then tied to "support."  And since Defendants cannot coherently litigate this case asserting both positions at once, it is hardly unreasonable for Oracle to ask whether Defendants have met their burden to plead a separate Solaris Updates market.

Rather than meet that burden, Defendants complain that merely by presenting its own perspective on the issue, Oracle has improperly imported disputed facts into the motion to dismiss process.  Terix Computer Co. Inc.'s Opp. To Oracle's Mot. to Dismiss Countercls., Dkt. # 182 ("Terix Opp.") at 2; Opp. of Maintech Inc. And Volt Delta Resources, LLC To Oracle's Mot. To Dismiss Defs.' Countercls., Dkt. # 183 ("Maintech Opp.") at 1.  This both mischaracterizes Oracle's motion and is incorrect as a matter of law.  There is nothing wrong with a defendant framing the issue presented by its motion to dismiss, as Oracle has, by explaining the business context of the dispute.  The Supreme Court has stated that "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that

1    requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v.*

2    *Iqbal*, 556 U.S. 662, 679 (2009).  Therefore, while it is of course true that factual allegations that

3    are well-pleaded cannot be *disputed* at this stage, nothing about that principle requires this Court

4    to evaluate the sufficiency of the allegations wearing blinders.

5         This is particularly true in antitrust cases where both the Supreme Court and the Ninth

6    Circuit have warned about the "potentially enormous expense of discovery in cases with 'no

7    reasonably founded hope that the [discovery] process will reveal relevant evidence. . . .'" *Bell*

8    *Atl. Corp. v. Twombly,* 550 U.S. 544, 559 (2007); *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042,

9    1047 (9th Cir. 2008) ("[D]iscovery in antitrust cases frequently causes substantial expenditures

10   and gives the plaintiff the opportunity to extort large settlements even where he does not have

11   much of a case.").  There is no better example of that danger than this case, where the

12   counterclaims are effectively "Hail Mary" defenses to largely conceded infringement; where

13   Terix *argues* that merely filing its claims means that it is "entitled to proceed in this action to

14   conduct broad discovery," Terix Opp. 9; and where Defendants have already served massively

15   broad antitrust discovery on Oracle.  Before that is allowed the Court is obligated to determine

16   whether there is a well-pleaded claim that is more than "labels and conclusions" or a "formulaic

17   recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555.

18        By this measure, Defendants' claims fail.  Terix's and Maintech's principal tying claims,

19   and their ancillary monopolization claims, rely on what is best characterized as a *postulation* that

20   Solaris Updates are divisible from the balance of the two "support packages" they are included

21   within.[1]  That is not a hard game to play.  One could just as easily postulate that the various risks

22   covered by an insurance policy are divisible, or that a house and the land it sits on are divisible.

23   *See Souza v. Estate of Bishop,* 821 F.2d 1332, 1335-36 (9th Cir. 1987) (single family homes and

24   the leased land on which they were built were not separate products).  But the proper analysis is

25   not about divisibility in the abstract.  As a fundamental premise, the antitrust laws are not

---

26   [1]   Specifically at issue are "Oracle Premier Support For Operating Systems" (which includes
27   updates, patches and fixes for Oracle's Solaris operating system and firmware) and "Oracle
     Premier Support For Systems" (which is identical, but also includes hardware service
28   support).  TCC ¶ 55; MCC ¶ 31.

1  concerned with the method by which Oracle chooses to provide updates to consumers unless, in

2  the real world, Oracle's support packages have tied together previously distinct markets for

3  Solaris Updates and other support services. *Jefferson Parish*, 466 U.S. at 20-21 (It is "clear that

4  a tying arrangement cannot exist unless two separate product markets have been linked."). This

5  has never been true for Oracle's products, and Defendants do not adequately allege that it was.

6      The same flaw defeats Defendants' other tying claims, such as the argument that by

7  requiring customers who want Oracle support to put all Solaris systems under some support

8  contract, Oracle has "tied" hypothesized markets for "Critical Server Solaris Support Services"

9  and "Non-Critical Server Solaris Support Services." TCC ¶ 80. There is not even a good faith

10  argument that these are distinct markets. Oracle sells exactly the same support products to these

11  "markets" and the only thing that distinguishes them is how badly the customer wants what

12  Oracle is selling. *See S. Pines Chrysler-Plymouth, Inc. v. Chrysler Corp.,* 826 F.2d 1360, 1363

13  (4th Cir. 1987) (popular and hard-to-sell car models were not in separate markets). Oracle

14  should not bear the costs and burdens of antitrust discovery based on "ties" of invented markets.

15      Defendants' non-antitrust claims are no better. In response to Oracle's motion, neither

16  Maintech nor Terix can point to actual allegations sufficient to identify the particular

17  misstatements that allegedly support their Lanham Act and trade libel claims. With respect to

18  their claims for intentional interference with contract and economic advantage, Defendants still

19  have not identified any specific customers or contracts that they believe were interrupted.

20  **II.   DEFENDANTS FAIL TO STATE A CLAIM FOR RELIEF**

21      **A.   Defendants Misrepresent The Motion To Dismiss Standard**

22      We would not normally spend time on pleading standards, but since Defendants' lead

23  argument is that Oracle's motion relies on facts outside the pleadings, we must. Terix Opp. 4-5;

24  Maintech Opp. 1. According to Defendants, it is improper for the moving party to contextualize

25  the allegations of a complaint against the industry and products at issue, and any perspective that

26  Oracle offers on their allegations is necessarily a "factually-disputed opinion" that is not

27  permitted. Terix Opp. 5. That is simply wrong as a matter of law.

28

1    It is well established in this district that a pleading party must "set forth factual

2 allegations sufficient to establish *plausible* grounds for an entitlement to relief." *Apple Inc. v.*

3 *Psystar Corp.*, 586 F. Supp. 2d 1190, 1195 (N.D. Cal. 2008).  With respect to antitrust claims,

4 the Ninth Circuit is clear that courts must "determine whether an antitrust claim is 'plausible' in

5 light of basic economic principles" and common sense.  *William O. Gilley Enters. v. Atl.*

6 *Richfield Co.*, 588 F.3d 659, 662 (9th Cir. 2009).  Courts need not accept as true allegations that

7 make no economic sense or are not plausible in context.  *Iqbal*, 556 U.S. at 679.  Moreover, the

8 federal rules do "not unlock the doors of discovery for a plaintiff armed with nothing more than

9 conclusions" and "[t]hreadbare recitals of the elements of a cause of action, supported by mere

10 conclusory statements, do not suffice."  *Id.* at 678-79.

11    Surely under those rules a moving party is allowed to explain to a court why its motion

12 presents an important legal issue.  Here, Defendants' deconstruction and reconstruction of

13 Oracle's products into tying arrangements threatens the integrity of an extremely common

14 industry practice:  the delivery of perpetually updated software through subscription-based

15 support agreements.  If the updates—which every software developer "monopolizes," since no

16 one else can lawfully make them—constitute separate "products" in "updates markets," the

17 subscription-based support licensing model is at risk to tying claims generally.  The allegation of

18 a separate Solaris Updates market is also plainly implausible in light of Defendants' contention

19 that perpetual access to Solaris Updates was included with every Solaris license.  Both of those

20 contentions cannot be true at once.

21    Oracle is not asking the Court to accept its perspective as factual rebuttal to what

22 Defendants have alleged.  That would be improper at this stage of the case.  Nor are we asking

23 the Court to dismiss the counterclaims because they attack a common industry licensing model

24 and are inconsistent with the license defense.  We are only trying to be mindful that

25 "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-

26 specific task."  *Iqbal*, 556 U.S. at 679.  With that in mind, we turn to the technical deficiencies in

27 Defendants' counterclaims.

28

### B. Defendants' Tying Allegations Fail

1. Defendants Fail To Plead A Tying "Market" for Oracle's Updates, Patches, Bug Fixes And Firmware (Ties 1, 2, 3)

Nothing in Defendants' papers cures the fact that their three tying theories about Solaris Updates do not plead separate and distinct markets, a necessary element of their claims. The legal issue is whether it is sufficient to plead that there **would be** "sufficient demand" for Solaris Updates as a separate market if they were available separately, as opposed to pleading that separate markets **actually existed** and were then linked by tying. The answer is no. The tying doctrine is not a tool to restructure the contours of products that firms have chosen to offer or force anyone to sell a component of a single product separately simply because certain customers may prefer such offerings. To the contrary, its singular concern is preventing the extension of market power in one market into a separate and distinct real world market. *See Jefferson Parish*, 466 U.S. at 21. Consequently, the analysis is grounded in what markets *are*, not what they *might be* with forced restructuring. Otherwise anything can be characterized as a tie. As the D.C. Circuit noted in *United States v. Microsoft Corp.*, 253 F.3d 34, 87 (D.C. Cir. 2001), "[i]n the abstract, of course, there is always direct separate demand for products: assuming choice is available at zero cost, consumers will prefer it to no choice."[2] The question, however, is whether consumers *actually exercised* that choice with respect to the particular products (or components of products) at issue. Only then will antitrust law recognize a theory based on "forced purchase of a *second distinct commodity* with the desired purchase of the dominant 'tying' product." *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 614 (1953).

Contrary to Defendants' briefs, this is the approach the Supreme Court took in both *Jefferson Parish* and *Eastman Kodak*. *Jefferson Parish* concerned anesthesiological and surgical care, and the court found two separate markets because the anesthesiologists *actually at issue*

---

[2] "Indeed, if there were no efficiencies from a tie (including economizing on consumer transaction costs such as the time and effort involved in choice), we would expect distinct consumer demand for each individual component of every good. In a competitive market with zero transaction costs, the computers on which this opinion was written would only be sold piecemeal — keyboard, monitor, mouse, central processing unit, disk drive, and memory all sold in separate transactions and likely by different manufacturers." *Id.* at 87.

1   were not usually employed by hospitals and their services were not usually bundled with other

2   hospital services.  *Jefferson Parish*, 466 U.S. at 21-22 ("As a matter of actual practice,

3   anesthesiological services are billed separately. . . .").  The same was true in *Eastman Kodak*,

4   where Kodak had *actually run* a separate parts business, and actively competed with other

5   OEMs, brokers and customers for such sales.  *Eastman Kodak Co. v. Image Technical Servs.,*

6   *Inc.*, 504 U.S. 451, 458 and n.2 (1992); *see also Red Lion Med. Safety, Inc. v. Ohmeda, Inc.*, 63

7   F. Supp. 2d 1218, 1237 n.16 (E.D. Cal. 1999) (separate products where "service and parts have

8   been sold separately in the past and still are sold separately"); *Datel Holdings Ltd. v. Microsoft*

9   *Corp.*, 712 F. Supp. 2d 974, 997-98 (N.D. Cal. 2010) (alleged tying between Microsoft Xbox

10   360 consoles and accessories, a market in which Microsoft and third parties had historically

11   competed).[3]  These cases involved actual, real world markets that existed in tangible terms at the

12   time of the alleged tying conduct.  Defendants do not allege anything that remotely resembles

13   them.

14          Nor is it enough to claim that Solaris Updates used to be somewhat more *available* than

15   they are now.[4]  One cannot equate allegations that Solaris customers had some past opportunity

16   to obtain software updates *a la carte,* for free, or included with the original Solaris license with

17   the required allegation that there was an existing, real-world market in which Oracle produced

18   and sold its software updates as a separate and distinct product line.  Terix Opp. 6; Maintech

19   Opp. 9.  Defendants simply do not plead the latter, nor can they given that their primary defense

20   to Oracle's claims is the inherently inconsistent notion that the updates were licensed with

21   Solaris itself.

22

23   _____

24   [3]   The other cases cited in Defendants' briefs are simply inapposite on the issue of whether
       software updates and software support constitute separate product markets.  *See Newcal*

25   *Indus., Inc. v. IKON Office Solution*, 513 F.3d 1038 (9th Cir. 2008) (addressing whether a
       single-brand aftermarket was cognizable, not whether it was separate from the allegedly tied

26   market); *Virtual Maint., Inc. v. Prime Computer, Inc.*, 11 F.3d 660 (9th Cir. 1994) (allegation
       of tying between *software* support services and *hardware* support services).

27   [4]   While the Court need not resolve the issue now, Defendants' contentions on past availability
       are exaggerated, misleading, and to a large extent not based on the pleadings or in conflict

28   with other contentions contained in Defendants' counterclaims.

It is not sufficient that *other companies* "such as IBM and Fujitsu have historically provided such updates" separately.  Terix Opp. 6.  Maybe there are separate markets for IBM and Fujitsu updates; who knows?  The question here is whether—at the time of the alleged tying conduct—*Oracle's* own updates were being provided in a separate market from Oracle's own support services.  This follows directly from Defendants' alleged markets, which are framed solely with respect to Oracle's products and *not* as "updates for all software" or "support services for all software."  *See* TCC ¶¶ 10-21; MCC ¶ 44.

Defendants cannot define markets in the abstract and rely on unsupported claims that they are "separate" and "distinct."  They must plead *facts* to support that conclusion, such as who their supposed competitors are in the "separate" market for software support, and whether they themselves have ever sold "Solaris updates" separately from "support."  All we have are Defendants' conclusory assertions of separateness.  That is insufficient.  *Iqbal*, 556 U.S. at 679.

### 2.   Terix's Tying Claim Based On "Critical" and "Non-Critical" Markets Fails (Tie 4)

The two supposedly tied markets in this claim are the alleged markets for "Critical Server Solaris Support Services" and "Non-Critical Server Solaris Support Services."  TCC ¶ 80.  Terix concedes that these supposedly distinct markets rest solely on a claimed distinction between the "need for OEM support . . . for some machines, and the lack of need for OEM support . . . for other machines."  Terix Opp. 10.  That is not the stuff of separate markets.  *See S. Pines*, 826 F.2d at 1363 ("Fluctuating differences in the character of demand for particular models within the automobile consumer market do not create separate products."); *Metromedia Broad. Corp. v. MGM/UA Entm't Co.,* 611 F. Supp. 415, 422-24 (C.D. Cal. 1985) (syndicated first runs and reruns of same TV series not separate products).

Tellingly, Terix is silent on the key shortcoming of this claim:  that "the *exact same servers* fit in both the 'Critical' and 'Non-Critical' categories, and the *exact same services* are available and provided for both."  Oracle Mot. 14.  Terix's claim targets Oracle's business decision that customers should not put one server under support, but then use such updates for other, non-covered servers running the same software.  So, for servers running the same

software, support must be all or none—which necessarily means that the "critical" servers that customers supposedly want covered and the "non-critical" servers they don't *are exactly the same.* Terix admits that "[i]t is black letter law that the boundaries of a relevant market are established by including *all* products/services that are reasonably substitutable for one another." Terix Opp. 17 (emphasis added), *citing inter alia, Thurman Indus., Inc. v. Pay N' Pak Stores, Inc.*, 875 F.2d 1369, 1374-75 (9th Cir. 1989) ("[A] product market is typically defined to include the pool of goods or services that qualify as economic substitutes because they enjoy reasonable interchangeability of use. . . ."). These principles doom Terix's claim because the same products and services fit in both of its alleged "critical / non-critical" markets, and as a matter of "black letter law" these supposed markets are one and the same. Terix Opp. 17.[5]

### 3.   Terix's Alleged "Economic" Tie Between "Sun/Oracle Firmware" and "Sun/Oracle Hardware Support Services" Fails (Tie 3)

Terix concedes that Oracle does not "refus[e] to sell the tying product [firmware] absent purchase of the tied product [hardware support]." Terix Opp. 11. And indeed, Oracle does not, given that Oracle offers Premier Support for Operating Systems, which makes firmware separately available to consumers *without* hardware support. TCC ¶ 55. Terix instead argues that Oracle ties the products "economically" and "prices the tied product at less than Oracle's cost," which allegedly makes it financially impossible for Defendants to compete. Terix Opp. 11. As Oracle stated in its motion, this is functionally equivalent to the "price squeeze" theory rejected in *Pacific Bell Telephone Co. v. linkLine Communications, Inc.* 555 U.S. 438 (2009).

Terix's attempt to distinguish *linkLine* is unpersuasive. Terix Opp. 10-11. In *linkLine*, the Supreme Court rejected a claim that AT&T raised the price of inputs (DSL components, which the plaintiffs claimed they needed to offer DSL) and then lowered the price of the service

---

[5]   Terix cannot sidestep this issue by characterizing its alleged markets as "submarkets" or its claims as "exclusive dealing." A valid submarket must have some distinguishing characteristic and be recognized as a "distinct economic entity," as Terix's case law shows. *Thurman*, 875 F.2d at 1375. Terix makes no such allegations, nor can it for the reasons above. Nor can Terix reframe this as an "exclusive dealing" claim. Terix Opp. 10 n.7. A plaintiff cannot save an insufficiently pleaded claim—much less assert a brand new theory of relief—in a brief opposing a motion to dismiss. *See Schneider v. Cal. Dep't of Corrections*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998)

1    that competed directly with the plaintiffs (DSL).  *linkLine*, 555 U.S. at 450.  Terix claims Oracle

2    raised the price of an input (firmware, which Terix alleges it needs to offer hardware service) and

3    then lowered the price of the service that competes directly with Terix (hardware service).  The

4    theories are materially indistinguishable, and Terix's claim therefore fails.[6]

5                    4.    Maintech's Tying Claim Fails (Tie 1)

6            Maintech spends much of its brief arguing about whether there is a distinction between

7    software updates, patches and firmware, on the one hand, and software support.  *See* Maintech

8    Opp. 5-12.  This discussion is entirely irrelevant to Maintech, which alleges expressly (and

9    strenuously) that it does *not* participate in the market for software support services.  MCC ¶ 10

10   ("Maintech does not directly provide any operating system or application software support for

11   any OEM equipment to its customers."); *see also* Maintech Opp. 13.  Whether "software

12   updates" are separate from "software support" therefore has no bearing on Maintech, which

13   cannot have been injured by any alleged tie to a market in which it does not participate.  Phillip

14   E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their*

15   *Application*, § 1767a (2014) ("Injury to the foreclosed rival occurs, of course, only because a tie

16   has forced buyers to purchase the defendant's tied product rather than the rival's.")

17           The only potentially relevant question for Maintech is whether Oracle ties software and

18   firmware updates to *hardware support*, the market in which Maintech actually participates.  And

19   on that issue, Maintech is quite clear that Oracle does *not* engage in tying because firmware and

20   software updates are available to customers separate from hardware support.  MCC ¶ 32.

21           In a transparent effort to save its claim, Maintech now asserts that Oracle does not, in

22   fact, make firmware updates available separate from hardware support.  Maintech Opp. 8-10, 13.

23   This is directly contradicted by the very documents Maintech attaches to its brief.  Exhibit A to

24   Maintech's Request for Judicial Notice delineates what is available under both Premier Support

25   For Operating Systems and Premier Support For Systems.  *Both* levels of support contain the

26

27   [6]   Terix cannot assert a bundling claim in *Cascade Health Solutions v. PeaceHealth*, 515 F.3d
       883 (9th Cir. 2008).  Terix Opp. 11.  Oracle does not "bundle" hardware services with
28     firmware because they are offered separately, as Terix concedes.  Terix Opp. 11; TCC ¶ 55.

1   exact same entry with respect to available updates:  "Program updates, patches, fixes, security

2   patches, and security alerts for operating system software and integrated software."  Maintech

3   Request for Judicial Notice, Dkt. #184 ("RJN"), Ex. A at 6, 8.  Exhibit B of Maintech's RJN

4   confirms that "integrated software" includes "firmware."[7]  Oracle's support plans provide

5   identical access to software and firmware updates, meaning customers that want firmware

6   updates are free to purchase only firmware updates from Oracle and obtain hardware services

7   from Maintech.

8        Maintech also argues that Oracle's "Matching" policy requiring coverage for all

9   Oracle/Sun servers is "the epitome of a tied market."  Maintech Opp. 10-11.  This is essentially

10  the same argument as Terix's Critical/Non-Critical server scenario addressed above.  *See supra*

11  at 7-8.  For the same reasons, it cannot save Maintech's fatally deficient tying claim.

12            5.    Defendants' Tying Claims Are Largely Time Barred

13        Terix and Maintech both offer the same basic arguments for why their tying claims are

14  not time barred.[8]  Terix Opp. 12-16; Maintech Opp. 13-15.  Defendants first assert that they have

15  not alleged any wrongful conduct or resulting injury outside of the statute of limitations period—

16  *i.e.*, before April 14, 2010.  Terix Opp. at 12-14; Maintech Opp. at 13.  That is wrong on the face

17  of Defendants' counterclaims.  The opening sentences of Terix's counterclaim allege that

18  "Oracle's acquisition of Sun was completed on January 27, 2010.  *Since that time*, Oracle has

19  pursued a deliberate policy of attempting to eliminate competition . . . ."  TCC ¶ 1 (emphasis

20  added).  The word "time" refers back to the date in the first sentence—January 27, 2010—and

21  Oracle's "policy" is the allegedly wrongful tying conduct that forms the core of Terix's

22  counterclaims.  Maintech alleges the same: "*Since the acquisition of Sun closed in 2010*, Oracle

23  has taken the position . . . that the only legitimate manner in which those customers may obtain

24  bug fixes, patches or updates to the Solaris operating system is by purchasing at a minimum a

---

7   As the exhibit makes clear, in 2013 the specific term "firmware" was replaced with the
    broader term "integrated software" for both levels of Oracle support.  Maintech RJN, Ex. B
    at 3 (listing for both support plans, "Removed '(e.g., firmware)' after 'integrated software'").

8   Oracle has not argued that Terix's tying claim regarding the provision of "Sun/Oracle
    Firmware" is barred by the statute of limitations.  *See* Oracle Mot. 18 n.9.

service package for operating system support."  MCC ¶ 32 (emphasis added).  Defendants'

argument that they have not alleged any wrongful act outside of the statute of limitations period

is contradicted by their own claims.

Defendants next argue that the mere fact that some alleged conduct continued into the

statutory period should extend the statute of limitations.  Terix Opp. 12-14; Maintech Opp. 13-

15.  That argument fails under the law.  The easiest case for finding a claim time-barred is where

the complaining party was first injured by pre-limitations conduct more than four years prior to

filing suit.  *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971).  As

Defendants allege, Oracle announced the supposedly harmful change in support services on

January 27, 2010 and disseminated this change among ISOs and consumers.  TCC ¶ 2.  If this

change "tied" the purchase of updates to service, as Defendants claim, customers (and

Defendants) would have been impacted immediately because customers would have begun

making purchasing decisions based on Oracle's announcement.  Oracle Mot. 19.

Subsequent "implementations" pursuant to this policy change did not re-trigger the

statutory clock, as Defendants contend.  Terix Opp. 13; Maintech Opp. 14.  Terix acknowledges

that the "change in policy" at the time of the Sun acquisition is the alleged "central wrongful

conduct" at the core of its tying claims (Terix Opp. 13), not the subsequent implementation of

that policy.  Maintech's counterclaims also point to the Sun acquisition in January 2010 as the

key moment in time.  MCC ¶ 32 ("Since the acquisition of Sun closed in 2010. . . .").

Subsequent implementations were nothing but "inertial consequences" of the prior, widely-

announced policy and therefore cannot restart the statutory period.  *See AMF, Inc. v. General*

*Motors Corp. (In re Multidistrict Vehicle Air Pollution)*, 591 F.2d 68, 72 (9th Cir. 1979).

Defendants predictably argue Oracle's conduct constitutes a "continuing violation."

Terix Opp. 14; Maintech Opp. 13-15.  But "continuing violations" are also subject to the "new

and independent act" requirement (as opposed to a mere "reaffirmation" of a prior act).  *See*

*Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1202 (9th Cir. 2014).  Moreover,

Terix's argument that it has "clearly allege[d] continuing wrongful conduct and continuing

SF\5767290

1   additional injury to Terix" is not supported by a cite to a single allegation from any of its

2   counterclaims.  Terix Opp. 14.

3          Maintech's elaborate legal discussion is also unavailing.  *Samsung* involved a wholly

4   new agreement within the limitations period extending the alleged cartel to second-generation

5   SD cards, not merely a "reiteration or extension of the prior agreement."  747 F.3d at 1203-04;

6   *accord AMF*, 591 F.2d at 72.  *Smith v. eBay Corp.* involved a tying claim "premise[d]" on the

7   "continued modification" of the forms of payments eBay would accept, which it progressively

8   continued to restrict within the limitations period.  2012 WL 27718, at *4-5 (N.D. Cal. Jan. 5,

9   2012).  Nothing like that happened here.  *eBay* itself rejected Maintech's argument that Oracle's

10  "sales of a new product" were sufficient to "restart[] the statute of limitations."  Maintech Opp.

11  14; *see eBay*, 2012 WL 27718, at *3 ("[T]he continued purchase of a defendants' product or

12  services does not constitute a 'new and independent' act that would restart the statute of

13  limitations.") (citations omitted).

14         Maintech tries to point to a "Statement of Changes" document detailing changes to

15  Oracle's policies, but that document cannot cure Maintech's allegations.  *None* of the changes

16  has *anything* to do with Maintech's tying allegations.  Some changes were merely clarifications

17  ("Modified this section to clarify policy"), others were to *expand* support ("Added Trusted

18  Solaris 8 to the list of covered system software"), and still others were to make clear that

19  firmware updates were included in both levels of Oracle support ("Added 'integrated software

20  (e.g., firmware)' throughout this section").  Maintech RJN, Ex. B at 10-14.  Without actual

21  allegations of a new and independent overt act within the limitations period, Defendants cannot

22  sustain a continuing violation theory.  *See, e.g.*, *MedioStream, Inc. v. Microsoft Corp.*, 869 F.

23  Supp. 2d 1095, 1106 (N.D. Cal. 2012) (tying claim barred because the complaint "plainly does

24  not allege that Microsoft executed an unlawful agreement within the limitations period").

25         Defendants conclude by arguing wrongly that their tying counterclaims are compulsory,

26  not permissive, and therefore relate back to Oracle's complaint.  Terix Opp. 15-16; Maintech

27  Opp. 15.  A counterclaim is logically related, and therefore compulsory, when "the essential facts

28  of the various claims are so logically connected that considerations of judicial economy and

SF\5767290

1   fairness dictate that all the issues be resolved in one lawsuit." *Hydranautics v. FilmTec Corp.*,

2   70 F.3d 533, 536 (9th Cir. 1995) (internal quotation omitted).  Defendants together allege nearly

3   fifty pages of new additional facts about Oracle to support their counterclaims, which only

4   tangentially relate to Oracle's claim that Defendants misappropriated and distributed

5   "copyrighted, proprietary Oracle software code."  First Am. Compl., Dkt. #110, ¶ 1.  Oracle's

6   claims and Defendants' counterclaims do not arise from an essential set of facts, and the cases

7   cited by Terix and Maintech are distinguishable.  In *Grumman Systems Support Corp. v. Data*

8   *General Corp.*, for example, the court ruled that that "the monopolization allegation does not

9   extend . . . far beyond" the allegations in the copyright infringement case.  125 F.R.D. 160, 164

10  (N.D. Cal. 1988).  Here, by contrast, Defendants' counterclaims extend far beyond Oracle's

11  claims—as reflected by the copious new factual allegations.  Defendants' claims are therefore

12  permissive, do not relate back to Oracle's complaint, and are time barred.[9]

13      **C.    Defendants' Monopolization Claims Fail**

14          Terix does not truly defend the notion that its Section 2 claims are based on different

15  conduct than its tying claims.  They are not, as Terix's counterclaims make clear in the sole

16  sentence describing Oracle's allegedly monopolistic conduct.  TCC ¶ 91 ("Oracle's wrongful

17  conduct detailed above constitute predatory and/or anticompetitive conduct.").  Because Terix

18  simply refers back to its tying claims, its monopolization claim fails for the reasons above.

19          That a Section 2 claim has "independent force," as Terix argues, does not help it.  Terix

20  Opp. 17.  Whether that is true or not,[10] Terix does not plead facts sufficient to establish

21  monopoly power (or anything close) in any of its alleged markets.  Monopoly power is a

22

---

23  [9]    Terix mischaracterizes the law by stating that the Cartwright Act is "subject to an even
24      broader tolling rule."  Terix Opp. 16 n.11.  Its own cases hold otherwise.  In *Sidney*, the court
        held that a cross-complaint is tolled by the complaint only where the cross-complaint
25      "arise[s] out of the same occurrence"—*i.e.*, only when compulsory.  *See Sidney v. Superior
        Court*, 198 Cal. App. 3d 710, 714 (1988).  A compulsory cross-complaint must be "related"
26      to the original claim, and California courts apply a similar "logical relationship" test as
        federal courts.  *Align Tech., Inc. v. Bao Tran*, 179 Cal. App. 4th 949, 960 (2009).

27  [10]   It is clearly not true for the portion of Terix's Section 2 claim based on the alleged "Non-
        Critical Server Solaris Support Services" market.  TCC ¶ 92.  That market is a fabrication,
28      which dooms any attempt by Terix to rely on it under Section 2.  *See supra* Part II.B.2.

1   required element of Section 2 claims, and is defined as "the power to control prices or exclude

2   competition." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966).  The only factual,

3   non-conclusory allegation that Terix makes regarding Oracle's power in the markets for "Solaris

4   Support Services" or "Sun/Oracle Hardware Support Services" is its claim that Oracle recently

5   reported increased "Sun-related service margins."  TCC ¶ 39.  It is unclear to which market this

6   relates, but it does not prove market power.  Oracle's margins (*i.e.*, its net profits over sales)

7   could have gone up for any number of reasons unrelated to Oracle's power in the market, *e.g.*,

8   decreased overhead.  And beyond legal conclusions, Defendants do not allege *anything* with

9   respect to Oracle's actual share of the markets for software or hardware support services, one of

10   the more traditional methods of proving market power.[11]

11          Maintech essentially concedes that it has not provided adequate detail to support its

12   claim.  Other than stating the legal elements of monopolization and string-citing paragraphs of its

13   counterclaims, Maintech simply asks for leave to amend.  Maintech Opp. 16.  As Oracle's brief

14   details, Maintech's conclusory allegations—such as its barebones statement that Oracle "brings

15   pretextual lawsuits"—cannot suffice.  If Maintech believes that it has a valid claim for

16   monopolization under Section 2, it must plead facts to support it.

17          **D.     Defendants' Copyright Misuse Claims Fail**

18          In the Ninth Circuit, copyright misuse only applies where customers are actually

19   *prohibited* from using competing products.  *See Practice Mgmt. Info. Corp. v. Am. Med. Ass'n*,

20   121 F.3d 516, 521 (9th Cir. 1997); *Apple Inc. v. Psystar Corp.*, 658 F.3d 1150, 1157 (9th Cir.

21   2011).  Terix concedes that customers are "free to purchase Support Services from third parties"

22   but contends that "in the real world it is a rare customer indeed who would purchase the same

23   thing twice."  Terix Opp. 24.  If the mere fact that customers do not want to purchase a product

24

25   [11]   Terix's allegation that Oracle has a "100% share" in Oracle *updates* does not prove market
       power in the markets for software or hardware *services*.  TCC ¶¶ 35-36.  The supposed
26     "updates market" is fictional, and is defined only by Oracle's proprietary interest in its own
       software code.  It says nothing about whether Oracle faces competition (or how much) in the
27     markets for the provision of actual services—where Terix claims to compete.  The Supreme
       Court has also abrogated the rule that once allowed courts to infer market power from
28     intellectual property rights.  *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006).

twice is enough to invalidate a copyright for misuse, *no copyright would ever be valid*. This so-called "economic incentive to 'not use competitors' products'" (*id.*) is present every single time a copyrighted product is sold, and it cannot form the basis of a copyright misuse claim absent separate proof that the customer was prohibited from purchasing competing products.[12]

Maintech concedes that Oracle "has not literally done the same thing" found to be misuse in the Ninth Circuit (Maintech Opp. 16), and makes essentially one argument—that its claim should not be dismissed because "Oracle has misused its copyrights not simply by controlling access to its copyrighted works via license agreements, but by denying rightful access by customers who already have license rights granting them such access." Maintech Opp. 17. This reveals the fatal contradiction between Defendants' counterclaims and their infringement defense. If customers received a license to updates by virtue of the original Solaris purchase, they could not have been affected by Oracle's alleged support policy change. Yet Defendants assert that those very customers were "forced" by Oracle to purchase software support in order to obtain access to software updates—access that licensed customers would have. Defendants cannot have it both ways. As the cases Maintech cites make clear, copyright misuse is concerned only with the use of a copyright to extend the holder's lawful monopoly power to other, non-copyrighted products, or to bar consumers from using competing products. *Psystar*, 658 F.3d at 1157; *Practice Mgmt.*, 121 F.3d at 521. Maintech makes no such allegation, and Oracle has done nothing to prohibit customers from availing themselves of whatever non-infringing services Defendants may provide.

### E.     Defendants' Lanham Act Claims Fail

There are several problems with Defendants' Lanham Act claims: they fail to identify Oracle's commercial advertising, how it was disseminated, or what specific misrepresentations were made. Maintech also fails to allege facts showing that it can recover for misstatements Oracle allegedly made about Terix.

---

[12] Terix's analogy to patent misuse based on "the improper tying of a patented product and an unpatented product" also goes nowhere. Terix Opp. 24. Terix admits Oracle does not tie its copyright-protected updates to hardware service. *See supra* note 6. And it does not tie updates to software support, because the two are not separate products. *See supra* Part II.B.1.

1.   Maintech And Terix Fail To Identify Oracle's Commercial Advertising Or How It Was Disseminated Widely

Maintech contends no more than that Oracle's alleged misstatements took place "in its marketing efforts," while Terix contends they were made as part of Oracle's "commercial advertising and promotion."  MCC ¶ 84; TCC ¶¶ 98-100.[13]  Terix says that Oracle made some of the paraphrased statements to "customers," TCC ¶¶ 98-100, and others "to actual and potential TERiX clients," TCC ¶ 69, while Maintech refers to marketing "directed to customer[s] and potential customers of Maintech and Terix."  MCC ¶ 84.  These are rote pleading elements, not facts supporting those elements—a fatal omission.  *Twombly*, 550 U.S. at 555.

Missing the point, Maintech and Terix argue that the law allows Lanham Act claims based on "more informal types of 'promotion'" than "classic advertising," Maintech Opp. 20, and that "[w]here the potential purchasers in the market are relatively limited in number, even a single promotional presentation to an individual purchaser" may be sufficient dissemination. Terix Opp. 19.  Perhaps, but neither Maintech nor Terix alleges any *facts* that would justify those exceptions.  For example, neither alleges that their potential hardware and software support customers are "relatively limited in number"—which would be absurd in this industry.  In *Coastal Abstract Serv., Inc., v. First Am. Title Ins. Co.*, 173 F.3d 725, 735 (9th Cir. 1999), on which Defendants rely, the court found that dissemination to *1 of 3* potential customers was sufficient, which is hardly equivalent to the number of potential customers here.  Similarly, although Lanham Act violations may include misrepresentations made in contexts other than classic advertising materials, what constitutes such promotion is analyzed based on the given industry's practice.  *See, e.g.*, *Gonzalez v. Allstate Ins. Co.*, 2005 WL 5891935 (C.D. Cal. Aug. 2, 2005).  But here, Maintech and Terix allege no facts showing what kinds of promotion are typical in the industry, nor would such background facts be helpful in mapping Oracle's alleged misstatements, as the counterclaims do not explain in what form those misstatements came. Without more, these claims fail.

---

[13]  Terix does not contest Oracle's point that it has failed to allege, in even cursory fashion, that the paraphrased misstatements in paragraph 69 were part of Oracle's advertising.  TCC ¶¶ 69, 98-100; Terix Opp. 19-20.

2.   Maintech And Terix Fail To Identify Specific Misrepresentations

In opposition, Maintech and Terix effectively concede that they have indeed paraphrased and generalized Oracle's alleged misrepresentations, rather than identify specific statements as they are required to do. *See* Maintech Opp. 19-20; Terix Opp. 20. This failure is the natural consequence of their inability to identify particular Oracle advertising or promotions, and highlights that they are simply trying to assert reciprocal Lanham Act claims to Oracle's well-pled claim through such impermissibly vague allegations. *See, e.g.*, *AccuImage Diagnostics Corp. v. TeraRecon, Inc.*, 260 F. Supp. 2d 941, 948-49 (N.D. Cal. 2003). Contrast Defendants' approach with Oracle's—while Oracle quoted Maintech's and Terix's specific misrepresentations, and described how those misstatements created a false impression, Maintech and Terix generally allege that any statement Oracle made to any Sun customer touching on the limits of third-party maintenance providers can support a Lanham Act claim. *Compare* First Am. Compl., Dkt. # 110, ¶¶ 45-50, *with* MCC ¶ 84 *and* TCC ¶¶ 98-100. The law does not provide so loose a standard. *See, e.g.*, *AccuImage Diagnostics*, 260 F. Supp. 2d at 948-49. Maintech also complains that Oracle is making a Rule 9(b) argument, Maintech Opp. 19-20. Not so. Defendants' allegations fail the Rule 8 and *Twombly*/*Iqbal* standard. Mot. 24-26.

3.   Maintech Has No Standing to Assert Alleged Misstatements About Terix

Because Maintech has not alleged facts showing that statements about Terix proximately caused injury to Maintech, it has no standing to bring a claim based on those misrepresentations. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1395 (2014). In response, Maintech describes *Lexmark*'s test and asserts—*without citation to its counterclaims*—that it passes. Maintech Opp. 21. That even Maintech cannot cite a single allegation that it suffered "economic or reputational injury flowing directly from" Oracle's alleged misrepresentations about Terix is telling.

**F.    Maintech's Trade Libel Claim Fails**

Maintech's trade libel claim fails to identify particular lost transactions or specific false statements. Mot. 27-28. In response, Maintech does not distinguish Oracle's cases or cite different ones, but rather claims that because Maintech "identified specific customers targeted by

Oracle – [BNYM], Royal Bank, and Sony – and alleged that by targeting them, Oracle caused

Maintech specific pecuniary losses," it "has amply pled the factual support for this claim."

Maintech Opp. 22.  But Maintech must identify specific misstatements by Oracle, describe when

Oracle made them, to whom, and in what manner, as well as explain how those specific false

statements played a material and substantial part in inducing BNYM, Royal Bank, and Sony not

to deal with Maintech.  *See, e.g., Eldorado Stone v. Renaissance Stone, Inc.*, 2005 WL 5517731

at *3 (S.D. Cal. Aug. 10, 2005); *First Advantage Background Servs. Corp. v. Private Eyes, Inc.*,

569 F. Supp. 2d 929, 937 (N.D. Cal. 2008); *Universal Grading Serv. v. eBay, Inc.*, 2011 WL

846060, at *9-*10 (N.D. Cal. Mar. 8, 2011).  Maintech does not allege such facts.

Instead of disputing the standard, Maintech attacks Oracle's point that Maintech cannot

base a trade libel (or other) claim on statements from Oracle's pleadings.  Maintech Opp. 22-23.

Oracle raised this in its motion because, as Maintech failed to provide any details, it is

impossible to tell whether Maintech is relying on Oracle's pleadings.  Mot. 28.  Maintech does

not contest that such a claim would fail on privilege grounds, but instead argues that a statement

is not immunized simply because it appears in a pleading.  Maintech Opp. 22-23.  Of course, this

is Oracle's point: because Maintech did not provide *any* facts about Oracle's alleged

misstatements,[14] *no one can tell* on what statements the claim is based.  Mot. 27-28.

### G.    Defendants' IPEA Claims Fail

Maintech and Terix's intentional interference with prospective economic advantage

claims are flawed because they do not specify on what wrongful acts the claims rely.  Mot. 29.

Although Maintech and Terix now attest that they meant to rely on other allegations in their

counterclaims, *see* Maintech Opp. 24; Terix Opp. 22, the fact is that their actual claims rely only

on restatements of the interference itself or a recitation of elements.  *See* MCC ¶ 96; TCC ¶ 131.

Aside from a few specific customers, Maintech and Terix impermissibly seek to recover

for allegedly lost relationships with unidentified and unidentifiable customers.  *See* Mot. 28-29;

---

[14]  Maintech's citations to its allegations in paragraphs 39 and 40 are to no avail.  Those
allegations are, at best, a high-level description of some of Oracle's communications and do
not provide the detail necessary to ground a trade libel claim.

1   MCC ¶ 96; TCC ¶ 127.  Maintech now states, "in addition to the more general allegations of

2   interference" on which Oracle moved to dismiss, Maintech did identify specific customers –

3   BNYM, Royal Bank, and Sony.  Maintech Opp. 23.  Maintech fails to address, and therefore

4   concedes, Oracle's argument that Maintech's allegations fail as to customers that Maintech did

5   *not* name.  The Court should therefore dismiss Maintech's interference claim to the extent it

6   relies on any customers other than BNYM, Royal Bank, and Sony.

7       As for Terix, rather than explain what allegations identify a specific and known group of

8   customers, Terix asserts that its allegations are identical to Oracle's.  Terix Opp. 21.  They are

9   not.  Oracle alleged Maintech and Terix interfered with Oracle's established hardware customers

10  that became Maintech's and/or Terix's hardware support customers—in other words, customers

11  known to Terix and Maintech because they are now *their* customers.  *See* First Am. Compl., Dkt.

12  # 110, ¶¶ 1, 27-28, 48, 62, 102.  By contrast, Terix states only that Oracle interfered with

13  "multiple Hardware owners."  TCC ¶ 127.[15]  Oracle's group of interfered-with customers are

14  known to Terix because they are Terix customers, whereas Terix's group of interfered-with

15  customers are not known to Oracle, because *they too* are Terix's customers or potential

16  customers.  That is why Oracle's allegations were sufficient, and Terix's are not.  Without

17  pleading facts about who these customers are, Terix's claims fail.  *See* Mot. 29.

18  ### H.   The Court Should Dismiss In Part Terix's Intentional Interference With Contract Claim

19      Terix cannot plead contracts in the abstract, but must identify the specific, valid contracts

20  with which it claims Oracle interfered.  Mot. 26-27.  Thus, Terix's attempt to plead interference

21  with other "valid and enforceable contracts with multiple Hardware owners" is invalid.  TCC ¶

22  121.  Terix does not (and cannot) disagree with Oracle's analysis or caselaw, but instead

23  professes bewilderment as to what Oracle seeks.  *See* Terix Opp. 21 n.13.  That is simple:

24

25  ---

    [15]  Terix points to paragraph 70 of its counterclaims, where it alleges that Oracle made false

26      statements to "current TERiX customers or [] potential customers with whom TERiX already
        had a commercial relationship."  TCC ¶ 70.  But paragraph 70 relies on paragraph 69, which

27      states that Oracle made these statements to Terix's "actual and potential customers"—
        *without* an allegation of an existing relationship with those potential customers.  TCC ¶ 69.

28      This inconsistency highlights the lack of detail in Terix's definitions.

1   because Terix concedes that its only adequate claim is as to its agreement with BNYM, the Court

2   should dismiss the contract interference claim to the extent it relies on any other contract.

3        **I.     Defendants' Unfair Competition Claims Fail**

4        Finally, if the Court dismisses Terix and Maintech's other counterclaims, it should also

5   dismiss their claims under California Business and Professions Code section 17200.  Mot. 30.

6   Maintech and Terix argue their section 17200 claims based on the "unfair" prong are

7   independent of the antitrust-based counterclaims, but the statute's scope "is not unlimited.

8   Courts may not simply impose their own notions of the day as to what is fair or unfair."  *Cel-*

9   *Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 182 (1999).  Specifically,

10   "the word 'unfair' [] means conduct that threatens an incipient violation of an antitrust law, or

11   violates the policy of spirit of one of those laws because its effects are comparable to or the same

12   as a violation of the law, or otherwise significantly threatens or harms competition."  *Id.* at 187.

13   Accordingly, Terix and Maintech's reliance on the "unfair" prong falls with the antitrust

14   counterclaims on which it is based.  *See Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 375

15   (2001) ("If the same conduct is alleged to be both an antitrust violation and an 'unfair' business

16   act or practice for the same reason … the determination that the conduct is not an unreasonable

17   restraint of trade necessarily implies that the conduct is not 'unfair' toward consumers.").[16]

18   **III.    CONCLUSION**

19        For these reasons, Oracle respectfully requests that the Court dismiss with prejudice all

20   counterclaims asserted by Defendants.

21   *///*

22

23

24

25

26    

27   [16]  Maintech states, with no elaboration whatsoever, that "Maintech may prevail under this claim on the fraudulent prong."  Maintech Opp. 25.  But any such reliance would fall with Maintech's Lanham Act and trade libel claims.  *See, e.g.*, *Seltzer v. Green Day, Inc.*, 725

28   F.3d 1170, 1180 n.1 (9th Cir. 2013).

1    Dated:   June 11, 2014                    Respectfully submitted,

2

3                                             By: /s/ Daniel M. Wall
                                                  Daniel M. Wall
                                                  Christopher B. Campbell
4                                                 LATHAM & WATKINS LLP

5                                                 Geoffrey M. Howard
                                                  Thomas S. Hixson
6                                                 Kyle Zipes
                                                  BINGHAM MCCUTCHEN LLP

7

8                                                 Attorneys for Plaintiffs
                                                  Oracle America, Inc. and
                                                  Oracle International Corporation

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28