United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ORACLE AMERICA, INC., et al.<br><br>　　　　　　　Plaintiffs,<br>　　v.<br><br>TERIX COMPUTER COMPANY, INC., et al.,<br><br>　　　　　　　Defendants. | Case No. 5:13-cv-03385-PSG<br><br>**ORDER GRANTING-IN-PART MOTION TO DISMISS AND GRANTING MOTION TO STRIKE**<br><br>**(Re: Docket Nos. 173 and 186)** |

In its heyday as a provider of the large computer servers that made the internet what it is, Sun Microsystems, Inc. had an understanding with its customers. No matter who the customer chose to support its servers running Sun's Solaris operating system, Sun would supply its copyrighted and proprietary Solaris updates and firmware for nothing—or near nothing. The result was a robust, competitive aftermarket in Solaris support services that included not only Sun but a range of third parties, including Defendants Terix Computer Company, Inc., Maintech, Inc. and Volt Delta Resources, LLC. But once Plaintiffs Oracle America, Inc. and Oracle International Corporation were in charge, customers had to make a choice—either buy their Solaris support services from Oracle, or find themselves cut off from any updates or firmware they might need to keep their servers up and running.

1

Case No. 5:13-cv-03385-PSG
ORDER GRANTING-IN-PART MOTION TO DISMISS AND GRANTING MOTION TO STRIKE

Or so say Defendants anyway.  After being sued by Oracle for scheming to misappropriate the updates and firmware in violation of Oracle's licenses, Defendants countered with a variety of antitrust and competition law claims all focused on Oracle's allegedly new rules of the game. Oracle now seeks to dismiss these counterclaims pursuant to Fed. R. Civ. P. 12(b)(6).  With respect to certain of Defendants' tying-related claims, as much as it might struggle to make sense of them under prevailing economic theory, the court nevertheless must defer to the Supreme Court's binding precedent and permit Defendants to proceed.  Defendants' other claims are not so fortunate.

## I.

In the aftermath of the Civil War, powerful trusts rose up in the United States to a degree never before seen.  These trusts and their practices threatened consumer welfare by restricting output and raising prices.  Congress responded by passing the Sherman Act, one of our nation's first major commercial regulatory schemes.  The Act was envisaged as "a comprehensive charter of economic liberty . . . [that] rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress."[1]

To that end, Section 1 of the Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . is declared to be illegal."[2] To prevail on a Section 1 claim, a plaintiff must show "(1) that there was a contract, combination, or conspiracy; (2) that the agreement unreasonably restrained trade under either a per se rule of illegality or a rule of reason analysis; and (3) that the restraint affected interstate commerce."[3]

---

[1] *N. Pac. Ry. v. United States*, 356 U.S. 1, 4 (1958).

[2] 15 U.S.C. § 1.

[3] *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1062 (9th Cir. 2001) (additional citation and quotation omitted).

Case No. 5:13-cv-03385-PSG
ORDER GRANTING-IN-PART MOTION TO DISMISS AND GRANTING MOTION TO STRIKE

United States District Court
For the Northern District of California

"Certain types of contractual arrangements are deemed unreasonable as a matter of law. The character of the restraint produced by such an arrangement is considered a sufficient basis for presuming unreasonableness without the necessity of any analysis of the market context in which the arrangement may be found."[4] "A price fixing agreement between competitors is the classic example of such an arrangement."[5]

But "[o]rdinarily, whether particular concerted action violates § 1 of the Sherman Act is determined through case-by-case application of the so-called rule of reason—that is, 'the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition.'"[6] An example of this latter category of activity can be the so-called tying arrangement, whereby a competitor with market power "agrees to sell one product (the tying product) but only on the condition that the buyer also purchase a different product (the tied product), or at least agrees that he will not purchase the tied product from any other supplier."[7]

Section 2 provides that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony."[8]

---

[4] *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 9 (1984) (citing *Cont'l T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 49-50 (1977)) (internal footnote omitted); *see also Northwest Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 289-90, (1985) ("Certain categories of agreements, however, have been held to be per se illegal, dispensing with the need for case-by-case evaluation. [The Supreme Court has] said that per se rules are appropriate only for 'conduct that is manifestly anticompetitive,' that is, conduct 'that would always or almost always tend to restrict competition and decrease output') (additional quotation and citation omitted).

[5] *Id.* (citing *Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 343-48 (1982)).

[6] *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723 (1988) (quoting *Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49 (1977)).

[7] *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1159 (9th Cir. 2003).

[8] 15 U.S.C. § 2.

3

While its plain language provides for criminal liability, Section 2 has long been understood also to provide civil liability for actual or attempted "monopolization"—the use of monopoly power to restrain commerce in a manner detrimental to consumer welfare.[9]

California law also targets antitrust violations. Section 16727 of the Cartwright Act "expressly prohibits illegal tying arrangements."[10] "Allegations of illegal tying agreements can be brought under Section 16726 or the narrower Section 16727."[11]

In 1992, Sun Microsystems released its first version of Solaris.[12] Solaris is a UNIX-based operating system designed and used to operate server, blade, storage and related hardware systems.[13] These systems include hardware that is critical to the proper functioning of its owner for legal, regulatory or business reasons, and therefore require extremely high support levels including guarantees of virtually immediate attention to any problems associated.[14] They also include less critical systems for test, development and back-up that have less exacting support needs.[15] Like many hardware providers, Sun regularly made available updates and firmware for

---

[9] *See Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993).

> The purpose of the [Sherman] Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market. The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself. It does so not out of solicitude for private concerns but out of concern for the public interest.

[10] *Nicolosi Distrib., Inc. v. BMW of N. Am.*, Case No. 3:10-3256, 2011 WL 1483424, at *2 (N.D. Cal. Apr. 19, 2011).

[11] *Id.* (citing *Corwin v. LA Newspaper Serv. Bureau, Inc.*, 4 Cal. 3d 842, 856 & n.12 (1971); *Morrison v. Viacom, Inc.*, 66 Cal. App. 4th 534 (1998)).

[12] *See* Docket No. 269 at ¶ 10. The major releases of Solaris at issue are Solaris 7 (released November 1998), Solaris 8 (February 2000), Solaris 9 (May 2002), Solaris 10 (January 2005) and Solaris 11 (November 2011). *See id.*

[13] *See id.* at ¶¶ 10-12.

[14] *See id.* at ¶ 14.

[15] *See id.* at ¶ 15.

Case No. 5:13-cv-03385-PSG
ORDER GRANTING-IN-PART MOTION TO DISMISS AND GRANTING MOTION TO STRIKE

Solaris that enhanced performance or simply fixed bugs in the system.[16]  Sun routinely permitted

its customers, as well as third-party support providers servicing them, the ability to obtain Solaris

updates and firmware promptly upon release for free or a reasonable and fair cost.[17]

Things changed in 2011 after Sun was acquired by Oracle.  Now customers who want

updates and firmware must sign an annual contract for technical support services to be performed

by Oracle for those hardware systems.[18]  No customer may purchase updates or firmware without

software services.  Oracle also prices the combination of updates, firmware and both services at

less than Oracle's cost.[19]  Customers that sign a support contract—either directly with Oracle or

through a reseller authorized by Oracle—receive a Customer Support Identification number linked

to the products covered by the support contract.[20]  The CSI number allows customers to create

login credentials to access Oracle's secure support website.[21]  Using these credentials, the licensed

customer may download Solaris updates and firmware for the hardware systems that are covered

by the support agreement.[22]  The customer may not share or use its CSI number for the benefit of

others or for the benefit of unsupported Oracle hardware—only customers who pay for and

maintain a technical support agreement with Oracle for the hardware at issue may download

Solaris updates and firmware and only for their own internal business use on specified computers.[23]

---

[16] *See id.* at ¶ 25.

[17] *See id.*

[18] Oracle brands its support services as "Oracle Premier Support for Operating Systems" and "Oracle Premier Support for Systems." *See id.* at ¶¶ 50-53.  The difference between the two offerings is that only the latter includes hardware support services.  *See id.* at ¶ 55.

[19] *See id.* at ¶¶ 54-56.

[20] *See* Docket No. 249 at ¶ 7.

[21] *See id.*

[22] *See id.*

[23] *See id.*

5

United States District Court
For the Northern District of California

Defendants offer their own support services for Solaris hardware.[24]  Each either contracts

directly with customers to provide this support or contracts indirectly as a subcontractor to another

entity, such as its co-defendant.[25]  In contrast to Sun's earlier policy, under the new Oracle policy,

if the customer declines to pay for support from Oracle, neither Defendants nor the customer may

access or use Oracle's support website.[26]  In particular, neither Defendants nor the customer may

download Solaris updates or firmware.[27]

After Oracle filed suit against Defendants for copyright infringement, fraud and other

torts,[28] Defendants counterclaimed, alleging: (1) violations of the Sherman Act; (2) violations of

the Lanham Act; (3) violation of the Cartwright Act; (4) interference with contract; (5) interference

with prospective economic advantage; (6) unfair competition; (7) trade libel and (8) declaratory

relief.[29]  At the heart of Defendants' counterclaims lie four, distinct tying charges:

- Tie 1 (Maintech and Volt): "patches, bug fixes and updates" for Solaris and firmware to "support packages for hardware and software running on Oracle/Sun systems,"
- Tie 2 (Terix): "Solaris Updates" to "Solaris Support Services,"
- Tie 3 (Terix): "Sun/Oracle Firmware" to "Sun/Oracle Hardware Support Services," and
- Tie 4 (Terix): "Critical Server Solaris Support Services" to "Non-Critical Server Solaris Support Services."

Oracle moves to dismiss, arguing principally that Defendants have failed to state any theory of

unlawful tying upon which relief could be granted.

---

[24] *See* Docket No. 269 at ¶ 30.

[25] *See id.*

[26] *See id.* at ¶ 53.

[27] As a result of the new Oracle policy, 22% of all "SPARC" Solaris 8 Solaris Updates were supported by Sun before the acquisition, compared with 93% supported by Oracle a year later.  The comparable figures of x86 Solaris 8, SPARC Solaris 9, x86 Solaris 9, SPARC Solaris 10, and x86 Solaris 10 were 13%-97%, 18%-92%, 13%-95%, 14%-78% and 12%-74%, respectively.  *See* Docket No. 269 at ¶ 52.

[28] *See* Docket No. 249 at 30-41.

[29] *See* Docket Nos. 267 and 269.  Only Maintech and Volt bring a claim for trade libel.

6

Case No. 5:13-cv-03385-PSG
ORDER GRANTING-IN-PART MOTION TO DISMISS AND GRANTING MOTION TO
STRIKE

United States District Court
For the Northern District of California

## II.

This court has subject matter jurisdiction over these counterclaims pursuant to 28 U.S.C. §§ 1331, 1338 and 2201. The court has supplemental jurisdiction over the pendant state law counterclaims pursuant to 28 U.S.C. § 1367. The parties further consented to the jurisdiction of the undersigned magistrate judge under 28 U.S.C. §636(c) and Fed. R. Civ. P. 72(a).

To survive a motion to dismiss, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."[30] When a plaintiff fails to proffer "enough facts to state a claim to relief that is plausible on its face," the complaint may be dismissed for failure to state a claim upon which relief may be granted.[31] A claim is facially plausible "when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[32] "[A] court must determine whether an antitrust claim is 'plausible' in the light of basic economic principles" and common sense.[33] Under Rule 12(b)(6), "dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory."[34] Dismissal without leave to amend is appropriate if it is clear that the complaint could not be saved by amendment.[35]

"In order to state a valid claim under the Sherman Act, a plaintiff must allege that the defendant has market power within a 'relevant market.' That is, the plaintiff must allege both that a 'relevant market' exists and that the defendant has power within that market."[36] "There is no

---

[30] Fed. R. Civ. P. 8(a)(2).

[31] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[32] *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009).

[33] *William O. Gilley Enters., Inc. v. Atl. Richfield Co.*, 588 F.3d 659, 662 (9th Cir. 2009).

[34] *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).

[35] *See Eminence Capital, LLC v. Asopeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).

[36] *Newcal Indus., Inc. v. IKON Office Solution*, 513 F.3d 1038, 1044 (9th Cir. 2008).

7

Case No. 5:13-cv-03385-PSG
ORDER GRANTING-IN-PART MOTION TO DISMISS AND GRANTING MOTION TO STRIKE

requirement that these elements of the antitrust claim be pled with specificity."[37]  "An antitrust

complaint [] survives a Rule 12(b)(6) motion unless it is apparent from the face of the complaint

that the alleged market suffers a fatal legal defect.  And since the validity of the 'relevant market'

is typically a factual element rather than a legal element, alleged markets may survive scrutiny

under Rule 12(b)(6) subject to factual testing by summary judgment or trial."[38]

### III.

Any modern tying theory must be measured against the seminal tying case of the past 25

years—*Eastman Kodak Co. v. Image Technical Services, Inc.*[39]  To say that *Kodak* has failed to

inspire a strong following would be an understatement.  Judges and academics have struggled to

understand the Supreme Court's underlying economic rationale that robust competition in a

primary product market does not preclude aggregation of market power in aftermarkets for product

parts and services.

> Judicial findings of market power for single brands, or in single brand aftermarkets,
> are in large measure a throwback to the industrial organization theory of the 1950s
> and earlier.  This theory tended to view product differentiation with suspicion,
> regarding it as inherently monopolistic. But product differentiation is an important
> fact of life, and many markets subject to differentiation remain robustly (if not
> perfectly) competitive.  Indeed, to the extent product differentiation makes
> collusion or oligopolistic coordination of prices more difficult to accomplish, it may
> make markets more competitive than they would be under product homogeneity.[40]

---

[37] *Id*. at 1045.

[38] *Id*.

[39] 504 U.S. 451, 464-78 (1992).

[40] Herbert Hovenkamp, *Market Power in Aftermarkets: Antitrust Policy and the Kodak Case*, 40 UCLA L. Rev. 1447, 1452 (1992); *see also* Jonathan I. Gleklen, *The ISO Litigation of* Eastman Kodak Co. v. Image Technical Services: *Twenty Years and Not Much to Show for It*, 27 Antitrust 56, 62 (2012) ("Twenty years after the Kodak decision, ISO plaintiffs have little to show for it."); Joshua D. Wright, *Abandoning Antitrust's Chicago Obsession: The Case for Evidence-Based Antitrust*, 78 Antitrust L.J. 301, 310 n.39 (Kodak "was the zenith of the Post-Chicago School's influence over antitrust law in the United States.  However, that influence was short-lived."); David A.J. Goldfine & Kenneth M. Vorrassi, *The Fall of the Kodak Aftermarket Doctrine: Dying a Slow Death in the Lower Courts*, 72 Antitrust L.J. 209, 209, 231 (2004) ("The lower courts, in effect, have overruled Kodak by pulling its teeth.").

8

Case No. 5:13-cv-03385-PSG
ORDER GRANTING-IN-PART MOTION TO DISMISS AND GRANTING MOTION TO
STRIKE

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

But whatever its popular reception, *Kodak* remains the law of the land and this court is bound to apply it.  The facts of *Kodak* are straightforward.  After a change of Kodak's policy that limited their access to Kodak replacement parts and made it difficult for them to compete with Kodak in providing equipment services, a variety of independent services organizations sued.[41]  Their specific antitrust claim alleged that Kodak had improperly tied equipment services in one market to replacement parts in another.  While Kodak argued that "a single brand of a product or service [could] never be a relevant market under the Sherman Act[,]" the Supreme Court disagreed.[42]  Because Kodak replacement parts were the only available option to repair Kodak machines, there could be no relevant market in Kodak parts other than the single Kodak brand market.[43]  The Court further held that Kodak—by tying its services to its parts—might "profitably . . . maintain supracompetitive prices in the [services] aftermarket [where] switching costs were high relative to the increase in service prices, and the number of locked-in customers were high relative to the number of new purchases."[44]  Put another way, the Court held that Kodak's change in policy could lock customers in to a more expensive services package because ISOs were no longer a viable option.

Since *Kodak*, the Ninth Circuit has made clear that the presentation of contract terms that give notice to the consumer of any potential supracompetitive prices in an aftermarket can save otherwise permissible activity from violating Section 1.  For example, in *Newcal Industries v. IKON Office Solution*, the Ninth Circuit held that contract terms that limit purchase or pricing decisions in any aftermarket—whether wholly derivative or not—do not constitute antitrust

---

[41] *See Kodak*, 504 U.S. at 456-60.

[42] *See id*. at 481-82.

[43] *See id*.

[44] *Id*. at 476.

Case No. 5:13-cv-03385-PSG
ORDER GRANTING-IN-PART MOTION TO DISMISS AND GRANTING MOTION TO STRIKE

violations because the resulting restrictive market is a "contractually-created market" rather than a manifestation of "economic market power."[45]  Similarly, in *Forsyth v. Humana, Inc.*, the plaintiff's antitrust claim defined the "relevant market" as including only those hospital consumers who had the defendant's insurance policies.[46]  "In other words, the plaintiffs claimed a submarket whose boundaries depended entirely on a written contract."[47]  Just as the Third Circuit had done in *Queen City Pizza v. Domino's Pizza*, the Ninth Circuit rejected that market definition, holding that explicit contractual provisions limiting Humana insureds to certain hospitals could not form the boundaries of an antitrust submarket.[48]

Taking these cases together, the Ninth Circuit has set out three overarching principles in evaluating tying claims.  "First, the law permits an antitrust claimant to restrict the relevant market to a single brand of the product at issue (as in *Eastman Kodak*).  Second, the law prohibits an antitrust claimant from resting on market power that arises solely from contractual rights that consumers knowingly and voluntarily gave to the defendant (as in *Queen City Pizza* and *Forsyth*).  Third, in determining whether the defendant's market power falls in the *Queen City Pizza* category of contractually-created market power or in the *Eastman Kodak* category of economic market power, the law permits an inquiry into whether a consumer's selection of a particular brand in the competitive market is the functional equivalent of a contractual commitment, giving that brand an agreed-upon right to monopolize its consumers in an aftermarket.  The law permits an inquiry into whether consumers entered into such 'contracts' knowing that they were agreeing to such a

---

[45] *Newcal*, 513 F.3d at 1048-49 (citing *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 438-40 (3d Cir. 1997)).

[46] *See* 114 F.3d 1467 (9th Cir. 1997).

[47] *Id*. at 1476.

[48] *See id*.  This is especially true where the aftermarket goods or services are themselves the subject of exclusive rights under statute, such as patents or copyrights.  *See Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1200-03 (N.D. Cal. 2008).

10

Case No. 5:13-cv-03385-PSG
ORDER GRANTING-IN-PART MOTION TO DISMISS AND GRANTING MOTION TO STRIKE

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

commitment."[49]  Applying these principles here, Defendants' Section 1 and Cartwright Act claims

pass muster—at least as they rely on Ties 1-3.

First and foremost, Defendants have pleaded a relevant aftermarket in Solaris updates and

firmware that is distinct from the initial market for servers in which Oracle is not alleged to have

substantial market power.  "As in [*Kodak*, *Queen City Pizza*, and *Forsyth*], the relevant market here

is not the indisputably competitive market in which the consumers first shop for the primary

product.  It is an aftermarket in which the consumers claim that they should be able to shop for a

secondary product."[50]  Defendants allege that suppliers "go through a different economic calculus"

when competing for customers of updates, firmware or services than they do when competing for

customers of the servers.[51]  "[T]he aftermarket here is wholly derivative from and dependent on the

primary market,"[52] but as for demand for Solaris servers, there would be no demand for Solaris

updates or firmware.  As a result, as in both *Kodak* and *Newcal*, Oracle's alleged unique position to

supply updates and firmware could permit Oracle to maximize its profit at a point on a sloping

downward demand curve substantially above marginal cost—an indication of market power.[53]

Second, Defendants are not resting on any market power that arises solely from contractual

rights that customers knowingly and voluntarily gave, at least to those customers who purchased

their server before Oracle implemented its new policy.  No matter how common the industry

---

[49] *Newcal* at 1048-49 (emphasis omitted).

[50] *Id*. at 1049.

[51] *Id*.

[52] *Id*.

[53] *See* Phillip Areeda, *Monopolization, Mergers, and Markets: A Century Past and the Future*, 75 Cal. L. Rev. 959, 980 (1987) ("If the defendant possesses a large enough share of that market to be able to raise prices at will, the defendant possesses monopoly power."); *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) ("One type of proof [of monopoly power] is direct evidence of the injurious exercise of market power.  If the plaintiff puts forth evidence of restricted output and supracompetitive prices, that is direct proof of the injury to competition which a competitor with market power may inflict, and thus, of the actual exercise of market power.").

11

United States District Court
For the Northern District of California

practice of combining up-front license payments and annual support payments, before the Oracle-Sun merger, it is alleged that customers could download updates and firmware for little or no cost. Certainly these customers who had purchased Solaris products before the merger could not have consented to the alleged restrictive aftermarket because at the time it did not exist.

Third, while Sun's customers might ultimately be shown to have consented to a future restrictive aftermarket in Solaris updates, nothing in Defendants' allegations resolves that issue in Oracle's favor as a matter of law.

Oracle is right that "[t]here are, however, some legal principles that govern the definition of an antitrust 'relevant market,' and a complaint may be dismissed under Rule 12(b)(6) if the complaint's 'relevant market' definition is facially unsustainable."[54]  But Oracle fails to show that the relevant market alleged by Defendants is in fact facially unsustainable.  Defendants allege there are no economic substitutes for the updates and firmware because they are specific to the Solaris software.[55]  While Oracle makes much of the fact that "it has always been the only legitimate source of updates" and "never ran an 'updates' business" separate from its services, Defendants' allegations are that this is exactly what Sun did before the acquisition.[56]  Just as in *Kodak*, "[a]t least some consumers would purchase service without parts [updates and firmware], because some service does not require parts [updates and firmware], and some consumers, those who self-service for example [by sourcing services from third parties like Defendants], would purchase parts [updates and firmware] without service."[57]

---

[54] *Id*.

[55] *Cf. Brown Shoe v. United States*, 370 U.S. 294, 325 (1962).

[56] *See* Docket No. 269 at ¶ 25.

[57] *Kodak*, 504 U.S. at 463 (citing *Jefferson Parish*, 466 U.S. at 21-22).  The same cannot be said of Tie 4.  Terix can point to no allegation that at any point Sun offered support services for critical servers separate from non-critical services.

12

Oracle separately challenges Defendants' counterclaims with a statute of limitations argument. But even if some of Defendants' tying claims might have otherwise been vulnerable to such a challenge because the relevant conduct took place more than four years before the filing of the counterclaims, the statute of limitations was tolled on July 19, 2013, when Oracle filed its own claims. The "institution of a plaintiff's suit suspends the running of limitations on a compulsory counterclaim while the suit is pending."[58] The Ninth Circuit has explained that a counterclaim is compulsory when "the essential facts of the various claims are so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit."[59]

Defendants' counterclaims clearly meet the Ninth Circuit standard. Oracle's operative complaint is targeted at ensuring that hardware owners only can obtain access to Solaris updates if they also purchase support services from Oracle. Defendants' counterclaims allege that this same policy constitutes copyright misuse and a violation of the antitrust laws. The parties' allegations thus are logically connected. This case squares with *Grumman Systems Support Corp. v. Data General Corp.*,[60] which held that the defendant's antitrust counterclaims were compulsory in response to the plaintiff's allegations of copyright infringement.[61] Because the "the essential facts

---

[58] *Employers Ins. of Wausau v. United States*, 764 F.2d 1572, 1576 (Fed. Cir. 1985) (citing *Burlington Indus., Inc. v. Milliken & Co.*, 690 F.2d 380, 389 (4th Cir.1982)); *see also Orange Cnty. Health Care Agency v. Dodge*, 793 F. Supp. 2d 1121, 1129 (C.D. Cal. 2011); *Yates v. Washoe Cnty. Sch. Dist.*, Case No. 3:07-0200, 2007 WL 3256576, at * 2 (D. Nev. Oct. 31, 2007); *Oahu Gas Serv., Inc. v. Pac. Resources, Inc.*, 473 F. Supp. 1296, 1299 (D. Hawaii 1979); *Kirkpatrick v. Lenoir Cnty. Bd. of Educ.*, 216 F.3d 380, 388 (4th Cir. 2000).

[59] *Pochiro v. Prudential Ins. Co. of Am.*, 827 F.2d 1246, 1249 (9th Cir. 1987) (quoting *Harris v. Steinem*, 571 F.2d 119, 123 (2d Cir.1978) (applying Fed. R. Civ. P. 13)). Although *Pochiro* technically involved application of Arizona law, Arizona Rule of Civil Procedure 13(a) was identical to the Federal Rule of Civil Procedure 13(a), and the decision principally relied upon federal authorities analyzing the federal rule. *Id.* at 1249-50; *see also Grumman Sys. Support Corp. v. Data Gen. Corp.*, 125 F.R.D. 160, 162 n.1 (N.D. Cal. 1988) (relying upon *Pochiro* in evaluating Fed. R. Civ. P. 13(a)).

[60] 125 F.R.D. 160 (N.D. Cal. 1988).

Case No. 5:13-cv-03385-PSG
ORDER GRANTING-IN-PART MOTION TO DISMISS AND GRANTING MOTION TO STRIKE

of the various claims" were logically tethered, judicial economy and fairness dictated that the court adjudicate these claims within a single lawsuit.[62]

Because Defendants have successfully pleaded their Section 1 claim—at least as to those customers who purchased hardware before Oracle's change in policy—their Section 2 monopolization claims may proceed as well.  Terix's Section 2 claim relies exclusively on the tying conduct it alleges under Section 1.[63]  Oracle, in turn, relies on its arguments as to Section 1 to support the insufficiency of Terix's Section 2 allegations.  Because the Sherman Act's market requirement applies "identically" under Section 1 and Section 2, this also supports Terix's claims under Section 2.[64]  The same is true of Maintech and Volt's tying-related Section 2 claims.

Maintech and Volt's remaining theories under Section 2 are not so fortunate; they are alleged in an entirely cursory fashion with little to no factual basis.[65]  For example, Maintech and Volt allege that Oracle's anticompetitive conduct includes "[b]ringing pretextual lawsuits against ISOs[.]"[66]  But lawsuits also constitute acts of petitioning the government that are "generally

---

[61] *See id.* at 162 ("there is sufficient overlap between the factual underpinnings of the two actions [the copyright action and the antitrust action] to save a great deal of judicial resources" if the actions were litigated together, thus making the actions "logically related" and making the antitrust claim a "compulsory counterclaim"); *see also MGA Entertainment, Inc. v. Mattel, Inc.*, Case No. 11-1063, 2012 WL 569389, at *14-15 (C.D Cal. Feb. 21, 2012) (MGA's antitrust claim was a compulsory counterclaim that was required to have been asserted in response to Mattel's copyright infringement claims.).

[62] *Pochiro*, 827 F.2d at 1249.

[63] *See* Docket No. 269 at ¶ 91("Oracle's wrongful conduct detailed above constitutes predatory and/or anticompetitive conduct.").

[64] *See Spectrum Sports*, 506 U.S. at 458-60; *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1044 n.3 (9th Cir. 2008) (noting that "market allegations are either sufficient or insufficient for" all Section 1 and Section 2 claims); *Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1196 (N.D. Cal. 2008) (quoting *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001) ("Failure to identify a relevant market is a proper ground for dismissing a Sherman Act claim.")).

[65] *See id.*

[66] *Id.*

14

immune from antitrust liability."[67]  Filing a lawsuit only can implicate the antitrust laws if the

lawsuit is "objectively baseless" and the litigant's "subjective motivation" consists of "an attempt

to interfere directly with the business relationships of a competitor" through the use of "the

governmental process—as opposed to the outcome of that process—as an anticompetitive

weapon."[68]  Maintech and Volt's bare allegation that Oracle's lawsuits are "pretextual" does not

meet this standard.[69]

**IV.**

Defendants separately challenge Oracle's conduct as copyright misuse.[70]  While copyright

protection for software is well established,[71] the Ninth Circuit has held that it may be a misuse of

---

[67] *See Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56 (1993).

[68] *Id.* at 60-61.

> We now outline a two-part definition of "sham" litigation.  First, the lawsuit must be
> objectively baseless in the sense that no reasonable litigant could realistically expect
> success on the merits.  If an objective litigant could conclude that the suit is reasonably
> calculated to elicit a favorable outcome, the suit is immunized under *E. R. R. Presidents
> Conference v. Noerr Motor Freight, Inc.*, and an antitrust claim premised on the sham
> exception must fail.  Only if challenged litigation is objectively meritless may a court
> examine the litigant's subjective motivation.  Under this second part of our definition of
> sham, the court should focus on whether the baseless lawsuit conceals "an attempt to
> interfere  directly with the business relationships of a competitor," *Noerr*, 365 U.S. 127,
> 144 (1961), through the "use [of] the governmental process—as opposed to the outcome of
> that process—as an anticompetitive weapon," *City of Columbia v. Omni Outdoor Adver.,
> Inc.*, 499 U.S. 365, 380 (1991) (emphasis omitted).

[69] *See id.*

[70] *See* Docket No. 267 at ¶ 104:

> Through the misconduct alleged above, including but not limited to Oracle's illegal tying
> and enforcement of support policies that deprive licensees to their rights to patches, bug
> fixes and updates, and to Oracle's effort to extend copyright protection for Solaris and
> firmware to uncopyrightable and uncopyrightable software and hardware support services,
> Oracle is attempting to use the Oracle Copyrights on the Solaris operating system and
> firmware in a manner adverse to the public policy behind the copyright laws.  Oracle's
> misconduct gives Oracle an unfair competitive advantage over ISOs like Maintech, and this
> misconduct constitutes misuse of its copyrights by Oracle.

*See* Docket No. 269 at ¶ 139:

> Oracle is misusing Oracle's Claimed Copyrights by (among other things) attempting to
> leverage its copyright monopoly(ies) to monopolize and/or improperly restrain trade in one
> or more markets, contrary to the public policy reflected in the copyright laws and to the
> detriment of both free competition and Oracle's competitors.

15

Case No. 5:13-cv-03385-PSG
ORDER GRANTING-IN-PART MOTION TO DISMISS AND GRANTING MOTION TO
STRIKE

United States District Court
For the Northern District of California

copyright to condition a license to a copyrighted work on a pledge not to use a competitor's product.[72]  The Ninth Circuit has applied the doctrine "sparingly" where a copyright is used to stifle competition.[73]  Because Defendants do not allege any such restriction on use of a competitive product as a condition of licensing Oracle's copyrighted software, Defendants do not plead a plausible copyright misuse defense here.

The Ninth Circuit has rejected copyright misuse theories on facts similar to the allegations in this case.  For example, in *Triad Systems Corp. v. Southeastern Express Co.*, the plaintiff (Triad) designed computers for use in the automotive industry and licensed unique diagnostic software to service those computers.[74]  The defendant was an independent service organization that serviced Triad computers.[75]  Triad sued the defendant for copyright infringement, asserting that, in servicing Triad computers, the defendant necessarily copied Triad's proprietary software to the computer's random access memory and thereby infringed Triad's copyright.[76]  Affirming a preliminary injunction, the Ninth Circuit rejected the defendant's copyright misuse claim because "Triad did not attempt to prohibit" the defendant or "any other ISO from developing its own service software

---

[71] *See Oracle Am. Inc. v. Google, Inc.*, 750 F.3d 1339, 1355-56 (Fed. Cir. 2014).

[72] *See Practice Mgmt. Info. Corp. v. AMA*, 121 F.3d 516, 521 (9th Cir. 1997).

[73] *Psystar*, 658 F.3d at 1157, 1159 ("The copyright misuse doctrine does not prohibit using conditions to control use of copyrighted material, but it does prevent copyright holders from using the conditions to stifle competition.") (noting that the "decision in *Practice Management* is the only case in which we upheld a copyright misuse defense").  The Ninth Circuit only has upheld the copyright misuse doctrine's application in situations where a customer was prohibited from using the products of any other competitors.  *See Practice Mgmt.*, 121 F.3d at 521 (finding misuse where the copyright holder "[c]ondition[ed] the license on [the customer's] promise not to use competitors' products").

[74] 64 F.3d 1330, 1333 (9th Cir. 1995).

[75] *See id.*

[76] *See id.*

16

Case No. 5:13-cv-03385-PSG
ORDER GRANTING-IN-PART MOTION TO DISMISS AND GRANTING MOTION TO STRIKE

to compete with Triad."[77] *Triad*'s holding that a "software licensing agreement may reasonably restrict use of the software as long as it does not prevent the development of competing" products has been endorsed by the Ninth Circuit.[78]

Defendants do not allege that Oracle prohibits its customers from accepting Solaris software or hardware services from Defendants or any other competitor. Defendants also do not allege that Oracle prohibits Defendants from developing competing products. Defendants' copyright misuse claims instead suggest only that Oracle's exercise of its right to license Solaris and Solaris updates to customers "constitutes misuse."[79] This falls far short of what is required.

## V.

To sustain their Lanham Act false advertising counterclaim, Defendants at a minimum must allege that Oracle made a false or misleading representation of fact about its or another's product in a commercial advertisement or promotion.[80] To constitute commercial advertising or promotion,

---

[77] *Id.* at 1337.

[78] *Psystar*, 658 F.3d at 1159.

[79] *See* Docket No. 267 at ¶ 104; Docket No. 269 at ¶ 139.

[80] *See* 15 U.S.C. § 1125(a)(1).

   (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--

     (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

     (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

*See also, e.g., Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997).

   The elements of a Lanham Act § 43(a) [codified at 15 U.S.C. § 1125(a)] false advertising claim are: (1) a false statement of fact by the defendant in a commercial

Case No. 5:13-cv-03385-PSG
ORDER GRANTING-IN-PART MOTION TO DISMISS AND GRANTING MOTION TO STRIKE

United States District Court
For the Northern District of California

1  Oracle's statement must be commercial speech, made for the purpose of influencing consumers to

2  buy Oracle's goods or services, and disseminated sufficiently to the relevant purchasing public.[81]

3  Once again, Defendants' allegations fall far short.

4      Defendants do not allege facts that Oracle made particular specific misrepresentations as

5  part of its commercial advertising and disseminated them sufficiently to the relevant consumers.

6  Nor do Defendants allege any facts about the commercial advertising or promotions in which

7  Oracle's alleged misstatements appeared.  Terix repeats three times that Oracle made the

8  paraphrased misstatements in paragraphs 99-100 "in commercial advertising and promotion," and

10  does not allege that the paraphrased misstatements in paragraph 69 were part of advertising at all.[82]

---

advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products.  *Cook, Perkiss and Liehe, Inc. v. N. Cal. Collection Serv., Inc.*, 911 F.2d 242, 244 (9th Cir. 1990); *accord ALPO Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958, 964 (D.C. Cir. 1990).

[81] *See, e.g., Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 734-35 (9th Cir. 1999).

In order for representations to constitute "commercial advertising or promotion" under Section 43(a)(1)(B), they must be: (1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services. While the representations need not be made in a "classic advertising campaign," but may consist instead of more informal types of "promotion," the representations (4) must be disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within that industry.

[82] *See* Docket No. 269 at ¶¶ 69, 98-100.

69.  Oracle's second set of efforts to interfere with TERiX's actual and potential customers consisted of the deliberate spread of false information regarding TERiX, TERiX's policies and practices, and customers' rights under their licenses with Oracle.  For example, Oracle has claimed to actual and potential TERiX clients (including without limitation BNYM and Royal Bank of Canada ("RBC") that (1) TERiX provides support services using improper parts, (2) TERiX illegally "traffics" in Oracle access credentials, and (3) customers do not have the contractual right to Solaris Updates under Oracle's changed policies, notwithstanding Oracle's knowledge that the original licenses grant customers those rights.

98.  By falsely informing customers, in commercial advertising and promotion, and in interstate commerce, that TERiX presently is falsely advertising itself and its services as being affiliated with Oracle or misrepresenting its affiliation or status with Oracle, Oracle is falsely advertising and falsely disparaging the nature, quality, and characteristics of

18

Case No. 5:13-cv-03385-PSG
ORDER GRANTING-IN-PART MOTION TO DISMISS AND GRANTING MOTION TO STRIKE

Maintech and Volt vaguely allege that Oracle made the alleged misstatements "in [their] marketing efforts."[83]  These allegations—just recitations of the Lanham Act elements without supporting facts—are insufficient.[84]

Defendants also do not allege facts showing that Oracle spread its alleged misstatements sufficiently to the relevant group of consumers.  Terix alleges Oracle made some of the paraphrased statements to "customers"[85] and others "to actual and potential TERiX clients"[86] while Maintech and Volt allege Oracle marketing "directed to customer[s] and potential customers of [Defendants]."[87]  Absent some facts showing who makes up the relevant group of customers, and how Oracle widely spread its misstatements to that group, Defendants' broader allegations are not plausible.[88]

---

TERiX's service, and offerings in violation of Section 43 of the Lanham Act, 15 U.S.C. § 1025.

99.  By falsely informing customers, in commercial advertising and promotion, and in interstate commerce, that Solaris Updates and Sun/Oracle Firmware are only available from Oracle with the purchase of annual contracts for technical support services, Oracle is falsely describing and misrepresenting the nature, quality, and characteristics of its own products, service, and offerings in violation of Section 43 of the Lanham Act, 15 U.S.C. § 1025.

100.  By falsely informing customers, in commercial advertising and promotion, and in interstate commerce, that Solaris Updates and Sun/Oracle Firmware cannot be obtained on their behalf by TERiX and other third-party service providers, Oracle is falsely describing and misrepresenting the nature, quality, and characteristics of its own products, license agreements, service, and offerings in violation of Section 43 of the Lanham Act, 15 U.S.C. § 1025.

[83] Docket No. 267 at ¶ 84 ("Oracle has made these misrepresentations in its marketing efforts directed to customer and potential customers of Maintech and Terix, in interstate commerce.").

[84] *See, e.g., LT Int'l Ltd. v. Shuffle Master, Inc.*, Case No. 2:12- 1216, 2014 WL 1248270, at *5 (D. Nev. Mar. 26, 2014) ("These allegations are little more than 'a formulaic recitation of the elements of a cause of action,' which the Court is not obligated to accept as true.  They do not state a plausible claim of relief even under Rule 8's standard.") (quoting *Twombly*, 550 U.S. at 555).

[85] Docket No. 269 at ¶¶ 98-100.

[86] *Id.* at ¶ 69.

[87] Docket No. 267 at ¶ 84.

[88] *See Chamilia, LLC v. Pandora Jewelry, LLC*, Case No. 04-6017, 2007 WL 2781246, at *9 (S.D.N.Y. Sept. 24, 2007); *LT Int'l*, 2014 WL 1248270, at *5.

Case No. 5:13-cv-03385-PSG
ORDER GRANTING-IN-PART MOTION TO DISMISS AND GRANTING MOTION TO STRIKE

United States District Court
For the Northern District of California

Another flaw is that Defendants paraphrase Oracle's alleged misrepresentations, rather than identifying specific statements.  Terix alleges Oracle made three categories of paraphrased false statements: (1) Terix falsely advertises itself as being affiliated with Oracle, (2) Oracle provides Solaris updates and Oracle/Sun Firmware only to purchasers of annual support contracts and (3) Terix and other providers cannot obtain Solaris updates and Oracle/Sun Firmware on a customer's behalf.[89]  Terix also alleges Oracle has claimed (1) Terix uses improper parts in its support services, (2) Terix traffics in Oracle access credentials and (3) Oracle customers do not have rights to Solaris updates under Oracle licenses.[90]  Maintech and Volt allege Oracle has made misrepresentations that "Maintech and Terix cannot provide legal and effective support services for Oracle/Sun systems," as well as "regarding the importance of patches, bug fixes and updates, the need for support agreements with Oracle in order to obtain these, and the inability of ISOs such as Maintech and Terix to provide these legally."[91]  But Defendants do not identify any actual statements made by Oracle or provide sufficient information to suggest that Oracle made actual statements that meet the Lanham Act's pleading requirements.[92]  Each claim describes broad categories of statements, but a Lanham Act claim focuses on the falsity of specific statements.[93]

---

[89] *See* Docket No. 269 at ¶¶ 98-100.

[90] *See id.* at ¶ 69.  These allegations are not re-alleged within Terix's Lanham Act claim.

[91] Docket No. 267 at ¶ 83.

[92] *See Incorp Servs., Inc. v. IncSmart.biz, Inc.*, Case No. 5:11- 04660, 2013 WL 394023, at *3 (N.D. Cal. Jan. 30, 2013).

> IncSmart has alleged facts describing why it believes Incorp cannot validly offer its services in every state.  But a description of that conduct is not enough to satisfy the elements of a false advertising claim because the elements of the cause of action require something specific.  Unlike Incorp, IncSmart has not described a particular false statement asserted in a commercial advertisement.  Indeed, IncSmart's allegations merely raise the possibility that Incorp has produced some type of commercial advertisement and the possibility that this hypothetical advertisement contains a false statement about the availability of its services. (emphasis and footnotes omitted).

[93] *See AccuImage Diagnostics Corp. v. Terarecon, Inc.*, 260 F. Supp. 2d 941, 948-49 (N.D. Cal. 2003).

20

Case No. 5:13-cv-03385-PSG
ORDER GRANTING-IN-PART MOTION TO DISMISS AND GRANTING MOTION TO STRIKE

These summary allegations do not put Oracle on notice of the nature of Maintech, Volt and Terix's claims and so do not pass Twombly's minimum requirements.

Maintech and Volt's claim also refers to, and relies on, Oracle's alleged misrepresentations about Terix.[94]  Maintech and Volt, however, do not have standing to bring a claim based on Oracle's alleged misrepresentations about Terix, because Maintech and Volt have not alleged facts showing that those misrepresentations proximately caused injury to Maintech and Volt's commercial interest in sales or business reputation.[95]  Instead, Maintech and Volt must show "economic or reputational injury flowing directly from the deception wrought by the defendant's advertising . . . That showing is generally not made when the deception produces injuries to a fellow commercial actor that in turn affect the plaintiff."[96]

---

The court finds that Taylor is entitled to more specific allegations of what conduct plaintiff claims is actionable as to Taylor under section 43(a) of the Lanham Act.  The complaint alleges that defendants misrepresented AccuImage's product when they "told current and potential AccuImage customers that, among other things, AccuImage's products are not FDA approved when, in fact, they are."  Plaintiff also alleges that Taylor "made false and misleading representations . . . to actual and potential AccuImage customers around the country to persuade them to purchase TeraRecon's . . . products."  The complaint does not, however, allege any facts regarding the location, timing, or content of Taylor's allegedly false statements.  The rest of the false advertising allegations in the complaint simply mimic the elements of the cause of action and do not plead sufficient facts. . . .  Therefore, the court grants Taylor's motion to dismiss claim one with leave to amend.The court also finds that TeraRecon does not have sufficient notice of the corporation's allegedly actionable conduct under this claim. Plaintiff uses the language of the statute to plead this cause of action but does not provide sufficient factual information about TeraRecon's actionable conduct aside from the allegation that they misrepresented whether or not AccuImage's product was FDA approved. . . .  As stated above, plaintiff must make more detailed allegations to satisfy the elements of the cause of action, such as: the circumstances under which TeraRecon made false statements, how the statements entered interstate commerce, and how plaintiff has been or is likely to be damaged as a result of defendants' false statements.

[94] *See* Docket No. 145 at ¶¶ 83-88 (referring to Oracle's misrepresentations about Terix).

[95] *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1395 (2014).

[96] *Id.* at 1391.

21

Case No. 5:13-cv-03385-PSG
ORDER GRANTING-IN-PART MOTION TO DISMISS AND GRANTING MOTION TO STRIKE

## VI.

To state a claim for intentional interference with prospective economic advantage, a plaintiff must allege facts demonstrating "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff, (2)  the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship [by independently wrongful conduct]; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant."[97]

The parties quibble about whether Defendants' alleged economic relationships are specific enough to fall within this kind of claim (prong 1) and whether Oracle's acts constituted "independently wrongful conduct" (prong 3) such to satisfy the *Korea Supply* test.

Defendants are on the winning side of the prong 3 argument; independently wrongful conduct—conduct "proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard"[98]—contemplates acts under the Sherman Act.  To the extent that claims under this statutory framework survive a motion to dismiss—as they do here—they also satisfy the "independently wrongful conduct" aspect of the test.

But Oracle ultimately prevails.  While Defendants urge the court to accept the specificity of their alleged lost-customer relationships in light of the court's prior ruling on Oracle's intentional interference claim,[99] the court is more than convinced that Oracle's claim cleared the Rule 12(b)(6) hurdle where Defendants' claims founder.  Oracle identified customers who "owned Oracle/Sun computer hardware, were long-time customers of support services from Oracle for that hardware

---

[97] *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003) (internal quotations and citations omitted).

[98] *Edwards v. Arthur Anderson LLP*, 44 Cal. 4th 937, 944 (2008).

[99] *See* Docket No. 61.

22

Case No. 5:13-cv-03385-PSG
ORDER GRANTING-IN-PART MOTION TO DISMISS AND GRANTING MOTION TO
STRIKE

United States District Court
For the Northern District of California

. . . and decided not to renew support agreements with Oracle and instead entered into support agreements with [Defendants]."[100]   Oracle's description sufficiently narrows the potential customer relationships at issue in the claim: those customers who own Oracle software, had previously utilized Oracle support software, and who had subsequently switched to Defendants' support services.

Defendants on the other hand merely allege "hardware support customers" and "multiple Hardware owners" as the interfered-with customers.[101]   As Oracle rightly points out, Oracle has no way to identify which customers are at issue because the allegation appears to contemplate any and all hardware customers, regardless of any clear connection to Oracle.   Terix's claim that its allegations are "much more focused than Oracle's"[102] is completely off base.   Because Defendants have failed to sufficiently identify the interfered-with customers, Defendants' claims for interference with prospective economic advantage are dismissed with leave to amend.

As for Terix's intentional interference with contract claim, to establish its claim, Terix must allege (1) a valid contract between Terix and a third party, (2) Oracle's knowledge of that contract, (3) Oracle's intentional conduct designed to cause a breach or disruption of that contract, (4) actual breach or disruption and (5) damages to Terix.[103]   Terix has alleged only one contract with specificity—its contract with BNYM.   All other alleged contracts are identified only as "valid and enforceable contracts with multiple Hardware owners."[104]   This claim, too, lacks adequate specificity.   While it is not required that Terix name each and every contract with which Oracle has

---

[100] Docket No. 249-4 at ¶¶ 128, 130.

[101] Docket No. 145 at ¶ 95; Docket No. 144 at ¶ 127.

[102] Docket No. 182 at 21.

[103] See, e.g., Gas & Elec. Co. v. Bear Stearns & Co., 50 Cal. 3d 1118, 1126 (1990).

[104] Docket No. 144 at ¶ 121.

Case No. 5:13-cv-03385-PSG
ORDER GRANTING-IN-PART MOTION TO DISMISS AND GRANTING MOTION TO STRIKE

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
For the Northern District of California

allegedly interfered, it must—at the very least—narrow the scope of possibilities to put Oracle on fair notice of the contours of the claim.[105]  Oracle does not dispute the claim as to the Terix-BNYM contract nor does it ask this court to dismiss it.[106]  The contract interference claim as to BNYM— but only this contract interference claim— stands.  But as to the other vaguely alleged "contracts with multiple Hardware owners," Oracle's motion to dismiss must be granted.

**VII.**

Maintech and Volt are the only defendants that have lodged a trade libel claim against Oracle.  In order to establish a trade libel claim, Maintech and Volt must allege Oracle intentionally, and falsely, disparaged the quality of Maintech and Volt's products or services, and thereby caused Maintech and Volt pecuniary harm.[107]  But as with Maintech and Volt's Lanham Act claim, Maintech and Volt have not shown specific false statements suggesting that Oracle acted inappropriately.  Nor do Maintech and Volt cite any authority suggesting that it is proper for a defendant to base a trade libel claim entirely on the content of a plaintiff's complaint.  Nor do Maintech and Volt suggest that they derive their claim from any other specific allegations in their counterclaims.

Even if this court were to find that Maintech and Volt's allegations were adequate, Maintech and Volt have utterly failed to allege specific pecuniary harm resulting from the purported libelous statements.  They only allege damages in the form of "loss of income" and

---

[105] *See Nexsales Corp. v. Salebuild, Inc.*, Case No. 11-3915, 2012 WL 216260, at *4 (N.D. Cal. Jan. 24, 2012) (where a plaintiff generally alleges the existence of a contract but "fails to identify any terms of the contract, the parties involved, the terms of the contract that were breached, how Defendant would have known of the contract, [or] what harm was suffered by Plaintiff as a result," the claim fails for lack of sufficient factual allegations).

[106] *See* Docket No. 173 at 26-27 ("The Court should therefore dismiss the contract interference claim to the extent it relies on any other contract besides that between Terix and BYNM.").

[107] *See, e.g.*, Restatement (Second) of Torts § 626; *Leonardini v. Shell Oil Co.*, 216 Cal. App. 3d 547, 572 (1989).

24

Case No. 5:13-cv-03385-PSG
ORDER GRANTING-IN-PART MOTION TO DISMISS AND GRANTING MOTION TO STRIKE

"diminution in value of business."[108]  Rather, Maintech and Volt must identify the specific business partners lost as well as the specific transactions lost.[109]  Maintech and Volt's counterclaims—as currently constructed—cannot meet this standard.

As for Defendants' unfair competition claim, the court agrees with Oracle's characterization that Section 17200 claims "stand or fall on the fate of the antecedent substantive causes of action."[110]  "[U]nfair conduct" means "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition."[111]  The court has already determined that Defendants' antitrust claims—at least as to the tying claims directed at Solaris sales prior to Oracle's switch in policy—will survive the Rule 12(b)(6) stage.  So the unfair competition claim must also stand.

## VIII.

Oracle separately moves to strike all of Defendants' collective 87 affirmative defenses in this case.[112]  As an initial matter, in support of their opposition, Defendants have requested that this court take judicial notice of pleadings and motions filed in *Oracle USA, Inc. v. Rimini Street,*

---

[108] Docket No. 145 at ¶ 97.

[109] *See Universal Grading Service v. eBay, Inc.*, Case No. 09-2755, 2011 WL 846060, at *9-*10 (N.D. Cal. Mar. 8, 2011)

> [the] plaintiff must prove in all cases that the publication has played a material and substantial part in inducing others not to deal with him, and that as a result he has suffered special damages . . . .  It is nearly always held that it is not enough to show a general decline in his business resulting from the falsehood, even where no other cause for it is apparent, and that it is only the loss of specific sales that can be recovered.  This means, in the usual case, that the plaintiff must identify the particular purchasers who have refrained from dealing with him, and specify the transactions of which he claims to have been deprived.

(citing *Erlich v. Etner*, 224 Cal. App. 2d 69, 73 (1964)).

[110] *Krantz v. BT Visual Images, L.L.C.*, 89 Cal. App. 4th 164, 179 (2001).

[111] *Cel-Tech Comms., Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal.4th 163, 187 (1999).

[112] *See* Docket No. 186.

25

Case No. 5:13-cv-03385-PSG
ORDER GRANTING-IN-PART MOTION TO DISMISS AND GRANTING MOTION TO STRIKE

United States District Court
For the Northern District of California

*Inc.*[113]  The court may take judicial notice of a "fact that is not subject to reasonable dispute because it is generally known" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."[114]  Because the documents' authenticity is not in dispute and may be verified by resort to the public record,[115] the court takes judicial notice as requested.

Under Rule 8(b)(1), an answer must "state in short and plain terms its defenses to each claim asserted against it."[116]  The central dispute here is whether the heightened pleading standards set forth in *Bell Atlantic Corp. v. Twombly* and *Ashcroft v. Iqbal* apply to affirmative defenses.[117]  Defendants rely on the pre-"*Twiq-bal*" case law from the Ninth Circuit that requires only "fair notice of the defense" to properly assert an affirmative defense under Rule 8.[118]  Defendants are right to point out that the Ninth Circuit has never overruled or abandoned this principle.  But Defendants fail to show that the Ninth Circuit has ever considered extending the heightened pleadings standards to affirmative defenses in light of *Twombly* and *Iqbal*.

This district—for what it is worth—has done just that on numerous occasions.[119]  Not only have courts across the district adopted the heightened pleading standard for affirmative defenses,

---

[113] *See Oracle USA, Inc. v. Rimini Street, Inc.*, D. Nev. Case No. 10-0106, Docket No. 153; *Oracle USA, Inc. v. Rimini Street, Inc.*, D. Nev. Case No. 10-0106, Docket No. 67.

[114] Fed. R. Evid. 201(b).

[115] *See id.*

[116] Fed. R. Civ. P. 8(b)(1).

[117] 550 U.S. 544 (2007); 556 U.S. 662 (2009).

[118] *Wyshak v. City Nat'l Bank*, 607 F.2d 824, 827 (9th Cir. 1979) ("[t]he key to determining the sufficiency of pleading an affirmative defense is whether it gives plaintiff fair notice of the defense.").

[119] *See, e.g., Barnes v. AT&T Pension Benefit Plan-Nonbargained Program*, 718 F. Supp. 2d 1167, 1171-72 (N.D. Cal. 2010) ("Rule 8's requirements with respect to pleading defenses in an answer parallel[] the Rule's requirements for pleading claims in a complaint.") ("the vast majority of courts [in this district] presented with the issue have extended *Twombly*'s heightened pleading

26

Case No. 5:13-cv-03385-PSG
ORDER GRANTING-IN-PART MOTION TO DISMISS AND GRANTING MOTION TO STRIKE

United States District Court
For the Northern District of California

but they have also stricken affirmative defenses—across the board—based on insufficiency of pleading.[120] This court follows suit.

In *Twombly*, the Supreme Court explained that complaints must contain enough factual assertions to provide "plausible grounds" to infer that the alleged conduct in fact took place.[121] The Supreme Court further elaborated the heightened standards in *Iqbal*, explaining that a claim has "plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. . . . Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."[122]

The Ninth Circuit has distilled the Supreme Court's teachings into "a two-step process" to evaluate the sufficiency of a pleading.[123] "First, a court should 'identif[y] pleadings that, because

---

standard to affirmative defenses"); *Hernandez v. Dutch Goose, Inc.*, Case No. 13-03537, 2013 WL 5781476, at *4 (N.D. Cal. Oct. 25, 2013) ("[T]here is widespread agreement among courts in this district that the *Iqbal-Twombly* pleading standard for claims for relief also applies to affirmative defenses."); *Perez v. Gordon & Wong Law Grp., P.C.*, Case No. 11-3323, 2012 WL 1029425, at *7 (N.D. Cal. March 26, 2012) (applying *Twombly* and *Iqbal* to affirmative defenses because "'[a]ffirmative defenses are governed by the same pleading standards as complaints.'") (quoting *Qarbon.com Inc. v. eHelp Corp.*, 315 F. Supp. 2d 1046, 1049 (N.D. Cal. 2004)); *Bottoni v. Sallie Mae, Inc.*, Case No. 10-3602, 2011 WL 3678878, at *1 (N.D. Cal. Aug. 22, 2011) ("courts in this district consistently have applied the *Twombly-Iqbal* pleading standard to the pleading of affirmative defenses, requiring a defendant to allege enough facts to state a claim to relief that is plausible on its face."); *Ujhelyi v. Vilsack*, Case No. 12-4282, 2013 WL 6174491, at *2 (N.D. Cal. Nov. 25, 2013) ("the majority of courts within this District have applied *Twombly* and *Iqbal* to affirmative defenses.").

[120] *See, e.g., Allen v. AVT Event Techs., Inc.*, Case No. 13-1922, 2013 WL 3157905, at *2 (N.D. Cal. June 20, 2013) (striking all of defendant's affirmative defenses because they all failed the *Twombly-Iqbal* pleading standards); *Ansari v. Elec. Document Processing, Inc.*, Case No. 12-1245, 2012 WL 3945482, at *5 (N.D. Cal. Sept. 10, 2012) (same); *Starbuzz Tobacco, Inc. v. Saeed*, Case No. 13-3837, 2013 WL 6354438, at *2 (N.D. Cal. Dec. 5, 2013) (same); *Surface Supplied, Inc. v. Kirby Morgan Dive Sys., Inc.*, Case No. 13-0575, 2013 WL 5496961, at *8-*9 (N.D. Cal. Oct. 3, 2013) (same); *Polo v. Shwiff*, Case No. 12-4461, 2013 WL 1797671, at *5 (N.D. Cal. April 29, 2013) (same); *J&J Sports Prods., Inc. v. Mendoz-Govan*, Case No. 10-5123, 2011 WL 1544886, at *7 (N.D. Cal. April 25, 2011) (same).

[121] *See Twombly*, 550 U.S. at 556.

[122] *Iqbal*, 556 U.S. at 678.

[123] *Eclectic Props. East, LLC v. Marcus & Millichap Co.*, Case No. 12-16526, 2014 WL 1797676, at *2 (9th Cir. May 7, 2014).

27

Case No. 5:13-cv-03385-PSG
ORDER GRANTING-IN-PART MOTION TO DISMISS AND GRANTING MOTION TO STRIKE

they are no more than conclusions, are not entitled to the assumption of truth.'"[124] "Then a court should 'assume the[] veracity' of 'well pleaded factual allegations' and 'determine whether they plausibly give rise to an entitlement to relief.'"[125]

Applying the Ninth Circuit's test to Defendants' affirmative defenses, Defendants have clearly not met the heightened pleading standard adopted by this district. While this court is not inclined to wade through all 87 defenses to pinpoint each and every deficiency, a few glaring examples stick out. Terix's twenty-second affirmative defense for nominative fair use is none other than a statement of each element of the law.[126] It lacks sufficient factual basis to give rise to a defense beyond mere legal conclusions that parrot the fair use standards.

Similarly, all four Defendants assert a waiver defense in which they allege that by virtue of offering Solaris updates for free, Oracle waived its right to assert a copyright claim.[127] While Oracle points out that abandonment—and not waiver—of a copyright is the proper defense to assert in an infringement action, Defendants have only pointed to the fact that Oracle issued licenses to customers for the copyrighted material. This fact alone does not give rise to a plausible claim of abandonment of copyright such to constitute a valid defense, nor do Defendants provide any other factual allegations that would further support a defense of waiver.

**IX.**

---

[124] *Id*. (quoting *Iqbal*, 556 U.S. at 679).

[125] *Id*. (quoting *Iqbal*, 556 U.S. at 678).

[126] *See* Docket No. 181:

Oracle's claim for relief under the Lanham Act fails because Oracle's Solaris Updates and firmware are products and/or services that are not readily identifiable without reference thereto, and TERiX's use constitutes use reasonably necessary to identify the product or service, and TERiX has taken no action that would, in conjunction with references to Oracle's products and services, suggest sponsorship or endorsement by Oracle.

[127] *See* Docket Nos. 181, 178, 180 & 179.

Case No. 5:13-cv-03385-PSG
ORDER GRANTING-IN-PART MOTION TO DISMISS AND GRANTING MOTION TO STRIKE

Defendants' tying-related claims (specifically Ties 1-3) and Maintech and Volt's interference with contract claim as to BNYM only, may proceed.  All other counterclaims are DISMISSED.  Because the court is not yet persuaded that amendment would be futile, leave to amend is GRANTED.

The court GRANTS Oracle's motion to strike affirmative defenses, again with leave to amend.

Any amended pleadings shall be filed within 14 days.

**SO ORDERED.**

Dated: November 7, 2014

_Paul S. Grewal_
PAUL S. GREWAL
United States Magistrate Judge

Case No. 5:13-cv-03385-PSG
ORDER GRANTING-IN-PART MOTION TO DISMISS AND GRANTING MOTION TO STRIKE

United States District Court
For the Northern District of California