1    [*See* List of Counsel on Following Page]

2

3

4

5

6

7                     UNITED STATES DISTRICT COURT

8                   NORTHERN DISTRICT OF CALIFORNIA

9                          SAN JOSE DIVISION

10

11

12 ORACLE AMERICA, INC., a Delaware      CASE NO.  5:13-cv-03385-PSG
corporation; and ORACLE

13 INTERNATIONAL CORPORATION, a      **DEFENDANTS' JOINT OPPOSITION TO**
Delaware corporation,                         **ORACLE'S MOTION FOR PARTIAL**

14                                       **SUMMARY JUDGMENT**
               Plaintiffs,

15                                Date:        March 17, 2015
       v.                            Time:        10:00 a.m.

16                                Ctrm:        Courtroom 5, 4th Floor
TERIX COMPUTER COMPANY, INC., a      Judge:      Hon. Paul S. Grewal
California corporation; MAINTECH

17 INCORPORATED, a Delaware
corporation; VOLT DELTA                    **REDACTED VERSION**

18 RESOURCES, LLC, a Nevada limited
liability company; SEVANNA

19 FINANCIAL, INC., a Nevada corporation;
WEST COAST COMPUTER

20 EXCHANGE, INC., a Nevada corporation;
and DOES 1-50,

21
               Defendants.

22

23 AND RELATED COUNTERCLAIMS.

24

25

26

27

28

GCA LAW PARTNERS LLP
VALERIE M. WAGNER (SBN 173146)
vwagner@gcalaw.com
JILL F. KOPEIKIN (SBN 160792)
jkopeikin@gcalaw.com
2570 W. El Camino Real
Mountain View, CA 94040, Suite 510
Tel:  650-428-3900
Fax:  650-428-3901

DURIE TANGRI LLP
RAGESH K. TANGRI (SBN 159477)
rtangri@durietangri.com
JOSEPH C. GRATZ (SBN 240676)
jgratz@durietangri.com
LAURA E. MILLER (SBN 271713)
lmiller@durietangri.com
217 Leidesdorff Street
San Francisco, CA  94111
Telephone:  415-362-6666
Facsimile:  415-236-6300

Attorneys for Defendants
VOLT DELTA RESOURCES, LLC and
MAINTECH INCORPORATED


MAINTECH INCORPORATED
Janella K. Simpson (SBN 86476)
jsimpson@volt.com
2401 North Glassell Street, 2nd Floor
Orange, CA 92865
Tel: 714-921-5416
Fax 714- 921-7496

Attorneys for Defendant MAINTECH INCORPORATED


HOPKINS & CARLEY
John V. Picone III, Bar No. 187226
jpicone@hopkinscarley.com
Jennifer S. Coleman, Bar No. 213210
jcoleman@hopkinscarley.com
A Law Corporation
The Letitia Building
70 South First Street
San Jose, CA 95113-2406
*mailing address:*
P.O. Box 1469
San Jose, CA 95109-1469
Telephone:  (408) 286-9800
Facsimile:  (408) 998-4790



ROBINSON & WOOD, INC.
Gabriel G. Gregg, Bar No. 187333
ggg@robinsonwood.com
227 North First Street
San Jose, CA 95113
Telephone:  (408) 298-7120
Facsimile:  (408) 298-0477

LARDIERE MCNAIR, LLC
Christopher L. Lardiere *(Pro Hac Vice)\*
chris@lmcounsel.com
3956 Brown Park Drive, Suite B
Hilliard, OH 43026
Telephone:  (614) 534-1355
Facsimile:  (614) 319-3746

RIMON PC
Richard James Mooney, Bar No.  176486
richard.mooney@rimonlaw.com
Scott Robert Raber, Bar No.  194924
Scott.raber@rimonlaw.com
One Embarcadero Center, #400
San Francisco, CA 94105
Telephone:  (800) 930-7271
Facsimile:  (800) 930-7271

Attorneys for Defendant and Counterclaimant TERIX COMPUTER COMPANY, INC.

1

## TABLE OF CONTENTS

2

Page No.

3    I.      INTRODUCTION ........................................................... 1

4    II.      UNDISPUTED AND DISPUTED FACTS ......................... 3

5            A. Overview ................................................................ 3

6            B. Procedural Background: Oracle's Refusal to Identify The
7               Infringement For Which It Seeks to Recover .................................. 3

8            C. Oracle's Copyrights ........................................................ 4

9               1. Solaris Operating System.................................... 4

10               2. Solaris Updates and Patches ............................ 5

11               3. Firmware for Oracle/Sun Servers ......................... 6

12            D. Solaris Licenses .......................................................... 7

13               1. Binary Code License............................................ 7

14               2. The Software License Agreement........................... 8

15               3. Common Development & Distribution License ("CDDL") .. 9

16            E. Oracle's Statements to Customers, and Its Conduct, Concerning
              Their Rights .................................................................. 10

17            F. Oracle's Attempt to Modify The BCL/SLA With Terms Of Use .... 10

18            G. Customers' Recognition of Their Own License Rights .................. 11

19               1. Customers Understood and Approved Terix's License
20               Analysis .......................................................... 11

21               2. Oracle's Hardware Customers Support Defendants' License
22               Analysis ....................................................... 12

   III.     LEGAL STANDARDS ................................................... 14

23    IV.      ARGUMENT................................................................... 15

24            A. Oracle's MPSJ Can Succeed Only By Negating Every License
25               Defense To Every Alleged Act of Infringement.............................. 15

26            B. The Major-Version Solaris Licenses Permit the Conduct at Issue .. 16

27               1. Oracle Has Chosen To Register And Assert Only
28               Solaris Copyrights On Solaris 8, 9, 10, And 11, Not

GCA Law Partners LLP
2570 W. El Camino Real, Suite 510
Mountain View, CA 94040
(650)428-3900

|   |   |
|---|---|
| Patches ................................................................ | 16 |
| 2. Terix Customers Are Licensed To Run The Code Comprising The Major Version Of Solaris That Shipped With Their Server ................................................ | 19 |
| 3. The Copyright Registration For The Subsequent Major Version Does Not Cover Material Appearing In Previously-Released Patches ................................ | 20 |
| a. The Copyright Registration For The Subsequent Major Version Does Not Cover Previously-Published Material ........................................ | 20 |
| b. The "Particularly-Identified Preexisting Work" Exception Does Not Apply Here ................................. | 21 |
| C. The Common Development and Distribution License Permits the Conduct at Issue............................................ | 23 |
| 1. The Customers Whose Servers Were Patched Were Licensed Under The CDDL, And Terix Was Acting As Those Customers' Agent ................................. | 24 |
| 2. Even To The Extent Terix Was Not Acting As The Agent Of Customers, Terix's Activities Would Be Licensed Under The CDDL ................................... | 25 |
| 3. Sun's Open-Source Licensing Also Precludes Summary Judgment On The License Defense With Respect To Firmware ................................................. | 29 |
| D. Oracle Cannot Show That As A Matter Of Law, All Of The Relevant Licenses Prohibit All Of The Conduct Alleged Here....... | 30 |
| 1. The BCL and the SLA Grant Customers Licenses to Receive Patches and Updates ............................. | 30 |
| 2. The Parol Evidence Supports Defendants' Interpretation, and is at Worst in Conflict ................................... | 32 |
| 3. New Access requirements for Solaris 10 patches................. | 35 |
| E. There Are Disputed Issues Of Fact Regarding Implied License That Must Be Resolved By The Jury................................. | 37 |
| V.    CONCLUSION................................................ | 39 |

## <u>TABLE OF AUTHORITIES</u>

GCA Law Partners LLP
2570 W. El Camino Real, Suite 510
Mountain View, CA 94040
(650)428-3900

1

<u>Cases</u>                                                                  Page No.

2

*Adickes v. S.H. Kress & Co.,*

3
      398 U.S. 144 (1970) ........................................................   15

4

*A&M Records v. Napster, Inc.,*

5
      239 F.3d 1004 (9th Cir. 2001) ....................................   38

6

*Alaska Stock LLC v. Pearson Educ., Inc.,*

7
      975 F. Supp. 2d 1027 (D. Alaska 2013) ...................   38

8

*Anderson v. Liberty Lobby, Inc.,*

9
      477 U.S. 242 (1986) ........................................................   14

10

*Apple, Inc. v. Samsung Electronics Co.,*

11
      876 F. Supp. 2d 1141 (N.D. Cal. 2012) ...................   14

12

*Automation By Design, Inc. v. Raybestos Products Co.,*

13
      463 F.3d 749 (7th Cir. 2006)  ....................................   19, 24

14

*Beckman Instruments, Inc. v. Cincom Sys., Inc.,*

15
      232 F.3d 893 (9th Cir. 2000)  ....................................   32

16

*Bourne v. Walt Disney Co.,*

17
      68 F.3d 621 (2d Cir. 1995)  ........................................   14

18

*City of Hope Nat. Med. Ctr. v. Genentech, Inc.,*

19
      43 Cal. 4th 375(2008)...................................................   33

20

*Cohen v. Paramount Pictures Corp.,*

21
      845 F.2d 851 (9th Cir. 1988)........................................   32

22

*DeForest Radio Tel. Co. v. United States,*

23
      273 U.S. 236 (1927)........................................................   38

24

*Estate of Hevia v. Portrio Corp.,*

25
      602 F.3d 34  (1st Cir. 2010) ....................................   19, 24

26

*Field v. Google,*
      412 F. Supp. 2d 1106 (D. Nev. 2006) ...................   37, 38

27

*Foad Consulting Group, Inc. v. Azzalino,*
      270 F.3d 821(9th Cir. 2001) ....................................   33

28

GCA Law Partners LLP
2570 W. El Camino Real, Suite 510
Mountain View, CA  94040
(650)428-3900

*Harris v. Simon & Schuster, Inc.*,
        646 F. Supp. 2d 622, 633 (S.D.N.Y. 2009) ................................................   33

*I.M.S. Inquiry Management Systems, Ltd. v.*
        *Berkshire Information Systems, Inc.*,
        307 F. Supp. 2d 521(S.D.N.Y. 2004) .....................................................   22, 23

*Intelligraphics, Inc. v. Marvell Semiconductor Inc.*,
        Nov. C-07-2499-JCS, 2008 U.S. Dist. LEXIS 09255,
        2008 WL3200212, (N.D. Cal. July 29, 2008) .........................................   39

*Keane Dealer Servs., Inc. v. Harts*,
        968 F. Supp. 944 (S.D.N.Y. 1997) .........................................................   37

*Marvel Entm't, Inc. v. Kellytoy (USA), Inc.*,
        769 F. Supp. 2d 520(S.D.N.Y. 2011) ......................................................   33

*Meridian Project Sys., Inc. v. Hardin Constr. Co., LLC*,
        426 F. Supp. 2d 1101 (E.D. Cal. 2006) ...................................................   33

*Netbula, LLC v. BindView Dev. Corp.*,
        516 F. Supp. 2d 1137 (N.D. Cal. 2007) ...................................................   14

*Netbula LLC v. Chordiant Software, Inc.*,
        Nov. C-08000019, 2009 U.S. Dist. LEXIS 58690,
        (N.D. Cal. July 9, 2009) .........................................................................   38, 39

*Oracle USA, Inc. v. Rimini Street, Inc.*,
        6 F. Supp. 3d 1086 (D. Nev. 2014 ) ........................................................   38

*Oskar Systems, LLC v. Club Speed, Inc.*,
        745 F. Supp. 2d 1155 (C.D. Cal. 2010) ..................................................   22, 23

*San Diego Gas & Elec. Co. v. Canadian Hunter Mktg. Ltd.*,
        132 F.3d 1303 (9th Cir. 1997 ) ...............................................................   27, 28

*Seiler v. Lucasfilm, Ltd.*,
        808 F.2d 1316 (9th Cir. 1986)  ...............................................................   17

*S.O.S., Inc. v. Payday, Inc.*,
        886 F.2d 1081 (9th Cir. 1989) ................................................................   14, 28, 33

*Stewart v. Abend*,
        495 U.S. 207(1990) ................................................................................   32

*Streetwise Maps, Inc. v. VanDam, Inc.*,
    159 F.3d 739 (2d Cir. 1998) .................................................................... 22

*Sun Microsystems, Inc. v. Microsoft Corp.*,
    188 F.3d 1115 (9th Cir. 1999) .................................................................. 14

*Taylor v. J.B. Hill Co.*,
    31 Cal. 2d 373 (1948) .............................................................................. 28

*Trident Center v. Conn. Gen. Life Ins. Co.*,
    847 F.2d 564 (9th Cir. 1988) .................................................................... 33

*United Steelworkers of Am. v. Phelps Dodge Corp.*,
    865 F.2d 1539 (9th Cir.1989) .................................................................. 14

*Walter E. Heller Western, Inc. v. Tecrim Corp.*,
    196 Cal. App. 3d 149 (1987) .................................................................... 33

*Wang Labs, Inc. v. Mistubishi Elec. Am., Inc.*,
    103 F.3d 1571 (Fed. Cir. 1997) ............................................................... 38

*Well-Made Toy Mfg. Corp v. Goffa Int'l Corp.*,
    354 F.3d 112 (2d Cir. 2003) .................................................................... 22

*XimpleWare, Inc. v. Versata Software, Inc.*,
    No. 5:13-CV-05161-PSG, 2014 WL 2080850,
    (N.D. Cal. May 16, 2014) ..................................................................... 9, 25

**Rules**                                                                       Page No.

17 U.S.C. §101 ............................................................................................. 21

17 U.S.C. §106(3) ......................................................................................... 32

17 U.S.C. §106(4) ......................................................................................... 32

17 U.S.C. §409(9) ..................................................................................... 20,21

17 U.S.C. §411(a) ......................................................................................... 19

Fed. R. App. P. 32.1 ...................................................................................... 32

Fed. R. Civ. P. 56(a) ..................................................................................... 14

Ninth Circuit Rule 36-3(c) ............................................................................ 32

GCA Law Partners LLP
2570 W. El Camino Real, Suite 510
Mountain View, CA 94040
(650)428-3900

| **Other Authorities** | **Page No.** |
|---|---|
| H.R. Rep. No. 94-1476 (1976) ............................................................ | 16, 21 |
| H.R. Rep. No. 100-609 (1988) .......................................................... | 16 |
| Benjamin Kaplan, *The Registration of Copyright*,<br>        *in* Copyright Law Revision Studies Nos. 17-19  prepared for the<br>        Subcomm. on Patents, Trademarks, and Copyrights of the<br>        Sen. Comm. on the Judiciary, 86th Cong., 2d Sess ................................ | 17 |
| Oracle Corporation, *solaris~on-src Mercurial Repository*,<br>        https://hg.java.net/hg/solaris~on-src/  ...................................... | 9 |
| Oracle Corporation, http://www.oracle.com/technetwork/systems/patches/firmware/faq-jsp-139605.html#q1  ................................................................. | 7 |
| United States Copyright Office,<br>        *Compendium of U.S. Copyright Office Practices,*<br>        *Second Edition* § 323.01   ....................................................... | 20 |
| United States Copyright Office,<br>        *Compendium of U.S. Copyright Office Practices,*<br>        *Third Edition* § 721.8 (2014) .................................................. | 20 |

GCA Law Partners LLP
2570 W. El Camino Real, Suite 510
Mountain View, CA  94040
(650)428-3900

## I.      INTRODUCTION

Oracle's Motion for Partial Summary Judgment ("MPSJ") seeks a sweeping ruling, but Oracle fails to prove that it is entitled to such relief.  Oracle's MPSJ seeks to dispose of Defendants' license defenses in their entirety.  To prevail on its motion, Oracle therefore must show that it is alleging *no* act of infringement in this case for which Defendants could make out a license defense.  Oracle's motion fails to do that, for multiple reasons.

*First*, Oracle refuses to take a position on what acts of infringement it is alleging – and its motion certainly doesn't identify any.  To the extent Oracle has hinted at what infringement it is alleging, the only thing that's clear is that it covers multiple different versions of the Solaris OS and hundreds if not thousands of different patches and updates to those different OS versions.  And even Oracle admits that different license agreements cover the different versions of the Solaris OS.  What's worse, ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████.  Oracle has not come close to demonstrating that Defendants can make out a license defense in *none* of those varied factual circumstances governed by different licensing regimes.  Its motion as framed therefore must be denied.  Nor – as a matter of basic notice and due process – should Oracle be permitted to refine its motion on reply, to cherry pick specific examples favorable to it.  *See* Section IV.A.

*Second,* disputed issues of material fact also bar Oracle from demonstrating that it is entitled to summary judgment ruling out a license defense in *any* circumstance, for the following independent reasons.

- Oracle acknowledges that a customer who purchased a Sun server running, e.g., Solaris 9 is licensed to run Solaris 9, but Oracle has not established that ███████ ███████████████████████████████████████████████████████ ████████████████████████.  Because Oracle did not separately register copyrights for its patches, additional material contained in the patch beyond the base version of Solaris 9 is not registered as part of the patch.  And to the extent Oracle seeks to rely on a claim that that material was later registered as part of Solaris 10, it fails, because the

1    previous publication of the material *as part of the patch* bars Oracle from registering

2    it as part of a later copyright.  See Section IV.B.

3  • Oracle also fails to account for the fact that Sun distributed *all* updates and patches to

4    its Solaris code for free, as open source software, from June 14, 2005 until August

5    18, 2010, and that as to those patches, Sun's decision to open-source them provides

6    the requisite license.  *See* Section IV.C.

7  • Oracle fails to establish as a matter of law that customers' licenses to the version of

8    Solaris each customer received when it bought a server do not include the right to

9    receive patches.  It tries to re-write its licenses to say that they permit use only of

10   patches provided directly to the customer by Sun pursuant to a current service plan

11   for which the customer has registered, but the language of the applicable license

12   agreements says nothing of the sort.  Rather, the licenses say only that they extend to

13   any error corrections or updates that Sun may choose to "provide" – without

14   specifying by who or to whom they must be provided, much less including language

15   requiring the customer to have a service plan in place.  A wealth of parol evidence

16   confirms that neither Sun ▇▇▇▇▇▇▇▇▇ understood either of the licenses to

17   impose such requirements, including Sun's own statement, present on its website

18   until mid-2007, that "[a] license to use a certain version of the software, such as

19   Solaris 9, **includes the right to use all current and future Solaris 9 updates.**"  *See*

20   Section IV.D.

21  • Lastly, Oracle's effort to knock out Defendants' implied license defense fails for

22   similar reasons: both by its statements and its conduct toward its customers and

23   defendants over the years Sun created the clear impression that the downloading of

24   patches was within the scope of the customers' rights, and the law therefore

25   recognizes an implied license.  *See* Section IV.E.

26   Accordingly, Oracle has not established that its MPSJ achieves the sweeping goal Oracle set

27  for itself: proving that there is no set of facts on which a license defense could apply to any act of

28  infringement that Oracle may allege in this case.  Nor has it succeeded in showing that there is no

DEFENDANTS' JOINT OPPOSITION TO ORACLE'S MOTION FOR PARTIAL SUMMARY
JUDGMENT; CASE NO. 5:13-CV-03385-PSG                                                    2

1  dispute of material fact as to any of the categories of infringement it has gestured at.  The MPSJ

2  therefore should be denied.

3  **II.    UNDISPUTED AND DISPUTED FACTS**

4  **A.    Overview**

5       This case has its origins in Oracle's decision to acquire Sun Microsystems, Inc. ("Sun").  At

6  that time, Oracle saw the potential to monetize Sun's intellectual property – a potential that Sun had

7  not tapped into because it had a practice to make its intellectual property freely available to the

8  public.  As soon as the merger was complete, Oracle completely changed the way it sold hardware

9  and licensed software.  Under Oracle's new regime, any sale of new hardware and software would

10  require an annual service contract to obtain any software support (and hardware too, but not

11  articulated as such).

12       Oracle is entitled to make those changes prospectively, because its new customers are fully

13  aware and contractually agree that the software that comes with the hardware they purchase

14  contains those conditions.  However, Oracle was not content with a change to the terms of *future*

15  licenses.  Oracle wanted to capture service revenue from the entire installed base of hardware that

16  had been sold, some more than a decade before the merger.   Oracle's solution was a revisionist

17  campaign to import new limitations into the previously-granted software licenses by creating click-

18  through agreements ostensibly modifying the license grants given to Sun customers pre-merger, and

    applying those revisions retroactively despite ████████████████████████████████████

19  ████████████████████.  Declaration of Valerie M. Wagner ("VWD"), Ex. 36 at

20  ORCLTM000013875-76.

21  **B.    Procedural Background: Oracle's Refusal to Identify The Infringement For
            Which It Seeks to Recover**

22

23       Since the inception of this case, Defendants tried to get Oracle to specify its infringement

24  contentions beyond the broad contours of its pleadings and lists of downloads.  Oracle has

25  adamantly refused, arguing that it would be too burdensome, and convinced this Court that such

26  matters were best deferred until expert reports.  VWD Ex. 14 at 76-79; Docket No. 389.

27       In its very first Interrogatory, Maintech asked Oracle to identify for each contended

28  infringement the following: the date/time, copyright registration or application, the lines of code or

DEFENDANTS' JOINT OPPOSITION TO ORACLE'S MOTION FOR PARTIAL SUMMARY
JUDGMENT; CASE NO. 5:13-CV-03385-PSG                                        3

sections of software, the nature of the infringement, and the identity of the third party who received the copyrighted material. VWD Ex. 2 at 5.  In its original response and a subsequent amendment, Oracle objected that the Interrogatory was premature and the information equally available to Defendants, and ███████████████████████████████████████████. *Id.* at 7, 9-10.  In a Second Amended Response, served on January 16, 2015, Oracle ████████████████████████████ ████████████████████████████████████████. *Id.* at 10-21.  All of these materials, however, still only amounted to ████████████████████████. Oracle has never identified which patch downloads it contends infringe which material covered by which copyright.  WEX and Sevanna also propounded interrogatories seeking similar information, to no avail. *See* Docket No. 368 at 2-4; VWD Ex. 1 at 18-23; Ex. 2 at 5-21.  Defendants jointly moved to compel on this Interrogatory, but Oracle represented at the December 12, 2014 hearing that it would present infringement contentions via expert testimony, and convinced the Court to deny the motions to compel.  VWD Ex. 14 at 76-79; Docket No. 389.

### C.     Oracle's Copyrights

Sun and its successor Oracle sell computer hardware and software designed to enable operation of that hardware.  The relevant software consists of various numerical releases of the Solaris operating system and versions of embedded software generically called firmware. When a customer purchases the relevant hardware, the licensed software typically comes installed on the hardware. *See, e.g.,* VWD Ex. 12 at 41:16-42:7; Ex. 27 at 36:4-11.

#### 1.     Solaris Operating System

Oracle alleges that the Solaris copyright registrations "generally cover versions of Oracle's Solaris operating system and other software, as well as the Solaris Updates thereto . . . ."  Second Amended Complaint ("SAC") ¶ 90, Docket No. 298 at 31:9-10.  But Oracle only has copyright registrations for Solaris 8 (released in 2000), 9 (released in 2002), Solaris 10 (released in 2005), and Solaris 11 (released in 2011).  Between 2005 and 2010, Oracle released ███████████████ █████████████████████████████████████████████████████████████████ ████████████████████████████████████. *See* VWD Ex. 6 at 2; Ex. 27 at 36:4-18; Ex. 10 at 21:6-22:2.  Oracle did not contemporaneously register any of the Solaris 10 updates.  Before this

1   lawsuit, Oracle had never attempted to register any firmware. The only firmware registrations at

2   issue were filed in 2014. *See* VWD Ex. 20.

3       After Oracle acquired Sun in 2010, there were no new copyright registrations for Solaris

4   between 2005 and 2014, even though Oracle released Solaris 11 in November 2011. *See* VWD Ex.

5   17 at 127. As this litigation started to heat up in early 2014, however, Oracle received a belated

6   registration for Solaris 11, which listed the previous registrations for Solaris 9 and 10, and a first

7   publication date of November 11, 2011. *Id.*

8       Before the Oracle acquisition, Sun licensed Solaris installed on new Sun servers, and

9   allowed downloads of Solaris at no charge under a free right to use license as long as the recipient

10  registered with Sun to receive the entitlement. VWD Ex. 27 at 27:12-29:16, 36:4-11; Ex. 28 at 1;

11  Ex. 6 at 1; PD Ex. 9; *see also* VWD Ex. 5. After the acquisition, Oracle ███████████████████

    ████████████████. VWD Ex. 12 at 41:16-42:7. Therefore, it is undisputed on the facts

12  before the Court on this motion that every Sun server was licensed to run Solaris.[1]

13

14         **2.      Solaris Updates and Patches**

15      As set forth in Oracle's Second Amended Complaint, and emphasized by its counsel at the

16  hearing before this Court on February 6, 2015, Oracle's copyright infringement claims center on

17  Oracle contentions that Defendants downloaded updates and patches for Solaris and firmware. *See*

18  SAC at ¶ 1, Docket No. 298 at 1:14-17 ("Terix and Maintech have taken or facilitated the taking of

19  large quantities of software patches, updates and bug fixes for Oracle's proprietary Solaris operating

20  system, and other technical support files used on Oracle's Sun-branded computers"). In other

21  words, Oracle is not accusing Defendants of selling copies of Solaris on the black market. Rather,

22  Oracle bases its copyright infringement claims on what it contends is the unauthorized

23  downloading, copying and distribution of "Oracle's copyrighted error corrections, patches, and

    updates" to customers. MPSJ at 1:19-22.

24      There are three types of Solaris software releases:

25

26      •   Major Versions (a/k/a "named releases"), such as Solaris 8 or Solaris 10,

           representing substantial architectural changes to Solaris. PD Ex. 9 at 1;

27

28  [1] The sole possible exception of which we are aware relates to some used servers purchased from non-authorized
    sources but, consistent with its "shoot-the-moon" approach, Oracle has put in no evidence of that on this motion.

- Update Releases ███████████████████████████████
████████████████████████████. VWD Ex. 11 at 17:10-18:4; Ex. 16
at 154:4-17; Ex. 4 at ORCLTM00028052, 78, 80 and 108; and

- Patches (sometimes, confusingly, referred to as "software updates"), such as ██████
████████, fixing bugs in Solaris.  VWD Ex. 7 at 23.

███████████████████████████████████████████████████████
████████████████████████████████████. *See* VWD Ex. 6 at 2; Ex. 7 at 7; Ex. 4 at
ORCLTM00285071.[2]

The distinction between patches and Solaris Update Releases is important because it is
undisputed that ████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████. *See* VWD Ex. 16 at
154:18-155:12; PD Ex. 9 at 1.  The Solaris updates that Sun made freely available on its web site
included ████████████████████████████████████████████████████
████████.  VWD Ex. 15 at 23:24-25:7; Ex. 6 at 2.  In fact, ███████████████
███████████████████████████████████████████████████████
████████.  VWD Ex. 7 at 27; Ex. 4 at ORCLTM00285109.

Accordingly, prior to Oracle's acquisition of Sun, all of the material on which Oracle now

bases its copyright infringement claims was made available for free to Solaris licensees, whether on

an immediate basis or after a few months' wait.

### 3. Firmware for Oracle/Sun Servers

The firmware at issue in this case is distinct in its function from the Solaris operating

system.  Oracle defines firmware as follows:

"Firmware is essentially software that is embedded on a hardware device and
directly controls it (resets, initializes and configures) before the operating system (for

---

[2] Oracle defined "Solaris Updates" as "software patches, updates and bug fixes for Oracle's proprietary Solaris operating system, and other technical support files used on Oracle's Sun-branded computers."  SAC at ¶ 1, Docket No. 298.  Oracle has chosen in this motion to use the term "patches" to refer to "copyrighted error corrections, patches and updates".  *See* MPSJ at 1.  However, since the term patches has been typically used to refer only to error corrections and bug fixes, Defendants suspect that this nomenclature change is due to Oracle's recognition that customers were provided clear license grants to "updates" as a category.

example, the Oracle Solaris Operating System, Linux, or Microsoft Windows) is booted. The firmware is what actually boots the OS, and it is usually contained in some sort of Flash PROM on a system board.

Unlike an OS, which is designed to run on lots of different configurations of hardware and occupies a lot of room . . . on the disk, firmware is usually space-constrained to a few megabytes . . ., so it usually contains only the code needed for that specific hardware configuration. That is why each Sun Server gets its own separate release of firmware. Firmware specific to one type of server system will usually not function on a different server system."

http://www.oracle.com/technetwork/systems/patches/firmware/faq-jsp-139605.html#q1 . "All Sun Servers ship with firmware already installed on them from the factory," and Oracle recognizes that if a system is stable, "there may be no reason to update your firmware." *Id.* Unlike its policies regarding access to Solaris patches, Oracle provides access to many firmware updates for systems that are under warranty. *Id.*; VWD Ex. 29 at 98:5-25; Ex. 24 at 8.

The Oracle firmware copyright registrations are clearly derivative works based on the previous versions of Sun firmware. *See* VWD Ex. 20 (firmware copyright registrations produced by Oracle).

### D. Solaris Licenses

There are two form licenses covering the relevant registered Solaris code in the patches. The licenses are issued to Oracle's customers when they purchase the hardware or, from approximately 2005 to 2010, when anyone could download the software independent of hardware purchase. Both form licenses grant broad, perpetual rights to use not only the Solaris operating system software, but also any Solaris patches subsequently provided.

#### 1. Binary Code License

Solaris 7, 8 and 9 are subject to a "Binary Code License Agreement" ("BCL"). The operative license grant in the BCL provides as follows:

> Sun grants to you a non-exclusive and non-transferable license for the internal use only of the ***accompanying software and documentation and any error corrections provided by Sun*** (collectively "Software") for the number of users and the class of computer hardware for which the corresponding fee has been paid.

PD Ex. 4, TRX0006279 at Section 1 *("License to Use")* (emphasis added). The BCL remains in effect until terminated and contains an integration clause limiting modifications to those contained

1  "in writing and signed by an authorized representative of each party." *Id.*, at sections 6

2  ("*Termination*") and 11 ("*Integration*").  (Oracle has identified no instance in which any such

3  written and executed amendment has been entered by any licensee, and Defendants are aware of

4  none.)  The operative license grant of the BCL, quoted above, does not contain any requirement that

5  a licensee be signed up for a service plan in order to be eligible to receive patches and updates.  It

6  does not contain any language specifying *how* patches must be provided in order for the license to

7  extend to them – *i.e.* it does not say that the license applies only to software provided *directly* to the

8  customer *by Sun*.  It states only that if Sun "provides" a patch then the license extends to it.

9  <div align="center">**2.      The Software License Agreement**</div>

10          Solaris 10 was licensed pursuant to the Software License Agreement ("SLA") and generally

11  with an accompanying Entitlement.  Oracle has submitted various copies of the SLA, and sample

12  Entitlements, all but one of which are largely identical in form.  *See, e.g.,* PD Exs. 5, 6 and 39.  The

13  license grant is stated in Section 1 as:

14              Subject to the terms of your Entitlement, Sun Grants you a
              nonexclusive, nontransferable limited license to use Software for its
15              Permitted Use of the license term.[3]

16  PD Ex. 5, TRX0006271, Section 1.  Section 5(e) of the SLA grants rights to Software Updates and

17  patches:

18              The terms and conditions of this Agreement ***will apply to any
              Software updates provided to you at Sun's discretion, that replace***
19              ***and/or supplement the original Software***, unless such update
              contains a separate license.
20

21  PD Ex. 5, TRX0006271, Section 5(e) (emphasis added).

22          Like the BCL, the SLA contains no language mandating that a licensee be signed up for a

23  service plan in order to be eligible to receive patches and updates.  Nor does it contain language

24  stating that patches must be provided directly to the customer *by Sun* in order for the license to

25  extend to them.  It provides only that updates provided to the customer – without any specification

26  of by who they may be provided – are covered under the license.  And the SLA, like the BCL,

27  _____

28  [3] All Solaris 10 Entitlements state the term of the granted license is "perpetual."  *See* PD Ex. 6.  Also, the SLA allows both personal and commercial use.  *See* PD Ex. 5.

1  contains an integration clause limiting modifications to those contained "in writing and signed by an

2  authorized representative of each party." *See* PD Ex. 5, TRX0006272*, Section 15.

3          **3.**        **Common Development & Distribution License ("CDDL")**

4  

5  VWD Ex. 11 at 50:7-52:14.

6  

7  

8  *Id.* at 79:25-80:21.

9  In order to gain these benefits, Sun made all of the source code it had written for Solaris freely and

10  publicly available on the Internet.  That code was licensed under the CDDL, which contains very

11  permissive terms: anyone may copy and distribute the Solaris code released under the CDDL by

12  Sun, and anyone may create and distribute their own modifications of that code.  VWD Ex. 30 at 4-

13  11; Ex. 3.  This permissiveness sets the CDDL apart from other open-source licenses, like the GNU

14  General Public License, that place many conditions on the distribution of code and require strict

15  compliance.  *See, e.g.*, *XimpleWare, Inc. v. Versata Software, Inc.*, No. 5:13-CV-05161-PSG, 2014

16  WL 2080850, at *1 (N.D. Cal. May 16, 2014).  Indeed, the CDDL is so permissive that a licensee

17  who violates its terms only loses the benefit of the license if he fails to cure the violation within 30

18  days of being made aware of it.  VWD Ex. 30 at 9, § 6.1.

19       Critically, this open-source code base ▮▮▮▮▮▮▮▮▮▮▮▮▮, at least until Oracle

20  killed the OpenSolaris project shortly after buying Sun.  Every code change checked in by a Sun

21  developer working on Solaris was instantly published as part of the OpenSolaris.  Indeed, all of

22  those 13,149 code check-ins—from the OpenSolaris launch at midnight on June 14, 2005[4] to the

23  last OpenSolaris check-in before the project was killed on August 18, 2010[5]—are still available on

24  Oracle's website.  *See* Oracle Corporation, *solaris~on-src Mercurial Repository*, *at*

25  https://hg.java.net/hg/solaris~on-src/.  The instant availability of this code meant that Sun got

26  another important benefit: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

27  [4] *Available at* https://hg.java.net/hg/solaris~on-src/rev/68f95e015346 ("change set 0").

28  [5] *Available at* https://hg.java.net/hg/solaris~on-src/rev/b23a4dab3d50 ("change set 13149").

VWD Ex. 15 at 106:12-19.  Thus, by open-sourcing its code, Sun

*Id.* at 106:21-107:1.

**E.      Oracle's Statements to Customers, and Its Conduct, Concerning Their Rights**

Through at least mid-2007, Sun's own website displayed a document titled Licensing

Policies Regarding the Solaris Operating System, which represented to customers and prospective

customers that when they bought a Sun server they received a license to Solaris, and that:

> The Solaris Operating System has specific named releases, such as 'Solaris 9'; each release may also have updates.  A license to use a certain version of the software, such as Solaris 9, **includes the right to use all current and future Solaris 9 updates**, but does not include the right to use the later version such as Solaris 10.

PD Ex. 9 (*see also* VWD Ex. 25 (emphasis added)).

Indeed,

.  *See* VWD Ex. 37 at

ORCLTM00000819-820; Section IV.D, below.  And for much of the 2000s, Sun made a significant

proportion of the patches and updates it released available for free on its website.  Declaration of

Bernd Appleby ("Appleby Decl.") ¶ 7, Ex. A.  Though the percentage varied over time, even

Oracle's own witnesses have admitted that

.  *See, e.g.,* VWD Ex. 10 at 105:7-23,

142:7-21.

**F.      Oracle's Attempt To Modify The BCL/SLA With Terms Of Use**

Oracle relies heavily on the idea that My Oracle Support ("MOS") required acceptance of

the click-through terms of use ("TOU") and those TOU successfully modified the underlying

licenses granted to Oracle's pre-merger customers at the time of the relevant hardware purchase.

Oracle attempts some sleight-of-hand, arguing that the TOU and the actual license obtained by the

customer at the time of the hardware purchase are part of "one transaction."  However, because the

versions of Solaris at issue were available from 2000-2010, the acceptance of the TOU, which took place up to more than ten years after the issuance of the license, is hardly part of the "same transaction."  Also, Oracle has introduced no evidence that the parties (Sun and the relevant customer) intended the TOU to be part of the license grant in the BCL or SLA – in fact since Oracle's TOU did not exist at the time of the formation of those contracts it could not have been part of the parties' intent to include that language.

Oracle unlawfully ████████████████████████████ (hence Oracle's obvious need for https://archive.org/web/ "Wayback Machine" exhibits and Defendants' Motion for Evidentiary Sanctions)[6] and has no admissible evidence as to the terms and conditions of access there.  It has presented no affirmative evidence showing that any patch download was made pursuant to actual acceptance of the MOS TOU.[7]  Moreover, those terms are insufficient to satisfy the signed writing requirement of the BCL and SLA.

### G.   Customers' Recognition of Their Own License Rights

Oracle attempts to bolster its motion with inadmissible statements characterizing Defendants' business practices as improper.  What Defendants did was recognize the holes in Oracle's licensing regime that concerned Oracle so acutely that it undertook great efforts to "revise" it and effectively impose a new licensing regime on its existing customers.

### 1.   Customers Understood and Approved Terix's License Analysis



*See, e.g.*, PD Ex. 22.

---

[6] The Joint Letter Brief regarding Terix's Motion for Evidentiary Sanctions was served on Oracle on February 6, 2014 (pursuant to Docket No. 466) and is to be filed the week of February 16, 2015.  The anti-trust investigation by the Michigan Department of the Attorney General, among other things, put Oracle on notice that it needed to preserve the SunSolve system.  See VWD Ex. 36.

[7] One would think that the company that claims to be one of the world's largest and most sophisticated software companies would have been able to correlate and memorialize particular customer login information with evidence of the actual document offered and accepted by the click-through process.

[redacted]. *See e.g.*, PD Ex. 22, TRX0002049 ("[redacted]").

Most customers that have participated in the Clearvision process have chosen to contract with Terix for services, sometimes after multiple rounds of discussion.[8] These undisputed facts highlight at least the following: [redacted]

**2. Oracle's Hardware Customers Support Defendants' License Analysis**

Contrary to Oracle's claim (MPSJ at 21), many customers in fact have challenged Oracle, pointing out that its access polices for patches conflict with their original license rights.

For example, even after the filing of this action, Senior Counsel at [redacted] *See* VWD Ex. 22. A follow-up letter from [redacted] counsel dated October 15, 2013, reconfirmed this position. *See* VWD Ex. 23 ("[redacted]

---

[8] *See* Declaration of Bernd Appleby, ¶ 3-4.



[redacted])

On [redacted], managing counsel for [redacted] delivered a letter setting forth [redacted] VWD Ex. 21 at ORCLTM00006872-873.[9] Other customers have followed suit. *See e.g.*, VWD Ex. 26 at 4-5 (email from [redacted]). Besides these examples, Oracle deponents have reported [redacted]. *See e.g.*, *See e.g.*, VWD Ex. 34 at 205:21-25 ("[redacted]")

In addition, Oracle knew [redacted]. VWD Ex. 13 at 30:8–31:8; 43:22–44:6; 36:1–37:6; 48:16–19. [redacted]. VWD Ex. 32. Specifically, [redacted]. VWD Ex. 33 at 87:12–88:6. Despite [redacted].[10] *Id.* at 101:1-101:23. [redacted]. *Id.* at 95:13–96:4.

---

[9] Defendants object to Oracle's citation to Mr. Appleby's testimony at PD Ex. 15 at 165-167 (cited in MPSJ at 21, n.18) as hearsay.

[10] Defendants object to Oracle's citation to the testimony of Atul Dhall at PD Ex. 16 at 96 (MPSJ at 10:17) as calling for an expert opinion. Defendants further object to Oracle's citation to the testimony of James Olding at PD Ex. 17 at 205-206 (MPSJ at 10:19) as inadmissible hearsay, and as lacking foundation.

## III.  LEGAL STANDARDS

Summary judgment may only be granted "if the movant shows that there is no genuine dispute as to ***any material fact*** and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a) (emphasis added).  Material facts are any that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "A dispute as to a material fact is 'genuine' if the evidence is such that 'a reasonable jury could return a verdict for the nonmoving party.'" *Apple, Inc. v. Samsung Electronics Co.*, 876 F. Supp. 2d 1141, 1144 (N.D. Cal. 2012). "The opposing party need not show the issue will be resolved conclusively in its favor." *Id.* (citing *Liberty Lobby*, 477 U.S. at 248-49).  "[A]ll justifiable inferences must be drawn in [the nonmovant's] favor."  *See United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir.1989) (*en banc*) (citing *Liberty Lobby*, 477 U.S. at 255).

"To prevail on its claim of copyright infringement, [the copyright owner] must prove ... 'copying' of protectible expression by [the accused infringer] ***beyond the scope of [the] license***." *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1085 (9th Cir. 1989) (emphasis added).  This is because "a copyright owner who grants a nonexclusive license to use his copyrighted material waives his right to sue the licensee for copyright infringement and can sue only for breach of contract." *Sun Microsystems, Inc. v. Microsoft Corp.*, 188 F.3d 1115, 1121-22 (9th Cir. 1999).  As a result, "in order to meet its burden in this case, Plaintiff must prove that Defendants exceeded the scope of the license." *Netbula, LLC v. BindView Dev. Corp.*, 516 F. Supp. 2d 1137, 1151 (N.D. Cal. 2007).

"Copyright disputes involving only the scope of the alleged infringer's license present the court with a question that essentially is one of contract: whether the parties' license agreement encompasses the defendant's activities." *Bourne v. Walt Disney Co.*, 68 F.3d 621, 631 (2d Cir. 1995).  In determining the scope of a copyright license, state law is applied so long as it does not conflict with federal copyright law and policy. *Netbula, LLC*, 516 F. Supp. 2d at 1148 (citing *S.O.S., Inc.* 886 F.2d at 1085).

## IV.     ARGUMENT

### A.     Oracle's MPSJ Can Succeed Only By Negating Every License Defense To Every Alleged Act Of Infringement

Oracle has chosen to frame its motion broadly: it seeks to knock out Defendant's license defenses in their entirety.  But Oracle's litigation strategy in this case means that its motion puts the cart before the horse because Oracle has refused to confirm its contentions regarding the copyrighted material at issue.  For Oracle to knock out the license defenses before specifying which acts it contends amount to infringement, and of what copyrights, means that Oracle's motion is essentially an *Adickes* motion (*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970)).  To win it, Oracle must "prove the negative," which it cannot do and certainly has not done.  *Id.*

In an effort to obscure this problem, Oracle's brief repeatedly tries to "flip the burden."  For example, it asserts that "[t]here is no legally tenable interpretation of the relevant licenses that entitles Solaris licensees to *all* patches for *all* versions of Solaris software and firmware, for free, forever."  MPSJ at 2:14-16.  But so what?  That might be the issue presented if *Defendants* had moved for summary judgment on their license defenses.  We have not.  What Oracle must prove here is that there is no legally tenable interpretation of the relevant licenses that entitles Solaris licensees to *any* patch for *any* version of Solaris software and firmware at any time that is at issue in this case.  Similarly, Oracle asserts that "Defendants cannot prove their express license defense for each relevant customer and server they supported…."  But that is not the question posed by Oracle's motion, which rather seeks to prove that Defendants cannot prove their express license defense for *any* relevant customer and *any* server they supported.[11]

As explained in Part II, Oracle distributed Solaris under different licenses at different times, had different practices in place at different times concerning which patches it made available without a service contract, and communicated different things to customers and prospective customers at different times concerning what their licenses entitled them to.  Those differences

---

[11] Oracle's assertion that Defendants must prove their license defense "customer by customer" (MPSJ at 23-24) suffers from the same fatal flaw: its motion by its own terms must prove that Defendants can prove a license defense as to *no* customer.  Moreover, Oracle has refused even to allege *infringement* customer by customer, so cannot rationally require Defendants to defend on that basis.

1   mean that different language must be interpreted, and that it must be interpreted in light of different

2   bodies of parol evidence.  Moreover, Oracle has not identified which allegedly infringing updates

3   have been installed, and on which servers.  Are they security-related patches (█████████████

4   ████████████████████████████████████████████████████████████████████████████

5   █████)?  *See* VWD Ex. 16 at 155:6-12, 157:6-16.  Are they "error corrections" within the meaning of

6   the BCL?  Were they installed on servers running Solaris 7, 8, or 9 (and thus subject to the BCL) or

7   Solaris 10 (and thus subject to the SLA)?  Were the servers purchased by the customers prior to

8   mid-2007, while Sun was informing customers and potential customers that "[a] license to use a

9   certain version of the software, such as Solaris 9, includes the right to use all current and future

10  Solaris 9 updates," or at during a time period when different statements were made?

11      In short, Defendants have been litigating inside a dark room where Oracle holds the only

12  flashlight and refuses to turn it on.  Now Oracle seeks a sweeping ruling from the Court that

13  Defendants have no license defense under any of the myriad licenses and circumstances that could

14  apply to Solaris or firmware downloads, while at the same time never giving the Court or

15  Defendants enough information to determine how Oracle contends any of the downloads infringe

16  any specific copyright(s).  Oracle chose to postpone the disclosure of its infringement contentions

17  for expert testimony, and this Court should not now allow Oracle to game the system by bringing a

18  dispositive motion before expert reports.

19      **B.      The Major-Version Solaris Licenses Permit the Conduct at Issue**

20          **1.      Oracle Has Chosen To Register And Assert Only Solaris Copyrights On**
21                  **Solaris 8, 9, 10, And 11, Not Patches**

22      Oracle is suing because Defendants are alleged to have copied Solaris patches.  But Oracle

23  has not registered its copyrights in any Solaris patches.  Zero.  Instead, it has registered only the

24  major versions of Solaris—8, 9, 10, and 11.  Copyright registration "is useful and important to users

25  and the public at large."  H.R. Rep. No. 94-1476 (1976) at 158.  It "helps to ensure the existence of

26  a central, public record of copyright claims."  H.R. Rep. No. 100-609 (1988) at 43.  It also serves an

27  important evidentiary function, requiring deposit of bona fide copies of the material that forms the

28  basis of the copyright claim; "[i]f it were otherwise, the possibilities for fraud would be limitless."

1   *Seiler v. Lucasfilm, Ltd.*, 808 F.2d 1316, 1322 (9th Cir. 1986).  *See generally* Benjamin Kaplan, *The*

2   *Registration of Copyright*, *in* Copyright Law Revision Studies Nos. 17-19, prepared for the

3   Subcomm. on Patents, Trademarks, and Copyrights of the Sen. Comm. on the Judiciary, 86th

4   Cong., 2d Sess., at 41-45 (copyright registration "is perhaps the chief official instrument" by which

5   the requirements of copyrightability are enforced).

6           Notwithstanding the importance of registration to our copyright system, whether to save on

7   costs, to obfuscate the nature of their copyright claims, or for some other reason, Sun (and later

8   Oracle) chose not to register the individual patches that were published, but instead to register major

9   versions of Solaris when they were released.  Sun and Oracle made the choice to register their rights

10  in ways that deprive the public of an accurate, central record of copyright claims relating to Solaris

11  for its own reasons.  But Oracle's choice has consequences for its infringement case against

12  Defendants.

13          Ordinarily, a copyright plaintiff can simply assert that the defendant's copying of a

14  particular work infringes the plaintiff's registered copyright in that particular work.  Here, however,

15  Oracle cannot make that assertion, because the particular works that were allegedly copied—the

16  patches themselves—were not registered.  For that reason, Oracle asserts instead that by copying a

17  particular patch, Terix infringed Oracle's registered copyright in one or more major versions of

18  Solaris—because those are the copyrights that Oracle registered.

19          Oracle has engaged in various gymnastics to avoid taking a position on which of its

20  registered copyrights is infringed by the copying of any given patch.  *See* VWD Ex. 1 at 18-23; Ex.

21  2 at 5-21.  But there are only two options.  A Solaris patch contains ████████████████████

22  ████████████████████████████████████████████.  For any such

23  ████████████████████████████████████████████, and thus

24  copying of the patch *may* infringe the prior-version registration.  For example, a patch to the Solaris

25  kernel package that came out after Solaris 9 but before Solaris 10 is ████████████████████

26  ████████████████, and thus could support an infringement action based on the ███████

27

28

1    registration.[12]

2         A patch also includes ████████████████████████████████████████.

3    (Indeed, the inclusion of ██████████████████████████████████████████.)  Some of that code

4    ████████████████████████████████████████████████████████████████████████████████

5    ███████████████████████████████████████████████████████████████████.  For

6    example, that same Solaris kernel patch that came out after Solaris 9 but before Solaris 10

7    ███████████████████████████████████████████████.  Of course, ███████████████████

8    ███████████████████████████████████████████████████████████████████████████████

9    █████████████████████████████████.  This is illustrated by the following diagram showing

10   ████████████████████████████████████████:

18        Oracle's copyright claim fails as to all three of these categories of code ████████████

19   ██████████████████:

20        As to the "blue" code, which appeared in a previous major version, the claim fails because

21   the customer already has a license to ██████████████████████████████████████, because

22   that license came with the server the customer bought.[13]  This license is discussed in section IV.B.2,

23

24   _____
     [12] To be sure, the patches contain ████████████████████████████████████, too.  The patches ████████

25   █████████████████████████████████████, and so on.  VWD Ex. 16 at 67:4-74:4.  But Oracle does not allege
     that any of that ancillary material is subject to any copyright registration, because that ancillary material appears only in

26   the patches, not in any of the registered major versions on which Oracle's claims rely.  Thus, for purposes of this case,
     only the executable files, and the source code from which those executables were compiled, matters.

27   [13] See also VWD Ex. 35 (Terix's 10th Amended Response to Oracle's Interrogatory No. 5).  This amended interrogatory
     response by Terix, timely served in this action, supersedes the earlier version submitted by Oracle in support of the

28   MPSJ.  See PD Ex. 1.

     DEFENDANTS' JOINT OPPOSITION TO ORACLE'S MOTION FOR PARTIAL SUMMARY
     JUDGMENT; CASE NO. 5:13-CV-03385-PSG                                                          18

below.

As to the "grey" code, ███████████████████, the claim fails because no

copyright registration even purports to cover that code.  *See* 17 U.S.C. § 411(a) (registration is a

prerequisite for bringing any "civil action for infringement of the copyright in any United States

work").

As to the "orange" code, ██████████████████████████████████

███████, by operation of law that code cannot be covered by the copyright registration for the

subsequent major version and therefore cannot form the basis for a copyright claim.  This argument

is discussed in section IV.B.3, below.

> **2.    Terix Customers Are Licensed To Run The Code Comprising The Major Version Of Solaris That Shipped With Their Server**

All of the servers at issue ████████████████████.  VWD Ex. 12 at 41:16-42:7.

████████████████████████████████████████████████

███████████████████████  VWD Ex. 15 at 65:11-67:3.  As explained in

Section IV.A, above, because Oracle frames its motion as a blanket attack on the license defense, in

order to prevail, Oracle must show that *none* of the customers at issue were licensed to run a major

version of Solaris on the servers on which the patches were installed.  In light of the Oracle

witnesses' testimony, however, the evidence is that ████████████████████████

██████████████████████, and Oracle has identified no exceptions.

Accordingly, so long as Oracle's claims relate to code in the *prior* major version of Solaris, that

code is licensed under the license documents discussed above in Section IV.D.  Because Terix was

acting as the agent of the licensed customer, that license protects Terix's activity.  *See, e.g.,*

*Automation By Design, Inc. v. Raybestos Products Co.*, 463 F.3d 749, 757 (7th Cir. 2006) (an agent

working on behalf of and for the benefit of a copyright licensee is protected by the license from

infringement claims); *Estate of Hevia v. Portrio Corp.*, 602 F.3d 34, 44-45 (1st Cir. 2010) ("When,

as in this case, there is no indication that a license-granting copyright owner has restricted the

licensee's ability to use third parties in implementing the license, the license is generally construed

to allow such delegation.").[14]

3.     **The Copyright Registration For The Subsequent Major Version Does Not Cover Material Appearing In Previously-Released Patches**

a)     **The Copyright Registration For The Subsequent Major Version Does Not Cover Any Previously-Published Material**

Code that appears for the first time in a patch, rather than appearing for the first time in a later major version, is not covered by the subsequent copyright registration for that later major version. That is because, at the time of the publication of the later major version that has been registered, the material that was published as part of a patch was "previously published" material which is excluded from the ambit of the major-version registration. This rule is explained by the United States Copyright Office in its official manual of procedures: "A registration for a specific version of a computer program covers the new material that the author contributed to that version, including any changes, revisions, additions, or other modifications that the author made to that version. . . . However, a registration for a specific version of a computer program does not cover any unclaimable material that may appear in that version. For purposes of registration, unclaimable material includes: Previously published material." United States Copyright Office, *Compendium of U.S. Copyright Office Practices, Third Edition* § 721.8 (2014) ("*Compendium III*"). This is by no means a new rule that would come as a surprise to Oracle; indeed, it has been Copyright Office policy since 1984. *See* United States Copyright Office, *Compendium of U.S. Copyright Office Practices, Second Edition* § 323.01 ("Registration for a derivative computer program covers only the additions, changes, or other new material appearing in the program for the first time.").

That a registration for a derivative work covers only new material in the derivative work, not any preexisting material incorporated into that derivative work, is a concept embedded in the statute governing copyright registration. That statute requires that every copyright application for a derivative work include "an identification of any preexisting work or works that it is based on or incorporates, and a brief, general statement of the additional material covered by the copyright

---

[14] Oracle argues that Maintech itself did not understand fully the license rights possessed by its customers. MPSJ at 10 and 24 citing PD Ex. 18. Maintech objects to the cited testimony as calling for an expert opinion (a legal conclusion) from a lay witness. At all events, Maintech's knowledge of a customer's rights does not affect the scope of those rights.

claim being regi." 17 U.S.C. § 409(9).  By drawing a dichotomy between the "preexisting work"
and the "material covered by the copyright claim being registered," the statutory language shows
that registering a derivative work does not register copyright in any preexisting work it incorporates.
This rule also comports with the statute's legislative history, which states in its discussion of
derivative works:

> The most important point here is one that is commonly misunderstood
> today: copyright in a "new version" covers only the material added by
> the later author, and has no effect one way or the other on the
> copyright or public domain status of the preexisting material.

H.R. Rep. No. 94-1476 (1976) at 57.

Applying this rule to the Solaris patches is straightforward.  By definition, a Solaris patch
that came out before a given major version of Solaris came out "previously" to that major version's
publication.  And the release of Solaris patches to customers constituted "publication," because
"'Publication' is the distribution of copies or phonorecords of the work to the public by sale or other
transfer of ownership, or by rental, lease, or lending." 17 U.S.C. § 101.  The patches were thus
"published" at the time they were made available for download to customers—before the release of
the next major version.  (Indeed, as discussed below, the code at issue was "published" even before
that—as it was being written, as part of the OpenSolaris source code repository.)

Indeed, Oracle's 30(b)(6) witness on its copyright registrations ▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮.  VWD Ex. 16 at 221:17-19 (Solaris 8), 245:1-6 (Solaris 9), 245:16-22 (Solaris 10),
252:7-17 (Solaris 11).

Thus, because the patches were published before the subsequent major version incorporating
some of the same material, the registration for the subsequent version cannot support an
infringement action for copying of the previously-published patch.

### b) The "Particularly-Identified Preexisting Work" Exception Does Not Apply Here

Some courts have established an exception to the rule that a copyright registration for a
derivative work never covers any preexisting work.  That exception applies when the copyright
registration for the derivative work specifically identifies a *particular* preexisting work whose

copyright is owned by the creator of the derivative work.  In that narrow situation, the registration for the derivative work is deemed to cover the preexisting work.  *See, e.g.*, *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 747 (2d Cir. 1998) (where a "pre-existing map" was "referred to in the certificate" for a derivative map, that later registration certificate could support an action for infringement of the preexisting map); *Well-Made Toy Mfg. Corp v. Goffa Int'l Corp.*, 354 F.3d 112, 116 (2d Cir. 2003) (distinguishing *Streetwise* on the ground that a preexisting doll was "not listed in any copyright registration" and thus finding that the registration certificate for a derivative doll could not support an action for infringement of the preexisting doll).  Two courts have applied this rule in the context of computer software, and those cases show why Oracle's major-version copyright registrations cannot support an action for infringement of previously-published Solaris patches.

In *I.M.S. Inquiry Management Systems, Ltd. v. Berkshire Information Systems, Inc.,* 307 F. Supp. 2d 521, 527 (S.D.N.Y. 2004), the plaintiff alleged that the defendant had accessed and copied its website in March of 2002.  *Id.*  The plaintiff presented a certificate of copyright registration for his website identifying the claimed work as having been first published in March of 2003.  *Id.*  That registration certificate did not identify the March, 2002 version of the website as a preexisting work on which the March, 2003 version was based.  *Id.* at 529.  Because the registration certificate did not identify "what precise underlying or preexisting work was supplemented," the registration was held not to cover the preexisting work.  *Id.* (discussing in detail *Streetwise* and *Well-Made*, *supra*).

Similarly, in *Oskar Systems, LLC v. Club Speed, Inc.*, 745 F. Supp. 2d 1155, 1163 (C.D. Cal. 2010), the plaintiff registered a 2008 version of its computer program, identifying it on the registration certificate as "a derivative work of prior versions of the same computer program."  The plaintiff alleged that the defendant had infringed copyright in the computer program in 2006.  The court observed that the registration certificate thus "fails to identify upon which prior version(s) of the program the registration is based and when those prior versions were created (or whether the version was one that existed before or after the alleged copying occurred), what the additional material the derivative is claiming, etc."  *Id.* at 1163.  Because the registration for the later version did not identify with particularity the preexisting work alleged to have been infringed, the court held

1   that the derivative-work registration could "not encompass the preexisting work that forms the basis

2   for Plaintiff's lawsuit." *Id*

3       Here, none of the copyright registrations at issue identify with particularity the allegedly-

4   infringed patches.  The copyright registration for Solaris 8 identifies "[p]rior versions of Solaris" as

5   the preexisting works—the same kind of nonspecific, categorical identification found insufficient in

6   *Oskar Systems*.  *See* VWD Ex. 17 at 106.  The copyright registrations for Solaris 9, 10, and 11 are

7   even less specific, identifying "[p]rior works by claimants and licensed-in components."  *Id.* at 114,

8   124, 143.  These registrations provide no indication whatsoever that they are intended to cover the

9   patches at issue in this case.

10      Thus, even if this court adopts the relaxed standard adopted in the *I.M.S. Inquiry*

11  *Management Systems* and *Oskar Systems* cases, the registrations at issue do not cover any

12  previously-published patches.

13      Because Oracle's claims are necessarily limited to allegations of infringement of the major

14  version of Solaris that preceded a given patch, and because Terix acted as the agent of customers

15  who had licenses to those respective preceding versions, Oracle's motion for summary judgment on

16  Defendants' license defense should be denied.

17  **C.       The Common Development and Distribution License Permits the Conduct at**
18  **Issue**

19      As discussed above in Section II.D.3, the ███████████████████████████████████████

20  ███████████████████████████████████████████████████████.  That repository, as

21  discussed above, was available for public download.

22      In this way, ███████████████████████████████████████████████████

23  ███████████████████  **had already been published** as part of OpenSolaris long before the release of the

24  patch.  This surprising fact has an important ramification for Oracle's copyright case: it means that

25  **all** of the allegedly copied material at issue in this case is licensed to the world at large at no cost

26  under the CDDL.  As discussed previously, the patch files at issue include ████████████████████

27  ███████████████████████████████████████████████████████████████████████

28  ███████████████████████████████—but that ancillary material is ██████████████████

1   █████████████████, and thus Oracle has no registered copyright to the material which could

2   support an action for copyright infringement.  And, through a felicitous coincidence, the most recent

3   of Oracle's Solaris copyright registrations—for Solaris 11—covers ██████████████████████

4   ████████████████████████████████████████████.  VWD Ex. 19 at 69-

5   118.

#### 1.   The Customers Whose Servers Were Patched Were Licensed Under The CDDL, And Terix Was Acting As Those Customers' Agent

8       For purposes of copyright law, a licensee and its agent are regarded as one entity (unless the

9   license prohibits the licensee to act through an agent).  *See, e.g.*, *Automation By Design, Inc. v.

10  Raybestos Products Co.*, 463 F.3d 749, 757 (7th Cir. 2006) (an agent working on behalf of and for

11  the benefit of a copyright licensee is protected by the license from infringement claims); *Estate of

12  Hevia v. Portrio Corp.*, 602 F.3d 34, 44-45 (1st Cir. 2010) ("When, as in this case, there is no

13  indication that a license-granting copyright owner has restricted the licensee's ability to use third

14  parties in implementing the license, the license is generally construed to allow such delegation.").

15  The CDDL contains no provision restricting the licensee's ability to use third parties in

16  implementing the license.  Thus, the question is whether Terix's customer—not Terix—was

17  licensed under the CDDL.

18      The CDDL provides two separate license grants: one in Section 2, and the other in Section

19  3.5.  The grant set forth in Section 2 is the one applicable to one who, like a Terix customer, simply

20  downloads and uses CDDL-licensed software, rather than modifying or distributing that software.

21  (The grant of license in Section 3.5 is an alternative applicable to those who distribute only

22  executable versions of the software, and it is discussed below in section IV.C.2.)  Section 2 of the

23  CDDL grants anyone "a world-wide, royalty-free, non-exclusive license . . . to use, reproduce,

24  modify, display, perform, sublicense and distribute the Original Software (or portions thereof), with

25  or without Modifications, and/or as part of a Larger Work," with the license grant "[c]onditioned

26  upon" the licensee's "compliance with Section 3.1 below."  VWD Ex. 30 at 6-7, §§ 2.1, 2.2.

27      Terix's customers were licensed because they were in compliance with Section 3.1.  That is

28  because Section 3.1 contains requirements that apply only to those who distribute the software, not

DEFENDANTS' JOINT OPPOSITION TO ORACLE'S MOTION FOR PARTIAL SUMMARY
JUDGMENT; CASE NO. 5:13-CV-03385-PSG                                              24

1    those who use it for their own purposes.  *See Id.* at 7, § 3.1, first sentence (imposing a requirement

2    with respect only to "[a]ny Covered Software that You distribute"), second sentence (imposing a

3    requirement with respect only to "every copy of the Source Code form of the Covered Software

4    You distribute or otherwise make available"), third sentence (imposing a requirement with respect

5    only to "such Covered Software," i.e., the "Covered Software You distribute or otherwise make

6    available" mentioned in the previous sentence).  Transmission of the software between a principal

7    and an agent is not "distribution" because the software is not shared with any stranger to the

8    principal-agent relationship, such as a non-employee "contractor."  This situation is thus unlike the

9    one in *XimpleWare, Inc. v. Versata Software, Inc.*, No. 5:13-CV-05161-PSG, 2014 WL 2080850, at

10   *6 (N.D. Cal. May 16, 2014), in which one of the defendants, Ameriprise, was alleged to have

11   "reproduced and distributed the software outside of Ameriprise and to non-employees."  There was

12   no allegation of a principal-agent relationship between Ameriprise and the third parties to whom it

13   was alleged to have distributed the software.  The *XimpleWare* court found that allegation to

14   amount to "distribution" for purposes of an open-source license.  Here, by contrast, Terix's

15   customers act through Terix as their agent in downloading and installing the patches, just as those

16   customers would otherwise act through their IT employees as their agents in downloading and

17   installing the patches.  Accordingly, there is no "distribution."

18       Because the grant of license in Section 2 is conditioned only upon compliance with Section

19   3.1, and Terix customers complied with Section 3.1, those customers were licensed under the

20   CDDL.  Because Terix was acting as the agent of those customer licensees when it undertook the

21   conduct at issue in this case, Terix is protected from infringement claims by that license.

### 2.    Even To The Extent Terix Was Not Acting As The Agent Of Customers, Terix's Activities Would Be Licensed Under The CDDL

24       As discussed above, there was no "distribution" by Terix, because Terix was acting as the

25   agent of a particular customer when it copied and installed patches.  But even to the extent Oracle is

26   able to show that Terix was not acting as the agent of a customer with respect to some particular act

27   of copying or distribution, Oracle is still not entitled to summary judgment.  That is because even if

28   Terix was, on its own account, distributing the patches, that activity was licensed under Section 3.5

1  of the CDDL.  VWD Ex. 30 at 8.

2        The CDDL is among the most permissive open-source licenses.  It states that "You may

3  distribute the Executable form of the Covered Software under the terms of this License **or under**

4  **the terms of a license of Your choice**, which may contain terms different from this License,

5  provided that You are in compliance with the terms of this License and that the license for the

6  Executable form does not attempt to limit or alter the recipients rights in the Source Code form from

7  the rights set forth in this License."  *Id.*, § 3.5.  Thus, as long as only the executable form is being

8  distributed, **any license at all** may be used, so long as it does not attempt to restrict downstream

9  users from exercising the rights to the source code distributed by Sun.  The express purpose of this

10 provision granting the "[a]bility to distribute executables under a different license"—a departure

11 from the Mozilla Public License, on which the CDDL is based—is that it "gives businesses more

12 flexibility" in using works licensed under the CDDL.  VWD Ex. 3.

13       Section 3.5 of the CDDL reads, in its entirety:

14              **3.5. Distribution of Executable Versions.**

15              You may distribute the Executable form of the Covered Software
                under the terms of this License or under the terms of a license of Your
16              choice, which may contain terms different from this License, provided
                that You are in compliance with the terms of this License and that the
17              license for the Executable form does not attempt to limit or alter the
                recipients rights in the Source Code form from the rights set forth in
18              this License. If You distribute the Covered Software in Executable
                form under a different license, You must make it absolutely clear that
19              any terms which differ from this License are offered by You alone,
                not by the Initial Developer or Contributor. You hereby agree to
20              indemnify the Initial Developer and every Contributor for any liability
                incurred by the Initial Developer or such Contributor as a result of
21              any such terms You offer.

22 VWD Ex. 30, § 3.5.  Terix complied with each of the requirements of Section 3.5.

23       The *first* requirement of Section 3.5 is that the executable form of the software be distributed

24 "under the terms of this License or under the terms of a license of Your choice, which may contain

25 terms different from this License[.]"  When Terix provided support services with respect to patches

26 it did so under the terms of its support contracts with its customers, which provide that Terix is an

27 agent of the customers for purposes of patch distribution, as discussed above in section II.G.1.

28       The *second* requirement of Section 3.5 is that the distributor is "in compliance with the

terms of" the CDDL.  The CDDL does not require that the licensee take any action in order to be in compliance with it, but includes one prohibition that, if violated, would mean that the violator was not in compliance with the terms of the CDDL: "You may not remove or alter any copyright, patent or trademark notices contained within the Covered Software, or any notices of licensing or any descriptive text giving attribution to any Contributor or the Initial Developer."  VWD Ex.  § 3.3.  Terix did not remove or alter any notices contained within the patches, or any related descriptive text. [15]  Thus, Terix was "in compliance with the terms of" the CDDL.

Oracle may argue that Terix was not "in compliance" with the CDDL because it did not inform its customers of the location where the source code was available, as would be required if it were distributing the program under other provisions of the license outside of Section 3.5.  VWD Ex. 30 at 8.  Those other provisions say that the licensee is to "inform recipients of any such Covered Software in Executable form as to how they can obtain such Covered Software in Source Code form in a reasonable manner," and the source code must be able to be obtained "on or through a medium customarily used for software exchange."  *Id.* at 7, § 3.1.  But the requirement of such a notice was deliberately omitted from Section 3.5, as the interpretive notes explaining the rationale for the CDDL explain.  In the Mozilla Public License, on which the CDDL is based, the analogous provision says that "You may distribute Covered Code in Executable form only if . . . You include a notice stating that the Source Code version of the Covered Code is available under the terms of this License, including a description of how and where You have fulfilled the obligations of Section 3.2."  VWD Ex. 31, Mozilla Public License 1.1 at § 3.6.  In drafting the CDDL, Sun explicitly chose to omit this requirement.  In the drafting notes, it explains: "the reference to MPL Section 3.2 and its specific required notices was also removed."  VWD Ex. 3.  By removing the notice requirement that had been in the analogous section of the Mozilla Public License, Sun gave users the "flexibility" that it intended to provide.  *Id.*  At the very least, this provision is ambiguous as to whether Section 3.5 requires notice of availability of source code.  Based on Sun's interpretive notes, that ambiguity "could be resolved in a manner consistent with" the license defense.  *San*

---

[15] *See* Declaration of Bernd Appleby, ¶ 5.

DEFENDANTS' JOINT OPPOSITION TO ORACLE'S MOTION FOR PARTIAL SUMMARY JUDGMENT; CASE NO. 5:13-CV-03385-PSG

1   *Diego Gas & Elec. Co. v. Canadian Hunter Mktg. Ltd.*, 132 F.3d 1303, 1307 (9th Cir. 1997).  And

2   because Sun is the drafter of the CDDL, any ambiguity *must* be resolved against Sun and its

3   successor, Oracle.  *See, e.g.*, *Taylor v. J.B. Hill Co.*, 31 Cal. 2d 373, 374 (1948) ("It is a settled rule

4   that in case of uncertainty in a contract it is construed most strongly against the party who caused

5   the uncertainty to exist—the party drafting the instrument."); *accord S.O.S., Inc. v. Payday, Inc.*,

6   886 F.2d 1081, 1088 (9th Cir. 1989) (holding that a copyright licensor is not assumed to have given

7   up "any right which it did not expressly retain," but not disturbing the background rule that contract

8   ambiguities are construed against the drafter).

9       The *third* requirement of Section 3.5 is that "the license for the Executable form [must] not

10   attempt to limit or alter the recipients rights in the Source Code form from the rights set forth in this

11   License."  The support contracts pursuant to which Terix provided support services with respect to

12   the patches, acting as the agent of its support customers, make no attempt to limit or alter the

13   customers' rights to OpenSolaris source code.  Thus, this requirement is met.

14       The *fourth* and final requirement of Section 3.5 is that, "[i]f You distribute the Covered

15   Software in Executable form under a different license, You must make it absolutely clear that any

16   terms which differ from this License are offered by You alone, not by the Initial Developer or

17   Contributor."  As a means of enforcing this requirement Section 3.5 states that, "You hereby agree

18   to indemnify the Initial Developer and every Contributor for any liability incurred by the Initial

19   Developer or such Contributor as a result of any such terms You offer."  In drafting the CDDL and

20   permitting distribution under "a license of Your choice," Sun was rightly concerned that those other

21   licenses might impose warranty or support obligations on Sun that it would otherwise not have.

22   Accordingly, the CDDL requires that the "license of Your choice" make clear that it does not

23   impose any obligations on Sun.  The support contracts do not purport to impose any obligations of

24   any kind on Sun or any other Solaris contributor.  Terix would take full responsibility as indemnitor

25   if Sun or Oracle was subject to any liability as a result of its support services, but those services

26   have not given rise to any such liability.

27       Accordingly, because it has complied with the requirements of Section 3.5, the CDDL

28   provides that Terix "may distribute the Executable form of the Covered Software."  That is what it

1   is accused of doing in this case—and that is activity licensed under the CDDL.

2           3.      **Sun's Open-Source Licensing Also Precludes Summary Judgment On**
3                   **The License Defense With Respect To Firmware**

4           Oracle has not identified what portion or portions of the firmware form the basis for its

5   claims of infringement of the firmware copyright registrations.  Accordingly, summary judgment on

6   the license defense is not proper if Defendants can show that any portion of the firmware is subject

7   to a license defense.  The firmware files were used under the same agency agreements discussed

8   above with respect to Solaris patches, so the same arguments discussed above with respect to

9   Solaris patches apply to those portions of the firmware that were open sourced.  Thus, the only

10  remaining issue is whether and how the firmware was released under an open-source license.



11          The firmware was not

12  . However, substantial portions of the firmware

13

14      **16**  As part of an attempt to

15

16  . VWD Ex. 38 at 367:21-368:4.  Bruce Munroe, Oracle's 30(b)(6)

17  witness on the source code, confirmed that

18

19  . *Id.* at 368:18-378:15  He had no explanation for why the copies

20  submitted to the Copyright Office had the                               before

21  submission. *Id.* at 378:16-379:11.

22          The BSD license included on the firmware files open-sourced by Sun contains three

23  requirements:

24      •   Redistribution and use of this software in source and binary forms, with or without
            modification, are permitted provided that the following conditions are met:

25

26          o   Redistribution of source code must retain the above copyright notice, this list
                of conditions and the following disclaimer.

27  _____
    **16** *Compare* VWD Exs. 39-40 at                                              *with*
28  http://opensource.org/licenses/BSD-3-Clause.

o   Redistribution in binary form must reproduce the above copyright notice, this list of conditions and the following disclaimer in the documentation and/or other materials provided with the distribution.

o   Neither the name of Sun Microsystems, Inc. or the names of contributors may be used to endorse or promote products derived from this software without specific prior written permission.

VWD Exs. 39-40 at ███████████████████████████████████████████. As with the CDDL, this license imposes requirements only on *distribution*, not on use; anyone may use the licensed firmware without complying with any conditions at all. Thus, because the customer acquired and used the firmware through its agent, Terix, and did not distribute it, the use was licensed.

**D.   Oracle Cannot Show That As A Matter Of Law, All Of The Relevant Licenses Prohibit All Of The Conduct Alleged Here**

Oracle argues that the licenses in question – the BCL and the SLA – unambiguously prohibit Defendants' conduct. MPSJ at 17-18. Oracle is incorrect. As explained below, the language of the agreements is at best ambiguous, and actually supports the conclusion that customers were licensed to receive the patches and updates at issue here. That conclusion is further supported by the overwhelming weight of the parol evidence which, under California law, the Court must consider in this circumstance.

**1.   The BCL and the SLA Grant Customers Licenses to Receive Patches and Updates**

The BCL, which applies to Solaris 7, 8, and 9, licenses a purchaser of those Solaris operating systems to use the system they receive "and any error corrections provided by Sun." PD Ex. 4. The term "error corrections" is not defined – nothing in the BCL purports to limit that broad term only to bug fixes or to draw a line between "patches" and "updates," much less to try to define what nature of enhanced functionality versus improvement to existing functionality would cause a given patch or update to fall on one side or the other of such a line. And, as noted above, Oracle has not attempted to specify on this motion or in this case which allegedly infringing downloads it contends were "error corrections" and which if any it contends were something else.

1    Likewise, the SLA, which applies to Solaris 10, grants a license that applies not only to the

2    original operating system but also to "updates … that replace and/or supplement the original"

3    software.  PD Ex. 5.  Oracle similarly has not attempted to argue that that broad language covers

4    only some of the updates and patches that are the subject of its infringement claims, much less to

5    specify which.

6    Instead, Oracle rests its textual argument principally on the term "provided."  It asserts that

7    that term is unambiguous, citing "make available for use; supply" as the plain and ordinary meaning

8    of "provided."  *Id.* at 17 & n.14.  But the BCL says nothing about *how* an error correction must be

9    provided *to the user* in order to qualify as licensed software.  It says only that it must be provided

10   "by Sun" – but without specifying *to whom* Sun must provide it.  And the SLA says it the original

11   license applies to updates provided "to you [i.e. the customer]" at Sun's discretion, *not* that updates

12   must be provided "to [the customer] *by Sun*."  So, in an effort to limit the broad scope of the

13   language of each agreement, Oracle creates a mash-up of them to suggest that its licenses apply

14   only to patches "provided by Sun" directly to Sun's customers "at Sun's discretion."  *Id.* at 17:14-

15   15.  It does so notwithstanding that the BCL and SLA are two different license agreements,

16   operative at two different times, each of which is applicable only to distinct versions of Solaris.

17   Oracle is reduced to conflating the language of two distinct agreements and trying to imply

18   additional language present in neither because, as Oracle's CEO Mark Hurd admitted,



27   VWD Ex. 12 at 124:17-125:5.  But Oracle's effort to re-write the BCL (and the SLA) fails, because

28   the language of each license supports the conclusion that it provide Sun's customers with the rights

1   to updates and patches that Sun chooses generally to provide for its user base.  Neither license

2   contains language restricting its effect to updates "provided directly to a customer by Sun."  Neither

3   license contains language requiring a customer to have an active service plan in order for Sun to

4   "provide" the customer an update.  And the SLA – which contains the phrase "at Sun's discretion"

5   – does not contain any language stating that Sun may choose to exercise that discretion on a

6   customer-by-customer basis. [17]

7       At a minimum, then, each license is ambiguous on the question of whether it grants

8   customers the right to use error corrections and updates.  As explained below, the relevant parol

9   evidence strongly supports the conclusion that they do.  Because questions of conflicting parol

10   evidence cannot be resolved on summary judgment, Oracle's motion must be denied.

11
12   **2.     The Parol Evidence Supports Defendants' Interpretation, and is at Worst in Conflict**

13       Tacitly acknowledging the ambiguity of its licenses, Oracle goes on to argue that according

14   to its various "policy documents," the word "provided" really means: ***provided only by Oracle***

15   ***pursuant to an active service contract for the specific server where the subject patch will be***

16   ***applied***.[18]  But those documents are in turn at odds with a wealth of other parol evidence.  Under

17   California law – and under Ninth Circuit precedent interpreting it – the Court must consider such

18   evidence, even if the Court would otherwise believe the language of the contract was not

19   _____

20   [17] The "discretion" language in the SLA simply allows Oracle to choose to provide or not provide (*i.e.* to build or not to

21   build) specific patches.  It does not allow Oracle to import conditions (e.g., "pursuant to a service contract") into the language of the SLA.  Oracle cites *Stewart v. Abend*, 495 U.S. 207, 228-29 (1990) for the proposition that a "copyright owner may license as it sees fit, or not at all."  It is true that nothing prevented Oracle from "hoarding all of [its] works

22   during the term of the copyright" and declining to license them.  *Id.*at 229.  But that is not what Oracle's predecessor Sun did.  Sun licensed its works widely, under broad terms that Oracle now regrets.  *Stewart* does not stand for the

23   proposition that, once granted, such a license may be arbitrarily revoked or its purpose frustrated.  *Id.*

24   [18] Oracle also cites *Beckman Instruments, Inc. v. Cincom Sys., Inc.*, 232 F.3d 893 (9th Cir. 2000) (unpublished) for the proposition that a license to "use" software is not a license to download it.  Putting aside the problem that as an unpublished case from before 2007, *Beckman* is not citable (*see* Ninth Circuit Rule 36-3(c); Fed. R. App. Proc. 32.1),

25   the accused infringer in *Beckman* outsourced copying of software to a third party where the license grant specifically prohibited outsourcing.  Here, Oracle's license grants specifically allow third parties to act as agents of the licensee.

26   Similarly, *Cohen v. Paramount Pictures Corp.*, 845 F.2d 851, 853 (9th Cir. 1988) dealt with a defendant's claim that a license to "exhibit" a motion picture—that is, to publicly perform it, a right governed by 17 U.S.C. § 106(4)—also

27   provided a license to sell videotapes of the motion picture—that is, to distribute copies to the public, a separate right governed by 17 U.S.C. § 106(3).  It does not, as Oracle says, provide a general rule of license interpretation

28   demonstrating that the word "provided" in Oracle's license agreements has a particular meaning.

1   ambiguous.  *See Trident Center v. Conn. Gen. Life Ins. Co.*, 847 F.2d 564, 568-570 (9th Cir. 1988)

2   (California law permits introduction of parol evidence even where contract seems unambiguous);

3   *Foad Consulting Group, Inc. v. Azzalino*, 270 F.3d 821, 826-28 (9th Cir. 2001) (California law, not

4   federal law, applies to interpretation of non-exclusive copyright licenses).

5          And where the parol evidence is in conflict, summary judgment is not appropriate.  *See City*

6   *of Hope Nat. Med. Ctr. v. Genentech, Inc.*, 43 Cal. 4th 375, 395 (2008) ("Interpretation of a written

7   instrument becomes solely a judicial function only when it is based on the words of the instrument

8   alone, when there is no conflict in the extrinsic evidence, or when a determination was made based

9   on incompetent evidence."); *Walter E. Heller Western, Inc. v. Tecrim Corp.*, 196 Cal. App. 3d 149,

10  158 (1987) ("When two equally plausible interpretations of the language of a contract may be made

11  . . . parol evidence is admissible to aid in interpreting the agreement, thereby presenting a question

12  of fact which precludes summary judgment if the evidence is contradictory.").[19]  That rule applies in

13  copyright cases presenting the question whether the conduct in question was licensed, just as it does

14  in cases involving the interpretation of other written agreements.  *See, e.g.*, *Meridian Project Sys.,*

15  *Inc. v. Hardin Constr. Co., LLC*, 426 F. Supp. 2d 1101, 1110 (E.D. Cal. 2006) (denying summary

16  judgment in light of conflicting parol evidence regarding interpretation of copyright license);

17  *Marvel Entm't, Inc. v. Kellytoy (USA), Inc.*, 769 F. Supp. 2d 520, 526 (S.D.N.Y. 2011) (same);

18  *Harris v. Simon & Schuster, Inc.*, 646 F. Supp. 2d 622, 633 (S.D.N.Y. 2009) (same).

19         The relevant extrinsic evidence in the record supports Defendants, and is conflicting at

20  worst.

21         *First,* as noted above in Section II.E, contemporaneous representations made by Sun on its

22  website during the relevant time period contain affirmative representations by Sun that its customers

23  were entitled to receive all updates.

---

[19] Oracle cites *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1089 (9th Cir. 1989) for the proposition that any right not "unambiguously" granted is reserved (MPSJ at 17) but that is not the issue here.  The question here is "when is the grant of rights ambiguous and how does the Court resolve it when it is."  As *Azzalino* makes clear, state-law principles of contract interpretation (which here require the consideration of extrinsic evidence even to determine whether ambiguity exists) apply.  270 F.3d at 826-28.  *Payday* is also inapposite because there, the defendant's use exceeded the scope of the license because the defendant prepared modified works and accessed source code beyond the scope of the license grant.  Here, any use was within the metes and bounds of the license grant and Defendants did not modify or access the source code in excess of the licensed use.

*Second,* the Entitlement to Solaris 10 10/09 is different from all previous (and successive) versions and that difference confirms that the other versions do not mean what Oracle would like them to mean.  The "Permitted Use" section of version 10 10/09

VWD Ex. 8 at ORCLTM00000615.  If language in the BCL and SLA included these limitations, the late-added limitations in this entitlement would be surplusage.[20]

*Third,* Sun's course of conduct – its history of making patches freely available – is evidence that it understood its own license to grant customers the right to such patches.  Oracle claims that "at all relevant times" including "back to at least 1999" Sun restricted access to at least some "private" patches.  *See* MPSJ at 6.  These purported "undisputed facts" are unsupported by the evidence Oracle cites and contradicted by other evidence.[21]  Sun documents produced in this action prove that Sun did not move any patches to "private" status until after the release of Solaris 10 – first, certain Solaris 10 patches in mid-2006, and then certain Solaris 8 and 9 patches in mid-2007.  For example, a                                                   provides:

---

[20] Oracle's MPSJ submits no evidence that this entitlement was ever provided to any customer.

[21] Oracle cites Mr. Appleby's deposition testimony in support of its claim (MPSJ at 20, citing PD Ex. 15 at 24-25) but the cited testimony refers to the time period of 2007.  *See id.* at 23:13-25:23.  It likewise cites Mr. Quinn's testimony (MPSJ at 6 citing PD Ex. 12, at 205, 207 but that testimony likewise is bounded to a specific time period (albeit one not defined by the evidence Oracle has submitted).  Oracle also cites the deposition testimony of (a) Goe, but he contradicts that testimony elsewhere (*see e.g.,* VWD Ex. 18 at 190:19-25 ("Q. But you had at least a residual memory after a decade of being a policy employee at Sun that there were versions of Solaris for which patches were freely available at the beginning of this e-mail chain? . . . . THE WITNESS: That's what it says."); (b) Nesheim (PD Ex. 36), whose testimony speaks to Oracle's "      ," not what it actually did; and (c) Stonaker (PD Ex. 37), whose testimony speaks to some undefined time period "                                        " but does not purport to

DEFENDANTS' JOINT OPPOSITION TO ORACLE'S MOTION FOR PARTIAL SUMMARY
JUDGMENT; CASE NO. 5:13-CV-03385-PSG                                                                    34

*See* VWD Ex. 37 at ORCLTM00000819-820.

The late 2005 precursor to the "Access Policy" document quoted above—which tellingly was not produced by Oracle in this action—further confirms that these "new access requirement" dates represent the first time that any patches were made "private" by Sun.

> *Sun is announcing changes to how we will be providing access to Solaris[TM] 10 patches, or what we now call software updates.*  Now that Solaris 10 is freely available, support services require the purchase of a Sun Service Plan.
> . . .
> *Under this new policy*, access to patches, or what we now call Software Updates, is restricted.  Security fixes and hardware driver updates are publicly available for free, but access to all other software updates requires a Sun Service Plan.

*See* Declaration of Gabriel G. Gregg, Ex. A (11/23/2005 "Solaris[TM] 10 Patch Policy Announcement") (emphasis added).[22]

Moreover, even under the new access regime for patches relating to Solaris 10 (as of mid-

---

[22] Oracle rests much of its argument on the terms of service for its support website and documents it distributed with patches (MPSJ at 19), but those documents necessarily came *after* its contracts with customers were formed. Notwithstanding the fact that Oracle did not properly preserve My Oracle Support (or SunSolve) and refuses to allow Defendants to inspect My Oracle Support to determine whether there was any manifestation of assent to the "click-through agreements" during the relevant times, this argument misses the mark.  These non-contractual policy documents neither could, nor do, change the terms of Sun/Oracle's licenses and the grant language in them.  And Oracle cannot succeed in elevating them to the level of contracts for an additional reason: if Sun's customers had a right to use updates and patches based on their original license to Solaris, then an "agreement" to provide them those materials subject to the customers' agreement to some restriction on their originally licensed use fails for want of consideration, because the customers are getting nothing beyond what they already are entitled to.

DEFENDANTS' JOINT OPPOSITION TO ORACLE'S MOTION FOR PARTIAL SUMMARY JUDGMENT; CASE NO. 5:13-CV-03385-PSG                                                                                    35

2006) and to Solaris 8 and 9 (as of mid-2007), the majority of patches in Recommended and Security clusters were public, not private. Oracle claims to have lost this vital information.[23] Terix employees, however, contemporaneously tracked this information, and their charts show a routinely low percentage of such patches designated "private" up through 2009. *See* Appleby Decl., Ex. A (TRX0240943-944 "Solaris_R&S_Patch_Status_100303-v1.xls"). And even Oracle concedes in the MPSJ that at least "Security Patches and Device Drivers" were publicly available prior to acquisition. *See* MPSJ at 7. Further, Oracle's repeated contention that only security related patches and firmware drivers were made publically available is false. Publically available patches during much of the Sun regime included patches up until the Oracle acquisition that included such material as kernel patches that addressed a great deal of bug IDs far beyond merely security and driver issues. *See* Appleby Decl. ¶ 9.

 *Fourth,* as set forth in Section II.G contrary to Oracle's assertion, the actions of customers support Defendants' license positions. Not only did most companies alerted to these positions by Terix elect to leave Sun/Oracle support and contract with Terix, but various licensees (including major U.S. companies) have stated affirmatively that they have license rights to patches. Moreover, neither Sun nor Oracle have ever actually brought any legal action against a customer or ex-customer arising out of allegedly improper downloading of patches. Rather, Oracle typically seeks to ████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████. *See* VWD Ex. 41 at ORCLTM00028974-975; *see also* Ex. 34 at 195:4-16 (acknowledging the "████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ██████████████████████████████). Indeed, according to Oracle, █████████████████ ████████████████████████████████████████████████████████, demonstrating the volume of ex-Oracle customers choosing to support their hardware off of Oracle support, including likely the

---

[23] Oracle witnesses have confirmed that █████████████████████████████████████████████ ████████████ during this lawsuit. For example, Bonnie Corwin, ████████████████████████, attested at her deposition that ██████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████████████ VWD Ex. 11 at 155:18-157:3.

1   downloading of patches, with no apparent consequence.  *See* VWD Ex. 9 at 9-12.

2          *Finally*, a year after Oracle's purchase of Sun closed, Dorian Daley, Oracle's General

3   Counsel, acknowledged ███████████████████████████████████████████████████████

4   ████████████████████████████████████████.  VWD Ex. 36 at ORCLTM000013872, 13876

5   ("█████████████████████████████████████████████████████████████████████████████

6   ████████████████████████████████████████████████████████████████████████████████

7   ██████████████████████████████████████████.").  Daley also admitted that

8   █████████████████████████████████████████.  VWD Ex. 36 at ORCLTM000013872  ("█

9   ████████████████████████████████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████████████████████████████████

11  ██████████████████████████████████████████████████.").

12         In sum, the language of the relevant license agreements, considered – as it must be under

13  California law – in light of the extrinsic evidence, shows that there is at least ambiguity concerning

14  customers' rights to receive updates and patches, and summary judgment therefore should be

15  denied.

16         **E.      There Are Disputed Issues Of Fact Regarding Implied License That Must Be
17                   Resolved By The Jury.**

18         Oracle's argument that, as a matter of law, Defendants could not have had an implied license

19  to patches for Solaris 8, 9 and 10 fails on its face.  "An implied license can be found where the

20  copyright holder engages in conduct 'from which [the] other [party] may properly infer that the

21  owner consents to [its] use." *Field v. Google*, 412 F. Supp. 2d 1106, 1116 (D. Nev. 2006) (internal

22  citation omitted).  In *Field v. Google*, the Court noted that "[c]onsent to use the copyrighted work

23  need not be manifested verbally and may be inferred based on silence where the copyright holder

24  knows of the use and encourages it."  412 F. Supp. 2d at 1114 (copyright holder's knowledge of use

25  by defendant, accompanied by holder's silence, constituted implied license); *see also Keane Dealer*

26  *Servs., Inc. v. Harts*, 968 F. Supp. 944, 947 (S.D.N.Y. 1997).

27         Oracle argues that defendants cannot meet the standard for an implied license because they

28  cannot show that Oracle "created a work at [Defendants'] request and handed it over, intending that

DEFENDANTS' JOINT OPPOSITION TO ORACLE'S MOTION FOR PARTIAL SUMMARY
JUDGMENT; CASE NO. 5:13-CV-03385-PSG                                          37

1   [they] copy and distribute it." MPSJ at 25 (*citing A&M Records v. Napster, Inc.,* 239 F.3d 1004,

2   1026 (9th Cir. 2001)). While Oracle is correct that the *Napster* court did agree with the trial court

3   that defendant had failed establish that the copyright holder "'created a work at [the other's] request

4   and handed it over, intending that [the other] copy and distribute it,'" the *Napster* court also did not

5   hold that this is an immutable requirement of the defense. *Id.* (citations omitted; also noting that

6   plaintiff had expressly objected to the availability of the copyrighted music on Napster). In the

7   fourteen years since *Napster*, courts in Northern District and elsewhere within the Ninth Circuit

8   have not required that defendants show that the copyright holder created the work at their request.

9   *See, e.g., Netbula LLC v. Chordiant Software, Inc.,* Nov. C-08000019, 2009 U.S. Dist. LEXIS

10  58690, *15-16 (N.D. Cal. July 9, 2009) ("Some courts have held than an implied license can exist

11  even where the copyright owner does not create a customer work for the putative licensee.");

12  *Oracle USA, Inc. v. Rimini Street, Inc.*, 6 F. Supp. 3d 1086, 1104-1106 (D. Nev. 2014) (following

13  *Field v. Google* enunciation of the defense; *Alaska Stock LLC v. Pearson Educ., Inc.,* 975 F. Supp.

14  2d 1027, 1041 (D. Alaska 2013) (court found implied license where there was no allegation the

15  copyright holder created the work for the defendant).

16      The correct inquiry on the implied license defense, therefore, is whether Oracle "impliedly"

17  granted a license through its conduct. *See Field v. Google*, 412 F. Supp. 2d at 116. This view of

18  implied license in the copyright context is consistent with the law of implied license in the context

19  of patent law, which does not require a finding that the patent holder created the patent at the

20  request of the defendant for the defendant to assert the defense of implied license. *DeForest Radio*

21  *Tel. Co. v. United States*, 273 U.S. 236, 242 (1927); *Wang Labs, Inc. v. Mistubishi Elec. Am., Inc.*,

22  103 F.3d 1571, 1580-82 (Fed. Cir. 1997).

23      In addition, Oracle argues that an implied license cannot permit what the actual license

24  prohibits and argues that the BCL, SLA and MOS click-through terms prohibited Defendants'

25  actions. MPSJ at 25. As set forth in Section IV.D, above, however, Oracle cannot explain how the

26  BCL and SLA prohibited the Defendants' actions, and they in fact did not.

27      As Oracle has failed to meet its burden as the moving party to obtain summary judgment on

28  the implied license defense, this Court should defer this issue for the jury. *See, e.g.*, *Netbula*, 2009

U.S. Dist. LEXIS 58690 at *16 ("Whether the licensor intended to grant an implied license 'is a question of fact that must be left to the jury.'") (quoting *Intelligraphics, Inc. v. Marvell Semiconductor Inc*., Nov. C-07-2499-JCS, 2008 U.S. Dist. LEXIS 09255, 2008 WL3200212, at *6 (N.D. Cal. July 29, 2008)).

**V.      CONCLUSION**

For the reasons set forth above, this Court should deny Oracle's motion in its entirety.


Dated:  February 13, 2015                    GCA LAW PARTNERS LLP

                                             /s/ Valerie M. Wagner
                                                 Valerie M. Wagner

                                             Attorneys for Defendants and
                                             Counterclaimants MAINTECH
                                             INCORPORATED and VOLT DELTA
                                             RESOURCES LLC

Dated:  February 13, 2015                    DURIE TANGRI LLP

                                             /s/ Ragesh K. Tangri
                                                 Ragesh K. Tangri

                                             Attorneys for Defendants and
                                             Counterclaimants MAINTECH
                                             INCORPORATED and VOLT DELTA
                                             RESOURCES LLC


Dated:  February 13, 2015                    ROBINSON & WOOD

                                             /s/ Gabriel G. Gregg
                                                 Gabriel G. Gregg

                                             Attorneys for Defendants
                                             TERIX COMPUTER COMPANY, INC.,
                                             SEVANNA FINANCIAL, INC., AND WEST
                                             COAST COMPUTER EXCHANGE, INC.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated:  February 13, 2015

HOPKINS & CARLEY
A Law Corporation

/s/ John V. Picone III
    John V. Picone III

Attorneys for Defendants
TERIX COMPUTER COMPANY, INC.,
SEVANNA FINANCIAL, INC., AND WEST
COAST COMPUTER EXCHANGE, INC.

1

**<u>ATTESTATION</u>**

2

     I, Valerie M. Wagner, am counsel for Defendants and Counter-Claimants Maintech,

3

Incorporated and Volt Delta Resources, LLC.  I am the registered ECF user whose username and

4

password are being used to file Defendants' Joint Opposition to Oracle's Motion for Partial

5

Summary Judgment.  In compliance with General Order 45, Section X(B), I hereby attest that the

6

above-identified signatory concurred in this filing.

7

Dated:  February 13, 2015               GCA LAW PARTNERS LLP

8

                                    By: /s/ Valerie M. Wagner

9

                                       Valerie M. Wagner

10

                                    Attorneys for Defendants and Counter-
Claimants Maintech, Incorporated and Volt

11

Delta Resources, LLC

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28