1   MORGAN, LEWIS & BOCKIUS LLP                LATHAM & WATKINS LLP
    Rollin B. Chippey, II (SBN 107941)         Daniel M. Wall (SBN 102580)
2   rchippey@morganlewis.com                   dan.wall@lw.com
    Thomas S. Hixson (SBN 193033)              Christopher S. Yates (SBN 161273)
3   thomas.hixson@morganlewis.com              chris.yates@lw.com
    Kevin M. Papay (SBN 274161)                Christopher B. Campbell (SBN 254776)
4   kevin.papay@morganlewis.com                christopher.campbell@lw.com
    Three Embarcadero Center                   505 Montgomery Street, Suite 2000
5   San Francisco, CA  94111-4067              San Francisco, California  94111-6538
    Telephone:  415.393.2000                   Telephone:  415.391.0600
6   Facsimile:  415.393.2286                   Facsimile:   415.395.8095

7   ORACLE CORPORATION                         ORACLE CORPORATION
    Dorian Daley (SBN 129049)                  Jeffrey S. Ross (SBN 138172)
8   dorian.daley@oracle.com                    jeff.ross@oracle.com
    Deborah K. Miller (SBN 95527)              10 Van de Graaff Drive
9   deborah.miller@oracle.com                  Burlington, MA 01803
    500 Oracle Parkway                         Telephone: 781.744.0449
10  M/S 5op7                                   Facsimile: 781.238.6273
    Redwood City, CA 94065
11  Telephone: 650.506.4846                    Attorneys for Plaintiffs
    Facsimile: 650.506.7114                    Oracle America, Inc., and Oracle
12                                             International Corporation

13

14                    UNITED STATES DISTRICT COURT

15                  NORTHERN DISTRICT OF CALIFORNIA

16                         SAN JOSE DIVISION

17

18  ORACLE AMERICA, INC., a Delaware        No. 5:13-cv-03385 PSG
    corporation; ORACLE INTERNATIONAL
19  CORPORATION, a Delaware corporation,    **ORACLE AMERICA, INC. AND
                                            ORACLE INTERNATIONAL
20              Plaintiffs,                  CORPORATION'S REPLY
                                            MEMORANDUM IN SUPPORT OF
21        v.                                MOTION FOR PARTIAL SUMMARY
                                            JUDGMENT**
22  TERIX COMPUTER COMPANY, INC., a
    California corporation; MAINTECH        Date:  March 30, 2015
23  INCORPORATED, a Delaware corporation;   Time:  10:00 a.m.
    VOLT DELTA RESOURCES, LLC, a Nevada     Courtroom 5, 4th Floor
24  limited liability company; SEVANNA      Hon. Paul J. Grewal
    FINANCIAL, INC.,  a Nevada corporation;
25  WEST COAST COMPUTER EXCHANGE,
    INC., a Nevada corporation; and DOES 1-50,   **REDACTED VERSION OF
26                                               DOCUMENT SOUGHT TO BE
                Defendants.                           SEALED**
27

28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   ARGUMENT ...................................................................................................... 3

    A.   Diversion 1:  Oracle Must Negate "Every" License Defense ................................ 3

    B.   Diversion 2:  The Copyright Registration Detour .................................................. 4

    C.   Diversion 3:  The Afterthought Open Source Licenses ........................................ 6

        1.   The CDDL ..................................................................................................... 6

        2.   The BSD License ......................................................................................... 10

    D.   The Real Issue: Defendants' Express License Defense, Based on the BCL
        and SLA, Fails As A Matter Of Law ...................................................................... 11

        1.   The Relevant Licenses Do Not Authorize, And Therefore Prohibit,
            Defendants' Conduct .................................................................................... 12

        2.   The Extrinsic Evidence Confirms the Licenses' Plain Meaning ............. 18

        3.   Defendants Must, but Cannot, Prove Their Express License
            Defense Customer by Customer ................................................................. 23

    E.   Defendants' Implied License Defense Fails As A Matter Of Law ...................... 24

III.  CONCLUSION ................................................................................................ 25

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*A&M Records, Inc. v. Napster, Inc.*,
  239 F.3d 1004 (9th Cir. 2001) ....................................................................... 25

*Alameda Cty. Flood Control v. Dep't of Water Resources*,
  213 Cal. App. 4th 1163 (2013) ........................................................... 14, 15, 17

*Alaska Stock, LLC v. Houghton Mifflin Harcourt Pub'g Co.*,
  747 F.3d 673 (9th Cir. 2014) ............................................................................ 6

*Alaska Stock LLC v. Pearson Educ., Inc.*,
  975 F. Supp. 2d 1027 (D. Alaska 2013) .......................................................... 25

*Apple Computer, Inc. v. Microsoft Corp.*,
  35 F.3d 1435 (9th Cir. 1994) ............................................................................ 6

*Automation By Design, Inc. v. Raybestos Products Co.*,
  463 F.3d 749 (7th Cir. 2006) ............................................................................ 9

*Barris Indus., Inc. v. Worldvision Enterprises, Inc.*,
  875 F.2d 1446 (9th Cir. 1989) ........................................................................ 18

*Batiz v. Am. Commercial Sec. Servs.*,
  776 F. Supp. 2d 1087 (C.D. Cal. 2011) ............................................................ 8

*Beckman Instruments, Inc. v. Cincom Sys., Inc.*,
  232 F.3d 893 (9th Cir. 2000) .......................................................................... 12

*Bourne v. Walt Disney Co.*,
  68 F.3d 621 (2d Cir. 1995) ....................................................................... 11, 15

*City of Hope Nat. Med. Ctr. v. Genentech, Inc.*,
  43 Cal. 4th 375 (2008) .................................................................................... 19

*Cohen v. Paramount Pictures Corp.*,
  845 F.2d 851 (9th Cir. 1988) ..................................................................... 14, 15

*De Forest Radio Tel. & Tel. Co. v. United States*,
  273 U.S. 236 (1927) ........................................................................................ 25

*Dore v. Arnold Worldwide, Inc.*,
  39 Cal. 4th 384 (2006) .................................................................................... 18

*Estate of Hevia v. Portrio Corp.*,
  602 F.3d 34 (1st Cir. 2010) .............................................................................. 9

ii                           Case No. 5:13-cv-03385 PSG

ORACLE'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

*Field v. Google*,
  412 F. Supp. 2d 1106 (D. Nev. 2006) ............................................................... 25

*Foad Consulting Group, Inc. v. Azzalino*,
  270 F.3d 821 (9th Cir. 2001) ........................................................................... 15

*Harris v. Gulf Ins. Co.*,
  297 F. Supp. 2d 1220 (N.D. Cal. 2003) ............................................................ 17

*Icon Enterprises Int'l, Inc. v. Am. Prods. Co.*,
  2004 WL 5644805 (C.D. Cal.) ........................................................................... 7

*In re Yan*,
  381 B.R. 747 (N.D. Cal. 2007) ........................................................................... 9

*Marvel Entm't, Inc. v. Kellytoy (USA), Inc.*,
  769 F. Supp. 2d 520 (S.D.N.Y. 2011) .............................................................. 19

*Netbula, LLC v. Chordiant Software, Inc.*,
  2009 WL 2044693 (N.D. Cal.) ......................................................................... 25

*Nike Inc. v. Wolverine World Wide, Inc.*,
  43 F.3d 644 (Fed. Cir. 1994) ............................................................................. 7

*Oracle USA, Inc. v. Rimini Street, Inc.*,
  6 F. Supp. 3d 1108 (D.Nev. 2014) .............................................................. *passim*

*Perfect 10 v. Amazon.com, Inc.*,
  508 F.3d 1146 (9th Cir. 2007) ........................................................................... 9

*S.O.S., Inc. v. Payday, Inc.*,
  886 F.2d 1081 (9th Cir. 1989) ............................................................... 11, 14, 15

*Stewart v. Abend*,
  495 U.S. 207 (1990) .................................................................................. 15, 17

*Southern Cal. Edison Co. v.  Superior Court*,
  37 Cal. App. 4th 839 (1995) ............................................................................ 18

*Transamerica Ins. Co. v. Sayble*,
  193 Cal. App. 3d 1562 (1987) ......................................................................... 17

*United States v. Anfield*,
  539 F.2d 674 (9th Cir. 1976) ........................................................................... 23

*Walter E. Heller W., Inc. v. Tecrim Corp.*,
  196 Cal. App. 3d 149 (1987) ........................................................................... 18

*Wang Labs., Inc. v. Mitsubishi Electronics Am., Inc.*,
  103 F.3d 1571 (Fed. Cir. 1997) ....................................................................... 25

ORACLE'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

A/76731725.5

**Statutes**

17 U.S.C. §106 ...................................................................................................................15

Cal. Civ. Code §1642 ........................................................................................................16

Cal. Code Civ. P. § 1856 ........................................................................................8, 20, 21

**Other Authorities**

Fed. R. Civ. P. 26 .............................................................................................................7, 8

Fed. R. Civ. P. 30(b)(6) ........................................................................................................8

Fed. R. Civ. P. 32(d)(3) ................................................................................................23, 24

Fed. R. Civ. P. 33(d) .............................................................................................................3

Fed. R. Civ. P. 37(c)(1) ........................................................................................................8

Fed. R. Civ. P. 56(a) .............................................................................................................5

Fed. R. Evid. 801(d)(2) .......................................................................................................23

Fed. R. Evid. 804(b)(3) .......................................................................................................23

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ORACLE'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

A/76731725.5

1    **I.      INTRODUCTION**

2          Defendants' opposition brief makes one wonder what motion they are responding to.[1]  It

3    goes on and on about issues, such as the composition of a patch and the policy and arcana of

4    copyright registration law, having nothing to do with the straightforward issue of license

5    interpretation relating to *Defendants'* affirmative defense.  The simple question before the Court

6    is whether, as Defendants repeatedly represented to induce their customers to use Defendants'

7    support services, their downloading, copying and distribution of Oracle's copyrighted software is

8    permitted by license.  Defendants bear the burden to prove that it is, and if it is not, Oracle's

9    motion must be granted.  Part II.A, below.

10          When Defendants finally get around to that issue, they run from the two licenses - the

11    BCL and SLA - that they have *for years* been telling their customers, Oracle, and the Court

12    permit them to take and distribute Solaris patches.  Recognizing that the BCL and the SLA do

13    not do so, Defendants focus for the first time on a completely different license, the Common

14    Development and Distribution License ("CDDL"), which is an open source license used by the

15    "developer … and open source community" to develop applications and has nothing to do with

16    the commercial use of Solaris or Defendants' commercial downloading activities.  This is the

17    most desperate of "Hail Mary's."  Most importantly, Defendants and their customers did not

18    operate under the CDDL or download open source patches - indeed, there is no such thing.

19    Defendants, instead, created a business that relied on downloading and distributing the

20    commercial patches that were available only to customers who paid for support.  Consistent with

21    that reality, the words OpenSolaris and CDDL have never been uttered in any of Defendants'

22    witnesses' testimony, including Terix's 30(b)(6) witness on the basis for the license defense.

23    They did not appear in Defendants' relevant interrogatory responses until *after* this motion was

24

25

26    _____
[1] This brief refers to "Defendants" collectively, although at times their joint opposition focuses

27    on alleged conduct by the Terix Defendants.  Oracle's motion is cited as ("Mot.") and the
opposition as ("Opp.").  Evidence directly responsive to issues raised for the first time in the

28    opposition is attached to the Declaration of Matthew Flairty ("FD").

1    filed, and the open source firmware license Defendants now rely on does not appear even there.[2]

2            In fact, Terix told a customer in 2009 that "you have no versions of this [Open Solaris]

3    OS," which "is not even in commercial use by customers anywhere on any servers anywhere,"

4    and that the "OpenSolaris license … is not even available to anyone to use but to developers at

5    www.opensolaris.org."  Rather, as Terix told another customer:  "SOLARIS has its own

6    AGREEMENT (the license) with rules, rights and grants made by the OEM …. For SOLARIS

7    versions 7, 8 and 9, this AGREEMENT (license) is called a Right to Use (RTU) and Binary

8    Code License (BCL) and for SOLARIS 10, … this AGREEMENT (license) is called a Software

9    License Agreement (SLA), and an Entitlement Document.").  The proper focus of this motion is

10   on the BCL and SLA.  Part II.B, below.

11           Defendants' stunning (and fruitless) shift of position - more than a year into the case and

12   many years into their pervasive infringement in purported reliance on the BCL and SLA - is a

13   clear recognition that those licenses do not permit their conduct.  Defendants' eventual

14   discussion of them, relegated to *page 30*, confirms that conclusion as a matter of clear contract

15   interpretation.  Their primary argument is a word game.  They agree customers are licensed to

16   use only Solaris and firmware patches "provided," but claim that means something other than

17   provided *by the licensor,* Sun, *to its licensees*.  What else could it possibly mean?  The only

18   sensible meaning of "provided" *in a software license* is that the licensor supplies the licensed

19   material to the licensee, who takes it and uses it under the terms of the license.  Defendants'

20   alternative definition seems to mean "not made impossible to access by any means" so that

21   patches they surreptitiously took using phony credentials, downloaded to their own servers, then

22   distributed to their customers for use on servers that were not covered by a support contract with

23   Oracle were "provided by Sun."  That's absurd; if Defendants truly believed they or their

24   customers had licenses to take and use patches that Oracle allowed only customers with active

---

25
26   [2] Like their license defense based on the BCL and SLA, Defendants are the only ones to have
     uncovered this supposed way to avoid the millions in support fees Oracle's thousands of
     sophisticated customers pay annually.  Defendants' new idea that releasing beta versions of
27   software as open source during the development process negates the software owner's ability to
     commercialize proprietary versions of the software through a separate channel would obviously
28   have profound and undesirable effects far beyond this case.

ORACLE'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT
A/76731725.5

1  support contracts to access and use, they would have stood on their licenses in the first instance,

2  insisting that Oracle honor them, rather than resorting to these subterfuges.  Defendants' baseless

3  arguments fail to carry their burden to prove that the BCL and SLA expressly license their

4  conduct.  They also fail to address, let alone provide evidence to carry, their burden of proving

5  the license defense for each customer and server they supported.  Part II.D, below.  The implied

6  license defense fails for that reason, and on its own merits.  Part II.E, below.

7      Finally, Defendants do not face up to their long-concealed but recently admitted unlawful

8  cross-use of Oracle's website credentials and IP, much less argue that their license defense (in

9  whatever iteration) excuses it.  They cannot, because it does not.

10     Defendants' diversions largely speak for themselves.  We address them briefly, in the

11  order raised (Parts II.A-C, below), then return to the real issues of license interpretation at issue

12  on this motion.  Parts II.D-E, below.

13  **II.  ARGUMENT**

14      **A.  Diversion 1:  Oracle Must Negate "Every" License Defense**

15     Defendants argue that because Oracle "has refused to confirm its contentions regarding

16  the copyrighted material at issue," it cannot defeat the license defense.  Opp. at 15:5-7.

17  Defendants' premise is false because Oracle has identified the infringement at issue in great

18  detail.  *See* Oracle's Second Amended Responses to Terix's Third Set of Interrogatories at 8-17

19  (FD, Ex. 1) (identifying, pursuant to Rule 33(d), extensive data, documents and testimony

20  showing the basis for the infringement claims).  Besides, the idea that Defendants are in the dark

21  about the scope of their own illicit downloads is contrived.  Defendants have identified a long list

22  of customers for which they admit downloading patches.  TIR 1 at 5-14 (FD, Ex. 3); MIR 1 at 6-

23  8 (FD, Ex. 4).

24     Defendants' conclusion is also false because there is no connection between identifying

25  each act of infringement alleged (which Oracle, in fact, did) and determining whether there is a

26  license that allows the infringing conduct.  They offer no evidence, or even argument, that their

27  license defense is anything other than all-or-nothing, *i.e.*, that a license excuses all alleged acts of

28  infringement because the licenses relied on supposedly cover all patches Defendants took,

ORACLE'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT
A/76731725.5

1   distributed and used.  To the extent that that is not Defendants' position, though, Defendants bear

2   the burden of establishing which license granted them the right to take, distribute and use the

3   patches to support the customers and servers at issue.  Defendants' defense relies on only four

4   licenses:  the BCL and SLA that their discovery responses relied on exclusively before Oracle

5   filed this motion, the CDDL recently added to their interrogatory responses, and the BSD license

6   that makes its debut in the opposition brief.  The CDDL and BSD license are irrelevant as a

7   matter of law, so the only real issue before the Court is the meaning of two "form licenses" - the

8   BCL (for Solaris 8 and 9) and the SLA (for Solaris 10), which, Defendants concede, are

9   indistinguishable for purposes of this motion.[3]  Thus, regardless of what specific acts of

10   infringement are alleged (*i.e.*, what specific patches Defendants took), the Court can decide

11   whether the one-page BCL and/or the two-page SLA authorized Defendants (as their customers'

12   supposed agents) to take, distribute and use Solaris and firmware patches as framed by Oracle's

13   Motion.  That Defendants don't *want* the Court to do that, because of the consequences, is clear.

14        Ultimately, Defendants' argument is also immaterial.  If "Oracle must prove [on this

15   motion] … that there is no legally tenable interpretation of the relevant licenses that entitles

16   Solaris licensees to **any** patch for **any** version of Solaris software and firmware at any time that is

17   at issue in this case" (Opp. at 15:15-18), so be it.  There is no such interpretation.  Defendants'

18   eventual effort to conjure one fails as a matter of law.  Part D, below.

19       **B.**    **Diversion 2:  The Copyright Registration Detour**

20        Defendants spend 8 pages on the composition of Solaris patches and the intricacies of

21   copyright registration law and policy.  Opp. at 16:19-23:16.  It is entirely beside the point.[4]

---

22   [3] TIR 5 at 23:10-12



23       (VWD Ex. 35); Opp. at 7:16-20

24

25     ; *id.* at 2:12-13

26     *id.* at 31:27-32:1 (

27   ").

28   [4] We submit that is apparent from Defendants' repeated claims that Oracle's registration method "has consequences for its infringement case against Defendants."  Opp. at 17:11-12; *see also id.*

ORACLE'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

1    As Defendants describe it, a Solaris patch "is made up mostly of code that was part of"

2    the previous major Solaris release (*e.g.*, Solaris 9), and also contains some code that will become

3    part of the next major release (*e.g.*, Solaris 10) and some that isn't part of any major release.

4    Opp. at 17:24-18:17.  As to the patch code that "appeared in a previous major version" (Opp. at

5    18:11-18), Defendants argue "the customer already has a license to all of the code making up

6    that previous major version, because that license came with the server the customer bought."  *Id.*

7    at 18:20-22.  In other words, Defendants' argument is that "most" of the code in the patches at

8    issue is licensed *by the BCL and SLA* - "The Major Version Solaris Licenses."  Opp. at 16:19; *id.*

9    at 19:11-12 ("Terix Customers Are Licensed To Run The Code Comprising The Major Version

10   Of Solaris That Shipped With Their Server").  But that does not address how these licenses

11   either cover the rest of the patch code that, by definition, is not included in the "previous major

12   version" or include a separate right to take, distribute and use patches.  Defendants confuse the

13   limited license granted by the BCL or the SLA to use the version of Solaris that came with a

14   customer's server with a license to take, distribute and use the unique patches developed after the

15   licensed "major version" that were not shipped with the server and, by Sun's and Oracle's

16   requirements, were restricted only to customers that had active support contracts that entitled

17   them to download and use them.  That issue is addressed in Part D, below.

18   The rest of Defendants' lengthy copyright law discourse adds nothing relevant.

19   Defendants are wrong as a matter of Ninth Circuit law that patch code that appears in a

20   subsequent major release "is not covered by the subsequent copyright registration."  Opp. at

21   20:3-23:16.  The owner of both an underlying work (a patch) and a derivative work (a

22   subsequent major release) "can . . . sue for copying of material that appears in both the derivative

23   work and the underlying work."  *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1447-

24

25   at 18:18-19 ("Oracle's copyright claim fails…"); *id.* at 19:2 ("the claim fails"); *id.* at 19:9
     (certain code "cannot for the basis for a copyright claim").  Defendants are missing the point.
26   This motion addresses the validity of Defendants' license affirmative defenses, not Oracle's
     copyright claim.  It assumes infringement is proved; otherwise there is no need for an affirmative
27   defense.  Oracle is, of course, entitled to move for summary judgment on a defense without also
     moving for summary judgment on its affirmative claim.  Fed. R. Civ. P. 56(a).
28

1    48 (9th Cir. 1994); *see also Alaska Stock, LLC v. Houghton Mifflin Harcourt Pub'g Co.*, 747

2    F.3d 673, 680 (9th Cir. 2014) (Copyright Act "expressly requires only 'identification' [of

3    preexisting works] in the singular, not titles of preexisting works incorporated."). The Court,

4    however, does not need to resolve that question now. As discussed above, Defendants concede

5    that a customer's right, if there is one, to use "most of" the code in the relevant patches is

6    governed by the BCL and SLA, and those licenses do not grant a right to use subsequently

7    developed patches forever and for free.

8    **C.      Diversion 3:  The Afterthought Open Source Licenses**

9              **1.      The CDDL**

10             Defendants' next assertion is that "**all** of the allegedly copied material at issue in this case

11   is licensed to the world at large at no cost under the CDDL." Opp. at 23:25-26. That outrageous

12   claim demonstrates Defendants' lack of understanding as to how an open source license operates

13   in conjunction with the separate and clearly applicable licenses (here, the BCL and SLA) that

14   cover the commercial versions of the software that Defendants and their customers exclusively

15   used. Defendants submit literally zero evidence that any of their customers are running

16   OpenSolaris, to which the CDDL applies, and indeed Defendants affirmatively argue that their

17   customers are running the commercialized versions of Solaris subject to the BCL and SLA.

18   Opp. at 19:17-19. Defendants' newly imagined CDDL defense, now apparently their primary

19   license defense, is hard to take seriously, and fails many times over.

20             First, the CDDL is an entirely different licensing regime created for an entirely different

21   purpose. It enables the "open source community" to download Beta versions of Solaris source

22   code from opensolaris.org and, in accordance with the CDDL's terms, use, modify and distribute

23   it (among other things). VWD Exs. 3 & 30. The purpose, as with any software made available

24   to developers, is "to encourage developers to create new applications that run on [Solaris], so

25   that when those applications are commercialized, they will drive additional licensing of" Solaris.

26   *Cf. Oracle USA, Inc. v. Rimini Street, Inc.*, 6 F. Supp. 3d 1108, 1117-18 (D.Nev. 2014) (*Rimini*

27   *II*); Opp. at 9:5-8 (through OpenSolaris, "Sun received the benefit of work by contributors in the

28   open source community, who made improvements to Solaris and contributed those

ORACLE'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

A/76731725.5

1   improvements back to Sun."); 2/6 Tr. at 34:20-25 (purpose of OpenSolaris was "to encourage

2   developers to develop applications, et cetera, to try and expand the footprint of the operating

3   system") (FD, Ex. 11).  Defendants did not do any of that, and do not claim they did.  Nor did

4   they download OpenSolaris source code for their customers—which would be a commercially

5   pointless thing to do.  They downloaded final, not Beta, versions of Solaris patches in executable

6   form relating to the commercial versions of Solaris (Solaris 7, 8, 9 and 10), from MOS and

7   SunSolve, not opensolaris.org.  Opp. at 19:17-19.  Because Defendants' Solaris downloads were

8   not made pursuant or subject to the CDDL, it cannot license their use as a matter of law.  *See*

9   *Rimini II*, 6 F. Supp. 3d at 1120 (rejecting as a matter of law express license defense based on

10  customer licenses ("OLSAs") where defendant downloaded Oracle's software from developer

11  platform ("OTN") governed by a separate license).[5]

12          Second, Defendants do not believe their own story.  Until January 2015, after Oracle had

13  filed this motion, Defendants had never even mentioned the CDDL in their interrogatory

14  responses identifying the basis for the license defenses.  *Compare* TIR 5 at 21:8-31:27 (PD, Ex.

15  2) *with* TIR 5 at 25:23-26:13 (VWD, Ex. 35).  Terix's 30(b)(6) deponent on the license defense

16  completed his identification of relevant licenses without mentioning it.  Quinn 164:4-18 (PD, Ex.

17  12).[6]  None of Defendants' dozen or so other witnesses did either.  That is not some remarkable

---

18  [5] *Rimini II* is right on point.  Oracle alleged infringement by a third-party maintenance provider,

19  which asserted an express license defense based on both a Developer License applicable to
    software it downloaded from the Oracle Technology Network Website ("OTN") and its

20  customers' Oracle License and Service Agreements ("OLSAs").  The Court held that "because
    Rimini received its copies of Oracle Database [software] only by downloading them from OTN,

21  … Rimini may not assert its clients' OLSAs as part of its express license defense."  *Id.* at 1120.

22  [6] To the contrary, Quinn testified unequivocally: "Our position is that the combination of the
    software license agreement and the entitlement document that are provided at the time of the

23  hardware system being sold provide a license to the software and to updates for Solaris."  Quinn
    138:2-7 (PD, Ex. 12).  Oracle therefore objects to Defendants' reliance on the CDDL and BSD

24  license, the basis for which was required to be disclosed both at the deposition and under Rule

25  26.  *See Nike Inc. v. Wolverine World Wide, Inc.*, 43 F.3d 644, 648-49 (Fed. Cir. 1994) (Ninth
    Circuit law; affirming preclusion of reliance on theory disclaimed at 30(b)(6) deposition); *see*

26  *also Icon Enterprises Int'l, Inc. v. Am. Prods. Co.*, 2004 WL 5644805, at *6 (C.D. Cal.) ("By
    commissioning the designee as the voice of the corporation, [Rule 30(b)(6)] obligates a corporate

27  party to prepare its designee to be able to give binding answers in its behalf." (citations
    omitted)); Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information … as required by Rule

28  26(a) or (e), the party is not allowed to use that information … to supply evidence on a motion

1   collective oversight.  Terix expressly told one of its customers in a 2009 "ClearVision"

2   presentation - its official licensing spiel - that "you have no versions of this [Open Solaris] OS.

3   It was released to the development community and open source community … and is not even in

4   commercial use by customers anywhere on any servers anywhere."  TRX0012093 (FD, Ex. 7).

5   Thus, Terix concluded, the "OpenSolaris license … is not even available to anyone to use but to

6   developers at www.opensolaris.org."  *Id.*  Rather, as Terix told another customer:  "SOLARIS

7   has its own AGREEMENT (the license) with rules, rights and grants made by the OEM to the

8   purchaser/user when the hardware system was purchased, or when a valid copy of the OS is

9   downloaded for a system from the OEM site under the OEM rules. … For SOLARIS versions 7,

10   8 and 9, this AGREEMENT (license) is called a Right to Use (RTU) and Binary Code License

11   (BCL) and for SOLARIS 10, … this AGREEMENT (license) is called a Software License

12   Agreement (SLA), and an Entitlement Document.").  TRX0002041-42 (PD, Ex. 22).  The

13   CDDL, as Terix admitted before it came-up with its Hail Mary, has no application to this case.

14           Third, as Defendants admit, the relevant licenses, the BCL and SLA, are "████," "████

15   ████████" integrated agreements that "████████" other writings as to their subject matter.

16   *See* TIR 5 at 27:7-24, 28:18-29:2; Maintech 11th Aff. Def. at 38:16-18 (D.I. 357).  Defendants

17   concede that the BCL or SLA "came with the server the customer bought" (Opp. at 18:22), and

18   allow the customer to use Solaris and "any error corrections or updates that Sun may choose to

19   'provide.'"  *Id.* at 2:12-13.  Thus, they admit the BCL and SLA are the agreements between

20   Oracle *and its server customers* governing their use of Solaris, firmware, and patches for that

21   software.  TRX0002049-50 (PD, Ex. 22).  As a matter of law, the BCL and SLA may not be

22   "explained or supplemented," let alone modified or superseded, by inconsistent terms in a

23   different license that would read their actual terms out of existence.  Cal. Code Civ. P. § 1856(b);

24   *In re Yan*, 381 B.R. 747, 755 (N.D. Cal. 2007) (error to rely on parol evidence that contradicted

25   plain meaning of integrated agreement).  Therefore, the CDDL does not and cannot license

26

27   … unless the failure was substantially justified or is harmless."); *Batiz v. Am. Commercial Sec.
     Servs.*, 776 F. Supp. 2d 1087, 1092 (C.D. Cal. 2011) ("Under Rule 37(c)(1), … a court may, *sua*

28   *sponte,* exclude evidence that a party failed to disclose under Rules 26(a) or 26(e).").

ORACLE'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

A/76731725.5

1    Oracle's server customers as a matter of law.  *See Rimini II*, 6 F.Supp. 3d at 1120 (rejecting

2    reliance on alternative customer license where relevant developer license was integrated).

3          Finally, even indulging the idea that the CDDL applies, Defendants violated it.  They first

4    claim Terix did not "distribute" Solaris because "Terix's customers act through Terix as their

5    agent in downloading and installing the patches, just as those customers would otherwise act

6    through their IT employees as their agents."  Opp. at 25:14-17.  Defendants are just making it up.

7    Terix downloaded patches to *its own servers* - and the concealed Joyce patching laptop (D.I. 498

8    at 7:1-8:3) - then *sold them* to its customers as part of its support services.  Thus, it distributed

9    them.  *See, e.g., Perfect 10 v. Amazon.com, Inc.*, 508 F.3d 1146, 1162 (9th Cir. 2007)

10   ("distribution requires an 'actual dissemination of a copy' . . . by sale or other transfer of

11   ownership").[7]  Terix also expressly admits that it "made [downloaded patches] available" to its

12   customers (RFA 32, 34, 35 Responses (FD, Ex. 2)), and of course it did; that was its business

13   model.  *See, e.g.*, Joyce 20:24-21:6 (PD, Ex. 14) ("we would . . . pull [Solaris patches] down to

14   the TERiX web FTP server.  And then the customer can pull them from the TERiX FTP server").

15         Therefore, if the CDDL were the relevant license, Defendants would have become

16   subject to CDDL Section 3.1, which applies to "Any Covered Software that You distribute or

17   otherwise make available in Executable form."  VWD, Ex. 30 at 7.  Section 3.1 requires:

18         Any Covered Software that You distribute or otherwise make
           available in Executable form *must also be made available in*
19         *Source Code form* and that Source Code form must be distributed
           only under the terms of this License.  [¶]
20
           You must *include a copy of this License with every copy* of the
21         Source Code form of the Covered Software You distribute or
           otherwise make available.  [¶]
22
           You must *inform recipients of any such Covered Software in*
23         *Executable form as to how they can obtain such Covered Software*

24

25   _____

     [7] Neither of Defendants' cases involved alleged distribution, so are off point, legally and
26   factually.  Opp. at 24:8-14, *citing Automation By Design, Inc. v. Raybestos Products Co.*, 463
     F.3d 749, 751-52 (7th Cir. 2006) (holding defendant did not sub-license copyrighted work by
27   providing it to its agent in carrying out the parties' license agreement); *Estate of Hevia v. Portrio
     Corp.*, 602 F.3d 34, 44-45 (1st Cir. 2010) (use of third party to implement license agreement
28   allowed where not expressly forbidden by license).

1    *in Source Code form* in a reasonable manner on or through a
     medium customarily used for software exchange.  [¶]

2    VWD, Ex. 30 at 7 (emphasis supplied).  Defendants do not even argue, let alone provide

3    evidence, that Terix complied with any of Section 3.1's three requirements, and it did not.  Opp.

4    at 25:18-29:1 (arguing only that Terix complied with CDDL Section 3.5); Dhall 346:13-23

5    (Terix "absolutely" failed to provide source code with patches provided to customers; "[t]here

6    would be no need to do that") (FD, Ex. 8).  The CDDL defense fails on that ground alone.

7          Oracle will not linger on Defendants' contorted arguments that Terix complied with

8    CDDL Section 3.5.  They claim Terix's customer support contracts are "licenses" (Opp. at

9    26:23-27, 28:9-13), though they license nothing relevant.  *See*, *e.g.*, TRX0011994-99 (FD, Ex.

10   5); TRX0532602-13 (FD, Ex. 6).  They concede Section 3.5 requires "compliance with the terms

11   of" the CDDL, but ignore the terms of Section 3.1, above.  Opp. at 26:28-27:7.  They

12   acknowledge that Section 3.5 (assuming any of this were applicable) required Terix to "make

13   absolutely clear" that its purported (but non-existent) license terms to its customers "are offered

14   by You alone, not by the Initial Developer or Contributor," but admit Terix did not comply with

15   that provision, instead offering a sleight-of-hand promise to indemnify Sun or Oracle.  Opp. at

16   28:14-26.  The CDDL defense thus fails on the only basis Defendants even suggest it applies.

17         Let's return to reality.  Neither Terix nor Maintech complied with the CDDL because

18   neither ever thought it was the least bit relevant to their businesses, and it wasn't, given that their

19   customers were using the commercial versions of Solaris at all times.   They did not download

20   Solaris source code and turn it into executable form as part of the "open source community."

21   They told customers the CDDL did not apply to what they do.  The CDDL is completely

22   irrelevant to the question of whether Defendants' infringing conduct was permitted by the terms

23   of a relevant license, i.e., the BCL or the SLA.

24         **2.     The BSD License**

25         According to Defendants, "the same arguments" apply to their reliance on another open

26   source license, the BSD license, to shield their firmware copying.  Opp. at 29:7-9.  Oracle agrees

27   that the outcome is the same under the BSD and the CDDL, for a number of reasons:  (i) Just as

28   with the CDDL discussed above, the BSD license covers an entirely different purpose than

ORACLE'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

A/76731725.5

1    Defendants' downloading and copying at issue – specifically, "to broaden the use of the SPARC

2    architecture" (Opp. at 29:14-16); (ii) the BSD does not even appear in Defendants' post-motion

3    interrogatory amendments or any of its witnesses' testimony; (iii) Defendants' reliance on the

4    BSD violates the firmware SLA integration clause; and, (iv) even if all of that were not true,

5    Defendants' distribution of Oracle firmware failed to comply with the BSD license terms, and

6    they do not offer evidence, or even argue, otherwise.  Opp. at 29:22-30:9.

7         Defendants' BSD license defense also fails because they provide no evidence that the

8    firmware source code available through OpenSPARC was the same firmware at issue in this

9    case.  As a result, they cannot meet their burden to show that the BSD expressly licenses any

10   conduct relevant to this case.  *See Bourne v. Walt Disney Co.*, 68 F.3d 621, 631 (2d Cir. 1995).

11   In fact, the firmware source code available through OpenSPARC included only versions from

12   2007 and earlier (Declaration of Greg Onufer, ¶¶ 4-5), whereas the firmware at issue here dates

13   from August 2010 to the present.  Mot. at 6, n.4.  An open source license to use a 2007 (or

14   earlier) version of a program is not a grant of permission to copy a 2010 (or later) version that

15   was never released under that open source license.

16   **D.    The Real Issue: Defendants' Express License Defense, Based on the**
         **BCL and SLA, Fails As A Matter Of Law**
17

18        The BCL and SLA unambiguously do not authorize, and thus "prohibit," *S.O.S., Inc. v.*

19   *Payday, Inc.*, 886 F.2d 1081, 1088 (9th Cir. 1989), Defendants' conduct, as do the relevant MOS

20   and SunSolve click-through licenses.  Mot. at 17-19.  After relying on the BCL and SLA for

21   years, Defendants now have almost nothing to say about them.  They cannot meet their burden to

22   prove any license term that expressly authorizes their conduct, and their strained effort to find

23   ambiguity in the licenses' clear terms goes nowhere.  The express license defense therefore fails

24   as a matter of law.  Part 1, below.  Defendants' discussion of extrinsic evidence, even if the

25   Court were to reach it, misstates the record and does not salvage their defense for the simple

26   reason that any extrinsic evidence conclusively confirms Oracle's view of the licenses' terms.

27   Part 2, below.  Defendants also cannot carry their burden to prove the license defense for each of

28   their supported customers and servers, and do not try.  Part 3, below.

1        **1.      The Relevant Licenses Do Not Authorize, And Therefore Prohibit, Defendants' Conduct**

2

3        The express license defense fails in its entirety for three independent reasons.  First, a

4    license to "use" software - without dispute all the BCL and SLA grant - is not a license to copy,

5    or in this case download, it.  *Rimini II*, 6 F. Supp. 3d at 1121 ("The right to use the licensed

6    software is separate from a right to reproduce or copy the software."); Mot at 17:25-18:5.[8]

7    Second, the BCL and SLA are expressly limited to patches "provided by Sun," or "provided to

8    you at Sun's discretion," so Defendants' downloading of patches that Sun/Oracle did not provide

9    without a valid support contract was not authorized, and so was prohibited as a matter of

10   copyright law.  Mot at 18:6-19:6.  Third, the MOS and SunSolve click-through licenses, which

11   specify that downloaded materials may be used only to support servers under paid Oracle

12   support, further confirm that Oracle did not agree to "provide" all of the copyrighted material it

13   developed, unless the customer had a paid support contract.  Defendants also violated those

14   licenses, and do not deny it.  Mot. at 19:7-17.

15       Defendants have no response to the first of those independently dispositive arguments –

16   the fact that they have no license to copy or distribute any Solaris software.  The license defense

17   therefore fails on that ground alone.  *Rimini II*, 6 F. Supp. 3d at 1121.

18       Defendants offer scattered and half-hearted responses to the third point about the MOS

19   and SunSolve click-through licenses.  They accuse Oracle of arguing that the Terms of Use

20   "modify[ ] the license grants" in the BCL and SLA (Opp. at 3:17); or are part of "one

21   transaction" "at the time of the hardware purchase" (Opp. at 10:27-28), but that is not Oracle's

22   point.  The BCL and SLA are only licenses "to use."  Defendants admit the click-through

23   licenses are "Additional AGREEMENTS" required to *access* MOS or SunSolve.  Mot. at 7:9-20;

24   *see also* TRX0012089-90 ("if you want to download a private patch from Sun on SUNSOLVE

25   …, you must follow the rules of SUNSOLVE, … because it is an AGREEMENT, which is in

26   addition to the AGREEMENT you currently have or had for support….  For a private patch, the

---

[8] Oracle mistakenly cited *Beckman Instruments, Inc. v. Cincom Sys., Inc.*, 232 F.3d 893 (9th Cir. 2000) for this rule.  Opp. at 32, n.18.  In any event, Defendants' assertion of their claimed agency status does not address the difference between copying and use.

ORACLE'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT
A/76731725.5

1   SUNSOLVE rules or 'click-through' - requires you to have a maintenance agreement, or private

2   level paid subscription to download that private patch from SUNSOLVE ….") (FD, Ex. 7).[9]  It is

3   wishful thinking to dismiss these "click-through licenses" that create "AGREEMENTS" that

4   must be "follow[ed]" (Quinn 113:17-114:21, 116:8-117:4 (PD, Ex. 12); TRX0002042 (PD, Ex.

5   22)) as "non-contractual policy documents."  Opp. at 35 n.22.  Given the limited nature of the

6   BCL and the SLA, the MOS and SunSolve Terms of Use are necessary, complementary

7   agreements governing how customers can access patches that Sun and Oracle developed.[10]

8       Defendants' claim that Oracle "has presented no affirmative evidence showing that any

9   patch download was made pursuant to actual acceptance of the MOS TOU" (Opp. at 11:9-11) is

10  false.  They admit that "a user would have had to click through a license if they were

11  downloading this online in order to get there and agree to the terms and conditions, which would

12  also create another agreement that the customer had in place."  Quinn 113:17-114:21, 116:8-

13  117:4 (PD, Ex. 12).  Defendants could not have downloaded patches from MOS without

14  violating the click-through licenses.  The license defense fails on this independent ground.

15      The focus of Defendants' response, on point two above, is a series of misplaced

16  arguments on how the BCL and SLA might be read to cover their patch downloading and

17  distribution, which depends on the premise that Sun and Oracle intended to give away all patches

18  developed perpetually.  Opp. at 30:11-32:10.  Oddly it is mostly an effort to convince the Court

19  *not to resolve* the meaning of the supposedly "ambiguous" license terms Defendants have

20  asserted and relied on for years, rather than to advance an alternative meaning of the term

21  "provided by Sun" (or "provided to you at Sun's discretion") that supports their interpretation.

22  _____

23  [9] Defendants' argument that these admitted contracts lack consideration "if Sun's customers had
    a right to use updates and patches based on their original license to Solaris" (Opp. at 35 n.22) is

24  based on the faulty premise that they did.  So does their argument that Oracle cannot "revoke[ ]"
    license rights Sun previously granted."  Opp. at 32 n.17.

25  [10] This common license regime is used to grant a license to the program acquired and to have that

26  license cover any subsequent patches or updates relating to the program that the licensee is
    entitled to acquire and use.  Eder 164:14-20, 165:7-166:4 (FD, Ex. 10).  It does not, as

27  Defendants incorrectly posit, grant a prospective and affirmative entitlement to receive whatever
    Sun/Oracle developed regarding the originally licensed program in the future.  Nesheim 134:2-

28  135:4 (PD, Ex. 36).

1    That effort fails as a threshold matter.  "An agreement is not ambiguous merely because the

2    parties (or judges) disagree about its meaning.  *Taken in context, words still matter.*"  *Alameda*

3    *Cty. Flood Control v. Dep't of Water Resources*, 213 Cal. App. 4th 1163, 1189 (2013).

4    Defendants must "tender a candidate reading of the language which is of aid to [them.  The

5    court] must ask what meanings are proffered and examine their plausibility in light of the

6    language."  *Id.* at 1179-80.  Then, except in the highly unusual circumstances where the proper

7    interpretation depends on conflicting extrinsic evidence, the Court must make the call.  Mot. at

8    15:8-14 (citing cases).  It is all but inconceivable that the interpretation of a form contract like

9    the BCL and SLA will turn on conflicting extrinsic evidence.  Their terms are not negotiated,

10   after all.  So there is no putting this off.  Either Oracle is right or Defendants are right, and now is

11   the time to decide.  None of Defendants' attempts to parse the licenses' language articulates any

12   plausible interpretation that could carry their burden to prove their license defense.

13          The closest Defendants come to offering their own interpretation is to reprise, in a

14   footnote, Quinn's novel equation of "provide" with "develop," or as Defendants now say,

15   "build."  Opp. at 32 n.17; *see* Mot. at 18:8-11.  That is a non-starter.  Even Terix CEO Appleby

16   admitted that developing, or building, a patch is not the same as providing it, and that the BCL

17   does not require Oracle to provide all error corrections it developed.  Appleby 284:17-285:23,

18   287:11-15 (PD, Ex. 15); *see also Cohen v. Paramount Pictures Corp.*, 845 F.2d 851, 853 (9th

19   Cir. 1988) (rejecting license interpretation where license's "words . . . must be tortured to expand

20   the limited right granted . . . to an entirely different [meaning]").[11]  Defendants' torture of the

21   licenses' plain words also runs afoul of federal copyright and California license interpretation

22   laws, because it would both read in terms not present - an obligation to provide (supply) all

23   patches Oracle builds - and read out Oracle's absolute right not to license any copyrighted

---

24   [11] Defendants misunderstand *Cohen*.  Oracle does not claim that case "provides a general rule of
25   license interpretation demonstrating that the word 'provided' in Oracle's license agreements has
     a particular meaning."  *Id.*  Of course not.  The rule *Cohen* establishes precludes Defendants'
26   attempt to interpret "provided" to mean something completely different than its plain meaning.
     Mot at 18:18-25.  Defendants' attempt to relegate this issues to their "parol evidence" argument
27   is misleading at best.  It relates to interpreting the licenses' plain words.  Mot. at 18:11-25.  The
     same is true of Defendants' discussion of *S.O.S.* in footnote 19.

ORACLE'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT
A/76731725.5

1    material it chooses.  *See Stewart*, 495 U.S. at 228-29; *S.O.S.*, 886 F.2d at 1088; *see also Alameda*

2    *Cty. Flood Control*, 213 Cal. App. 4th at 1180 (in interpreting a contract, court may not "insert

3    what has been omitted, or omit what has been inserted").  Here, where copyright law expressly

4    governs, Defendants are conspicuously silent on the subject.

5        Defendants argue that "[n]either license contains language requiring a customer to have

6    an active service plan in order for Sun to 'provide' a customer an update."  Opp. at 32:1-4.  That

7    misplaces the burden of proof, ignores copyright law, and misses the point.  Defendants have the

8    burden to identify each provision that expressly licenses their conduct.  *See, e.g., Bourne*, 68

9    F.3d at 631.  As a matter of black letter law, "copyright licenses are assumed to prohibit any use

10    not authorized," and must be "construed in accordance with the purposes underlying federal

11    copyright law" to "protect[ ] … the author's rights."  *S.O.S.*, 886 F.2d at 1088.  To establish

12    Defendants' license defense, the license would need to be read to *expressly authorize* Defendants

13    to take and use patches *without* a support contract.  A general statement that patches "provided"

14    by Sun at its discretion are licensed does not equate to a perpetual obligation to make all patches

15    – including the great majority of patches that required a separate support agreement - available

16    for free.  Nor, as a matter of law, can the word "provided" possibly mean "sold to others under a

17    support agreement," or "put behind a support wall and with access prohibited to everyone except

18    customers with paid support contracts."  *See Cohen*, 845 F.2d at 853.

19        Defendants acknowledge that the SLA makes it crystal clear that Sun would only provide

20    patches at its discretion, yet claim that the SLA "does not contain language stating that Sun may

21    choose to exercise [its] discretion [to provide patches] on a customer-by-customer basis."  Opp.

22    at 32:4-6.  Sun did not need to describe how it might exercise its discretion in order to retain it.

23    In fact, Sun/Oracle freely provides patches to every customer with a support contract, which is

24    perfectly consistent with the licenses' terms.  Making that discretionary decision as to when and

25    how to supply patches (*i.e.*, only making most available to paying customers) is exactly what the

26    copyright laws allow Sun/Oracle to do.  *See* 17 U.S.C. §106; *Foad Consulting Group, Inc. v.*

27    *Azzalino*, 270 F.3d 821, 827 (9th Cir. 2001) ("Congress did not choose to regulate the conditions

28    under which a copyright holder can grant a nonexclusive copyright license to another.").

1    Defendants point to no license provision by which Sun expressly divested itself of that right.

2           Defendants assert the tautology that "if a customer has a license to a patch then the

3    customer can use it," and conclude from it that "the language of each license [the BCL and SLA]

4    supports the conclusion that it provide [*sic*] Sun's customers with the rights to updates and

5    patches that Sun chooses generally to provide for its user base."  Opp. at 31:18-32:1.  It's not

6    clear what point Defendants are trying to make, but they have proved Oracle's.  Sun/Oracle did

7    not choose to provide the patches at issue to its user base without a paid support contract, so by

8    Defendants' own argument neither the BCL or SLA grants a right to use, let alone take, them.

9    Mot. at 18:6-19:6.[12]

10          Defendants also try to differentiate the BCL and SLA.  It is another pointless diversion.

11   Defendants admit neither license distinguishes among error corrections, patches and updates

12   (collectively, "patches"); and that both licenses cover the use of all of those, but only if they are

13   "provided" by Sun, at its discretion.  Opp. at 30:22-31:12.  Instead, the purported distinction is

14   that the BCL does not specify "*to whom*" Sun must provide the patches, and the SLA does not

15   specify that the patches must be provided "*by Sun*."  *Id.*  That distinction creates no plausible

16   difference, and literally goes nowhere.

17          The BCL and SLA are licenses between Sun and its customers covering copyrighted

18   software.  Who else would be providing and receiving Sun's copyrighted software under a

19   license between Sun and its customers than those two contracting parties, respectively?

20   Defendants also truncate the SLA's language.  It actually says "provided to you at Sun's

21   discretion."  TRX0006275 (PD, Ex. 5).  Who, other than Sun, would be providing patches to

22   Sun's licensees at Sun's discretion?  Besides, the implication of Defendants' argument is that

23   _____

24   [12] The BCL and SLA each accompany the original delivery of the server and the Solaris
     operating system.  They grant a ▉▉▉▉▉▉▉▉ the Solaris software and firmware delivered, as
25   well as patches subsequently "▉▉▉▉▉▉▉▉▉" or "▉▉▉▉▉▉▉▉▉▉▉▉▉▉" TIR 5
     at 26:19-23, 28:6-18 (PD, Ex. 2).  There is nothing about either the BCL or the SLA which states
26   that it is a substitute for the parallel transaction – the support agreement – by which customers
     obtain the right to download patches developed by Oracle/Sun and placed behind a paywall.  *See*
27   Cal. Civ. Code §1642 ("Several contracts relating to the same matters, between the same parties,
     and made as parts of substantially one transaction, are to be taken together.").  Defendants'
28   argument makes no commercial or textual sense.

1  Sun first prescribed (in the BCL) that Sun had to provide the patches, but didn't care who

2  received them, then reversed course and prescribed (in the SLA) that the patches had to be

3  provided to its customers (at Sun's discretion, no less), but didn't care by whom.  The licenses'

4  plain words cannot plausibly be read to support Defendants' "who's-on-first" interpretation.  *See*

5  *Harris v. Gulf Ins. Co.,* 297 F. Supp. 2d 1220, 1225-26 (N.D. Cal. 2003) (rejecting, at summary

6  judgment, a "patently unreasonable" interpretation of a contract that led to an "absurd"

7  conclusion) (citing *Transamerica Ins. Co. v. Sayble*, 193 Cal. App. 3d 1562, 1566 (1987));

8  *Alameda Cty. Flood Control*, 213 Cal. App. 4th at 1180 ("Courts will not adopt a strained or

9  absurd interpretation in order to create an ambiguity where none exists.").

10       In any event, Defendants distinction is irrelevant because it does not help them.  They do

11  not identify any evidence, or even argue, that Sun/Oracle provided the patches at issue *to* anyone

12  besides its customers (or, as Defendants argue, to Terix as their agent); or that they or their

13  customers were provided patches *by* anyone other than Sun/Oracle. [13]  Defendants admit they

14  downloaded the patches from Sun/Oracle's servers.

15       In the end, this all goes nowhere.  Defendants admit *both licenses say the same thing*:

16  "the language of each license [the BCL and SLA] supports the conclusion that it provide [sic]

17  Sun's customers with the rights to updates and patches that Sun chooses generally to provide for

18  its user base."  Opp. at 31:28-32:1. [14]

19       Finally, Defendants do not even argue that their cross-use of Oracle's MOS credentials

20

---

21  [13] In fact, Sun/Oracle provided the patches only to customers with a paid support contract, as
Defendants well know as they fraudulently obtained support contracts from Oracle to access the

22  patches they needed to support their customers.  Sun/Oracle certainly did not provide them to
Defendants; Defendants do not dispute that they took them using phony credentials under false

23  pretenses in violation of Sun and Oracle's click-through licenses.  Oracle also did not provide
them to Defendants' customers, except perhaps for the single server for which many of them

24  contracted for support pursuant to Terix's unlawful scheme to support thousands of unsupported

25  servers.  Regardless, this is not a dispute about to or from whom the patches were provided.

26  [14] The SLA clarifies that Sun's decision whether to provide patches is "at its discretion," but that
only expresses Oracle's legal rights as a copyright owner.  *See Stewart v. Abend*, 495 U.S. 207,

27  228-29 (1990).  The BCL says nothing to forfeit that legal right.  Similarly, the 2009 Solaris 10
Entitlement merely clarifies that "no right to use updates, or upgrades to Solaris is included

28  unless you acquire a service plan that includes this right."  ORCLTM00000615 (PD, Ex. 39).

Case No. 5:13-cv-03385 PSG

1   and copyrighted software - concealed for more than a year but finally admitted in January - is

2   licensed, and it is not.  At face value, Defendants' argument that the BCL and SLA license each

3   Solaris server customer to take and use all subsequent patches does not even suggest that one

4   customer's license authorizes *another customer's* use.  The defense fails on that ground as well.[15]

5          Defendants cannot meet their burden to identify a license provision that expressly

6   excuses their conduct, because their proposed interpretation of the BCL and SLA tortures the

7   licenses' plain words, and ignores their copying (not "use"), cross-use and independent violation

8   of the MOS and SunSolve click through licenses.  Because the relevant licenses are not

9   "reasonably susceptible" to Defendants' interpretation, "the case is over."  *Dore v. Arnold*

10  *Worldwide, Inc.,* 39 Cal. 4th 384, 393 (2006) (quoting *Southern Cal. Edison Co. v. Superior*

11  *Court*, 37 Cal. App. 4th 839, 847 (1995)).

12                 **2.      The Extrinsic Evidence Confirms the Licenses' Plain Meaning**

13         Defendants misstate the law and facts related to parol evidence.  It is not true that "where

14  the parol evidence is in conflict, summary judgment is not appropriate."  Opp. at 33:5.  "[T]he

15  mere existence of extrinsic evidence supporting an alternative meaning does not foreclose

16  summary judgment where the extrinsic evidence is insufficient to render the contract susceptible

17  to the non-movant's proffered interpretation."  *Barris Indus., Inc. v. Worldvision Enterprises,*

18  *Inc.*, 875 F.2d 1446, 1450 (9th Cir. 1989) (affirming summary judgment and approving district

19  court's approach of "preliminarily considering the [extrinsic] evidence before rejecting it");

20  *accord Walter E. Heller W., Inc. v. Tecrim Corp.*, 196 Cal. App. 3d 149, 158 (1987) (Opp. at

21  33:9-12) (summary judgment inappropriate only where contradictory parol evidence, largely

22  competing testimony about the negotiating parties' intent, supports "equally plausible

23  interpretations").  Also, Defendants' lead case says only that where "ascertaining the intent of the

24  parties at the time the contract was executed depends on the *credibility* of extrinsic evidence, that

25  *credibility* determination and the interpretation of the contract are questions of fact that *may*

26

27  [15] As the Court knows, Oracle has moved for sanctions for Terix's concealment of, and false
    testimony related to, evidence of cross-use, including a finding that the license defenses do not
28  apply to cross-use.  D.I. 498 at 10:11-21 (Request for Relief 3).

ORACLE'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

A/76731725.5

1   properly be resolved by the jury."  *City of Hope Nat. Med. Ctr. v. Genentech, Inc.*, 43 Cal. 4th

2   375, 395 (2008) (the two attorneys who had negotiated the contract gave "widely divergent

3   testimony" about what the parties understood certain provisions to mean; "[d]eciding which of

4   these two witnesses to believe was a credibility determination for the jury") (emphasis supplied);

5   *see also Marvel Entm't, Inc. v. Kellytoy (USA), Inc.*, 769 F. Supp. 2d 520, 526 (S.D.N.Y. 2011)

6   (*granting* summary judgment as to numerous aspects of plaintiff's claims despite defendant's

7   proffer of conflicting extrinsic evidence, and denying summary judgment only where extrinsic

8   evidence required "credibility determinations").  Defendants' parol evidence fails to support an

9   alternative, "equally plausible interpretation" to the licenses' plain meaning, and no "credibility

10   determination" is required to interpret these form licenses.

11      Defendants erect the straw man that Oracle "[t]acitly acknowledge[es]" its licenses'

12   ambiguity and relies on parol evidence to interpret "provided" to mean "provided only by Oracle

13   pursuant to an active service contract for the specific server where the subject patch will be

14   applied."  Opp. at 32:13-16.  Defendants are way off base.  Oracle stated: "The Court should

15   read 'provided' consistent with its plain meaning and copyright law:  customers are licensed to

16   use Solaris and firmware patches that Oracle provides to them, sometimes (prior to 2010) for free

17   but in other cases only pursuant to a paid support contract."  Mot. at 18:15-18.  The relevant

18   licenses' words are unambiguous and the contracts are integrated, so extrinsic evidence is

19   unnecessary (and in some instances inadmissible), but if considered uniformly supports Oracle's

20   plain language interpretation.  Mot. at 20:1-23:18.

21      Although Defendants fail to articulate an alternative meaning of "provided," they appear

22   to claim that it means "developed" (Quinn 106:25-108:1 (PD, Ex. 12), or "built" (Opp. at 32

23   n.17), such that Oracle's "customers were entitled to receive all patches" ever created by Sun or

24   Oracle, for free.  Opp. at 33:21-23; *see also id.* at 37:12-15 (claiming unspecified "ambiguity

25   concerning customers' rights to receive updates and patches").  No extrinsic evidence,

26   admissible or not, supports that interpretation, particularly given the clearly contrary evidence

27   that, at all relevant times, Sun restricted a significant percentage of its patches to support paying

28   customers only and had written policies that uniformly limited the use of restricted patches to

1    servers under an active support contract.  Mot. at 6:9-7:20, 20:5-19.  It is inconceivable that Sun

2    could have done so had it expressly granted its thousands of customers the unfettered right to

3    receive and use all Solaris patches without any restrictions.

4          Defendants first claim "contemporaneous representations made by Sun on its website

5    during the relevant period contain affirmative representations by Sun that its customers were

6    entitled to receive all patches."  Opp. at 33:21-23, citing *id.* at 10:7-14, in turn citing only one

7    policy statement.  Defendants are arguing against themselves and California law.  As Defendants

8    emphasize, the BCL and SLA, by their express terms, each "supersedes all prior or

9    contemporaneous oral or written communication … and prevails over any conflicting or

10   additional terms of any … other communication between the parties relation to its subject matter

11   during the term of this Agreement."  TRX0006279 (PD, Ex. 4); TRX0006272 (PD, Ex. 5); Opp.

12   at 8:26-9:2.  Therefore, as Defendants told their customers, the Sun policy document "do[es] not

13   amend end-user rights granted" in the relevant licenses.  TRX0002043-44 (PD, Ex. 22);

14   TRX0002042 (PD, Ex. 22) ("Remember that the policy statements, or marketing-speak, that

15   sometimes surround the OEM sites, are not the key items to understand, but the terms of these

16   AGREEMENTS.").  They argue the same thing.  Opp. at 35 n.22 ("These non-contractual policy

17   documents neither could, nor do, change the terms of Sun/Oracle's licenses and the grant

18   language in them.").  Separately, but for the same reason, the policy statement is inadmissible.

19   Cal. Code Civ. Proc. § 1856(b).

20         But even if considered, the policy statement supports Oracle's interpretation, not

21   Defendants'.  Its reference to "updates," read in context, plainly refers to periodic "Update

22   Releases" (Opp. at 6:6-7), not incremental, real-time patches, as to which it expressly states that

23   only "End users of Sun systems who buy an annual support contract are authorized to use all

24   updates and upgrades to Solaris that ship during the term of their contract."  TRX000014075

25   (PD, Ex. 9); *see also* ORCLTM00000811-13 ("Without a Subscription [support contract], you

26   can only get all the patches/fixes *when they are rolled into an OS release*.") (emphasis supplied)

27   (PD, Ex. 8).  Defendants do not address that provision, or the many other Sun policy statements

28   that confirm that "[c]ustomers with unsupported hardware systems are not entitled to download

1    or receive updates, maintenance releases, patches, . . . or any other technical support services for

2    unsupported hardware systems." ORCLTM00000062 (PD, Ex. 41); Mot. at 22:10-23:18.

3           Defendants' misreading of the policy statement is also at odds with the undisputed real-

4    world fact that Sun customers were not "entitled to receive all patches" without a paid support

5    contract. *See* Cal. Code Civ. Proc. § 1856(c); Mot. at 6:20-7:7. The course of conduct of Sun's

6    and Oracle's entire customer base - thousands of sophisticated customers - is clear and

7    undisputed. They paid (in many cases millions of dollars annually) to access and use restricted

8    Solaris and, later, firmware patches that Sun (and then Oracle) did not provide without a support

9    contract. Defendants' quibbles with that industry-wide course of conduct ignore the undisputed

10   facts that, on their own, doom Defendants' license defense, which is premised on the notion that

11   the BCL and SLA grant a right to use *all Solaris and firmware patches for free perpetually*.

12   Defendants fail to present any evidence to dispute this reality, and go on to prove Oracle's point.

13          Oracle witness William Nesheim explained that Sun maintained private patches at all

14   relevant times. Nesheim 138:7-139:23 (PD, Ex. 36). Defendants claim Nesheim testified only

15   about "Oracle's 'goal,' not what it actually did." Opp. at 34 n.21. That is false. Nesheim

16   testified that Sun's "business practices didn't change from 2000 through the acquisition by Sun

17   [*sic*: Oracle]." Nesheim 138:7-14 (responding to question placing timeframe "from 2000 to

18   2010") (PD, Ex. 36). That business practice, for which Nesheim was "part of the decision-

19   making process," was that patches used to address security issues were publicly available but

20   "for an entire other class of patches, typically for issues which impacted certain use cases of

21   platforms, then those patches were considered restricted patches and we did not provide access to

22   those patches unless they had a service contract." *Id.* at 138:20-139:7. Nesheim also explained

23   that public patches were an "exception," because "[w]e valued our patches, we saw that our

24   customers who were purchasing our service contracts valued our patches. So we explicitly made

25   an effort to minimize the number of patches which were made available without contract. So it

26   was a business decision." *Id.* at 139:11-23. Oracle witness Dan Goe also testified that Sun had

27

28

ORACLE'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

A/76731725.5

1    "restricted" patches "back in 1999 going forward always." Goe 191:25-193:2 (PD, Ex. 35).[16]

2        Defendants argue that Sun's practice of maintaining private patches available only with a

3    support contract goes back to 2006 or 2007, not 1999. Opp. at 34:12-36:11. Even if that were

4    true, and it is not, Defendants are missing the point. Whenever Sun had private patches, its

5    licensees paid to download and use them, and otherwise Sun did not "provide" them to all

6    customers for free as Defendants contend it obligated itself to do. Besides, if, as Defendants

7    claim, Sun "understood its own license to grant customers the right to such patches" (Opp. at

8    34:12-13), how could it have unilaterally rescinded that right in 2006-07, and why would Sun's

9    thousands of customers have simply started handing over millions of dollars each year for

10    something they already had the right to? Defendants' position is flatly at odds with the real

11    world in which Sun and its customers operated.

12        Defendants misleadingly suggest that most patches were public "up through 2009," citing

13    Appleby's declaration, which concedes (without explaining), that Terix tracked only

14    "recommended and security" patches issued by Sun. Opp. at 35:22-36:11. As Sun typically

15    made "security patches" publicly available, though, of course a disproportionate percentage of

16    this subset of patches was public. As Dhall admitted, " a very large number" of patches were not

17    recommended and security patches. (Dhall 339:7-9, 338:24-339:2) (FD, Ex. 8) ("Yes, there were

18    lots of patches which were not an R&S cluster."). In any event, Defendants cannot dispute that

19    Sun had a large number of private patches that it charged customers to access - which eviscerates

20    the notion that the subject licenses had granted them the right to use *all* patches developed by

21    Sun for free.

22        Defendants also cannot dispute their own course of performance, which was to take

23    elaborate steps to conceal themselves and their conduct from Oracle and their own customers,

24

25    [16] Defendants are wrong that Goe "contradicts that testimony." Opp. at 34 n.21. He wrote in a
2012 email that "My memory, which definitely could be faulty, says that when Sun open sourced
26    Solaris there was a period of time when patches were freely available." Goe 190:1-3 (VWD, Ex.
18). The email's recipient corrected his faulty memory. *Id.* at 190:4-5. Defendants say
27    Stonaker's testimony "does not purport to reach back to all times after 1999" (Opp. at 34 n.21),
but if so it is because they did not ask a precise question. Stonaker 277:23-278:3 (PD, Ex. 37).

28

ORACLE'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

A/76731725.5

1    rather than asserting its customers' (or its own) purported license rights.  Mot. at 10:10-14:8.[17]

2    Defendants claim some of *their own customers* supported their license interpretation by

3    contracting with Terix (Opp. at 11:18-13:22, 36:12-37:1), but fail to mention that Terix, as █████

4    ████████████████████████████████████████████████████████████████████████████████

5    ██████████████████████.  ████████████  139:17-140:23 & Ex. 552 (FD, Ex. 9).  The fact

6    that some Terix customers asserted its party line in the context of this litigation (Opp. at 12:18-

7    13:13) also does not change the fact that "none of Oracle's thousands of customers *independently*

8    asserted" Defendants' proffered interpretation of the relevant licenses.  Mot. at 21:18-21

9    (emphasis supplied).[18]

### 3.    Defendants Must, but Cannot, Prove Their Express License Defense Customer by Customer

12         Defendants must identify, for each customer and server, the allegedly applicable license.

13   *See Oracle USA, Inc. v. Rimini Street, Inc.,* 6 F. Supp. 3d 1086, 1093-94 (D.Nev. 2014)

14   (*Rimini I*).  Mot at 23:20-24:28.  They admit they cannot, despite telling their customers for years

15   that they could, and do not argue otherwise.[19]  Defendants also admit that "used servers

---

[17] Defendants object that Dhall's testimony, as Terix's representative, that "access customers" were those "to whom we've delivered a patch after acquiring a patch from MOS" (Dhall 96:11-22 (PD, Ex. 16) calls for an expert opinion. Opp. at 13 n.10.  They did not make that objection at his deposition, so it is waived. Fed. R. Civ. P. 32(d)(3).  Besides, Dhall's testimony is not an opinion; it is simply what Terix did.  Defendants also object, on foundational and hearsay grounds, to Olding's testimony that Terix copied hundreds of gigabytes of Solaris patches. Olding 205:19-206:15 (PD, Ex. 17).  They failed to make, so waived, the foundational objection. In any event, Olding was familiar with and indeed had responded to the underlying Quinn email, which is a party admission and so not hearsay.  Fed. R. Evid. 801(d)(2).

[18] Defendants object to Appleby's testimony that customers told Terix they "weren't comfortable" with its single-server-support model and that, according to one, it "doesn't pass the smell test" (Appleby 165:19-167:12 (PD, Ex. 15), as hearsay.  Opp. at 13 n.9.  The statements are not offered for their truth - *i.e.*, that Terix's model in fact didn't pass the smell test - but to show Terix's customers believed it did not, which is relevant to industry practice.  Mot. at 21:15-28; *see United States v. Anfield,* 539 F.2d 674, 678 (9th Cir. 1976) ("[T]he hearsay rule does not … exclude evidence offered to prove the fact that a statement was made, rather than the truth."). Even if the statements were hearsay, they were made against interest, and are therefore admissible, because the customers were being supported by the same model they said they "weren't comfortable" was legal.  *See* Fed. R. Evid. 804(b)(3).

[19] Maintech objects to Coscia's testimony that it does not even try to confirm its customers' license rights, and that he does not know what such a license would need to contain, as "calling

ORACLE'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

A/76731725.5

1    purchased from unauthorized sources" are not licensed.  Opp. at 5, n.1; Mot. at 23:20-24:28.

2          Defendants' only response is to duck the issue, claiming that Oracle "must prove that

3    Defendants can prove a license defense as to *no* customer," and complain that Oracle has refused

4    even to allege *infringement* customer by customer."  Mot. at 15 n.11.  First, Defendants continue

5    to misunderstand the nature of an affirmative defense and their burden on this motion.  *See*

6    *Rimini I,* 6 F. Supp. 3d at 1093.  They offer no evidence of any license - either the BCL/SLA or

7    the fanciful open source licenses - for any customer or server.  Indeed, Defendants' introduction

8    of completely new and different licenses only highlights their failure to carry their burden of

9    proving which one supposedly shields which customer and, in turn, their infringing conduct.

10   Second, Defendants' attempted burden-shift does not change the result.  Part A, above.  Third,

11   they ignore the real facts.  Not only has Oracle identified thousands of infringing downloads and

12   related information, *Defendants* have identified a long list of customers, for which they claim to

13   have downloaded patches.  They have also identified an even longer list of those customers'

14   servers that they supported.  Part A, above.  Nothing prevents Defendants from offering evidence

15   that those downloads were licensed other than the obvious fact that they were not and

16   Defendants have no evidence to prove that they are.

17         The motion should be granted for this additional reason.

18         **E.       Defendants' Implied License Defense Fails As A Matter Of Law**

19         Defendants do not dispute that an implied license cannot grant rights that an express

20   license prohibits.  Mot. at 25:2-14, citing cases.  Oracle's express licenses - the BCL, SLA and

21   click-through licenses - do not authorize, so as a matter of law prohibit, Defendants' illicit

22   downloads and cross-use.  Part D, above.  The implied license defense fails on that basis alone.

23         Defendants argue that post-*Napster* cases "have not required that defendants show that

24   the copyright holder created the work at their request" (Opp. at 38:2-22), but ignore the Ninth

25   Circuit's other requirement that the copyright owner must "intend[ ] that [defendant] copy and

26

27   for an expert opinion (a legal conclusion)."  Opp. at 20 n.14.  Defendants waived their opinion
     objection.  Fed. R. Civ. P. 32(d)(3).  In any event, the fact that Maintech did nothing is just
28   that - a fact, obviously proper for a lay witness to testify to.  So is Coscia's lack of knowledge.

1    distribute" the work.  *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1026 (9th Cir. 2001).

2    Their leading case, *Field*, similarly requires that "the copyright holder knows of the use and

3    encourages it."  *Field v. Google*, 412 F. Supp. 2d 1106, 1114 (D. Nev. 2006).  No evidence

4    remotely shows that Oracle intended or encouraged Defendants to copy and distribute its

5    copyrighted software.  To the contrary, Oracle put the patches behind a pay wall and required a

6    license and support contract to access them, which Defendants thwarted by elaborate subterfuge.

7         Defendants' cases are easily distinguishable or support Oracle.  *Oracle USA* granted

8    summary judgment on defendant's implied license defense where, like here, it had concealed its

9    activities from Oracle.  *Rimini I*, 6 F. Supp. 3d at 1106-07 ("no reasonable jury could conclude

10   from Oracle's shipments of the installation media to a location described as a 'secondary offsite

11   backup location' that Oracle then authorized Rimini to copy that software onto Rimini's

12   systems"); *see also Netbula, LLC v. Chordiant Software, Inc.*, 2009 WL 2044693, at *6 (N.D.

13   Cal.) (declining to find an implied license on summary judgment).  Field "intended for Google to

14   rely on his silence" and knew "Google would automatically interpret that silence as permission"

15   to (allegedly) infringe.  *Field*, 412 F. Supp. 2d. at 1116-17; *see also Alaska Stock LLC v. Pearson

16   Educ., Inc.*, 975 F. Supp. 2d 1027, 1041-43 (D. Alaska 2013) (plaintiff granted licenses

17   retroactively and took proactive measures to ensure that its images continued to be used by

18   defendant, which had routinely exceeded the scope of the license); *De Forest Radio Tel. & Tel.

19   Co. v. United States*, 273 U.S. 236, 242 (1927) (plaintiff was "not only fully consenting to the

20   making and using by the United States of the patent, but was aiding such making and using");

21   *Wang Labs., Inc. v. Mitsubishi Electronics Am., Inc.*, 103 F.3d 1571, 1581-82 (Fed. Cir. 1997)

22   ("Wang tried to coax Mitsubishi into the SIMM market, … provided designs, suggestions, and

23   samples to Mitsubishi, and … eventually purchased SIMMs from Mitsubishi, before accusing

24   Mitsubishi years later of infringement.").

25   **III.    CONCLUSION**

26        The Court should grant summary judgment on Defendants' license and other factually

27   identical defenses.

28

1    DATED:  March 4, 2015                Morgan, Lewis & Bockius LLP

2                                         By: _____/s/ Thomas S. Hixson_____

3                                                   Thomas S. Hixson
                                                   Attorneys for Plaintiffs
4                                          ORACLE AMERICA, INC., ORACLE
                                           INTERNATIONAL CORPORATION

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORACLE'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT
A/76731725.5