UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ORACLE AMERICA, INC., et al.   ) | Case No. 5:13-cv-03385-PSG |
| ) | |
| Plaintiffs,   ) | **ORDER GRANTING MOTION FOR** |
| v.   ) | **PARTIAL SUMMARY JUDGMENT** |
| ) | |
| TERIX COMPUTER COMPANY, INC., et al.,   ) | **(Re: Docket No. 396)** |
| ) | |
| Defendants.   ) | |

Plaintiffs Oracle America, Inc. and Oracle International Corporation move for partial summary judgment of Defendants Terix Computer Company, Inc., Maintech Incorporated, Volt Delta Resources, Sevanna Financial, Inc. and West Coast Computer Exchange, Inc.'s express and implied license defenses. Because the court finds no disputed issues of material fact on these defenses, and that Oracle is entitled to judgment as a matter of law, Oracle's motion is GRANTED.

**I.**

A copyright owner holds the exclusive right "to authorize" each right enumerated in the Copyright Act,[1] including the right to license. Anyone holding a valid license has an affirmative defense to an owner's claim for copyright infringement. A defendant asserting a license defense has the initial burden of identifying any license provision that puts it in the clear. If it does so, the

---

[1] *See* 17 U.S.C. § 106.

owner may overcome the defense by showing that the defendant's conduct exceeded the scope of the provision in question.[2] "[C]opyright licenses are assumed to prohibit any use not authorized."[3]

In 1992, Sun Microsystems released its first version of Solaris.[4] Solaris is a UNIX-based operating system designed and used to operate server, blade, storage and related hardware.[5] This includes hardware that is critical for legal, regulatory or business reasons, and therefore requires extremely high support levels.[6] It also includes less critical systems for test, development and back-up.[7] Sun regularly made available updates and firmware for Solaris that enhanced performance or simply fixed bugs in the system.[8] Solaris updates and firmware are copyrighted, and their use is controlled by express license.

Different licenses govern the use of different versions of Solaris at issue in this case. Sun's Binary Code License Agreement, an integrated written contract covering Solaris versions 7, 8 and 9, provides the customer a "License to Use" the software as follows:

> Sun grants to you a non-exclusive and non-transferable license for the internal use only of the accompanying software and documentation and any error corrections provided by Sun (collectively "Software") for the number of users and the class of computer hardware for which the corresponding fee has been paid.[9]

With Solaris 10, released in 2005, Sun changed the license structure to a two-part form: a Software License Agreement and accompanying Entitlement.[10] The SLA provides:

---

[2] *See LGS Architects, Inc. v. Concordia Homes*, 434 F.3d 1150, 1156 (9th Cir. 2006).

[3] *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1088 (9th Cir. 1989).

[4] *See* Docket No. 269 at ¶ 10. The major releases of Solaris at issue are Solaris 7 (released November 1998), Solaris 8 (February 2000), Solaris 9 (May 2002), Solaris 10 (January 2005) and Solaris 11 (November 2011). *See id*.

[5] *See id*. at ¶¶ 10-12.

[6] *See id*. at ¶ 14.

[7] *See id*. at ¶ 15.

[8] *See id*. at ¶ 25.

[9] Docket No. 399-9 at 26; Docket No. 357 at 35.

[10] Docket No. 399-9 at 27; Docket No. 357 at 36.

> Subject to the terms of your Entitlement, Sun Grants you a nonexclusive, nontransferable limited license to use Software for its Permitted Use for the license term. * * * The terms and conditions of this Agreement will apply to any Software updates provided to you at Sun's discretion, that replace and/or supplement the original Software, unless such update contains a separate license.[11]

Each customer's Entitlement is "the collective set of applicable documents authorized by Sun evidencing your obligation to pay associated fees (if any) for the license, associated Services, and the authorized scope of use of Software under this Agreement."[12] The firmware at issue is licensed separately pursuant to the SLA and an accompanying firmware Entitlement.[13]

Sun's Common Development and Distribution License[14] enables the "open source community" to download Beta versions of Solaris source code from opensolaris.org and, in accordance with the CDDL's terms, use, modify and distribute it (among other things).[15] The purpose is "to encourage developers to create new applications that run on [Solaris], so that when those applications are commercialized, they will drive additional licensing of" Solaris.[16]

Sun was acquired by Oracle in 2011. Since at least that time, customers who want Solaris updates and firmware must sign an annual contract for technical support services to be performed by Oracle.[17] No customer may purchase updates or firmware without these services.[18] Customers

---

[11] Docket No. 399-9 at 28; Docket No. 357 at 36. Terix cites two Solaris SLAs. Maintech's license affirmative defense cites others. All are substantively identical to each other.

[12] Docket No. 397-6.

[13] Docket No. 397-33. The firmware at issue in Oracle's copyright claim, and thus the related licenses, date only from August 2010 to the present. Oracle's copyright claim also does not extend to any "public" Solaris patches Sun provided to Defendants' customers before 2010. *See* Docket No. 298 at ¶ 92.

[14] The parties agree that the BSD license (which applies to the OpenSPARC project) and the CDDL are substantially identical to each other.

[15] Docket No. 505-3; Docket No. 505-21.

[16] *Cf. Oracle USA, Inc. v. Rimini Street, Inc.*, 6 F. Supp. 3d 1108, 1117-18 (D. Nev. 2014); Docket No. 510-5 at 9 (through OpenSolaris, "Sun received the benefit of work by contributors in open source community, who made improvements to Solaris and contributed those improvements back to Sun."); Docket No. 539-11 at 34:20-25 (purpose of OpenSolaris was "to encourage developers to develop applications, et cetera, to try and expand the footprint of the operating system").

[17] Oracle brands its support services as "Oracle Premier Support for Operating Systems" and "Oracle Premier Support for Systems." *See* Docket No. 269 at ¶¶ 50-53. The difference between the two offerings is that only the latter includes hardware support services. *See id.* at ¶ 55.

3

Case No. 5:13-cv-03385-PSG
ORDER GRANTING MOTION FOR PARTIAL SUMMARY JUDGMENT

that sign a support agreement—either directly with Oracle or through a reseller authorized by Oracle—receive a Customer Support Identification number linked to the products covered by the agreement.[19] The CSI number allows customers to create login credentials to access Oracle's secure support website.[20] Using these credentials, the customer may download Solaris updates and firmware for the hardware systems that are covered by the support agreement.[21] The customer may not share or use its CSI number for the benefit of others or for the benefit of unsupported Oracle hardware—only customers who pay for and maintain an agreement with Oracle for the hardware at issue may download Solaris updates and firmware and only for their own internal business use on specified computers.[22]

Defendants offer their own support services for Solaris hardware.[23] Each either contracts directly with customers to provide this support or indirectly as a subcontractor to another entity, such as its co-defendant.[24]

Oracle filed this suit against Defendants for copyright infringement, fraud and other torts,[25] and Defendants promptly counterclaimed, alleging antitrust violations, unfair competition and other torts.[26] Defendants also pleaded a variety of affirmative defenses to Oracle's claims, including affirmative defenses of express and implied license. Terix's license defense relies on its

---

[18] As a result of the new Oracle policy, 22% of all "SPARC" Solaris 8 Solaris Updates were supported by Sun before the acquisition, compared with 93% supported by Oracle a year later. The comparable figures of x86 Solaris 8, SPARC Solaris 9, x86 Solaris 9, SPARC Solaris 10, and x86 Solaris 10 were 13%-97%, 18%-92%, 13%-95%, 14%-78% and 12%-74%, respectively. *See id.* at ¶ 52.

[19] *See* Docket No. 249 at ¶ 7.

[20] *See id.*

[21] *See id.*

[22] *See id.*

[23] *See* Docket No. 269 at ¶ 30.

[24] *See id.*

[25] *See* Docket No. 249 at 30-41.

[26] *See* Docket No. 356-5 at 12-24.

customers' license rights.[27] According to Terix, "with the purchase of a Sun server or downloading of the Solaris 7, 8 or 9 operating system, and pursuant to the accompanying BCL, purchasing Customers received perpetual license rights both to their obtained version of Solaris 7, 8 or 9 and to any subsequent Solaris Updates."[28] Terix's claimed "License Rights for Solaris 10" are allegedly based on the "[SLA] and an accompanying Entitlement."[29]

After a series of pleadings and discovery-related skirmishes, Oracle now moves for partial summary judgment on each of Defendants' license defenses.

## II.

This court has jurisdiction under 28 U.S.C. §§ 1331 and 1338. The parties further consented to magistrate judge jurisdiction under 28 U.S.C. §636(c) and Fed. R. Civ. P. 72(a). Fed. R. Civ. P. 56(a) provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[30] At the summary judgment stage, the court "does not assess credibility or weigh the evidence, but simply determines whether there is a genuine factual issue for trial."[31] Material

---

[27] Docket No. 359 at 29; Docket No. 399-9 at 26.

[28] Docket No. 399-9 at 27.

[29] *Id.* at 27-29. Terix's interrogatory response cites several versions of the Solaris Entitlement (Docket No. 397-6), but relies on it only insofar as the license grant is "perpetual." Docket No. 399-9 at 28; Docket No. 399-12 at 130:25-131:6. At deposition, Terix also referred to the Entitlement's definition of Software as Solaris 10, its Permitted Uses, and its reference to the SLA. Docket No. 399-12 at 134:3-135:22, 138:16-24. Terix offers no license defense related to Solaris 11. *Id.* at 29:13-16.8. Terix also refers to a "Sun Microsystem User License Agreement" stating "'Terms of Use' on the SunSolve website" and a "'User License Agreement' readme file" that accompanies Solaris Updates downloaded from MOS. Docket No. 399-9 at 30:1-11. Terix claims both licenses are "explicit . . . that their terms are not intended to supersede any original license grants, but rather that the terms of the original license agreements relating to the version of Solaris for which the Solaris Update is sought continues to apply to the downloaded Solaris Update (i.e., the BCL for Solaris 7, 8 or 9, and the SLA and accompanying Entitlement for Solaris 10)." *Id.* at 30:12-16. Similarly, Terix refers "on information and belief" to "General Terms Agreements" some Oracle customers had, but concedes those were also "limited by any restrictions set out in the . . . terms accompanying the software"—*i.e.*, the BCL and SLA. Docket No. 359 at 29; Docket No. 399-12 at 102:5-103:6 (apart from a few, Terix does not know which customers had GTAs); Docket No. 399-13 (license grant in GTA Quinn testified about is "subject to . . . any supplemental license terms accompanying the Software," *i.e.*, the BCL or SLA). It also refers to the CDDL, an "open source" license. Docket No. 359 at 32.

[30] Fed. R. Civ. P. 56(a).

[31] *House v. Bell*, 547 U.S. 518, 559-60 (2006).

5
Case No. 5:13-cv-03385-PSG
ORDER GRANTING MOTION FOR PARTIAL SUMMARY JUDGMENT

facts are those that may affect the outcome of the case.[32]  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.[33]

Defendants raise substantial questions about Oracle's copyright registrations, and in particular, whether portions of certain versions' registrations were previously published. Registration is a prerequisite to a civil action for infringement,[34] and a copyright "registration for a specific version of a computer program does not cover any unclaimable material that may appear in that version.  For purposes of registration, unclaimable material includes: Previously published material."[35]  At the same time, the owner of both an underlying work (a patch) and a derivative work (a subsequent major release) "can . . . sue for copying of material that appears in both the derivative work and the underlying work."[36]  The court needs to resolve this issue eventually, but not now: even if Oracle's registrations are flawed, Defendants' license defenses still fail as a matter of law.

---

[32] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted.").

[33] *See id.*

[34] *See J & J Sports Prods., Inc. v. Kigo*, Case No. 10-cv-05512, 2011 WL 3418394, at *1 (N.D. Cal. Aug. 4, 2011) ("A federal copyright claim must include a showing of preregistration or registration of the copyright." (citing 17 U.S.C. § 411(a) ("[N]o civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title.")); *Cosmetic Ideas, Inc. v. IAC/Interactive Corp.*, 606 F.3d 612, 618 (9th Cir. 2010) (treating § 411 registration requirement as element of copyright infringement claim).

[35] United States Copyright Office, *Compendium of U.S. Copyright Office Practices, Third Edition* § 721.8 (2014) ("*Compendium III*").  This has been Copyright Office's policy since 1984.  *See* United States Copyright Office, *Compendium of U.S. Copyright Office Practices, Second Edition* § 323.01 ("Registration for a derivative computer program covers only the additions, changes, or other new material appearing in the program for the first time.").

[36] *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1447-48 (9th Cir. 1994); *see also Alaska Stock, LLC v. Houghton Mifflin Harcourt Publ'g Co.*, 747 F.3d 673, 680 (9th Cir. 2014) (Copyright Act "expressly requires only 'identification' [of preexisting works] in the singular, not titles of preexisting works incorporated.").

### III.

Defendants' license defense requires that they present terms—express or implied—that excuse each of Oracle's allegations that they copied Oracle code in violation of Oracle's exclusive rights under 17 U.S.C. § 106. None of the licenses Defendants present meets this basic test.

*First*, while Defendants make much of the particularity of Oracle's infringement claims—or lack thereof—the nature of Oracle's motion makes the issue immaterial. Defendants argue that because Oracle "has refused to confirm its contentions regarding the copyrighted material at issue," it cannot defeat the license defense.[37] But whatever the remaining imprecision of Oracle's contentions,[38] Defendants identify no connection between identifying each act of infringement alleged and determining whether there is a license that allows the infringing conduct. As Oracle points out, Defendants offer no evidence, or even argument, that their license defense is anything other than all-or-nothing. And in any event, Oracle accepts that to prevail on its motion, it must show that there is no legally tenable interpretation of any license Defendants put forth "that entitles Solaris licensees to *any* patch for *any* version of Solaris software and firmware at any time that is at issue in this case."[39]

*Second,* Defendants have not shown a genuine issue of material fact as to any express license. "[A] license must be construed in accordance with the purposes underlying federal copyright law" with particular emphasis on "the protection of the author's rights."[40] Under California law, the intent of the parties to a written agreement "is to be ascertained from the writing alone, if possible."[41] California law also recognizes that contract interpretation is a question of law for the court that should only be left to a jury if "the interpretation turns upon the credibility of

---

[37] *See* Docket No. 510-5 at 15.

[38] *See* Docket No. 541-8 at 8-17.

[39] Docket No. 510-5 at 15. Defendants also have identified a long list of customers for which they admit downloading patches. *See* Docket No. 541-11 at 5-14; Docket No. 541-13 at 6-8.

[40] *S.O.S., Inc.*, 886 F.2d at 1088.

[41] *U.S. Cellular Inv. Co. v. GTE Mobilnet, Inc.*, 281 F.3d 929, 934 (9th Cir. 2002) (quoting Cal. Civ. Code § 1639).

extrinsic evidence."[42]  Where there is a dispute as to the meaning of a contract's term, the court must determine whether the term is ambiguous or "reasonably susceptible" to more than one interpretation.[43]  Regardless of the answer, the trial judge is the arbiter of both ambiguous and unambiguous language, as long as the evidence required to resolve the ambiguity is uncontroverted.[44]

This question of contract law asks whether the terms of the Binary Code License Agreement and the Software License Agreement and accompanying Entitlement permit Defendants' conduct.  And upon examination, it is clear that they do not.  The BCL applies to Solaris versions 7, 8 and 9 and provides in relevant part:

> Sun grants to you a non-exclusive and non-transferable license for the internal use only of the accompanying software and documentation and any error corrections provided by Sun . . . for the number of users and the class of computer hardware for which the corresponding fee has been paid.[45]

The SLA imposes similar restrictions on Solaris 10:

> Subject to the terms of your Entitlement, Sun Grants you a nonexclusive, nontransferable limited license to use Software for its Permitted Use for the license term.  ***The terms and conditions of this Agreement will apply to any Software updates provided to you at Sun's discretion, that replace and/or supplement the original Software, unless such update contains a separate license.[46]

Each customer's Entitlement is "the collective set of applicable documents authorized by Sun evidencing your obligation to pay associated fees (if any) for the license, associated Services, and the authorized scope of use of Software under this Agreement."[47]

For the period at issue, Oracle offered hardware customers the ability to buy an annual contract for technical support services that gave them access to patches through My Oracle Support.  These individuals could create individualized log-in credentials whereby they could

---

[42] *Parson v. Brand Dev. Co.*, 62 Cal. 2d 861, 865 (1965).

[43] *See Dore v. Arnold Worldwide, Inc.*, 39 Cal. 4th 384, 393 (2006).

[44] *See id.; Winet v. Price*, 4 Cal. App. 4th 1159, 1166 n.3 (1992).

[45] Docket No. 397-4.

[46] Docket No. 397-5.

[47] Docket No. 397-6.

1   download patches for their covered servers. Each download was subject to a click-through license

2   requiring that users comply with MOS Terms of Use:

> You agree that access to My Oracle Support, including access to the service request function, will be granted only to your designated Oracle technical support contacts and that the Materials may be used only in support of your authorized use of the Oracle programs and/or hardware for which you hold a current support contract from Oracle.[48]

By the very terms of these various contracts, it is clear that these licenses authorize use of the specified Solaris software and firmware, as well as patches subsequently provided by Sun or Oracle. And to the extent some of these patches are downloaded through MOS, they are subject to any click-through license and the MOS Terms of Use. Focusing on the term "provide," Defendants argue that the BCL and SLA allow users to download *any* software or patches that Sun or Oracle developed. But even Terix CEO Bernd Appleby admitted that developing, or building, a patch is not the same as providing it, and that the BCL does not require Oracle to provide all error corrections it developed.[49] The court sees no ambiguity on the face of the license agreements that might warrant adopting any meaning other than the plain meaning of provide: to supply.[50] And no other language in these agreements suggests an obligation to make available anything developed but not supplied.[51] There is simply no reasonable justification to stretch the plain meaning of the contract's language beyond the four-corners of the agreement.[52]

The SLA is clear that Sun would only provide patches at its discretion. It is true, as Defendants note, that the SLA "does not contain language stating that Sun may choose to exercise [its] discretion [to provide patches] on a customer-by-customer basis."[53] But Sun did not need to

---

[48] Docket No. 397-7.

[49] Docket No. 399-17 at 284:17-285:23, 287:11-15.

[50] "An agreement is not ambiguous merely because the parties (or judges) disagree about its meaning. *Taken in context, words still matter.*" *Alameda Cnty. Flood Control v. Dep't of Water Resources*, 213 Cal. App. 4th 1163, 1189 (2013).

[51] *See Stewart v. Abend*, 495 U.S. 207, 228-29 (1990).

[52] *See Cohen v. Paramount Pictures Corp.*, 845 F.2d 851, 853 (9th Cir. 1988) (rejecting interpretation of license agreement where "words . . . must be tortured to expand the limited right granted . . . to an entirely different [meaning]").

[53] Docket No. 510-5 at 32.

1   describe how it might exercise its discretion in order to retain it.  In fact, Oracle freely provides
2   patches to every customer with a support contract, which is consistent with the licenses' terms.
3   Making that discretionary decision as to when and how to supply patches (*i.e.*, only making most
4   available to paying customers) is exactly what the copyright laws allow Oracle to do.[54]

5   Given this interpretation, the next question as a matter of law is whether Defendants'
6   conduct was authorized under the BCL and SLA.  The answer is plainly no.  Where Defendants
7   falter is that the licenses specifically contemplate download privileges "for the number of users and
8   the class of computer hardware for which the corresponding fee has been paid" or for updates "that
9   replace and/or supplement the original Software" for which a customer pays "associated fees."
10  Defendants violated the terms of the relevant licenses by using a customer's credentials to—at the
11  very least—download patches for any number of that customer's machines, whether covered by the
12  license terms or not.  This type of use is clearly not contemplated on the face of the license
13  agreements.  Even if Defendants could somehow show that their conduct was authorized, their
14  downloading would still be subject to the terms of the click-through licenses which require that
15  materials downloaded from MOS "may be used only in support of your authorized use of the
16  Oracle programs and/or hardware for which you hold a current support contract from Oracle."[55]

17  While the court does not find any ambiguity in the contract language that might warrant
18  consideration of extrinsic evidence, even Defendants' purportedly damning evidence misses the
19  mark.  Defendants offer policies that were posted on the internet to substantiate Oracle's supposed
20  intent to perpetually license their products.  Specifically,

> [t]he Solaris Operating System has specific named releases, such as 'Solaris 9';
> each release may also have updates.  A license to use a certain version of the
> software, such as Solaris 9, includes the right to use all current and future Solaris 9
> updates, but does not include the right to use the later version such as Solaris 10.[56]

---

[54] *See* 17 U.S.C. § 106; *Foad Consulting Group, Inc. v. Azzalino*, 270 F.3d 821, 827 (9th Cir. 2001) ("Congress did not choose to regulate the conditions under which a copyright holder can grant a nonexclusive copyright license to another.").

[55] Docket No. 397-7.

[56] Docket No. 510-57.

10
Case No. 5:13-cv-03385-PSG
ORDER GRANTING MOTION FOR PARTIAL SUMMARY JUDGMENT

But there is no evidence that this explanation of the relationship between Solaris versions overrides the plain language of the contract which contemplates that a customer can access patches and updates related to whatever Solaris version they are running on licensed servers—subject to a support contract.  In particular, the BCL and SLA both include integration clauses which prohibit amendment.[57]  Because of these integration clauses, the licenses cannot be "explained or supplemented by evidence of consistent additional terms,"[58] let alone inconsistent ones.

As to the CDDL,[59] there is no dispute that the patches at issue were downloaded to be applied to versions of Solaris covered by the BCL and SLA.  Defendants have not argued that the relevant customers were running OpenSolaris—the only version of Solaris covered by the CDDL.[60]

---

[57] *See* Docket No. 397-4:

> This Agreement is the entire agreement between you and Sun relating to its subject matter. It supersedes all prior or contemporaneous oral or written communications, proposal, representations and warranties and prevails over any conflicting or additional terms of any quote, order, acknowledgment, or other communication between the parties relating to its subject matter during the term of this Agreement.  No modification of this Agreement will be binding, unless in writing and signed by an authorized representative of each party.

*See* Docket No. 397-5:

> This Agreement, including any terms contained in your Entitlement, is the entire agreement between you and Sun relating to its subject matter.  It supersedes all prior or contemporaneous oral or written communications, proposals, representations and warrants, and prevails over any conflicting or additional terms of any quote, offer, acknowledgment, or other communication between the parties relating to its subject matter during the term of this Agreement.  No modification of this Agreement will be binding, unless in writing and signed by an authorized representative of each party.

[58] Cal. Code Civ. Proc. § 1856(b).

[59] Section 2 of the CDDL grants anyone "a world-wide, royalty-free, non-exclusive license . . . to use, reproduce, modify, display, perform, sublicense and distribute the Original Software (or portions thereof), with or without Modifications, and/or as part of a Larger Work," subject to compliance with Section 3.1:

> Any Covered Software that You distribute or otherwise make available in Executable form must also be made available in Source Code form and that Source Code form must be distributed only under the terms of this License.  You must include a copy of this License with every copy of the Source Code form of the Covered Software You distribute or otherwise make available.  You must inform recipients of any such Covered Software in Executable form as to how they can obtain such Covered Software in Source Code form in a reasonable manner on or through a medium customarily used for software exchange.  Docket No. 505-21.

[60] Indeed, until January 2015, when Oracle filed its motion, Defendants had never even mentioned the CDDL in their interrogatory responses identifying the basis for the license defenses.  *Compare* Docket No. 399-9 at 21-31 *with* Docket No. 510-53 at 25-26.  None of Defendants' dozen or so other witnesses did either.  For example, Terix's 30(b)(6) deponent on the license defense

Instead, Defendants argue that the OpenSolaris source code that Oracle posted online overlaps with source code inherent to Solaris versions 7-10. According to Defendants, this means that the CDDL applies to all versions of Solaris and their associated patches. But as discussed above, this does not change the fact that the BCL and SLA contain integration clauses that preclude any later agreement from altering or superseding their terms. OpenSolaris was available from www.opensolaris.org.[61] All of the patches at issue were downloaded from MOS and applied to Solaris versions 7-10.[62] These are clearly different products that operate under different licensing regimes.[63] Defendants cannot invoke the CDDL to try and retroactively justify their violation of the BCL and SLA.[64]

*Third*, Defendants' implied license defense fails. "Courts have found implied licenses only in 'narrow' circumstances where one party 'created a work at [the other's] request and handed it over, intending that [the other] copy and distribute it.'"[65] But "[a]s a general matter, implied terms

---

completed his identification of relevant licenses without mentioning it, *see* Docket No. 399-12 at 164:4-18, and in fact testified unequivocally: "[o]ur position is that the combination of the software license agreement and the entitlement document that are provided at the time of the hardware system being sold provide a license to the software and to updates for Solaris." *Id*. at 138:2-7.

[61] *See* Docket No. 541-4 at 8.

[62] *See id.*

[63] Terix expressly told one of its customers in a 2009 "ClearVision" presentation that "you have no versions of this [Open Solaris] OS. It was released to the development community and open source community . . . and is not even in commercial use by customers anywhere on any servers anywhere." Docket No. 541-17. Thus, Terix concluded, the "OpenSolaris license . . . is not even available to anyone to use but to developers at www.opensolaris.org." *Id.* Rather, as Terix told another customer: "SOLARIS has its own AGREEMENT (the license) with rules, rights and grants made by the OEM to the purchaser/user when the hardware system was purchased, or when a valid copy of the OS is downloaded for a system from the OEM site under the OEM rules. . . . For SOLARIS versions 7, 8 and 9, this AGREEMENT (license) is called a Right to Use (RTU) and Binary Code License (BCL) and for SOLARIS 10, . . . this AGREEMENT (license) is called a Software License Agreement (SLA), and an Entitlement Document."). Docket No. 399-31.

[64] Even if the CDDL were to apply, Defendants argue that the CDDL governs distribution rather than use of OpenSolaris and because customers—and Defendants as customers' agents—were using and not distributing the software, they were not in violation of the CDDL. But all this proves is that the CDDL was not intended to apply to customers that would use OpenSolaris. Rather, the CDDL contemplates developers who take OpenSolaris, improve upon it and then distribute it to their customers.

[65] *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1026 (9th Cir. 2001); *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1226 (C.D. Cal. 2001) (rejecting implied license defense where "[o]bviously, Plaintiffs did not create their copyrighted works at StreamCast's request or for StreamCast's benefit").

United States District Court
For the Northern District of California

1   should never be read to vary express terms," and no implied license may permit what the actual

2   licenses prohibit.[66] Here, there is no evidence that Oracle commissioned Defendants to create any

3   of the software or patches at issue. Even under Defendants' broader standard that "[a]n implied

4   license can be found where the copyright holder engages in conduct 'from which [the] other [party]

5   may properly infer that the owner consents to [its] use,'"[67] the record does not support any such

6   implication.

7   Defendants argue that Oracle knew that Defendants thought they had a right to download

8   patches but failed to take any affirmative action to stop Defendants—a "silence" that Defendants

9   characterize as consent.[68] But Defendants present no reasonable justification for why or how

10  silence following a clear objection to their conduct could constitute consent.[69] The undisputed fact

11  is that Oracle put its products behind a pay wall and later filed suit to vindicate its rights under the

12  license agreements. There is no remaining question that must be considered by a jury.

---

[66] *Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 374 (1992); *Spiegler v. Home Depot U.S.A., Inc.*, 552 F. Supp. 2d 1036, 1054 (C.D. Cal. 2008) ("Implied covenants are justified only when they are not inconsistent with some express term of the contract") (citations omitted); 23 Richard A. Lord, *Williston on Contracts* § 63:21 (4th ed. 2010) ("It is elementary that one cannot imply a term or promise in a contract which is inconsistent with an express term of the contract itself.").

[67] *Field v. Google*, 412 F. Supp. 2d 1106, 1116 (D. Nev. 2006).

[68] *See id.* at 1114 ("[c]onsent to use the copyrighted work need not be manifested verbally and may be inferred based on silence where the copyright holder knows of the use and encourages it.").

[69] Defendants' cited cases are distinguishable or actually support summary judgment. For example, *Oracle USA, Inc. v. Rimini Street, Inc.* granted summary judgment on defendant's implied license defense where, like here, it had concealed its activities from Oracle. 6 F. Supp. 3d 1086, 1106-07 (D. Nev. 2014) ("no reasonable jury could conclude from Oracle's shipments of the installation media to a location described as a 'secondary offsite backup location' that Oracle then authorized Rimini to copy that software onto Rimini's systems"); *see also Netbula, LLC v. Chordiant Software, Inc.*, Case No. 08-cv-00019, 2009 WL 2044693, at *6 (N.D. Cal. July 9, 2009) (declining to find an implied license on summary judgment). In *Field v. Google*, Field "intended for Google to rely on his silence" and knew "Google would automatically interpret that silence as permission" to (allegedly) infringe. 412 F. Supp. 2d. at 1116-17. *See also Alaska Stock LLC v. Pearson Educ., Inc.*, 975 F. Supp. 2d 1027, 1041-43 (D. Alaska 2013) (plaintiff granted licenses retroactively and took proactive measures to ensure that its images continued to be used by defendant, which had routinely exceeded the scope of the license); *De Forest Radio Tel. & Tel. Co. v. United States*, 273 U.S. 236, 242 (1927) (plaintiff was "not only fully consenting to the making and using by the United States of the patent, but was aiding such making and using"); *Wang Labs., Inc. v. Mitsubishi Electronics Am., Inc.*, 103 F.3d 1571, 1581-82 (Fed. Cir. 1997) ("Wang tried to coax Mitsubishi into the SIMM market, . . . provided designs, suggestions, and samples to Mitsubishi, and . . . eventually purchased SIMMs from Mitsubishi, before accusing Mitsubishi years later of infringement.").

### IV.

Oracle's motion for partial summary judgment is GRANTED.

**SO ORDERED.**

Dated: May 5, 2015

                                           _____
                                           PAUL S. GREWAL
                                           United States Magistrate Judge